# EXHIBIT 2



**AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit www.adr.org for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent:  Daiichi Sankyo Co., Ltd.

Address:  3-5-1, Nihonbashi-honchō, Chūo-ku

| City:  Tokyo, Japan | State:  Select... | Zip Code:  103-8426 |
|---|---|---|

| Phone No.:  +81-3-6225-1111 | Fax No.:  +81-3-6225-1131 | |
|---|---|---|

Email Address:  tsukaguchi.naoto.yr@daiichisankyo.co.jp

Name of Representative (if known):  Preston K. Ratliff II (Paul Hastings LLP); Steven J. Balick (Ashby & Geddes)

Name of Firm (if applicable):  Paul Hastings; Ashby & Geddes

Representative's Address:  Paul Hastings LLP, 200 Park Ave

| City:  New York | State:  New York | Zip Code:  10166 |
|---|---|---|

| Phone No.:  (212) 318-6000 | Fax No.: | |
|---|---|---|

Email Address:  prestonratliff@paulhastings.com; sbalick@ashbygeddes.com

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

See attached Demand for Arbitration.
The agreement to arbitrate is set forth in Section 19.3.4 of the attached Collaboration Agreement (Exhibit A).

Dollar Amount of Claim: $  Undetermined

Other Relief Sought: ☑ Attorneys Fees ☐ Interest ☐ Arbitration Costs ☐ Punitive/Exemplary
☑ Other:  Declaratory, injunctive and equitable relief

Amount enclosed: $  7,700
In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Educational training and/or industry experience sufficient to demonstrate a reasonable level of relevant scientific, medical and industry knowledge in biotechnology.

Hearing locale:  Seattle, Washington

*(check one)* ☐ Requested by Claimant ☑ Locale provision included in the contract

Estimated time needed for hearings overall:                    hours  or  Seven                    days



**AMERICAN ARBITRATION ASSOCIATION®**   INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| | |
|---|---|
| Type of Business: | |
| Claimant:  Biotechnology | Respondent:  Pharmaceuticals |

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?

Yes

| Signature (may be signed by a representative): | Date:  11/12/2019 |
|---|---|

Name of Claimant:  Seattle Genetics, Inc.

Address (to be used in connection with this case):  21823 - 30th Drive S.E.

| City:  Bothell | State:  Washington | Zip Code:  98021 |
|---|---|---|
| Phone No.: (425) 527-4000 | Fax No.: | |

Email Address:

Name of Representative:  Michael A. Jacobs

Name of Firm (if applicable):  Morrison & Foerster LLP

Representative's Address: 425 Market Street

| City:  San Francisco | State:  California | Zip Code:  94105 |
|---|---|---|
| Phone No.: (415) 268-7000 | Fax No.: (415) 268-7522 | |

Email Address:  MJacobs@mofo.com

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

1  MICHAEL A. JACOBS (CA SBN 111664)
   MJacobs@mofo.com
2  MATTHEW A. CHIVVIS (CA SBN 251325)
   MChivvis@mofo.com
3  MORRISON & FOERSTER LLP
   425 Market Street
4  San Francisco, California  94105-2482
   Telephone: 415.268.7000
5  Facsimile: 415.268.7522

6

7  BRYAN WILSON (CA SBN 138842)
   BWilson@mofo.com
8  TERESA A. MACLEAN (CA SBN 313517)
   TMacLean@mofo.com
   MORRISON & FOERSTER LLP
9  755 Page Mill Road
   Palo Alto, California  94304-1018
10 Telephone: 650.813.5600
   Facsimile: 650.494.0792
11
   Attorneys for Claimant,
12 SEATTLE GENETICS, INC.

13

14                    **AMERICAN ARBITRATION ASSOCIATION**

15

16 SEATTLE GENETICS, INC.                    Case No.

17              Claimant,                    **CLAIMANT SEATTLE
                                             GENETICS' DEMAND FOR
18       v.                                  ARBITRATION**

19 DAIICHI SANKYO CO., LTD.,

20              Respondent.

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      Claimant Seattle Genetics, Inc. ("Claimant" or "SGI") submits this demand to resolve SGI's dispute with Respondent Daiichi Sankyō Co., Ltd. ("Respondent" or "DSC") regarding the ownership of certain improvements relating to SGI's drug conjugation technology by arbitration.  This dispute arises under the parties' collaboration agreement, dated July 2, 2008 (the "Agreement").  Arbitration before the American Arbitration Association ("AAA") is required by Section 19.3.4 of the Agreement.  (*See* Ex. A.)

2.      SGI is a cancer-focused biotechnology company widely known as a pioneer in antibody-drug conjugates ("ADCs").  ADCs are specialized therapeutics in which antibodies to specific disease targets are linked with biologically active payloads—the "drug" component of the ADC.  This linking is referred to as "conjugation" and is achieved using a component referred to as a "linker" in the ADC.  Before the collaboration with SGI, DSC tried to develop its own conjugate, DE-310, but could not achieve clinical results that would support commercialization.  DSC subsequently approached SGI and sought access to SGI's proprietary drug conjugation technology, expertise, and patent rights.  The parties agreed on the terms set forth in the Agreement.

3.      Over the course of more than five years, SGI provided DSC with critical knowledge, information, materials, and instruction to enable DSC to develop and commercialize ADCs directed to a specific target antigen.  But the potential applications for this technology were far broader, extending well beyond any specific antigen or payload.  To safeguard SGI's rights in the face of such extensive access to SGI know-how and patent rights, the Agreement placed specific obligations on DSC, including one for which SGI vigorously and carefully negotiated:  a requirement that SGI would own any Improvements relating to SGI's Drug Conjugation Technology, as those terms are defined in the Agreement, and, further, that DSC would "hereby assign" any such Improvements to SGI.  DSC's assignment of Improvements to SGI was a key benefit of the bargain that DSC made in exchange for access to SGI's valuable conjugation know-how and patent rights.

4.      Notwithstanding the provisions relating to Improvements in the Agreement, DSC used SGI-owned Improvements in its pipeline of candidate ADC products, including DS-8201, which appears to be commercially viable.  DSC even filed patent applications on these Improvements without telling SGI about them or asking for SGI's permission.  DSC assigned these Improvements to SGI by operation of law, and SGI owns the Improvements as set forth in the Agreement.

**AGREEMENT TO ARBITRATE**

5.      This dispute is subject to Arbitration because it "arises" between SGI and DSC "in respect of [the] Agreement."  (Ex. A § 19.3.)  The Agreement provides that DSC was obligated to "hereby assign" Improvements to SGI.  (*Id.* § 3.3.1.)  DSC disputes this obligation.  This is not a question of patent scope or inventorship.  (*Id.* § 19.3.6.)  Rather, it is a question of what constitutes an Improvement as set forth in the Agreement and whether DSC complied with its obligations under the Agreement.  Such a dispute is subject to arbitration under the Agreement.  SGI has followed the procedure provided in the Agreement for seeking resolution of the parties' dispute, while DSC has not.

6.      DSC's violation of the intellectual property ownership provisions of the Agreement came to the attention of SGI management this year.  Shortly thereafter, on August 19, 2019, SGI delivered a notice of dispute to DSC (*id.* § 19.3.1) and requested a meeting with DSC as required under the Agreement (*id.* § 19.3.2).  DSC initially refused to schedule a meeting with SGI, arguing that no "dispute" was presented and a meeting would be "premature."  After SGI insisted on following the dispute resolution procedures set forth in the Agreement, DSC relented and agreed to schedule a meeting.  The delay caused the meeting to take place on September 23, 2019, more than a month after SGI's Notice of Dispute.

7.      When the parties' representatives met, SGI provided a detailed written summary that reflected the nature and extent of the dispute.  (*Id.* § 19.3.2.)  In contrast, DSC provided a conclusory statement that the drug conjugation technology it uses in its ADCs does not constitute Improvements under the Agreement.  SGI requested a follow up meeting, but DSC did not respond until October 9, 2019.  Despite no attempt on the part of DSC to resolve the dispute, SGI

1    committed Dr. Clay Siegall, SGI's President and Chief Executive Officer, to an in-person

2    meeting with a DSC executive on November 6, 2019, in compliance with the requirements of the

3    Agreement.  (*Id.* § 19.3.3.)

4        8.    Two days before that meeting, DSC filed suit in the United States District Court

5    for the District of Delaware, alleging DSC alone owns the drug conjugation technology it uses in

6    its ADCs.  In its complaint, DSC alleged that it "was unable to resolve its dispute with SGI" even

7    though it had made no attempt to do so.  (Compl. ¶ 41, *Daiichi Sankyo Co. v. Seattle Genetics,*

8    *Inc.*, No. 19-cv-02087-UNA (D. Del. Nov. 4, 2019), ECF No. 1.)  The filing of this suit violated

9    the Agreement's dispute resolution provisions because the dispute is about ownership of

10   Improvements pursuant to the terms of the Agreement, and, therefore, the dispute arises in respect

11   of the Agreement.  (Ex. A § 19.3 *et seq.*)  With no advance notice to SGI, DSC also issued a

12   public press release regarding its purported claim, notwithstanding the parties' understanding that

13   certain aspects of the Agreement and related correspondence were confidential.  SGI, nonetheless,

14   went forward with the planned November 6 meeting.  DSC served its complaint two days later,

15   on November 8, 2019, demonstrating its clear intent to pursue a dispute resolution pathway in

16   breach of the Agreement.  To mitigate DSC's breach, SGI prepared this Demand for filing and

17   service on November 12, 2019, the next business day after DSI served its complaint.

18       9.    The Agreement provides that the dispute is to be arbitrated in Seattle, Washington,

19   and that the proceedings are to be "governed by" and the Agreement "construed in accordance

20   with" the laws of "the State of Washington and the United States of America."  (*Id.* § 19.2.)  The

21   AAA is the arbitral body that the parties selected to conduct the Arbitration in the Agreement.

22   (*Id.* § 19.3.4.)

23       10.   The Agreement further provides:

24           The Parties shall choose, by mutual agreement, one (1) arbitrator
             within thirty (30) days of receipt of notice of the intent to arbitrate.
25           If no arbitrator is appointed within the times herein provided or any
             extension of time that is mutually agreed upon, the AAA shall make
26           such appointment within thirty (30) days of such failure.  The
             judgment rendered by the arbitrator shall include costs of
27           arbitration, reasonable attorneys' fees and reasonable costs for
             expert and other witnesses.  Nothing in this Agreement shall be
28           deemed as preventing either Party from seeking injunctive relief (or

any other equitable or provisional remedy).  If the issues in dispute involve scientific, technical or commercial matters, any arbitrator chosen hereunder shall have educational training and/or industry experience sufficient to demonstrate a reasonable level of relevant scientific, medical and industry knowledge.

(*Id.* § 19.3.4.)

## THE PARTIES

11.    Claimant SGI is a biotechnology company that develops and commercializes transformative therapies targeting cancer, with a specific emphasis on ADCs.  SGI is headquartered in Bothell, Washington, and incorporated under the laws of Delaware.

12.    Respondent DSC is a Japanese pharmaceutical corporation having its principal place of business at 3-5-1, Nihonbashi Honchō, Chūo-ku, Tokyo 103-8426, Japan.

## BACKGROUND

### SGI Pioneered Antibody-Drug Conjugation Technology

13.    SGI has been a pioneer in the field of antibody-drug conjugation and remains at the forefront of this area to this day.  Drs. Perry Fell and Clay Siegall, who met while working as research scientists at Bristol Myers Squibb ("BMS"), founded SGI in 1998 to explore and develop technologies for targeted antibody and biological therapeutics, including ADCs.

14.    As a result of pioneering early research and significant investment, SGI introduced many of the critical advancements in the field of antibody-drug conjugation, including path-breaking developments relating to protease cleavable linkers—peptide linkers capable of being enzymatically cleaved, allowing for targeted intracellular release of the drug.  Of the five currently approved ADCs in the United States, two—ADCETRIS® (developed by SGI) and POLIVY® (developed by SGI's licensee Genentech/Roche)—use SGI's proprietary drug-conjugation technology.  Other ADCs that incorporate SGI's technology are in advanced stages of clinical development, including enfortumab vedotin (co-developed by SGI and SGI's licensee Astellas), tisotumab vedotin (co-developed by SGI and SGI's licensee Genmab), and belantamab mafodotin (developed by SGI's licensee GlaxoSmithKline).

15.    U.S. Patent No. 6,214,345 (the "'345 patent"), which SGI licensed from BMS at the company's inception, is a foundational patent relating to SGI's drug conjugation technology.

The class of protease cleavable linkers that the '345 patent describes is often referred to as "Firestone Linkers" after the first named inventor.  During its term, the '345 patent was a crown jewel in SGI's broader suite of ADC patents and know-how.  As disclosed and claimed in the '345 patent and shown below, the basic components of a Firestone Linker include a carboxylic acyl unit such as a maleimidocaproyl, a protease-cleavable peptide unit of two to twelve amino acids in length, and, optionally, one or two self-immolative spacers.

Firestone Linkers are useful for attaching a broad range of drug compounds to a broad range of biologic molecules, including antibodies.  The '345 patent specifically contemplates the use of Firestone Linker technology to conjugate antibodies to camptothecin derivatives—a class of drug compounds that includes the cytotoxic (i.e., cell killing) drug used in at least four ADCs now in DSC's pipeline:  DS-8201, U3-1402, DS-1062, and DS-7300.  As discussed below, the linker in all four of these products has the Firestone Linker architecture.

16.     SGI's other patents and applications relating to its drug conjugation technology claim, among other aspects of the technology, methods for linking drugs to antibodies, e.g., U.S. Patent No. 8,288,352 (the "'352 patent"); methods of treating patients with drug-resistant cancer using antibody-drug conjugates, e.g., U.S. Patent Application No. 11/677,029, issued as U.S. Patent No. 7,750,116 (the "'116 patent"); antibody-drug conjugates containing alcohol-based linkages, e.g., U.S. Patent No. 7,091,186 (the "'186 patent"); and antibody-drug conjugates for treating cancer, autoimmune disease, or infectious disease, e.g., U.S. Patent Application No. 10/522,911, issued as U.S. Patent No. 7,659,241 (the "'241 patent").  DSC's desire for access to the Firestone Linker and these technologies, as well as SGI's related know-how, drove the bargain that the parties ultimately reached in the Agreement.

**SGI and DSC Carefully Negotiated the Provisions of the Agreement**

17.     In the mid-2000s, SGI was still a small research and development company, with about 250 employees and less than $40 million in revenues, focused on the development of the first ADCs with Firestone Linker technology.  With no commercial product, SGI's ADC technology was its primary asset.  Many companies were looking to partner with SGI due to the promise of its platform, and SGI needed licensing revenues from well-capitalized companies to fund its research.  SGI, however, was keenly aware that its licenses needed to provide robust protection for the integrity of SGI's ADC-related technology and needed to mitigate against misappropriation of this technology outside the scope of the licenses, lest its licensees soon become direct competitors with vastly larger resources.

18.     In contrast, DSC was a large Japanese multinational pharmaceutical company with more than 10,000 employees, expertise in small molecule drugs, and many products, and was looking to move into large molecule cancer therapeutics.  DSC's initial attempts to develop such therapeutics ended in failure.  In the early 2000s, DSC began testing DE-310, a molecule that attached a chemotherapeutic (based on camptothecin) to a poly-alcohol polymer carrier.  Early results with DE-310 did not justify commercialization, and DSC turned to antibody therapeutics. It partnered with the University of Alabama to develop an antibody targeting the DR5 cell surface receptor and later pursued other opportunities in the antibody space by acquisition.  It was at this time, in 2006, that DSC became interested in pursuing ADCs, but DSC had no expertise in the area.  Given SGI's seminal work on ADCs and strong technology platform, it was natural that DSC would turn to SGI.

19.     In 2006, SGI and DSC entered into their first agreement to produce and evaluate certain antibodies conjugated using SGI's technology.  Following promising results, the relationship expanded, resulting in the parties' 2008 Collaboration Agreement to research and develop ADC products for a designated antigen, DR5, using antibodies that DSC had developed in its partnership with the University of Alabama.

20.     The premise of SGI's Agreement with DSC appears in the preamble.  SGI owned rights relating to technology "useful for linking" antibodies to cytotoxic compounds.  (Ex. A,

Preamble.)  DSC desired to obtain access to "SGI patent rights and know-how related to SGI's proprietary cytotoxin and linker technology" for use in the "development, commercialization, manufacture, marketing and sale of Licensed Products."  (*Id.*)  Thus, the Agreement recognized that it was SGI—and not DSC—that had expertise in antibody-drug conjugation.

21.     Because the parties' collaboration involved a license to SGI's fundamental patents and applications and extensive knowledge transfer, SGI took careful steps to ensure it retained control of "Improvements," as defined in the Agreement, insisting on express terms to that effect.  "Program Inventions" arising more specifically out of the collaboration, on the other hand, had separate governing provisions, with different ownership depending on the relative contribution of each party.  The parties, therefore, agreed to an intellectual property framework that struck the following balance:  DSC would receive a broad license to SGI's patent rights and proprietary drug conjugation know-how (together, "SGI Technology") for use in developing and commercializing an ADC for the specified target, and SGI would own all Improvements relating thereto, regardless of the antibody or the drug conjugated.  In certain circumstances, Program Inventions would be subject to joint ownership.

22.     To effectuate the Improvements concept, the Agreement expressly granted to SGI a present assignment of "*all* such *Improvements* that relate to the *Drug Conjugation Technology*," providing that "to the extent that such Improvements shall have been conceived, developed or reduced to practice by [DSC], [DSC] *hereby assigns* all of its right, title and interest therein to SGI."  (*Id.* § 3.3.1 (emphasis added).)  The Agreement further required that DSC "promptly notify SGI of the discovery of [any] Improvement[s]."  (*Id.*)  DSC requested broader rights to Improvements during the parties' negotiations, but SGI refused.  A license that would have allowed DSC to develop derivatives of SGI's Drug Conjugation Technology and pursue them outside the scope of the Agreement was non-negotiable.

23.     The Agreement defined "Improvements" broadly to include "*all* patentable or non-patentable inventions, discoveries or other know-how . . . that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology."  (*Id.* § 1.1.32 (emphasis added).)  In turn, "SGI Technology" meant "SGI Patents"—the patents and

applications designated on Schedule B and related patents—and "SGI Know-How"—defined as "any and all technical information, processes, formulae, data, inventions, methods, chemical compounds, biological or physical materials, know-how and trade secrets, in each case that are not in the public domain, *that relate to or are useful to practice* the Drug Conjugation Technology." (*Id.* §§ 1.1.63 (emphasis added), 1.1.64, 1.1.65.)

24.     Drug Conjugation Technology included any "compositions and methods *useful for attaching*" drugs to antibodies, and "*any related assays and methods* SGI provides to Licensee pursuant to the Research Program." (*Id.* § 1.1.17 (emphasis added).)  This definition provided, as an example of drugs to conjugate to an antibody, "cytotoxins or cytostatic compounds *such as* monomethyl Auristatin E and monomethyl Auristatin F." (*Id.* (emphasis added).)  Nothing in the definition limited Improvements to specific antibodies or cytotoxins or cytostatic compounds.

25.     The Agreement provided that DSC may use SGI's Confidential Information only for purposes "expressly authorized and contemplated" by the Agreement. (*Id.* § 8.1.) "Confidential Information" was defined to include "SGI Know-How, Drug Conjugation Technology disclosed to [DSC] that is Controlled by SGI, SGI's interest in any Improvements and New Technologies" and "may also include information relating to such Party's research programs, development, marketing and other business practices and finances." (*Id.*)

**SGI Provided DSC with Extensive Access to SGI's Drug Conjugation Technology Under the Agreement**

26.     SGI undertook its obligations under the Agreement in good faith, providing DSC with extensive access to SGI Technology.  The SGI Patents designated in Schedule B of the Agreement include twelve patent families covering essential and diverse aspects of SGI's conjugation technology, such as linkers, conjugation methods, drugs, manufacturing, and medical uses. (Ex. A, Schedule B.)  Among these patents and applications, the '345 patent (discussed above) exemplifies the fundamental linker technology that SGI provided to DSC under the Agreement.  SGI also licensed other fundamental patents and applications to DSC, including the '352, '116, '186, and '241 patents (also discussed above).

27.     In addition to providing DSC with a license to a wide array of patent rights, SGI worked closely with DSC to provide DSC with proprietary technical knowledge about SGI's conjugation technology, including vital "research bench" insights on how to implement the technology.  As part of this knowledge transfer, SGI provided DSC scientists with starting materials, protocols, and extensive research and development support.  This included on-site demonstrations and hands-on training in antibody-drug conjugation to produce ADCs, as well as the information and assays needed to analyze and characterize those ADCs once made.  SGI and DSC held multiple in-person meetings during which SGI provided extensive information and assistance regarding ADC toxicology, pharmacology, manufacturing, and analytical methods. The purpose of the know-how transfer was to enable DSC to enter and progress in the ADC field, albeit only under the terms of the Agreement and for the specified target.

28.     Below are some of the meetings that SGI and DSC held during the term of the Agreement:

- On July 29, 2008, DSC employees visited SGI's office in Bothell, WA, for a day of meetings where SGI provided them with training and information regarding toxicology, pharmacokinetics, pharmacology, and other methods of ADC analysis, as well as SGI's proprietary peptide linker technology.

- DSC employees again visited SGI's office on July 28, 2009, for another day of meetings at which SGI shared additional know-how, including answering detailed questions from DSC regarding pharmacology, toxicology, and development methods, and providing feedback on DSC's activities and data.

- In September 2009, DSC employees visited SGI's office for another series of meetings where SGI provided them with training and detailed information regarding SGI's ADC manufacturing process and strategy, as well as its ADC conjugation process. During this visit, the DSC employees also toured SGI's chemistry laboratory and its conjugation laboratory.

- In December 2009, several DSC researchers spent at least two days in SGI's laboratories, where SGI scientists provided hands-on training on how to conjugate

antibodies to drugs.  On the first day, SGI scientists demonstrated the conjugation process, and on the second day, the DSC researchers carried out the process under the supervision of the SGI scientists.  The purpose of the visit was to enable DSC scientists to replicate SGI's conjugation technology successfully in their own labs.

- On June 10, 2010, at least two DSC employees visited SGI's office for meetings to discuss toxicity study design and preclinical safety evaluations of ADCs.  For this meeting, DSC asked for, and SGI provided, detailed information relating to one of SGI's ADC drug candidates.

- On March 22, 2012, DSC employees again visited SGI's office for a day of meetings, where SGI provided them with additional training and information regarding pharmacology, biomarkers, toxicology, and clinical pharmacology of ADCs.

29.     In the years following 2008, DSC scientists received and benefited from expansive access to SGI's patent rights and know-how.[1]  DSC nonetheless chose to terminate the Agreement on June 30, 2015, without an ADC on which SGI would earn royalties.  DSC suggested that activity and toxicity issues were the reasons for its termination.  SGI was disappointed by the termination as the collaboration still showed promise.  Given the substantial amount of Drug Conjugation Technology that SGI shared, SGI insisted on a five-year extension of the Confidential Information provisions covering SGI Know-How under the Agreement.

30.     Unbeknownst to SGI, DSC had already embarked on a parallel ADC program, developing Improvements that exploit Firestone Linkers and relate to SGI's Drug Conjugation Technology.  These Improvements are now reflected in the ADC products in DSC's pipeline, such as DS-8201, U3-1402, DS-1062, and DS-7300.  DSC concealed these Improvements from SGI while continuing to benefit from SGI's Confidential Information.  To date, DSC has made no offer to compensate SGI whatsoever for the use of SGI Technology.  Had SGI known that DSC

---

[1] DSC may still have significant SGI information and documentation in its possession, and the current arbitration proceedings may reveal additional facts about the nature and extent of DSC's access to, and use of, SGI Technology.

was developing such drug conjugation technology, it never would have provided the access to SGI Technology that it did.

**THE DISPUTE**

**SGI's Discovery That DSC's Drug Conjugation Technology Constitutes Improvements Relating to SGI's Drug Conjugation Technology**

31.     In 2008, SGI scientists were at the forefront of antibody-drug conjugation research, and SGI was one of only a select few biotechnology companies in the world capable of practicing and exploiting this technology for therapeutic purposes.  Even today, ADCs are so cutting edge that only a handful of companies—many of them SGI licensees—have been able to develop products successfully.

32.     Only a few companies have their own proprietary antibody-drug conjugation technologies.  There are, however, key differences between these technologies and SGI's, including:  (1) whether the linker is cleavable or non-cleavable; (2) if cleavable, the mechanism of cleavage; and (3) the chemistry for conjugating the drug to the target antibody, including the amino acid residue on the antibody to which the drug linker is conjugated.  ImmunoGen and Pfizer, for example, utilize technology with cleavage and conjugation modes that are structurally and functionally distinct from SGI's.  None of these companies use Firestone Linker architecture for their ADCs.

33.     SGI was aware that DSC had started to develop ADCs.  Until SGI's recent review, however, SGI did not realize that DSC's drug conjugation technology, in fact, constituted Improvements relating to SGI's Drug Conjugation Technology.  Upon closer analysis, including a detailed comparison of the DSC linker structure with SGI's Firestone Linker, SGI learned that the DSC linkers are indeed Firestone Linkers with the same elements in the same sequence described and claimed in the '345 patent.  For example, the linker used in DS-8201 contains what DSC describes as an "enzymatically cleavable peptide-linker," which includes a carboxylic acyl unit, a

protease-cleavable peptide unit, and what DSC itself characterizes as a self-immolative spacer, as shown here:[2]



As to the carboxylic acyl group, DSC uses the very molecule—maleimidocaproyl—that SGI uses in ADCETRIS.  During the parties' collaboration under the Agreement, SGI provided DSC with detailed instructions on how to use maleimidocaproyl for conjugating drug linkers to an antibody. U3-1402, DS-1062, and DS-7300 use the same linker platform as DS-8201, and related DSC patents and applications describe conjugation protocols substantially the same as the proprietary protocols that SGI provided to DSC.

34.     These conjugation technology Improvements were developed, and many of the associated patents and applications were filed, during the term of the Agreement, when DSC scientists were receiving access to SGI's patent rights and know-how.  Indeed, some of the named inventors on these patents and applications, including Koji Morita, Yuji Kasuya, Toshinori Agatsuma, and Yuki Abe, were among the DSC scientists who had access to SGI know-how.  In

---

[2] *See, e.g.*, Yusuke Ogitani et al., *Bystander killing effect of DS-8201a, a novel anti-human epidermal growth factor receptor 2 antibody-drug conjugate, in tumors with human epidermal growth factor receptor 2 heterogeneity*, 107 Cancer Sci. 1039-1046, 1039, 1041 (July 2016) (noting that DS-8201 has an "enzymatically cleavable peptide-linker" that includes "a self-immolative moiety between the tetrapeptide linker and payload part.").

what cannot be a coincidence, Toshinori Agatsuma was also the DSC representative who signed

the termination letter ending the parties' collaboration in 2015.

### Improvements at Issue Relating to SGI's Drug Conjugation Technology

35.     From its review, SGI now knows that DSC conceived, developed, or reduced to

practice at least the following "inventions, discoveries or other know-how . . . that utilize,

incorporate, derive directly from, directly relate to, are made using or are based directly on the

SGI Technology" and that relate to SGI's Drug Conjugation Technology:

- The conjugation technology that DSC uses in its ADC products, such as DS-8201, U3-1402, DS-1062, and DS-7300.

- U.S. Patent Nos. 9,808,537, 9,850,312, 9,872,924, 10,155,821, and 10,195,288; U.S. Patent Application Nos. 15/285,156, 15/302,803, 15/821,662, 15/821,697, 16/130,615, 16/142,354, 16/256,715, 16/264,395, and 16/330,085; International Patent Application Nos. PCT/JP2017/036215, PCT/JP2018/007152, and PCT/JP2018/018572; and other U.S. and foreign counterparts thereof (describing ADCs having a protease-cleavable linker that contains a carboxylic acyl unit and a peptide unit, as well as pharmaceutical compositions and uses thereof).

- U.S. Patent Application No. 15/579,512 and other U.S. and foreign counterparts thereof (describing conjugation methods for producing ADCs).

### FIRST CAUSE OF ACTION
(Declaratory Relief/Quiet Title – Ownership of IP "Hereby Assigned" under Federal Common Law and Washington State Law)

36.     SGI incorporates by reference the allegations in paragraphs 1 through 35 above.

37.     This claim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

2202 and RCW 7.28.310.

38.     An actual, immediate, and real controversy has arisen and now exists between

SGI, on one hand, and DSC, on the other hand, regarding the ownership of certain intellectual

property, patents, and/or applications—including, but not limited to, the conjugation technology

that DSC uses in its ADC products, including DS-8201, U3-1402, DS-1062, and DS-7300; U.S.

Patent Nos. 9,808,537, 9,850,312, 9,872,924, 10,155,821, and 10,195,288; U.S. Patent

Application Nos. 15/285,156, 15/302,803, 15/579,512, 15/821,662, 15/821,697, 16/130,615,

16/142,354, 16/256,715, 16/264,395, and 16/330,085; International Patent Application

1   Nos. PCT/JP2017/036215, PCT/JP2018/007152, and PCT/JP2018/018572; and other U.S. and

2   foreign counterparts thereof (individually and/or collectively, the "Improvement IP").

3        39.     The Improvement IP constitutes "Improvements that relate to the Drug

4   Conjugation Technology."  DSC "hereby assign[ed]" to SGI these Improvements under the

5   Agreement by operation of law.  SGI, therefore, has an ownership interest in the Improvement IP.

6        40.     DSC has made adverse claims to the Improvement IP, including by causing

7   assignments to be recorded with the United States Patent and Trademark Office that fail to list

8   SGI as assignee.

9        41.     SGI seeks a declaration that SGI owns the Improvement IP as inventions,

10  discoveries, and other know-how "hereby assign[ed]" to SGI under the Agreement by operation

11  of law.

12       42.     SGI also requests an adjudication of title that removes any and all adverse claims

13  by DSC as clouds upon SGI's title to the Improvement IP, including injunctive relief requiring

14  DSC to execute confirmatory assignments and any other documents that SGI requests to confirm

15  SGI's ownership interest in the Improvement IP.

16

17                          **SECOND CAUSE OF ACTION**
                    (Breach of Contract under Washington State Law)

18       43.     SGI incorporates by reference the allegations in paragraphs 1 through 42 above.

19       44.     On or about July 2, 2008, SGI and DSC entered into the Agreement, which is a

20  valid, lawful, and enforceable contract.

21       45.     As described in more detail above, DSC has breached its obligations under the

22  Agreement by failing to perform as required.  For example, DSC breached its obligations under

23  Section 3.3.1 of the Agreement at least by causing a cloud over title to the Improvements IP that

24  the Agreement provides was "hereby assigned" to SGI, including by causing assignments to be

25  recorded with the United States Patent and Trademark Office that fail to list SGI as assignee.  As

26  an additional example, DSC failed to inform SGI about, and may have purposefully concealed,

27  the Improvement IP during the term of the Agreement up to and including the date DSC

28  terminated the Agreement.  As a further example, DSC breached its obligations under Section 8.1

of the Agreement by having used and continuing to use SGI's Confidential Information for purposes not expressly authorized or contemplated by the Agreement. DSC also breached the Agreement by failing to follow the dispute resolution procedures set forth in Section 19.3.

46.     As a result of DSC's multiple breaches of the Agreement, SGI has suffered injury for which specific performance may be the only remedy.

## RELIEF REQUESTED

WHEREFORE, SGI prays for award against DSC as follows:

A. An order declaring SGI the sole and rightful owner and legal title holder of (and rightful applicant for any term extension or other equivalent rights relating to) the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

B. Injunctive relief, in the form of an order directing DSC to: (a) take all necessary steps to confirm, assign, and/or restore ownership to SGI of the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement; (b) cease and desist from using any Improvement IP and from representing that DSC owns the Improvement IP (including for the purpose of applying for any term extension or other equivalent rights); and (c) identify and return to SGI the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

C. A constructive trust as to the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

D. A running royalty;

E. Monetary damages (including lost profits and royalties and any other consequential damages) according to proof;

F. All costs, including attorney fees, expenses, and other costs, incurred in connection with this Demand; and

G.  Any other and further relief that the Arbitrator deems just and proper.

Dated: November 12, 2019

MORRISON & FOERSTER LLP

By _____
MICHAEL A. JACOBS

Attorneys for Claimant
SEATTLE GENETICS, INC.

# EXHIBIT A

## COLLABORATION AGREEMENT

This Agreement is entered into as of _July 2_ , 2008 by and between:

**SEATTLE GENETICS, INC.**, a Delaware corporation, having its principal place of business at 21823 30th Drive S.E., Bothell, Washington 98021

(hereinafter referred to as "SGI")

and

**DAIICHI SANKYO CO., LTD.**, a corporation organized under the laws of Japan, having its place of business at 1-2-58, Hiromachi, Shinagawa-ku, Tokyo, Japan, 140-8710

(hereinafter referred to as "Licensee").

### WITNESSETH

**WHEREAS,** SGI owns or Controls (as defined below) intellectual property rights relating to certain technology useful for linking certain proprietary cytotoxins to other molecules, such as antibodies capable of directing such cytotoxins to specific tissues and/or cells;

**WHEREAS,** Licensee owns or Controls (as defined below) intellectual property rights relating to antibodies to the Designated Antigen (as defined below), and is currently conducting research and development programs to incorporate such antibodies into pharmaceutical compounds that may have activity in certain disease-related pathways, and to develop antibodies that bind to the Designated Antigen;

**WHEREAS,** Licensee wishes to acquire from SGI an exclusive worldwide license under SGI patent rights and know-how related to SGI's proprietary cytotoxin and linker technology for use in conjunction with Licensee's development, commercialization, manufacture, marketing and sale of Licensee's antibodies that bind to the Designated Antigen; and

**WHEREAS,** SGI wishes to grant to Licensee an exclusive worldwide license to SGI's cytotoxin and linker technology for use in conjunction with Licensee's development, commercialization, manufacture, marketing and sale of Licensed Products (as defined below);

**NOW, THEREFORE,** in consideration of the mutual covenants and obligations set forth herein, the Parties hereto, intending to be legally bound, agree as follows:

## ARTICLE 1 - DEFINITIONS AND INTERPRETATION

**1.1    Definitions**: For the purposes of this Agreement the following words and phrases shall have the following meanings:

**1.1.1**   "AAA" has the meaning set forth in Section 19.3.4.

**1.1.2** "**ADC**" or "**Antibody-Drug Conjugate**" means an Antibody that is linked to a cytotoxin or cytostatic compound and that contains, uses or is made using Drug Conjugation Technology.

**1.1.3** "**ADC Access Fee**" has the meaning set forth in Section 6.1.1.

**1.1.4** "**ADC Data**" has the meaning set forth in Section 2.6.

**1.1.5** "**Affiliate**" of a Party means any corporation or other business entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with a Party. As used herein, the term "control" means the direct or indirect ownership of fifty percent (50%) or more of the stock having the right to vote for directors thereof or the ability to otherwise control the management thereof.

**1.1.6** "**Agreement**" means this agreement, all amendments and supplements to this Agreement and all schedules to this Agreement, including the following:

| | | |
|---|---|---|
| Schedule A | - | Research Plan. |
| Schedule B | - | SGI Patents. |
| Schedule C | - | SGI In-Licenses. |

**1.1.7** "**Antibody**" or "**Antibodies**" means any antibody, or fragment thereof, that has a unique amino acid sequence and that selectively binds to the Designated Antigen.

**1.1.8** "**Breaching Party**" has the meaning set forth in Section 13.3.

**1.1.9** "**Calendar Quarter**" means any of the three-month periods beginning on January 1, April 1, July 1 or October 1 of any year.

**1.1.10** "**Change in Control**" has the meaning set forth in Article 16.

**1.1.11** "**Claims**" has the meaning set forth in Section 14.1.1.

**1.1.12** "**Confidential Information**" has the meaning set forth in Section 8.1.

**1.1.13** "**Control**" means, with respect to any information or intellectual property right, possession by a Party of the ability to grant the right to access or use, or to grant a license or a sublicense to, such information or intellectual property right as provided for herein without violating the terms of any agreement or other arrangement with any Third Party.

**1.1.14** "**Cost of Goods**" shall mean with respect to Drug Conjugation Materials supplied to Licensee (a) for manufacturing activities performed by Third Parties, SGI's reasonably documented out-of-pocket costs incurred in such manufacture and supply of Drug Conjugate Materials, as well as SGI's internal costs incurred in supporting the third party manufacturing relationship, including without limitation process development, scale-up, quality assurance and quality control and the like; and (b) for manufacturing activities performed by SGI

or its Affiliates, the consolidated fully burdened cost of providing such goods or services, which shall include costs of the following: direct labor and material; product quality assurance and quality control; stability studies; losses or wastage in process development, to the extent not the result of negligence or the use of non-standard operating procedures; facility and equipment depreciation; facility and equipment validation and control; activities conducted to evaluate the product safety profile; analyses of the activity and quality of materials; submission and maintenance of regulatory documentation; shipping; expenses incurred in connection with respect to each of the foregoing; applicable allocable overhead, as determined in accordance with GAAP as consistently applied by SGI; intellectual property and technology acquisitions and licenses and related expenses useful for development or commercialization of Licensed Products, including royalties, license fees, milestone payments and other payment obligations paid to Third Parties with respect to providing such goods and services.

   **1.1.15 "Designated Antigen"** means the human DR5 antigen, encoded by the gene designated Gene ID: 8795 (NCBI Entrez Gene Symbol TNFRSF10B), naturally occurring variants of the human DR5 antigen, and naturally occurring post-translational modifications thereof.

   **1.1.16 "Drug Conjugation Materials"** means (a) the compounds monomethyl Auristatin E and monomethyl Auristatin F and variants, derivatives, analogues and salts thereof, (b) compounds that are useful in attaching such compounds to antibodies and (c) any related raw materials and reagents SGI provides to Licensee pursuant to the Research Program, in each case to the extent included in or covered by the SGI Technology. Drug Conjugation Materials shall also include Improvements to Drug Conjugation Materials and any additional cytotoxic or cytostatic compounds that are included in New Technologies and that the Parties agree to include under this Agreement pursuant to Section 3.3.2.

   **1.1.17 "Drug Conjugation Technology"** means (a) cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic compounds to antibodies and (c) any related assays and methods SGI provides to Licensee pursuant to the Research Program.

   **1.1.18 "Effective Date"** means the date set forth in the first line of this Agreement.

   **1.1.19 "Events of Force Majeure"** has the meaning set forth in Article 15.

   **1.1.20 "Exclusive License"** has the meaning set forth in Section 3.1.

   **1.1.21 "Exclusive License Renewal Fee"** has the meaning set forth in Section 6.2.

   **1.1.22 "Existing Third Party Royalties"** has the meaning set forth in Section 6.4.1.

   **1.1.23 "FD&C Act"** means the federal Food, Drug & Cosmetic Act, as amended.

**1.1.24 "FDA"** means the United States Food and Drug Administration, and any successor agency thereto.

**1.1.25 "Field"** means monoclonal antibody targeting applications for the treatment and diagnosis of conditions and diseases in humans and animals.

**1.1.26 "First Commercial Sale"** means, in each country of the Territory, the first commercial sale of a Licensed Product by Licensee, its Affiliates or Sublicensees to a Third Party following, if required by law, Regulatory Approval and, when Regulatory Approval is not required by law, the first commercial sale in that country, in each case for use or consumption of such Licensed Product in such country by the general public.

**1.1.27 "Fiscal Year"** means any twelve-month period beginning on April 1st and ending on March 31st of succeeding year.

**1.1.28 "FTE Fees"** has the meaning set forth in Section 6.1.2.

**1.1.29 "GAAP"** means generally accepted accounting principles in the United States.

**1.1.30 "Generic Product"** means, on a country-by-country basis, an ADC using or incorporating SGI Technology that binds selectively to the Designated Antigen: (i) the manufacture, use or sale of which infringes a Valid Patent Claim of an SGI Patent, Joint Patent or Licensee Patent in such country (provided that an enforcement action is not currently proceeding pursuant to Section 9.3 based on such ADC); and (ii) that is marketed by an unlicensed Third Party or Third Parties in such country.

**1.1.31 "Good Laboratory Practices"** means the then current standards for laboratory activities for pharmaceuticals, as set forth in the FD&C Act and applicable regulations and guidances promulgated thereunder, including without limitation the Code of Federal Regulations, as amended from time to time.

**1.1.32 "Improvements"** means all patentable or non-patentable inventions, discoveries or other know-how developed and Controlled by either Party after the Effective Date that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology; provided that Improvements shall not include any of the foregoing developed by SGI that, within a reasonable time period after such inventions, discoveries or know-how are made or identified, SGI determines are subject to payment or other financial obligations to one or more Third Parties, which instead shall be included in New Technologies.

**1.1.33 "IND"** means (a) an Investigational New Drug Application filed with the FDA or its equivalent in any country outside the United States where a regulatory filing is required or obtained to conduct a clinical trial; or (b) with respect to any country where a regulatory filing is not required or obtained to conduct a clinical trial, the first enrollment of a patient in the first trial involving the first use of a Licensed Product in humans.

**1.1.34 "Indemnitee"** has the meaning set forth in Section 14.2.

-4-

**1.1.35** "**Indemnitor**" has the meaning set forth in Section 14.2.

**1.1.36** "**Initiation**" means, with respect to a human clinical trial, the dosing of the first patient with a Licensed Product pursuant to the clinical protocol for the specified clinical trial.

**1.1.37** "**Joint Patents**" has the meaning set forth in Section 9.2.2.

**1.1.38** "**Liabilities**" has the meaning set forth in Section 14.1.1.

**1.1.39** "**Licensed Product**" means any and all products utilizing or incorporating an ADC: (a) the manufacture, use, sale, offer for sale, export or import of which would infringe a Valid Patent Claim of an SGI Patent if not for the licenses granted in this Agreement; or (b) which otherwise utilize, incorporate, derive from, relate to, are made using or are based on SGI Know-How.

**1.1.40** "**Licensee ADC Know-How**" means all technical information, processes, formulae, data, inventions, methods, chemical compounds, biological or physical materials, know-how and trade secrets, other than Improvements, that are Controlled by Licensee, in each case that are not in the public domain and are developed by Licensee using SGI Technology that are necessary for identifying, developing, making, using or selling ADCs.

**1.1.41** "**Licensee ADC Patents**" means all patent applications and patents that are Controlled by Licensee claiming inventions (other than Improvements) that are necessary for identifying, developing, making, using or selling ADCs made using SGI Technology.

**1.1.42** "**Licensee Know-How**" means all technical information, processes, formulae, data, inventions, methods, chemical compounds, biological or physical materials, know-how and trade secrets, in each case that are not in the public domain, that relate to (a) the composition, method of using or method of making the Designated Antigen, or (b) the composition, method of using or method of making an Antibody, and that are Controlled by Licensee.

**1.1.43** "**Licensee Patents**" means all patent applications and patents Controlled by Licensee that claim (a) the composition or method of using or method of making the Designated Antigen, or (b) the composition or method of using or method of making an Antibody.

**1.1.44** "**Net Sales**" means, as to each calendar quarter, the gross invoiced sales prices charged for all Licensed Products sold by or for Licensee, its Affiliates and Sublicensees to independent Third Parties during such quarter, after deduction (if not already deducted in the amount invoiced) of the following items paid by Licensee, its Affiliates and Sublicensees during such calendar quarter with respect to sales of Licensed Products, provided and to the extent that such items are incurred or allowed and do not exceed reasonable and customary amounts in the market in which such sales occurred:

-5-

(a)     trade, quantity and/or cash discounts, allowances or rebates actually taken and allowed, including promotional or similar discounts or rebates and discounts or rebates to governmental or managed care organizations and wholesalers;

(b)     credits or allowances given or made with respect to Licensed Products by reason of rejection, defects, recalls, returns, rebates, retroactive price reductions or uncollectible amounts;

(c)     any tax, tariff, duty or government charge (including any sales, value added, excise or similar tax or government charge, but excluding any income tax) levied on the sale, transportation or delivery of a Licensed Product and borne by the seller thereof without reimbursement from any Third Party; and

(d)     any charges for freight, postage, shipping or transportation, or for insurance, in each case to the extent borne by the seller.

All of the foregoing deductions from the gross invoiced sales prices of Licensed Products shall be determined in accordance with GAAP.  In the event that Licensee, its Affiliates or Sublicensees make any adjustments to such deductions after the associated Net Sales have been reported pursuant to this Agreement, the adjustments shall be reported and reconciled in the next report and payment of any royalties due.

**1.1.45** **"New Technologies"** means any patentable or non-patentable inventions, discoveries, or other know-how Controlled by SGI that either: (a) are developed by SGI after the Effective Date and that, within a reasonable time period after such inventions, discoveries or know-how are made or identified, SGI determines are subject to payment or other obligations to one or more Third Parties or (b) are in-licensed by SGI after the Effective Date, and that in each case either (x) utilize, incorporate, derive from, directly relate to, are made using or are based on the SGI Technology existing as of the Effective Date, or (y) are otherwise useful in the practice or use of the Drug Conjugation Technology.  New Technologies shall include without limitation cytotoxic or cytostatic compounds, other than those included in the Drug Conjugation Materials as of the Effective Date, that SGI Controls during the Research Program Term.

**1.1.46** **"Notice of Dispute"** has the meaning set forth in Section 19.3.1.

**1.1.47** **"Parties"** means SGI and Licensee, and "Party" means either of them.

**1.1.48** **"Phase I Clinical Trial"** means a human clinical trial, the principal purpose of which is a preliminary determination of safety in healthy individuals or patients.

**1.1.49** **"Phase II Clinical Trial"** means a controlled dose clinical trial prospectively designed to evaluate the efficacy and safety of a candidate drug in the targeted patient population and to define the optimal dosing regimen.

**1.1.50** **"Phase III Clinical Trial"** means a controlled, and usually multi-center, clinical trial, involving patients with the disease or condition of interest to obtain sufficient efficacy and safety data to support Regulatory Approval of a candidate drug.

**1.1.51** "**Program Inventions**" has the meaning set forth in Section 9.1.1.

**1.1.52** "**Program Licensee Patents**" has the meaning set forth in Section 9.3.3.

**1.1.53** "**Publication**" has the meaning set forth in Section 8.5.

**1.1.54** "**Regulatory Approval**" means final regulatory approval (including, where applicable, pricing approval in the event that actual sales do not take place before such approval) required to market a Licensed Product for a disease or condition in accordance with the applicable laws and regulations of a given country. In the United States, its territories and possessions, Regulatory Approval means approval of a New Drug Application ("NDA"), Biologics License Application ("BLA") or an equivalent by the FDA.

**1.1.55** "**Reports**" has the meaning set forth in Section 7.1.1.

**1.1.56** "**Research Fees**" has the meaning set forth in Section 6.1.2.

**1.1.57** "**Research Fees Report**" has the meaning set forth in Section 6.1.2.

**1.1.58** "**Research Plan**" means the plan for the Research Program agreed upon by the Parties and attached hereto as Schedule A.

**1.1.59** "**Research Program**" means the research program conducted pursuant to Article 2 and the Research Plan.

**1.1.60** "**Research Program Term**" means the term of the Research Program set forth in Section 2.2.

**1.1.61** "**Royalty Term**" means, on a Licensed Product-by-Licensed Product and country-by-country basis, until the later to occur of: (a) the tenth (10th) anniversary of the date of First Commercial Sale of the Licensed Product in such country; or (b) the expiration of the last to expire Valid Patent Claim of an SGI Patent that would be infringed by the sale of the Licensed Product in such country, if not for the licenses granted hereunder; provided, however, that a Valid Patent Claim related to an Improvement or Program Invention invented solely by Licensee and assigned to SGI pursuant to Section 3.3.1 or 9.1.2, respectively, shall not be included for purposes of calculating Royalty Term.

**1.1.62** "**SGI In-Licenses**" means the following agreements between SGI and the indicated Third Parties: (a) the License Agreement between Bristol-Myers Squibb Company ("BMS") and SGI dated March 30, 1998, as amended (the "BMS Agreement"); (b) the License Agreement between Arizona State University ("ASU") and SGI dated February 3, 2000, as amended (the "ASU Agreement"); and (c) any other license agreement between SGI and a Third Party covering New Technologies under which Licensee is granted a sublicense under this Agreement as provided in Section 3.3.2.

**1.1.63** "**SGI Know-How**" means any and all technical information, processes, formulae, data, inventions, methods, chemical compounds, biological or physical materials, know-how and trade secrets, in each case that are not in the public domain, that relate to or are

-7-

useful to practice the Drug Conjugation Technology and that have been, or hereafter are during the Research Program Term, Controlled by SGI.  SGI Know-How shall include Improvements Controlled by SGI but shall exclude New Technologies unless included pursuant to Section 3.3.2.

**1.1.64 "SGI Patents"** means:

(a)    any existing patents and patent applications listed in Schedule B to this Agreement, which shall be amended from time to time to reflect any other patents and patent applications;

(b)    any patents and patent applications covering Improvements and, solely to the extent the parties so agree pursuant to Section 3.3.2, New Technologies, in each case that are Controlled by SGI;

(c)    any future patents issued from any patent applications referred to above and any future patents issued from any continuation, continuation-in part (to the extent Controlled by SGI), or divisional of any of the foregoing patent applications or any patent applications from which the foregoing patents issued, in each case to the extent Controlled by SGI; and

(d)    any reissues, reexaminations, confirmations, renewals, registrations, substitutions, extensions, or counterparts of any of the foregoing, in each case to the extent Controlled by SGI.

For clarification, SGI's interest in any Joint Patents shall not be considered SGI Patents.

**1.1.65 "SGI Technology"** means the SGI Patents and the SGI Know-How.

**1.1.66 "Sublicensee"** means any person or entity that is granted a sublicense under the SGI Technology by Licensee or its Affiliates in accordance with the terms of this Agreement.

**1.1.67 "Supply Fees"** has the meaning set forth in Section 6.1.2.

**1.1.68 "Term"** has the meaning set forth in Article 13.

**1.1.69 "Territory"** means all countries in the world.

**1.1.70 "Third Party"** means any person or entity other than Licensee, SGI and their respective Affiliates.

**1.1.71 "Valid Patent Claim"** means an unexpired claim of an issued patent which has not been found to be unpatentable, invalid or unenforceable by an unreversed and unappealable decision of a court or other authority in the subject country.

**1.2**    Certain Rules of Interpretation in this Agreement and the Schedules.

-8-

**1.2.1**    Unless otherwise specified, all references to monetary amounts are to United States of America currency (U.S. Dollars);

**1.2.2**    The preamble to this Agreement and the descriptive headings of Articles and Sections are inserted solely for convenience of reference and are not intended as complete or accurate descriptions of the content of this Agreement or of such Articles or Sections;

**1.2.3**    The use of words in the singular or plural, or with a particular gender, shall not limit the scope or exclude the application of any provision of this Agreement to such person or persons or circumstances as the context otherwise permits;

**1.2.4**    The words "include" and "including" have the inclusive meaning frequently identified with the phrases "without limitation" and "but not limited to";

**1.2.5**    Unless otherwise specified, time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the period commences and including the day on which the period ends and by extending the period to the next business day following if the last day of the period is not a business day in the jurisdiction of the Party to make such payment or do such act; and

**1.2.6**    Whenever any payment is to be made or action to be taken under this Agreement is required to be made or taken on a day other than a business day, such payment shall be made or action taken on the next business day following such day to make such payment or do such act.

## ARTICLE 2 - RESEARCH PROGRAM

**2.1**    **Objective and Conduct of the Research Program.**  Licensee intends to conduct a Research Program, with SGI's support, to evaluate ADCs for research, development and commercialization under this Agreement.  Licensee acknowledges that, in addition to the licenses to the SGI Patents granted hereunder, the SGI Know-How transferred to Licensee during the Research Program contains valuable information that is critical to Licensee's development of ADCs hereunder.  All research work performed by Licensee and SGI hereunder shall be performed in a good scientific manner and in compliance with all applicable laws.

**2.2**    **Term of the Research Program.**  The term of the Research Program shall initially be for a period of two (2) years after the Effective Date (the "Research Program Term"), unless terminated earlier in accordance with Article 13. Licensee shall have a one-time right to extend the Research Program Term for an additional year by providing written notice to SGI not less than thirty (30) days prior to the expiration of the initial Research Program Term.  SGI shall submit, within thirty (30) days from the expiration of the Research Program Term (in the case that the Research Program Term is extended by Licensee as set forth above, within thirty (30) days from the expiration of such extended term), a written report to Licensee which describes the research activities conducted by SGI during such Research Program Term.

**2.3**    **Delivery of Drug Conjugation Materials.**  In support of the Research Program, during the Research Program Term, SGI will (a) deliver Drug Conjugation Materials to Licensee in accordance with the Research Plan; and (b) at Licensee's request, provide Licensee with the

-9-

chemical structures for the Drug Conjugation Materials provided to the Licensee to enable Licensee to manufacture Drug Conjugation Materials itself. All Drug Conjugation Materials and other information provided by SGI to Licensee hereunder will be deemed Confidential Information of SGI pursuant to Article 8.

**2.4    SGI Preparation of ADCs.**  SGI will use reasonable commercial efforts to prepare ADCs using Antibodies supplied by Licensee to SGI which shall meet and satisfy specifications mutually agreed upon by SGI and Licensee, and shall deliver the resulting ADCs to Licensee in accordance with the Research Plan.

**2.5    Payment.**  Licensee shall pay SGI the amounts set forth in Section 6.1.2 for any research efforts or other assistance provided by SGI.

**2.6    Ownership of Data.**  Licensee shall own all right, title and interest in and to the data, research and results related specifically to ADCs arising out of activities conducted pursuant to the Research Program ("ADC Data"). SGI shall disclose to Licensee any ADC Data that are developed, conceived, or otherwise made, solely or jointly, by or on behalf of SGI in the course of, as a result of, or in connection with the Research Program, promptly after the same is developed, conceived or otherwise made. SGI hereby assigns to Licensee any and all right, title, and interest SGI may have in, to and under ADC Data; provided, that SGI may retain copies of, and use, all ADC Data for any purpose related to this Agreement, including but not limited to, patent prosecution and defense pursuant to Article 9.

**2.7    Disclaimer.**  EXCEPT AS MAY BE OTHERWISE EXPRESSLY PROVIDED IN ARTICLE 12 OR THE RESEARCH PLAN, SGI MAKES NO REPRESENTATIONS AND GRANTS NO WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, REGARDING THE DRUG CONJUGATION MATERIALS OR ANY ADCs PREPARED BY SGI, INCLUDING ANY WARRANTY OF QUALITY, MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR USE OR PURPOSE.

## ARTICLE 3 - EXCLUSIVE LICENSE

**3.1    Exclusive License Grant.**

**3.1.1**   Upon execution of this Agreement, subject to the terms and conditions of this Agreement, including payment of the ADC Access Fee set forth in Section 6.1.1, SGI shall be automatically deemed to grant to Licensee a worldwide, exclusive (even as to SGI), royalty-bearing license under the SGI Technology, with the right to sublicense as permitted in Section 3.2, to discover, research, develop, make, have made, import, export, use, offer for sale, and sell Licensed Products that bind selectively to the Designated Antigen within the Field in the Territory (the "Exclusive License"). The Exclusive License shall continue for the Royalty Term, unless earlier terminated pursuant to Article 13, subject to Licensee's compliance with the terms and conditions of this Agreement, including payment of all applicable fees, milestones and royalties hereunder.

**3.1.2**   During the Term, SGI shall not carry out, by itself or in collaboration with any third parties, to discover, research, develop, make, have made, import, export, use, offer for

sale, and sell any antibody-drug conjugate products that bind selectively to the Designated Antigen within the Field in the Territory.

**3.2    Rights to Sublicense.**

      **3.2.1**    Licensee shall have the right to grant sublicenses of the rights granted to Licensee pursuant to this Agreement to any Affiliate or any Third Party, subject to the terms and conditions of the SGI In-Licenses listed on <u>Schedule C</u>.  Licensee shall not have the right to sublicense the SGI Technology outside the scope of the license granted in Section 3.1, including to develop further Drug Conjugation Technology on a stand-alone basis or to create antibody-drug conjugates that include or are based upon any antibodies that bind selectively to an antigen other than the Designated Antigen.

      **3.2.2**    Licensee agrees to contractually obligate any Sublicensee to make all payments due to SGI pursuant to this Agreement by reason of achievement of any fees, milestones and royalties set forth herein, as well as to comply with all terms of this Agreement applicable to Licensee (including all terms of this Agreement identified as applicable to Sublicensee). Licensee shall also require any such Sublicensee to agree in writing to keep books and records and permit SGI to review the information concerning such books and records in accordance with the terms of this Agreement.

      **3.2.3**    Licensee shall notify SGI of each sublicense granted to Affiliates or Third Parties and shall provide SGI with the name and address of each Sublicensee and a description of the rights granted and the territory covered by each Sublicensee.

**3.3    Improvements and New Technologies.**

      **3.3.1    Improvements.**  In the event that, during the Term, Licensee conceives, develops or reduces to practice an Improvement that relates to the Drug Conjugation Technology, Licensee shall promptly notify SGI of the discovery of such Improvement.  SGI shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such Improvements shall have been conceived, developed or reduced to practice by Licensee, Licensee hereby assigns all of its right, title and interest therein to SGI.  SGI's interest in any such Improvements that it Controls shall be included in the SGI Technology and made available to Licensee via the Exclusive License provided in Article 3.  Licensee may use such Improvement assigned to SGI by Licensee for any purpose within the scope of the Exclusive License granted herein solely during the Term of this Agreement.

      **3.3.2    New Technologies.**  Subject to the bona fide rights of Third Parties that may exist, Licensee shall have the right to practice any New Technologies in the Research Program pursuant to the Exclusive License granted under Article 3 as follows:  SGI shall promptly notify Licensee of any New Technologies to which it obtains rights (with the right to grant sublicenses thereunder) during the Research Program Term by providing to Licensee a description of the New Technologies, including all material terms under which Licensee would be able to access such New Technologies. If Licensee is interested in practicing such New Technologies, the Parties shall discuss in good faith modifications to this Agreement to reflect the terms governing Licensee's access to any New Technologies pursuant to this Agreement,

which shall include without limitation Licensee's agreement to bear the financial burden attributable to Licensee's use of such New Technologies; provided that the SGI Technology shall be deemed to include SGI Know-How and SGI Patents (as applicable) relating to or covering such New Technologies only after the Parties execute an amendment to this Agreement specifying such modified terms.

        **3.3.3**   **Amendment of Schedule B.**  Schedule B shall be amended from time to time to add the patents and patent applications Controlled by SGI covering New Technologies or Improvements in accordance with this Section 3.3.

      **3.4**    **Compliance with the SGI In-Licenses.**

        **3.4.1**   Licensee, its Affiliates and Sublicensees shall comply with all obligations, covenants and conditions of the SGI In-Licenses listed in Schedule C, and any amendments thereto following written disclosure thereof to Licensee, that apply under each of the SGI In-Licenses.  The Parties agree that BMS is a Third Party beneficiary to this Agreement to the extent SGI Technology includes technology sublicensed under the BMS Agreement.

        **3.4.2**   SGI will not enter into any amendment to an SGI In-License that imposes additional monetary obligations on Licensee or materially reduces the scope of the licenses granted to Licensee hereunder without the prior written consent of Licensee.

      **3.5**    **License to SGI.**  Subject to the provisions of this Agreement, Licensee hereby grants to SGI, during the Research Program Term, a non-exclusive, royalty-free, sublicenseable license under the Licensee Patents and Licensee Know-How in the Territory, to enable SGI to conduct the Research Program.

## ARTICLE 4 - TECHNOLOGY DISCLOSURE

      **4.1**    **Disclosure of Drug Conjugation Technology.**  During the Research Program Term, SGI shall (a) disclose to Licensee such SGI Know-How as is reasonably useful to enable Licensee to use the Drug Conjugation Materials and Drug Conjugation Technology as provided in the Research Plan or to practice the Exclusive License on the terms, and subject to the conditions, of this Agreement and (b) upon Licensee's reasonable request and with adequate notice to SGI, make available to Licensee at SGI's facilities, SGI's personnel to provide a reasonable amount of technical assistance and training to Licensee's personnel. Licensee shall pay to SGI for such assistance an amount equal to the FTE Fees in accordance with Section 6.1.2 for SGI employees providing such assistance.

## ARTICLE 5 - DEVELOPMENT AND COMMERCIALIZATION; MANUFACTURING

**5.1** **Diligence.** Licensee shall use commercially reasonable efforts to research, develop, commercialize and market Licensed Products, such efforts to be consistent with the exercise of prudent scientific and business judgment and comparable to the efforts Licensee applies to its other projects of similar potential and market size. Without limiting the foregoing, Licensee shall, as commercially prudent, (a) conduct such preclinical and clinical trials as are necessary or desirable to obtain Regulatory Approvals for Licensed Products in major markets therefor, (b) diligently obtain any necessary approvals to market such Licensed Products in major markets therefor (including, as relevant, pricing and reimbursement approval), and (c) market such Licensed Products in each country in which Licensee has received Regulatory Approval therefor. Licensee shall comply with all applicable laws, rules and regulations (including good laboratory, clinical and manufacturing practices) in the development and commercialization of such Licensed Products, and shall cause its Affiliates and Sublicensees to do the same. Subject to the diligence obligations of Licensee set forth above, Licensee may determine, at its sole discretion, its course for conducting research, development, commercialization and marketing of Licensed Products.

**5.2** **Joint Research Meetings.** During the Research Program Term, SGI and Licensee shall hold joint meetings, from time to time, in accordance with the Research Plan, to discuss and consult on research and development activities of the Research Program, by video conference, teleconference or face to face, as mutually agreed between the Parties.

**5.3** **Funding and Progress Reports.** Except as set forth herein, as between SGI and Licensee, Licensee shall be solely responsible for funding all costs of the research, development and commercialization of Licensed Products. Licensee shall keep SGI informed in a timely manner as to the progress of the development of Licensed Products. Beginning on January 30, 2009, and annually thereafter within thirty (30) days following the end of each calendar year, Licensee shall provide SGI with a written report summarizing Licensee's significant activities related to research and development of Licensed Products and status of clinical trials and applications for Regulatory Approval necessary for marketing Licensed Products. Such reports shall be deemed Licensee's Confidential Information for the purposes of Article 8.

**5.4** **Manufacturing.** Except as otherwise expressly set forth in this Agreement, Licensee shall be responsible for all manufacturing and supply of Licensed Products. Notwithstanding the foregoing, at any time during the Term of this Agreement SGI shall consider in good faith any request by Licensee to provide documents or other information that SGI has created or possesses that is necessary to support Licensee's manufacturing of Drug Conjugation Materials or Licensed Products or to support Licensee in establishing and/or procuring third party arrangements for obtaining clinical and/or commercial supplies of Licensed Products. Licensee shall reimburse SGI for any out-of-pocket costs incurred by SGI in providing any such documents or information, plus an amount equal to SGI's then current FTE Fee for SGI's personnel engaged in such activities, at the rate set forth in Section 6.1.2. In the event SGI agrees to provide any assistance beyond the limited activities described above or to supply any materials directly to Licensee, the Parties shall negotiate in good faith a separate agreement governing the terms of any such assistance or supply by SGI, including relevant

prices and other such terms as may be appropriate and customary in agreements for providing such assistance or for supplying similar products at similar volumes.

## ARTICLE 6 - FEES, MILESTONES AND ROYALTIES.

    **6.1**   **Research Fees.**  Licensee shall pay to SGI the following amounts in consideration of the Research Program:

        **6.1.1**  Within ten (10) business days of the Effective Date, Licensee shall pay to SGI the sum of Four Million U.S. Dollars ($4,000,000) by wire transfer of immediately available funds (the "ADC Access Fee").

        **6.1.2**  Licensee shall pay SGI at an annual rate of Three Hundred Fifty Thousand Dollars ($350,000) per FTE who performs research, development, consultation or support work as requested by Licensee pursuant to this Agreement (the "FTE Fees"). Commencing upon the first (1st) anniversary of the Effective Date and upon every anniversary thereafter, the FTE Fees will increase in accordance with the percentage change over the applicable annual period in the Consumer Price Index (U.S. Bureau of Labor Statistics for all urban consumers, U.S. city average, all items). The Parties agree that the total FTE Fees for the first two (2) years of the Research Program Term shall not exceed an amount equal to one point six (1.6) FTEs without the written consent of Licensee; provided, however, that SGI shall not be required to provide any services requested by Licensee under this Agreement if such services would exceed the limit set forth above unless Licensee provides its written consent and agrees to reimburse SGI for such excess FTE Fees. Upon renewal of the Research Program Term as provided for in Section 2.2 above, Licensee and SGI shall mutually agree upon a budget for FTE Fees to be incurred during such one year renewal period. Licensee shall also pay SGI for all Drug Conjugation Materials supplied by SGI to Licensee hereunder at the rate of one-hundred twenty-five percent (125%) of SGI's Cost of Goods therefor (the "Supply Fees"). The FTE Fees and the Supply Fees are collectively referred to herein as the "Research Fees". Within thirty (30) days after the end of each Calendar Quarter, SGI shall submit a report to Licensee supporting the calculation of the Research Fees due for such Calendar Quarter (a "Research Fees Report"). Licensee shall pay all Research Fees to SGI within thirty (30) days of receipt of each Research Fees Report.

    **6.2**   **License Maintenance Fees.**  Licensee shall be required to make a payment to SGI in the sum of One Hundred Fifty Thousand Dollars ($150,000) by wire transfer of immediately available funds (the "Exclusive License Renewal Fee") on each anniversary of the Effective Date until Licensee receives the first Regulatory Approval for a Licensed Product in the Territory. Notwithstanding the foregoing, the Exclusive License Renewal Fee will be offset by the amount of any payments made under Section 6.5 of this Agreement during the twelve (12) month period preceding the date on which an Exclusive License Renewal Fee is due. If Licensee fails to make any payment required by this Section 6.2 within thirty (30) days after written notice thereof from SGI, then the Exclusive License will terminate immediately.

    **6.3**   **Royalties Payable by Licensee.**  In consideration for the Exclusive License granted to Licensee herein, during the Royalty Term, and subject to Sections 6.4.2 and 6.4.3, Licensee shall pay to SGI royalties on Net Sales of Licensed Products on a Licensed Product by Licensed Product basis. Such royalties shall be paid at the following rates as set forth below:

(a)     Four percent (4.0%) of the first Two Hundred Million Dollars ($200,000,000) in aggregate Net Sales of each Licensed Product in each calendar year;

(b)     Five percent (5.0%) of the portion of aggregate Net Sales of each Licensed Product between Two Hundred Million Dollars ($200,000,000) and Six Hundred Million Dollars ($600,000,000) in each calendar year;

(c)     Six percent (6.0%) of the portion of aggregate Net Sales of each Licensed Product in excess of Six Hundred Million Dollars ($600,000,000) in each calendar year; and

(d)     In establishing the royalty structure of this Section 6.3, the Parties recognize, and Licensee acknowledges, the substantial value of the various actions and investments undertaken by SGI prior to the Effective Date.  Such value is significant and in addition to the value of SGI's grant to Licensee of the Exclusive License pursuant to Section 3.1, as it enables the rapid and effective development and commercialization of the Licensed Products in the Territory.  Therefore, the Parties agree that the royalty payments calculated as a percentage of Net Sales (plus the fees and milestone payments provided for elsewhere herein) provide fair compensation to SGI for these additional benefits.

(e)     If and for so long as there is a Generic Product being sold by a Third Party in a calendar quarter in a country in the Territory, then the royalties otherwise payable by Licensee to SGI in such country pursuant to Sections 6.3(a), (b) and (c) above shall be reduced by the percent set forth below of the amounts otherwise owed:

| Generic Products unit volume sales for each Licensed Product in such country | Reduction rate |
| --- | --- |
| <25% | 0% |
| 25~>50% | 25% |
| 50~>75% | 50% |
| >75% | 75% |

### 6.4     Third Party Royalties.

6.4.1   Licensee shall be solely responsible for paying all royalties owed to Third Parties by either Licensee or SGI on account of sales of Licensed Products, including royalties owed due to use of the SGI Technology.  SGI represents and warrants that (i) all Third Party royalties owed pursuant to the existing SGI In-Licenses are accurately described in Schedule B ("Existing Third Party Royalties"), (ii) it has provided Licensee with true and complete copies,

-15-

except for certain redactions, of all agreements and amendments to the extent such agreements are relevant to determining the amount of royalties owed and (iii) Licensee shall not have an obligation to make any payment to ASU, including without limitation any royalty payments to ASU, for Licensed Products that use either MMAE or MMAF as set forth in Schedule B.

6.4.2   If the sum of (a) the royalties payable by Licensee, its Affiliates or Sublicensees to SGI under Section 6.3, (b) the Existing Third Party Royalties payable by Licensee, its Affiliates or Sublicensees pursuant to Section 6.4.1 and (c) any other royalties payable by Licensee, its Affiliates or Sublicensees to Third Parties necessary in order to practice the SGI Technology exceeds seven percent (7%) of Net Sales of a Licensed Product in any calendar year, then the royalties otherwise due and payable by Licensee under Section 6.3 shall be reduced by an amount equal to fifty percent (50%) of any royalties due by Licensee with respect to Net Sales of a Licensed Product in such year that exceed seven percent (7%) of such Net Sales; provided, however, that the royalty payments due and payable to SGI pursuant to Section 6.3 with respect to a Licensed Product in any calendar year shall not be reduced below four percent (4%) to the extent the royalty payments due to SGI are not reduced in accordance with Section 6.3(e). For clarity, (c) in this Section 6.4.2 shall not include the royalties payable to the UAB Research Foundation, which has granted Licensee an exclusive license to use patents concerning Antibodies.

6.4.3   If Licensee commercializes a Licensed Product and must pay a royalty to BMS under the BMS Agreement pursuant to Section 6.4.1 above and such royalty is reduced to less than two percent (2%) of Net Sales for a Licensed Product (the amount of any such reduction, the "Reduction Amount") by reason of negotiation by SGI and BMS, then the royalty otherwise due and payable by Licensee to SGI under Section 6.3 for such Licensed Product shall be increased by an amount equal to fifty percent (50%) of the Reduction Amount.

6.5   **Milestone Payments.**  As additional consideration for the licenses, rights and privileges granted to it hereunder, Licensee shall pay to SGI the following milestone payments within thirty (30) days of the first occurrence in the Territory of each event set forth below with respect to the first Licensed Product to achieve such event, whether such events are achieved by Licensee, its Affiliates or Sublicensees, as follows:

(a)   Upon decision by Licensee to initiate Good Laboratory Practices toxicology studies, One Million Dollars ($1,000,000);

(b)   Upon Initiation of a Phase I Clinical Trial, Two Million Dollars ($2,000,000);

(c)   Upon Initiation of a Phase II Clinical Trial, Three Million Dollars ($3,000,000);

(d)   Upon Initiation of a Phase III Clinical Trial, Five Million Dollars ($5,000,000);

(e)   Upon receipt of Regulatory Approval by the FDA or equivalent, Fifteen Million Dollars ($15,000,000);

-16-

        **(f)**     Upon receipt of Regulatory Approval in any country within the European Union, Ten Million Dollars ($10,000,000);

        **(g)**     Upon receipt of Regulatory Approval in Japan, Seven Million Dollars ($7,000,000);

        **(h)**     Upon the date of first achievement of worldwide Net Sales of Licensed Products in a single Fiscal Year exceeding Two Hundred Million Dollars ($200,000,000), Ten Million Dollars ($10,000,000); and

        **(i)**     Upon the date of first achievement of worldwide Net Sales of Licensed Products in a single Fiscal Year exceeding Four Hundred Million Dollars ($400,000,000), Twenty Million Dollars ($20,000,000).

If any of the milestones in (a) through (e) above is achieved before one or more preceding milestones, then such preceding milestone payment(s) shall be deemed to become due within thirty (30) days after the achievement of the subsequent milestone. Furthermore if either of the milestones in (f) or (g) above is achieved before any of the preceding milestones in (a) through (d) above, then payments for all such preceding milestones (a) through (d) that have not yet been paid shall be deemed to become due within thirty (30) days after the achievement of either of the milestones in (f) or (g) above.

For avoidance of doubt, any milestones in (a) through (g) that are paid for the first Licensed Product shall not apply to any subsequent Licensed Product.

     **6.6**    **Payment Terms.** Royalties shown to have accrued by each Report provided for under Article 7 of this Agreement shall be paid within ten (10) business days from such Report is due pursuant to Section 7.1.3.

     **6.7**    **Payment Method.** All payments by Licensee to SGI under this Agreement shall be paid in U.S. dollars, and all such payments shall be made by bank wire transfer in immediately available funds to the bank account designated by SGI in writing.

     **6.8**    **Exchange Control.** If at any time legal restrictions prevent the prompt remittance of part or all royalties with respect to any country in the Territory where Licensed Product is sold, payment shall be made through such lawful means or method as the Parties reasonably shall determine.

     **6.9**    **Withholding Taxes.** Except as otherwise provided below, all amounts due from Licensee to SGI provided under this Agreement are written as gross amounts. Licensee shall be entitled to deduct the amount of any withholding taxes payable or required to be withheld by Licensee, its Affiliates or Sublicensees, to the extent Licensee, its Affiliates or Sublicensees pay such withheld amounts to the appropriate governmental authority on behalf of SGI, if any. Licensee shall use commercially reasonable efforts to minimize any such taxes, levies or charges required to be withheld on behalf of SGI by Licensee, its Affiliates or Sublicensees. Licensee promptly shall deliver to SGI proof of payment of all such taxes, levies and other charges, together with copies of all communications from or with such governmental authority with

respect thereto, and shall cooperate with SGI in seeking any related tax credits that may be available to SGI with respect thereto.

## ARTICLE 7 - ROYALTY REPORTS AND ACCOUNTING

### 7.1    Reports, Exchange Rates.

**7.1.1**    During the Royalty Term, Licensee shall furnish to SGI, with respect to each Calendar Quarter, a written report showing, on a consolidated basis in reasonably specific detail and on a country-by-country basis, (a) the gross sales of Licensed Products sold by Licensee, its Affiliates and its Sublicensees in the Territory during the corresponding Calendar Quarter and the calculation of Net Sales from such gross sales; (b) the royalties payable in U.S. dollars, if any, which shall have accrued hereunder based upon such Net Sales of Licensed Products; (c) the withholding taxes, if any, required by law to be deducted in respect of such royalties; (d) the dates of the First Commercial Sale of each Licensed Product in each country in the Territory, if it has occurred during the corresponding Calendar Quarter; and (e) the exchange rates (as determined pursuant to Section 7.1.4 herein) used in determining the royalty amount expressed in U.S. dollars (collectively, "Reports").

**7.1.2**    Licensee shall include in each permitted sublicense granted by it pursuant to this Agreement a provision requiring its Affiliates and Sublicensees to make Reports to Licensee within thirty (30) days of the close of each Calendar Quarter and to keep and maintain records of sales made pursuant to such sublicense as if such sales were by Licensee for the purpose of Section 7.1.1.

**7.1.3**    Reports shall be due on the forty-fifth (45th) day following the end of the Calendar Quarter to which such Report relates.  Licensee shall keep complete and accurate records in sufficient detail to properly reflect all gross sales and Net Sales and to enable the royalties payable hereunder to be determined.

**7.1.4**    With respect to sales of Licensed Products invoiced in U.S. dollars, the gross sales, Net Sales, and royalties payable shall be expressed in U.S. dollars.  With respect to sales of Licensed Products invoiced in a currency other than U.S. dollars, the gross sales, Net Sales and royalties payable shall be expressed in the currency of the invoice issued by the Party making the sale together with the U.S. dollars equivalent of the royalty due, calculated using the average rate of exchange published in Reuters during the applicable Calendar Quarter.

### 7.2    Audits.

**7.2.1**    Upon the written request of SGI and with at least thirty (30) days' prior written notice, but not more than once in any calendar year, Licensee shall permit an independent certified public accounting firm of internationally recognized standing, selected by SGI and reasonably acceptable to Licensee, at SGI's expense, to have access during normal business hours to such of the records of Licensee as required to be maintained under this Agreement to verify the accuracy of the Reports due hereunder.  Such accountants may audit records relating to Reports made for any year ending not more than thirty-six (36) months prior to the date of such request.  The accounting firm shall disclose to SGI only whether the Reports were correct or not,

-18-

and the specific details concerning any discrepancies.  No other information obtained by such accountants shall be shared with SGI.

   **7.2.2**  If such accounting firm concludes that any royalties were owed but not paid to SGI, Licensee shall pay the additional royalties within thirty (30) days of the date SGI delivers to Licensee such accounting firm's written report so concluding.  The fees charged by such accounting firm shall be paid by SGI; provided, however, if the audit discloses that the royalties payable by Licensee for the audited period are more than one hundred ten percent (110%) of the royalties actually paid for such period, then Licensee shall pay the reasonable fees and expenses charged by such accounting firm.  If such accounting firm concludes that the royalties paid were more than what was owed during such period, SGI shall refund the overpayments within thirty (30) days of the date SGI receives such accounting firm's written report so concluding.

  **7.3**  **Confidential Financial Information.**  SGI shall treat all financial information subject to review under this Article 7 or under any sublicense agreement as Confidential Information of Licensee as set forth in Article 8, and shall cause its accounting firm to retain all such financial information in confidence under terms substantially similar to those set forth in Article 8.

## ARTICLE 8 – CONFIDENTIALITY

  **8.1**  **Non-Disclosure Obligations.**  Except as otherwise provided in this Article 8, during the Term and for a period of five (5) years thereafter, each Party shall maintain in confidence, and use only for purposes as expressly authorized and contemplated by this Agreement, all confidential or proprietary information, data, documents or other materials supplied by the other Party under this Agreement and marked or otherwise identified as "Confidential."  Confidential Information of SGI shall include SGI Know-How, Drug Conjugation Technology disclosed to Licensee that is Controlled by SGI, SGI's interest in any Improvements and New Technologies.  Confidential Information of a Party may also include information relating to such Party's research programs, development, marketing and other business practices and finances.  For purposes of this Agreement, information and data described above shall be hereinafter referred to as "Confidential Information."  Each Party shall use at least the same standard of care as it uses to protect its own Confidential Information to ensure that its and its Affiliates' employees, agents, consultants and clinical investigators only make use of the other Party's Confidential Information for purposes as expressly authorized and contemplated by this Agreement and do not disclose or make any unauthorized use of such Confidential Information.

  **8.2**  **Permitted Disclosures.**  Notwithstanding the foregoing, but subject to the last sentence of this Section 8.2, the provisions of Section 8.1 shall not apply to information, documents or materials that the receiving Party can conclusively establish with competent evidence:

   **(a)**   have become published or otherwise entered the public domain other than by breach of this Agreement by the receiving Party or its Affiliates;

(b)    are permitted to be disclosed by prior consent of the other Party;

(c)    have become known to the receiving Party by a Third Party, provided such Confidential Information was not obtained by such Third Party directly or indirectly from the other Party under this Agreement on a confidential basis;

(d)    prior to disclosure under the Agreement, was already in the possession of the receiving Party, its Affiliates or Sublicensees, provided such Confidential Information was not obtained directly or indirectly from the other Party under this Agreement;

(e)    are required to be disclosed by the receiving Party to comply with any applicable law, regulation or court order, or are reasonably necessary to obtain patents, copyrights or authorizations to conduct clinical trials with, and to commercially market, Licensed Product(s), provided that the receiving Party shall provide prior notice of such disclosure to the other Party and take reasonable and lawful actions to avoid or minimize the degree of disclosure;

(f)    solely to the extent reasonably necessary in a patent application claiming Program Inventions made hereunder to be filed with the United States Patent and Trademark Office and/or any similar foreign agency, provided that the Party filing the patent shall provide at least thirty (30) days prior written notice of such disclosure to the other Party and take reasonable and lawful actions to avoid or minimize the degree of disclosure;

(g)    to a Sublicensee as permitted hereunder, provided that such Sublicensee is then subject to obligations of confidentiality and limitations on use of such Confidential Information substantially similar to those contained herein; and

(h)    to a bona fide collaborator or manufacturing, development or sales contractor or partner, but only to the extent directly relevant to the collaboration, partnership or contract and provided that such collaborator, partner or contractor is then subject to obligations of confidentiality and limitations on use of such Confidential Information substantially similar to those contained herein.

Notwithstanding the disclosures permitted under subsections (e)-(h), if the information, documents or materials covered by such subsection is otherwise protected by obligations of confidentiality, then the confidentiality obligations of Section 8.1 shall still apply.

**8.3**    **Terms of the Agreement.**  Licensee and SGI shall not disclose any terms or conditions of this Agreement to any Third Party other than a prospective Sublicensee or in connection with either Party's merger or acquisition discussions without the prior consent of the other Party, except as required by applicable laws, regulations or a court order or to comply with rules of a securities exchange, in which case the disclosing Party shall provide notice to the other Party and take reasonable and lawful actions to avoid or minimize the degree of such disclosures, including obtaining confidentiality obligations from prospective Sublicensees or merger or acquisition candidates at least as protective as those provided for herein. Notwithstanding the foregoing, Licensee may disclose and provide a copy of this Agreement to the UAB Research Foundation; provided, that the UAB Research Foundation maintains the confidentiality of this Agreement pursuant to confidentiality provisions at least as protective as those provided for herein.

**8.4     Press Releases and Other Disclosures to Third Parties.**  Neither SGI nor Licensee will, without the prior consent of the other, issue any press release or make any other public announcement or furnish any statement to any person or entity (other than either Parties' respective Affiliates) concerning the existence of this Agreement, its terms and the transactions contemplated hereby, except for (i) an initial press release mutually agreed upon by the Parties, (ii) disclosures made in compliance with Sections 8.2 and 8.3, (iii) attorneys, consultants, and accountants retained to represent the Parties in connection with the transactions contemplated hereby.

**8.5     Publications.**  Neither Party may publish, present or announce results of ADCs developed hereunder either orally or in writing (a "Publication") without complying with the provisions of this Section 8.5.  The other Party shall have thirty (30) days from receipt of a proposed Publication to provide comments and/or proposed changes to the publishing Party. The publishing Party shall take into account the comments and/or proposed changes made by the other Party on any Publication and shall agree to designate employees or others acting on behalf of the other Party as co-authors on any Publication describing results to which such persons have contributed in accordance with standards applicable to authorship of scientific publications.  If the other Party reasonably determines that the Publication would entail the public disclosure of such Party's Confidential Information and/or of a patentable invention upon which a patent application should be filed prior to any such disclosure, submission of the concerned Publication to Third Parties shall be delayed for such period as may be reasonably necessary for deleting any such Confidential Information of the other Party (if the other Party has requested deletion thereof from the proposed Publication), and/or the drafting and filing of a patent application covering such invention, provided such additional period shall not exceed sixty (60) days from the date the publishing Party first provided the proposed Publication to the other Party.

## ARTICLE 9 - INVENTIONS AND PATENTS

### 9.1     Ownership of Inventions.

**9.1.1     Disclosure of Inventions.**  Each Party shall promptly disclose to the other Party, including without limitation at the joint meetings provided in Section 5.2, the making, conception or reduction to practice of any inventions directly arising out of activities conducted under this Agreement ("Program Inventions").

**9.1.2     Ownership of Program Inventions.**  All right, title and interest in all Program Inventions that are discovered, made or conceived as part of the activities conducted under this Agreement shall be owned as follows:

**(a)**     Licensee shall own all Program Inventions that (i) are invented solely by one or more employees, agents or consultants of Licensee and do not primarily relate to the Drug Conjugation Technology or (ii) are invented solely or jointly by employees, agents or consultants of Licensee and/or SGI and primarily relate to the Designated Antigen or Antibodies.  To the extent that any such Program Inventions relating primarily to the Designated Antigen or Antibodies shall have been invented by SGI and are owned by SGI, SGI hereby assigns all of its right, title and interest therein to Licensee;

(b)     SGI shall own all Program Inventions that (i) are invented solely by one or more employees, agents or consultants of SGI and do not primarily relate to the Designated Antigen or Antibodies or (ii) are invented solely or jointly by employees, agents or consultants of Licensee and/or SGI and primarily relate to the Drug Conjugation Technology (including all Improvements).   To the extent that any Program Inventions relating primarily to Drug Conjugation Technology shall have been invented by Licensee and are owned by Licensee, Licensee hereby assigns all of its right, title and interest therein to SGI; and

(c)     Except as set forth in Sections 9.1.2(a) and 9.1.2(b), Licensee and SGI shall jointly own all other Program Inventions.  For purposes of clarification and notwithstanding anything to the contrary set forth herein, all Program Inventions that relate primarily to ADCs, including without limitation, patents or patent applications claiming compositions of matter or methods of use of Licensed Products, shall be jointly owned.

(d)     Inventorship, for purposes of this Agreement, shall be determined in accordance with applicable national patent laws.  To the extent permissible under applicable national patent laws, each Party will cause each employee and contractor conducting work on such Party's behalf under this Agreement to be subject to a contract that (a) compels prompt disclosure to the Party of all inventions and other intellectual property conceived, created or reduced to practice by such employee or contractor during his or her performance under the Research Program and (b) assigns to such Party all right, title and interest in and to all such inventions and other intellectual property and all related Patents.  Each Party will require each employee and contractor conducting work on such Party's behalf under this Agreement to maintain records in sufficient detail and in a good scientific manner appropriate for patent purposes to properly reflect all work done.  To the extent any royalties are owed to an employee or contractor of a Party relating to an invention, that Party shall be solely responsible for such royalties.

**9.2**     **Patent Prosecution and Maintenance.**

**9.2.1**   SGI shall be responsible for and shall control the preparation, filing, prosecution, grant and maintenance of all SGI Patents.  Throughout the Term of this Agreement, SGI shall, at its sole expense, prepare, file, prosecute and maintain such SGI Patents in good faith consistent with its customary patent policy and its reasonable business judgment, and shall consider in good faith the interests of Licensee in so doing.

**9.2.2**   Each Party shall be responsible for and shall control the preparation, filing, prosecution, grant and maintenance, of any patents and patent applications claiming Program Inventions owned solely by it in accordance with Section 9.1 and shall, at its sole expense, prepare, file, prosecute and maintain such patent rights in good faith consistent with its customary patent policy and its reasonable business judgment.  Patents and patent applications claiming Program Inventions owned jointly by both Parties in accordance with Section 9.1 ("Joint Patents") shall be controlled, prepared, filed, prosecuted and maintained by an outside legal firm mutually agreed to between the Parties, under the direction and control of Licensee.  The cost of such outside legal expenses for Joint Patents related to Licensed Products shall be borne by Licensee and Licensee shall direct and control the preparation, filing, prosecution and maintenance of such Joint Patents in good faith consistent with its customary patent policy and

-22-

its reasonable business judgment, and shall consider in good faith the interests of SGI in so doing. The costs for all other Joint Patents shall be borne equally by the Parties and the Party responsible for the preparation, filing, prosecution and maintenance of such Joint Patents shall be mutually agreed upon by the Parties; provided, that the controlling Party agrees to act consistent with its customary patent policy and its reasonable business judgment and considers in good faith the interests of the other Party in so doing.  The Party responsible for filing and controlling patent prosecution and maintenance for Program Inventions shall provide to the other Party copies of any response, document or communication with patent authorities that could materially affect the scope of any patent or patent application covering Program Inventions or detrimentally effect the rights of the Parties in such inventions in any way, at least thirty (30) days prior to the planned submission or communication.  Such other Party shall have the opportunity to comment on the response or document within such thirty (30) day period, which comments shall be reasonably considered by the Party primarily responsible for the prosecution.

**9.2.3**   If either Party decides not to continue prosecuting any Joint Patents or not to maintain any Joint Patent claiming a Program Invention then such Party shall promptly so notify the other Party (which notice shall be at least thirty (30) days before any relevant deadline for such patent).  Thereafter, the other Party shall have the right to prosecute or maintain such patent, at such Party's sole expense.

**9.2.4**   The Parties shall at all times fully cooperate with each other in order to reasonably implement the foregoing provisions of this Section 9.2.  Such cooperation may include each Party's execution of necessary legal documents, coordinating filing and/or prosecution of applications for Joint Patents to avoid potential conflicts with SGI Patents during prosecution (including novelty, enablement, estoppel and double patenting, execution of amendments and documents for reliance on the CREATE Act, if mutually agreed upon by both parties), and the assistance of each Party's relevant personnel.  Without limiting the foregoing, it is understood that even if a Party is permitted to reference the other Party's technology in a patent application pursuant to this Agreement, the filing Party shall not file any such patent application without first confirming with the non-filing Party in writing that any such filing could not reasonably be expected to adversely affect the non-filing Party's patent strategy.  If the non-filing Party determines that any such filing could adversely affect its filing strategy, the filing Party shall not file any such patent application and the Parties shall cooperate in accordance with this Section 9.2.4 to determine a strategy that would protect each Party's interests, including, without limitation, delaying the filing or co-owning such patent application, as the case may be.  Except as otherwise expressed authorized in this Agreement, Licensee shall not disclose and/or claim in any patent application, patent or publication any Confidential Information within the SGI Technology, Drug Conjugation Technology or Drug Conjugation Materials without SGI's prior written consent.  Except as otherwise expressly authorized in this Agreement, SGI shall not disclose and/or claim in any patent application, patent or publication any Confidential Information within the Licensee technology without Licensee's prior written consent.

**9.3**     **Enforcement of SGI Patents.**

**9.3.1**   SGI shall have the first right, at its sole expense, but not the obligation, to determine the appropriate course of action to enforce the SGI Patents or otherwise abate the infringement thereof, to take (or refrain from taking) appropriate action to enforce the SGI

Patents, to control any litigation or other enforcement action and to enter into, or permit, the settlement of any such litigation or other enforcement action with respect to the SGI Patents. SGI shall in good faith consider the interests of Licensee in conducting the foregoing activities. All monies recovered upon the final judgment or settlement of any such suit to enforce any SGI Patents with respect to the manufacture, use or sale by Third Parties of products competitive with Licensed Products or technologies competitive with Drug Conjugation Technology shall be allocated first to any Third Party from which SGI obtained license with respect to such SGI Patents, to the extent required under the relevant SGI In-License, second to SGI to the extent necessary to compensate it for its expenses in its enforcement, third to Licensee to the extent necessary to compensate it for its expenses in cooperating with SGI in its enforcement, and finally any remaining amounts shall be treated as Net Sales subject to the royalty obligations described in Article 6 of this Agreement if the suit is solely related to a Licensed Product and if otherwise related to Drug Conjugation Technology, shall be prorated between the Parties in accordance with the damages for which such judgment or settlement is reasonably intended to compensate. Licensee shall reasonably cooperate with SGI in any such action at SGI's expense, to enforce the SGI Patents, including being joined as a party to such action if necessary. In no event may SGI assert an argument or settle a suit in a manner that would materially prejudice the rights granted to Licensee under this Agreement without Licensee's prior written consent.

   **9.3.2**   If SGI fails to take any action to enforce the SGI Patents or control any litigation with respect to the SGI Patents with respect to the manufacture, use or sale by Third Parties of products competitive with Licensed Products or technologies competitive with Drug Conjugation Technology within a period of ninety (90) days after the Parties receive reasonable notice of the infringement of the SGI Patents, or in the case of an ANDA filing, within thirty (30) days of receipt of the notice of submission of the ANDA filing, then Licensee shall have the right to bring and control any such action by counsel of its own choice, at its sole expense. In such case, all monies recovered upon the final judgment or settlement of any such suit to enforce any SGI Patents shall be allocated first to any Third Party from which SGI obtained license with respect to such SGI Patents, to the extent required under the relevant SGI In-License, second to Licensee to the extent necessary to compensate it for its expenses in its enforcement, third to SGI to the extent necessary to compensate it for its expenses in cooperating with Licensee in its enforcement, and finally any remaining amounts shall be treated as Net Sales subject to the royalty obligations described in Article 6 of this Agreement if the suit is solely related to a Licensed Product and if otherwise related to Drug Conjugation Technology, shall be prorated between the Parties in accordance with the damages for which such judgment or settlement is reasonably intended to compensate. In such a case, SGI shall cooperate fully with Licensee, at Licensee's expense, in its efforts to enforce the SGI Patents, including being joined as a party to such action if necessary. In no event may Licensee assert an argument or settle a suit in a manner which would render a claim in the SGI Patents invalid or unenforceable without SGI's prior written consent.

   **9.3.3**   Licensee shall have the right, at its sole expense, to determine the appropriate course of action to enforce patents claiming Program Inventions owned solely by Licensee in accordance with Section 9.1 ("Program Licensee Patents"), or otherwise to abate the infringement thereof, to take (or refrain from taking) appropriate action to enforce the Program Licensee Patents, to control any litigation or other enforcement action and to enter into, or permit, the settlement of any such litigation or other enforcement action with respect to the Program

-24-

Licensee Patents. All monies recovered upon the final judgment or settlement of any such suit to enforce any Program Licensee Patents shall be retained by Licensee. SGI shall fully cooperate with Licensee, at Licensee's expense, in any action to enforce the Program Licensee Patents.

9.3.4   In the event either Party becomes aware of an infringement by a Third Party of a Joint Patent, it shall promptly notify the other Party which shall be followed by a written notice. Subject to the rights of both Parties set forth in Sections 9.3.1 and 9.3.2 above, Licensee shall have the right to bring and control any such action related to a Joint Patent related to a Licensed Product, by counsel of its own choice at its sole expense. For all other Joint Patents, the Parties shall cooperate in selecting an outside legal firm mutually agreeable to both Parties and shall equally share control of the suit and all expenses. In such case, all monies recovered upon the final judgment or settlement of any such suit to enforce any Joint Patents shall be allocated first to any Third Party from which either Party obtained license with respect to such Joint Patents, to the extent required under the relevant in-license to either Party, second to the Parties to the extent necessary to compensate each for its respective expenses in its enforcement, and finally any remaining amounts shall be treated as Net Sales subject to the royalty obligations described in Article 6 of this Agreement if the suit is solely related to a Licensed Product and otherwise, shall be prorated between the Parties in accordance with the damages for which such judgment or settlement is reasonably intended to compensate. If the monies recovered are not sufficient to compensate for all expenses of both Parties, such monies shall be divided on a pro rata basis based on the proportion of each Parties expenses to the total combined expenses of enforcement. If either Party chooses not to participate in the enforcement action to the extent it is required, it shall forfeit its right to share in the recovery, but shall nonetheless cooperate fully with the other Party, at the other Party's expense, in its efforts to enforce the Joint Patents, including being joined as a party to such action if necessary. In no event shall a Party make an argument or settle a dispute which would render a claim in a Joint Patent to be invalid or unenforceable without the other Party's prior written consent.

9.4   **Prior Patent Rights.**   Notwithstanding anything to the contrary in this Agreement, with respect to any SGI Patents that are subject to the SGI In-Licenses, the rights and obligations of the Parties under Section 9.2 and 9.3 shall be subject to the rights of the licensor of the SGI In-License to participate in and control prosecution, maintenance and enforcement of such SGI Patents, and to receive a share of damages recovered in such action, in accordance with the terms and conditions of the applicable SGI In-License.

## ARTICLE 10 - INFRINGEMENT ACTIONS BROUGHT BY THIRD PARTIES

If Licensee, SGI or any of their respective Affiliates, or any of Licensee's Sublicensees, is sued by a Third Party for infringement of a Third Party's patent because of the use of the Drug Conjugation Technology in connection with activities conducted pursuant to this Agreement, the Party that has been sued shall promptly notify the other Party within thirty (30) days of its receipt of notice of such suit.  The notice shall set forth the facts of such infringement available to the relevant Party.  The Parties shall then meet to discuss each Party's commercial interests in the defense of the suit, a plan for the defense of the suit, how the costs of the suit should be allocated, and which Party should have primary control of the suit, provided that if such infringement relates primarily to Drug Conjugation Technology, then SGI shall have the first right to control such suit.  In no event may one Party settle or otherwise consent to an adverse judgment in such suit that materially diminishes the rights or interests of the other Party without the express written consent of the other Party.

## ARTICLE 11 - REGULATORY ASSISTANCE

Should Licensee desire to file an IND or an application for Regulatory Approval, or equivalents of the foregoing, for a Licensed Product, SGI will use reasonable commercial efforts to provide at Licensee's request, technical information SGI has created or possesses that is reasonably required by Licensee, including information relating to the chemical structure of the ADC, the toxin used to create such ADC, and the linker and chemistry used to create such ADC, as well as documents related specifically to Drug Conjugation Technology that are necessary to compile the Chemistry Manufacturing and Controls section of an application for Regulatory Approval and any other relevant information SGI has created or possesses as the Parties may mutually agree.  If SGI has a drug master file with the FDA or equivalent that contains information useful to support an IND or application for Regulatory Approval, SGI shall so notify Licensee and the Parties shall discuss the terms under which Licensee may have a right of reference or access to the contents of such drug master file.  Licensee shall reimburse SGI for any out-of-pocket costs incurred by SGI in providing any such information or assistance pursuant to this Article 11, plus an amount equal to SGI's then current FTE Fee for SGI's personnel engaged in such activities, as set forth in Section 6.1.2.  In the event SGI agrees to provide regulatory assistance beyond the limited activities described above, the Parties shall negotiate in good faith a separate agreement governing the terms of any such regulatory assistance by SGI, including terms as may be appropriate and customary in agreements for similar types of regulatory assistance.

## ARTICLE 12 – REPRESENTATIONS AND WARRANTIES

### 12.1    Representations and Warranties.

**12.1.1** This Agreement has been duly executed and delivered by each Party and constitutes the valid and binding obligation of each Party, enforceable against such Party in accordance with its terms, except as enforceability may be limited by bankruptcy, fraudulent conveyance, insolvency, reorganization, moratorium or other laws relating to or affecting creditors' rights generally and by general equitable principals.  The execution, delivery and

-26-

performance of this Agreement has been duly authorized by all necessary action on the part of each Party, its officers and directors.

**12.1.2** The execution, delivery and performance of the Agreement by each Party does not conflict with any agreement, instrument or understanding, oral or written, to which it is a party or by which it is bound, nor violate any law or regulation of any court, governmental body or administrative or other agency having jurisdiction over it.

**12.1.3** SGI represents and warrants that it has the right to grant the licenses granted herein and that as of the Effective Date it has no knowledge of any rights of any Third Parties that would be infringed by the practice of the SGI Patents or other SGI Technology in connection with activities to be conducted hereunder. Licensee represents and warrants that it has the right to grant the licenses granted to SGI herein and that as of the Effective Date it has no knowledge of any rights of any Third Parties that would be infringed by activities to be conducted by the Parties hereunder.

**12.2   Performance by Affiliates.** The Parties recognize that each may perform some or all of its obligations under this Agreement through Affiliates, provided, however, that each Party shall remain responsible and be a guarantor of the performance by its Affiliates and shall cause its Affiliates to comply with the provisions of this Agreement in connection with such performance.

## ARTICLE 13 – TERM AND TERMINATION

**13.1   Term.** Unless earlier terminated pursuant to this Article 13, the term of this Agreement (the "Term") shall commence on the Effective Date and shall remain in full force and effect until the expiration of the last to expire Royalty Term.

**13.2   Termination by Licensee.** Licensee shall have the right, at any time after the Effective Date, to terminate this Agreement in its entirety by providing not less than ninety (90) days' prior written notice to SGI of such termination; provided that Licensee must make payment of the ADC Access Fee if notice of termination is made within ten (10) days from execution of this Agreement and such ADC Access Fee shall be considered non-refundable upon execution of this Agreement.

**13.3   Termination for Cause.** Either Party may terminate this Agreement for material breach by the other Party (the "Breaching Party") of any material provision of the Agreement, if the Breaching Party has not cured such breach within sixty (60) days after notice thereof.

**13.4   Termination Upon Insolvency.** Either Party may terminate this Agreement if, at any time, (a) the other Party shall file in any court or agency pursuant to any statute or regulation of any state, country or jurisdiction, a petition in bankruptcy or insolvency or for reorganization or for an arrangement or for the appointment of a receiver or trustee of that Party or of its assets, (b) such other Party proposes a written agreement of composition or extension of its debts, (c) such other Party shall be served with an involuntary petition against it, filed in any insolvency proceeding, and such petition shall not be dismissed within sixty (60) days after the filing thereof, (d) such other Party shall propose or be a party to any dissolution or liquidation, or (e) such other Party shall make an assignment for the benefit of its creditors. All rights and licenses

granted under this Agreement are, and shall be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101(56) of the United States Bankruptcy Code.

**13.5    Termination of SGI In-Licenses.**  SGI shall provide Licensee with a copy of any claim of material breach by the licensor of any SGI In-License that could be reasonably expected to materially prejudice Licensee's rights under this Agreement. All rights and obligations under an SGI In-License sublicensed under this Agreement shall terminate upon sixty (60) days prior written notice by SGI if Licensee performs any action that would constitute a breach of any material provision of such SGI In-License Agreement , as described in a notice of default from the licensor of the SGI In-License, and fails to cure or commence and continue actions to cure such breach within such forty-five (45) day period; provided, however, such cure period may be extended by mutual written consent of the Parties.  SGI covenants that it will use reasonable commercial efforts to maintain all SGI In-Licenses for the duration of this Agreement. All rights and obligations under the BMS Agreement shall automatically terminate if Licensee fails to maintain the insurance required under the BMS Agreement for so long as such insurance is required pursuant to the BMS Agreement.  SGI will cooperate with Licensee to cure any claimed material breach under an SGI In-License Agreement and will not take any action that could be reasonably expected to materially prejudice the rights of Licensee under an SGI In-License without the prior written consent of Licensee.

**13.6    Effect of Expiration and Termination.**

**13.6.1**  Except where explicitly provided within this Agreement or by operation of any applicable law, termination of this Agreement for any reason, or expiration of this Agreement, will not affect any: (a) obligations, including payment of any royalties or other sums which have accrued as of the date of termination or expiration, and (b) rights and obligations which are intended to survive termination or expiration of this Agreement, including provisions of Articles 1, 8, 9, 10, 14 (as to actions arising during the term of this Agreement or in the course of a Party practicing any licenses retained by such Party thereafter), 18 and 19, Sections 7.2, 7.3 and 13.6 and any payment obligations pursuant to Section 6 incurred prior to termination. Notwithstanding the foregoing, all licenses granted by SGI to Licensee hereunder, including all Exclusive Licenses, and all sublicenses granted by Licensee hereunder, will immediately terminate upon termination of this Agreement pursuant to Sections 13.2, 13.3 (if SGI is terminating party) 13.4 (if SGI is terminating party) or 13.5.

**13.6.2 License to Licensee.**  Upon the expiration of the Royalty Term or termination by Licensee under Section 13.3 or Section 13.4, SGI shall grant, and shall by this provision be deemed to have granted, to Licensee a perpetual, worldwide, nonexclusive license to use the SGI Technology (including Improvements assigned to SGI by Licensee) to make, use, sell, offer for sale and import Licensed Products that bind selectively to the Designated Antigen. If such license is granted upon expiration of the Royalty Term, then such license shall be royalty-free.  If such license is granted upon termination by Licensee under Sections 13.3 or 13.4 and Licensee so desires to obtain such license, then SGI shall grant such license to Licensee with terms and conditions to be mutually agreed upon by both Parties.  Under all circumstances, any royalties owed to a Third Party pursuant to an SGI In-License shall not be affected by this Section 13.6.2 and shall be paid by Licensee under Section 6.4 of this Agreement.

-28-

**13.6.3 License to SGI.** Upon any termination of the Exclusive License or termination by SGI under Section 13.3 or Section 13.4, Licensee shall grant a license to SGI in the Territory under the Licensee ADC Know-How described in Section 1.1.42 and Licensee ADC Patents described in Section 1.1.43 to identify, develop and commercialize products that contain an ADC upon the terms and conditions to be mutually agreed upon by both Parties. In no circumstances shall the license granted to SGI under this Section 13.6.3 include any rights to Licensee Know-How or Licensee Patents.

## ARTICLE 14 - INDEMNITY

### 14.1    Direct Indemnity.

**14.1.1** Each Party shall defend, indemnify and hold harmless the other Party from and against all liabilities, losses, damages, and expenses, including reasonable attorneys' fees and costs, (collectively, the "Liabilities") resulting from all Third Party claims, suits, actions, terminations or demands (collectively, the "Claims") that are incurred, relate to or arise out of (a) the breach of any material provision of this Agreement by the indemnifying Party (or the inaccuracy of any representation or warranty made by such Party in this Agreement), or (b) the gross negligence, recklessness or willful misconduct of the indemnifying Party in connection with the performance of its obligations hereunder.

**14.1.2** Licensee shall defend, indemnify and hold harmless SGI from and against all Liabilities resulting from all Claims that are incurred, relate to or arise out of the development, manufacture or commercialization of Licensed Products by SGI for Licensee or by Licensee, its Affiliates or Sublicensees, including any failure to test for or provide adequate warnings of adverse side effects, or any manufacturing defect in any Licensed Product; except in each case to the extent such Liabilities resulted from the negligence, recklessness or willful misconduct by SGI or the inaccuracy of any representation or warranty made by SGI in this Agreement or from any other action for which SGI must indemnify Licensee under Section 14.1.3.

**14.1.3** SGI shall defend, indemnify and hold harmless Licensee from and against all Liabilities resulting from all Claims that are incurred, relate to or arise out of any claims of infringement of Third Party rights arising out of the use of SGI Technology to make ADCs or Licensed Products (but not any other technology, including the composition or methods of making or using Antibodies or technology not relating to Drug Conjugation Technology), except to the extent such Liabilities resulted from the negligence, recklessness or willful misconduct by Licensee or the inaccuracy of any representation or warranty made by Licensee in this Agreement or any other action for which Licensee must indemnify SGI hereunder.

**14.2    Procedure.** A Party (the "Indemnitee") that intends to claim indemnification under this Article 14 shall promptly provide notice to the other Party (the "Indemnitor") of any Liability or action in respect of which the Indemnitee intends to claim such indemnification, which notice shall include a reasonable identification of the alleged facts giving rise to such Liability, and the Indemnitor shall have the right to participate in, and, to the extent the Indemnitor so desires, jointly with any other Indemnitor similarly noticed, to assume the defense thereof, including the defense of Indemnitee, with counsel selected by the Indemnitor at its own cost. However, notwithstanding the foregoing, the Indemnitee shall have the right to retain its

-29-

own counsel, with the fees and expenses to be paid by the Indemnitee. Regardless of whether Indemnitor exercises its right to select its counsel and to defend Indemnitee directly or the Parties proceed with separate counsel, the Parties shall exercise reasonable efforts to cause their respective counsel to enter into a joint defense agreement providing for the protection of confidential communication among SGI, Licensee and their respective counsel and to otherwise cooperate in all aspects of the defense of such Claim if such agreement is appropriate. Any settlement of a Liability for which any Indemnitee seeks to be indemnified, defended or held harmless under this Article 14 that could adversely affect the Indemnitee shall be subject to prior consent of such Indemnitee, provided that such consent shall not be withheld unreasonably.

## ARTICLE 15 - FORCE MAJEURE

No Party (or any of its Affiliates) shall be held liable or responsible to the other Party (or any of its Affiliates), or be deemed to have defaulted under or breached the Agreement, for failure or delay by such Party in fulfilling or performing any term of the Agreement when such failure or delay is caused by or results from causes beyond the reasonable control of the affected Party (or any of its Affiliates), including fire, floods, embargoes, war, acts of war (whether war be declared or not), insurrections, riots, civil commotions, acts of God, earthquakes, or omissions or delays in acting by any governmental authority (collectively, "Events of Force Majeure"); provided, however, that the affected Party shall exert all reasonable efforts to eliminate, cure or overcome any such Event of Force Majeure and to resume performance of its obligations promptly. Notwithstanding the foregoing, to the extent that an Event of Force Majeure continues for a period in excess of six (6) months, the affected Party shall promptly notify in writing the other Party of such Event of Force Majeure and within four (4) months of the other Party's receipt of such notice, the Parties shall negotiate in good faith either (a) a resolution of the Event of Force Majeure, if possible, (b) an extension by mutual agreement of the time period to resolve, eliminate, cure or overcome such Event of Force Majeure, (c) an amendment of this Agreement to the extent reasonably possible, or (d) an early termination of this Agreement.

## ARTICLE 16 - ASSIGNMENT

This Agreement may not be assigned or otherwise transferred, nor, except as expressly provided hereunder, may any right or obligations hereunder be assigned or transferred to any Third Party by either Party without the consent of the other Party, such consent not to be unreasonably withheld; provided, however, that either Party may, without such consent but with notification, assign this Agreement and its rights and obligations hereunder to any of its Affiliates or in connection with the transfer or sale of all or substantially all of its business, or in the event of its merger or consolidation of such Party (such merger or consolidation shall be hereinafter referred to as a "Change in Control"). Any permitted assignee shall assume all rights and obligations of its assignor under this Agreement; provided, however, that an acquirer of SGI in connection with a Change of Control shall not be obligated, but shall have the right, to disclose or offer to Licensee pursuant to Section 3.2 any New Technologies Controlled by such acquirer prior to the Change of Control. Any attempted assignment of this Agreement not in accordance with this Article 16 shall be void and of no effect. Any attempted assignment of this Agreement not in accordance with this Article 16 shall be void and of no effect.

**ARTICLE 17 - SEVERABILITY**

Each Party hereby agrees that it does not intend to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries. Should one or more provisions of this Agreement be or become invalid, the Parties hereto shall substitute, by mutual consent, valid provisions for such invalid provisions, in their economic effect, are sufficiently similar to the invalid provisions that it can be reasonably assumed that the Parties would have entered into this Agreement based on such valid provisions. In case such alternative provisions cannot be agreed upon, the invalidity of one or several provisions of this Agreement shall not affect the validity of this Agreement as a whole, unless the invalid provisions are of such essential importance to this Agreement that it is to be reasonably assumed that the Parties would not have entered into this Agreement without the invalid provisions.

**ARTICLE 18 – INSURANCE**

During the Term and thereafter for the period of ten (10) years, each Party shall maintain on an ongoing basis comprehensive general liability insurance covering its obligations and activities hereunder with reputable and financially secure insurance carriers in a form and at levels as customary for a company of this size in the pharmaceutical or biotechnology industry, as applicable, in the Territory (or reasonable self-insurance sufficient to provide materially the same level and type of protection as required pursuant to Section 11.5 of the BMS Agreement). In addition, Licensee agrees to provide the information regarding its self-insurance plan as set forth in Section 4.2(b) of the BMS Agreement and otherwise comply with the requirements set forth therein regarding self-insurance plans.

**ARTICLE 19 - MISCELLANEOUS**

**19.1    Notices.**  Any consent, notice or report required or permitted to be given or made under this Agreement by one of the Parties hereto to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, first class air mail or courier), first class air mail or courier, postage prepaid (where applicable), addressed to such other Party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the address or in accordance with this Section 19.1 and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

> If to SGI:
> Seattle Genetics, Inc.
> 21823 30th Drive S.E.
> Bothell, WA 98021
> Attention:  General Counsel
> Telephone:  (425) 527-4000
> Facsimile:  (425) 527-4109
>
> If to Licensee:
> Daiichi Sankyo Co. Ltd.,
> 1-2-58, Hiromachi, Shinagawa-ku,

-31-

Tokyo, Japan, 140-8710
Attention: Dr. Hideyuki Haruyama
              Corporate Officer
              General Manager, R&D Planning
              R&D Division
Telephone: :+81-3-3492-3131
Facsimile: :+81-3-5436-8561

**19.2   Applicable Law.**   The Agreement shall be governed by and construed in accordance with the laws of the State of Washington and the United States of America, without regard to the conflict of law principles thereof that may dictate application of the laws of any other state.

**19.3   Dispute Resolution.**   The Parties agree that if any dispute or disagreement arises between Licensee on the one hand and SGI on the other in respect of this Agreement, they shall follow the following procedure in an attempt to resolve the dispute or disagreement.

**19.3.1** The Party claiming that such a dispute exists shall give notice in writing ("Notice of Dispute") to the other Party of the nature of the dispute;

**19.3.2** Within fourteen (14) business days of receipt of a Notice of Dispute, a nominee or nominees of Licensee and a nominee or nominees of SGI shall meet in person and exchange written summaries reflecting, in reasonable detail, the nature and extent of the dispute, and at this meeting they shall use their reasonable endeavors to resolve the dispute;

**19.3.3** If, within a further period of fourteen (14) business days, the dispute has not been resolved, the President of SGI and an Executive Officer of Licensee shall meet at a mutually agreed upon time and location for the purpose of resolving such dispute;

**19.3.4** If, within a further period of thirty (30) business days, the dispute has not been resolved or if, for any reason, the required meeting has not been held, then the same shall be submitted by the Parties for resolution by an arbitral body in Seattle, Washington in accordance with the then-current commercial arbitration rules of the American Arbitration Association ("AAA") except as otherwise provided herein.  The Parties shall choose, by mutual agreement, one (1) arbitrator within thirty (30) days of receipt of notice of the intent to arbitrate.  If no arbitrator is appointed within the times herein provided or any extension of time that is mutually agreed upon, the AAA shall make such appointment within thirty (30) days of such failure.  The judgment rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses.  Nothing in this Agreement shall be deemed as preventing either Party from seeking injunctive relief (or any other equitable or provisional remedy).  If the issues in dispute involve scientific, technical or commercial matters, any arbitrator chosen hereunder shall have educational training and/or industry experience sufficient to demonstrate a reasonable level of relevant scientific, medical and industry knowledge.

**19.3.5** In the event of a dispute regarding any payments owing under this Agreement, all undisputed amounts shall be paid promptly when due and the balance, if any, promptly after resolution of the dispute.

**19.3.6** Notwithstanding the foregoing, any disputes relating to inventorship or the validity, enforceability or scope of any patent or trademark rights shall be submitted for resolution by a court of competent jurisdiction.

**19.4** **Entire Agreement.** This Agreement contains the entire understanding of the Parties with respect to the specific subject matter hereof. All express or implied agreements and understandings, either oral or written, heretofore made are expressly superseded by this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by both Parties hereto.

**19.5** **Independent Contractors.** SGI and Licensee each acknowledge that they shall be independent contractors and that the relationship between the two Parties shall not constitute a partnership, joint venture, agency or any type of fiduciary relationship. Neither SGI nor Licensee shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on the other Party, without the prior consent of the other Party to do so.

**19.6** **Affiliates.** Each Party shall cause its respective Affiliates to comply fully with the provisions of this Agreement to the extent such provisions specifically relate to, or are intended to specifically relate to, such Affiliates, as though such Affiliates were expressly named as joint obligors hereunder.

**19.7** **Waiver.** The waiver by either Party hereto of any right hereunder or the failure to perform or of a breach by the other Party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other Party whether of a similar nature or otherwise.

**19.8** **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

-33-

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SEATTLE GENETICS, INC.**

By: _____

Name:  Clay B. Siegall, Ph.D.

Title:  President & CEO

APPROVED AS TO FORM
LEGAL DEPARTMENT

**DAIICHI SANKYO CO., LTD.**

REVIEWED FINANCE DEPT.

By: _____

Name:  Kazunori Hirokawa, MD, Ph.D.

Title:   Executive Officer, Head of R&D Division

-34-

## SCHEDULE A

## RESEARCH PLAN

### RESEARCH AND DEVELOPMENT SUPPORT

Assistance will be provided in the form of Drug Conjugation Materials, technical summaries and regular teleconferences. Requested data, reports, methods and materials will be provided on an as available basis and as relevant information is updated. On-site meetings can be scheduled as needed to advance development efforts. Upon executing the agreement SGI will provide a technical summary data package.

**Preclinical Development**
SGI will provide the following preclinical support:
1. Preparation of ADCs: at Licensee's request, SGI will prepare up to 4 grams each of ADC test article (Antibody-vcMMAF, Antibody-vcMMAE, and Antibody-mcMMAF) and control article to support preclinical studies and pilot-scale toxicology studies
2. Preclinical Studies
   a. Consultation on pharmacology and pharmacodynamic studies conducted with ADCs (including but not limited to an antibody-vcMMAF, antibody-vcMMAE, or antibody-mcMMAF conjugate)
   b. Consultation on range-finding and pilot toxicity studies for ADCs (including but not limited to an antibody-vcMMAF, antibody-vcMMAE, or antibody-mcMMAF conjugate) and free drug
   c. Consultation for planning IND-enabling toxicity and pharmacology studies
3. Preclinical Assays
   a. Generic assay protocols to support pharmacokinetics and pharmacodynamic (PK/PD) studies, to include:
      - LCMS for free drug (for example, MMAE, MMAF or cys-mcMMAF)
      - ELISAs for IgG, ADC, mole ratio of drug to mAb
   b. Reagents developed to support PK/PD preclinical assays:
      - Free drug (MMAE, MMAF or cys-mcMMAF) and heavy-atom derivatives
      - anti-Auristatin antibodies for detection of free drug and ADC

**Conjugation Development**
1. Drug-Linker Material Supply
   a. Research-grade and/or GLP-grade drug-linker will be supplied as available from SGI; GLP and GMP-grade material supplies of drug-linker (for example, vcMMAE, vcMMAF and mcMMAF) can be ordered through SGI's preferred provider CMO relationships)
   b. Research and GLP-grade material supplies of free drug (for example, MMAE, MMAF and cys-mcMMAF) will be supplied as available from SGI

   c.  Reference material for drug-linker and analytical reference material for drug will be supplied as available from SGI or can be ordered through preferred provider CMOs

   d.  Raw materials necessary for GMP drug-linker manufacturing at CMO will be provided as available by SGI

   e.  QC Release Testing and Certificates of Analysis will be provided with drug-linker materials

   f.  Other data, reports, methods and materials as reasonably requested by Licensee

2.  Characterization and preliminary stability test

SGI will perform preliminary stability testing of hTRA8 ADCs during storage for the evaluation described in Sections 1-3, Pharmacology, Toxicology, and ADME in SCHEDULE B RESEARCH PLAN conducted by Daiichi-Sankyo.

SGI will perform characterization and preliminary stability testing using one lot of each hTRA8 ADC (vcMMAE, vcMMAF and/or mcMMAF), as defined below. The formulation buffer to use for each of the hTRA8 ADCs will be defined by Daiichi-Sankyo prior to SGI initiating characterization and stability testing.

   a.  Tests/analytical methods

      i.  Appearance

      ii.  Protein concentration

      iii.  SEC (Molecular size, average and distribution; aggregate content)

      iv.  HIC and PLRP (Number of drugs, average and distribution)

      v.  RP-HPLC (amount of impurities or unconjugated drug)

      vi.  SDS-PAGE

   b.  Storage conditions for the preliminary stability test

      i.  Temperature (2 points: -80 °C, 4 °C)

      ii.  Protein concentration (2 points : 1, 10 mg/mL)

      iii.  Period (3 points: initial, 1 month, 3 months)

3.  ADC Process Development

   a.  Process development support

      i.  Lab procedures and equipment descriptions, including basic safety guidance

      ii.  Technical summaries on conjugation optimization and scale-up

      iii.  Example results from characterization and release test methods

   b.  Access to draft methods for in-process, characterization and final product testing of an ADC

   c.  Consultation on formulation choices and formulation study design

   d.  Advice on conjugation technology transfer, scale-up and production at a CMO

Daiichi-Sankyo (DS) will perform the following research after the *in vitro* activities of ADCs provided from SGI will be confirmed using the cancer cells.

**Pharmacology**
- Evaluation of cytotoxic activities of mc-MMAF and mc-vc-MMAF ADCs in a broad range of tumor types *in vitro* to identify target tumor type(s) for the development. In this study, cathepsin B activity and intracellular auristatin concentration of each cell line will be measured if possible. Confirmation of action mechanism of ADCs using several *in vitro* studies will be conducted.
- Evaluation of the therapeutic index of ADCs in two human tumor xenograft models.
- Identification of feasible dosing schedule of ADCs in a human tumor xenograft model.
- Conduct efficacy studies in around four different tumor xenografts selected based on the *in vitro* study results.
- Analysis of mechanism of action including cathepsin B activity and intracellular auristatin concentration in tumor tissues along with PK/PD analysis in human tumor xenograft models.

**Toxicology**

The toxicity profile of ADCs will be evaluated in a single-dose toxicity study in cynomolgus monkeys. In this study, observation of clinical signs, blood chemical examination, etc. will be performed. Plasma concentration of ADCs, free drug, and anti-ADCs antibody will be measured as shown in ADME part.

**ADME**

The pharmacokinetics profile of ADCs will be evaluated in a single-dose pharmacokinetics study in cynomolgus monkeys (mentioned in the above Toxicology Part) and BALB/cA Jcl-nu mice (mentioned in the above Pharmacology Part), and ADCs, free drugs, and anti-ADCs antibodies concentration in plasma will be measured in these studies. Tissue distribution experiment of ADCs will be conducted.

**CMC**

ADCs provided from SGI will be characterized by the tests/analytical methods mainly selected from the Section 2 Characterization and preliminary stability test in SCHEDULE A RESEARCH PLAN. Preliminary stability tests such as stability against freeze-thaw treatment and long-term stability test, may be performed.

## SCHEDULE B

## SGI PATENTS

| Title | Patent and/or Application No. | Licensor | Third Party Royalty Obligation |
|---|---|---|---|
| "Tumor Inhibiting Tetrapeptide Bearing Modified Phenethyl Amides" | U.S. Patent No. 5,635,483 and foreign counterpart patents | Arizona State University | N/A for MMAE or MMAF (or variants, analogues or derivatives thereof); otherwise 1% of Net Sales |
| "Lysosomal Enzyme Cleavable Anti-Tumor Conjugates" | U.S. Patent No. 6,214,345 and foreign counterpart patents | Bristol-Myers Squibb | 2% of Net Sales |
| "Pentapeptide Compounds and Uses Related Thereto" | U.S. Patent Nos. 6,884,869, 7,098,308, and 7,256,257; U.S. Application Nos. 11/451,147 PCT Application No. PCT/US02/13435 [Nationalized in AU (Accepted), CA, EP, JP (Accepted), and US] | N/A | N/A |
| "Drug Conjugates and Their Use for Treating Cancer, An Autoimmune Disease or an Infectious Disease" | U.S. Application No. 10/522,911; PCT Application No. PCT/US03/24209 [Nationalized in AU, CA, EP, JP, and US] | N/A | N/A |
| "Monomethylvaline Compounds Capable Of Conjugation To Ligands" | U.S. Application Nos. 10/983,340, 11/833,954, 11/833,959, 11/833,961, and 11/833,964; PCT Application No. PCT/US04/38392 [Nationalized in AU, BR, CA, CN, EP, HK, IL, IN, JP, KR, MX, NZ, RU, SG, and ZA] | N/A | N/A |
| "Partially Loaded Antibody and Methods of Their Conjugation" | U.S. Application No. 10/591,743; PCT Application No. PCT/US05/07239 [Nationalized in AU, CA, EP, JP, and US] | N/A | N/A |
| "Auristatins Having an Aminobenzoic Acid Unit at the N-Terminus" | U.S. Application No. 11/667,437 PCT Application No. PCT/US05/41514 [Nationalized in AU, CA, EP, JP, and US) | N/A | N/A |
| "p-Amidobenzylethers in Drug Delivery Agents" | U.S. Patent No. 7,091,186; U.S. Application No. 10/252,947 | N/A | N/A |
| "Monomethylvaline Compounds Having Phenylalanine Side-Chain Modifications at the C-Terminus" | PCT Application No. PCT/US06/26352 [Nationalized in AU, CA, EP, JP, and US) | N/A | N/A |

| "Monomethylvaline Compounds Having Phenylalanine Carboxy Modifications at the C-Terminus" | PCT Application No. PCT/US06/26809 [Nationalized in US] | N/A | N/A |
|---|---|---|---|
| "Methods of Treating Drug-Resistant Cancers" | U.S. Application No. 11/677,029 (Unpublished) | N/A | N/A |
| "Beta-Glucuronide-based Drug Conjugates" | PCT Application No. PCT/US06/27925 [Nationalized in AU, CA, EP, JP, and US] | N/A | N/A |

## SCHEDULE C

### SGI IN-LICENSES

The following SGI In-Licenses are attached:

License Agreement between SGI and Bristol-Myers Squibb Company dated March 30, 1998, as amended on June 8, 1998, June 26, 1998, July 29, 1999, July 26, 2000 and March 22, 2002.

License Agreement between SGI and Arizona State University dated February 3, 2000, as amended on February 24, 2000 and March 14, 2002.

1

2   MICHAEL A. JACOBS (CA SBN 111664)
    MJacobs@mofo.com
3   MATTHEW A. CHIVVIS (CA SBN 251325)
    MChivvis@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California  94105-2482
    Telephone: 415.268.7000
6   Facsimile: 415.268.7522

7   BRYAN WILSON (CA SBN 138842)
    BWilson@mofo.com
8   TERESA A. MACLEAN (CA SBN 313517)
    TMacLean@mofo.com
9   MORRISON & FOERSTER LLP
    755 Page Mill Road
10  Palo Alto, California  94304-1018
    Telephone: 650.813.5600
11  Facsimile: 650.494.0792

12  Attorneys for Claimant,
    SEATTLE GENETICS, INC.
13

14

15                      **AMERICAN ARBITRATION ASSOCIATION**

16
    SEATTLE GENETICS, INC.                          Case No.
17
                           Claimant,                **CERTIFICATE OF SERVICE**
18
              v.
19
    DAIICHI SANKYO CO., LTD.,
20
                           Respondent.
21

22

23        I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address
    is 755 Page Mill Road, Palo Alto, California  94304-1018.  I am not a party to the within cause,
24  and I am over the age of eighteen years.

25        I further declare that on the date hereof, I served a copy of:

26        •    **CLAIMANT SEATTLE GENETICS' DEMAND FOR
               ARBITRATION**
27

28

sf-4117093

☒ **BY OVERNIGHT DELIVERY [Code Civ. Proc sec. 1013(c)]** by placing a true copy thereof enclosed in a sealed envelope with delivery fees provided for, addressed as follows, for collection by FedEx, at 755 Page Mill Road, Palo Alto, California  94304-1018 in accordance with Morrison & Foerster LLP's ordinary business practices.

I am readily familiar with Morrison & Foerster LLP's practice for collection and processing of correspondence for overnight delivery and know that in the ordinary course of Morrison & Foerster LLP's business practice the document(s) described above will be deposited in a box or other facility regularly maintained by FedEx or delivered to an authorized courier or driver authorized by FedEx to receive documents on the same date that it (they) is are placed at Morrison & Foerster LLP for collection.

☒ **BY ELECTRONIC SERVICE [Code Civ. Proc sec. 1010.6; CRC 2.251]** by electronically mailing a true and correct copy through Morrison & Foerster LLP's electronic mail system to the email address(es) set forth below, or as stated on the attached service list per agreement in accordance with Code of Civil Procedure section 1010.6 and CRC Rule 2.251.

Naoto Tsukaguchi
Daiichi Sankyo Co., Ltd.
3-5-1 Nihonbashi-honchō, Chūo-ku
Tokyo, Japan 103-8426

tsukaguchi.naoto.yr@daiichisankyo.co.jp

_____ Fax
_____ U.S. Mail
X_____ Overnight
_____ Personal
X_____ Electronic Service

Steven J. Balick
Andrew C. Mayo
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE  19899

sbalick@ashbygeddes.com
amayo@ashbygeddes.com

_____ Fax
_____ U.S. Mail
X_____ Overnight
_____ Personal
X_____ Electronic Service

Preston K. Ratliff II
Joseph M. O'Malley
Isaac S. Ashkenazi
Ashley N. Mays-Williams
Paul Hastings LLP
200 Park Avenue
New York, NY 10166

prestonratliff@paulhastings.com
josephomalley@paulhastings.com
isaacashkenazi@paulhastings.com
ashleymayswilliams@paulhastings.com

_____ Fax
_____ U.S. Mail
X_____ Overnight
_____ Personal
X_____ Electronic Service

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Palo Alto, California, this 12th day of November, 2019.

_____
Cynthia D. Fix
(typed)

_____
(signature)