# EXHIBIT 2



**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit www.adr.org for appropriate forms.*

| |
|---|
| You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement. |
| Name of Respondent:  Daiichi Sankyo Co., Ltd. |
| Address:  3-5-1, Nihonbashi-honchō, Chūo-ku |

| City:  Tokyo, Japan | State:  Select… | Zip Code:  103-8426 |
|---|---|---|
| Phone No.:  +81-3-6225-1111 | Fax No.:  +81-3-6225-1131 | |

| |
|---|
| Email Address:  tsukaguchi.naoto.yr@daiichisankyo.co.jp |
| Name of Representative (if known):  Preston K. Ratliff II (Paul Hastings LLP); Steven J. Balick (Ashby & Geddes) |
| Name of Firm (if applicable):  Paul Hastings; Ashby & Geddes |
| Representative's Address:  Paul Hastings LLP, 200 Park Ave |

| City:  New York | State:  New York | Zip Code:  10166 |
|---|---|---|
| Phone No.:  (212) 318-6000 | Fax No.: | |

| |
|---|
| Email Address:  prestonratliff@paulhastings.com; sbalick@ashbygeddes.com |
| The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration. |
| Brief Description of the Dispute:<br><br>See attached Demand for Arbitration.<br>The agreement to arbitrate is set forth in Section 19.3.4 of the attached Collaboration Agreement (Exhibit A). |
| Dollar Amount of Claim: $  Undetermined |
| Other Relief Sought:  ☑ Attorneys Fees   ☐ Interest   ☐ Arbitration Costs   ☐ Punitive/Exemplary<br>☑ Other:  Declaratory, injunctive and equitable relief |
| Amount enclosed: $ 7,700<br>In accordance with Fee Schedule:  ☐ Flexible Fee Schedule   ☑ Standard Fee Schedule |
| Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:<br><br>Educational training and/or industry experience sufficient to demonstrate a reasonable level of relevant scientific, medical and industry knowledge in biotechnology. |
| Hearing locale:  Seattle, Washington<br>(check one) ☐ Requested by Claimant   ☑ Locale provision included in the contract |
| Estimated time needed for hearings overall:                     hours  or  Seven                    days |

*Please visit our website at www.adr.org if you would like to file this case online.
AAA Case Filing Services can be reached at 877-495-4185.*



**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

| | |
|---|---|
| Type of Business: | |
| Claimant: Biotechnology | Respondent: Pharmaceuticals |

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?
Yes

| Signature (may be signed by a representative): | Date: 11/12/2019 |
|---|---|

Name of Claimant: Seattle Genetics, Inc.

Address (to be used in connection with this case): 21823 - 30th Drive S.E.

| City: Bothell | State: Washington | Zip Code: 98021 |
|---|---|---|
| Phone No.: (425) 527-4000 | Fax No.: | |

Email Address:

Name of Representative: Michael A. Jacobs

Name of Firm (if applicable): Morrison & Foerster LLP

Representative's Address: 425 Market Street

| City: San Francisco | State: California | Zip Code: 94105 |
|---|---|---|
| Phone No.: (415) 268-7000 | Fax No.: (415) 268-7522 | |

Email Address: MJacobs@mofo.com

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online.
AAA Case Filing Services can be reached at 877-495-4185.*

MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
MATTHEW A. CHIVVIS (CA SBN 251325)
MChivvis@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

BRYAN WILSON (CA SBN 138842)
BWilson@mofo.com
TERESA A. MACLEAN (CA SBN 313517)
TMacLean@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792

Attorneys for Claimant,
SEATTLE GENETICS, INC.

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| SEATTLE GENETICS, INC. | Case No. |
| Claimant, | **CLAIMANT SEATTLE GENETICS' DEMAND FOR ARBITRATION** |
| v. | |
| DAIICHI SANKYO CO., LTD., | |
| Respondent. | |

## INTRODUCTION

1. Claimant Seattle Genetics, Inc. ("Claimant" or "SGI") submits this demand to resolve SGI's dispute with Respondent Daiichi Sankyō Co., Ltd. ("Respondent" or "DSC") regarding the ownership of certain improvements relating to SGI's drug conjugation technology by arbitration. This dispute arises under the parties' collaboration agreement, dated July 2, 2008 (the "Agreement"). Arbitration before the American Arbitration Association ("AAA") is required by Section 19.3.4 of the Agreement. (*See* Ex. A.)

2. SGI is a cancer-focused biotechnology company widely known as a pioneer in antibody-drug conjugates ("ADCs"). ADCs are specialized therapeutics in which antibodies to specific disease targets are linked with biologically active payloads—the "drug" component of the ADC. This linking is referred to as "conjugation" and is achieved using a component referred to as a "linker" in the ADC. Before the collaboration with SGI, DSC tried to develop its own conjugate, DE-310, but could not achieve clinical results that would support commercialization. DSC subsequently approached SGI and sought access to SGI's proprietary drug conjugation technology, expertise, and patent rights. The parties agreed on the terms set forth in the Agreement.

3. Over the course of more than five years, SGI provided DSC with critical knowledge, information, materials, and instruction to enable DSC to develop and commercialize ADCs directed to a specific target antigen. But the potential applications for this technology were far broader, extending well beyond any specific antigen or payload. To safeguard SGI's rights in the face of such extensive access to SGI know-how and patent rights, the Agreement placed specific obligations on DSC, including one for which SGI vigorously and carefully negotiated: a requirement that SGI would own any Improvements relating to SGI's Drug Conjugation Technology, as those terms are defined in the Agreement, and, further, that DSC would "hereby assign" any such Improvements to SGI. DSC's assignment of Improvements to SGI was a key benefit of the bargain that DSC made in exchange for access to SGI's valuable conjugation know-how and patent rights.

4. Notwithstanding the provisions relating to Improvements in the Agreement, DSC used SGI-owned Improvements in its pipeline of candidate ADC products, including DS-8201, which appears to be commercially viable. DSC even filed patent applications on these Improvements without telling SGI about them or asking for SGI's permission. DSC assigned these Improvements to SGI by operation of law, and SGI owns the Improvements as set forth in the Agreement.

**AGREEMENT TO ARBITRATE**

5. This dispute is subject to Arbitration because it "arises" between SGI and DSC "in respect of [the] Agreement." (Ex. A § 19.3.) The Agreement provides that DSC was obligated to "hereby assign" Improvements to SGI. (*Id.* § 3.3.1.) DSC disputes this obligation. This is not a question of patent scope or inventorship. (*Id.* § 19.3.6.) Rather, it is a question of what constitutes an Improvement as set forth in the Agreement and whether DSC complied with its obligations under the Agreement. Such a dispute is subject to arbitration under the Agreement. SGI has followed the procedure provided in the Agreement for seeking resolution of the parties' dispute, while DSC has not.

6. DSC's violation of the intellectual property ownership provisions of the Agreement came to the attention of SGI management this year. Shortly thereafter, on August 19, 2019, SGI delivered a notice of dispute to DSC (*id.* § 19.3.1) and requested a meeting with DSC as required under the Agreement (*id.* § 19.3.2). DSC initially refused to schedule a meeting with SGI, arguing that no "dispute" was presented and a meeting would be "premature." After SGI insisted on following the dispute resolution procedures set forth in the Agreement, DSC relented and agreed to schedule a meeting. The delay caused the meeting to take place on September 23, 2019, more than a month after SGI's Notice of Dispute.

7. When the parties' representatives met, SGI provided a detailed written summary that reflected the nature and extent of the dispute. (*Id.* § 19.3.2.) In contrast, DSC provided a conclusory statement that the drug conjugation technology it uses in its ADCs does not constitute Improvements under the Agreement. SGI requested a follow up meeting, but DSC did not respond until October 9, 2019. Despite no attempt on the part of DSC to resolve the dispute, SGI

1  committed Dr. Clay Siegall, SGI's President and Chief Executive Officer, to an in-person
2  meeting with a DSC executive on November 6, 2019, in compliance with the requirements of the
3  Agreement.  (*Id.* § 19.3.3.)

4  8.  Two days before that meeting, DSC filed suit in the United States District Court
5  for the District of Delaware, alleging DSC alone owns the drug conjugation technology it uses in
6  its ADCs.  In its complaint, DSC alleged that it "was unable to resolve its dispute with SGI" even
7  though it had made no attempt to do so.  (Compl. ¶ 41, *Daiichi Sankyo Co. v. Seattle Genetics,*
8  *Inc.*, No. 19-cv-02087-UNA (D. Del. Nov. 4, 2019), ECF No. 1.)  The filing of this suit violated
9  the Agreement's dispute resolution provisions because the dispute is about ownership of
10 Improvements pursuant to the terms of the Agreement, and, therefore, the dispute arises in respect
11 of the Agreement.  (Ex. A § 19.3 *et seq.*)  With no advance notice to SGI, DSC also issued a
12 public press release regarding its purported claim, notwithstanding the parties' understanding that
13 certain aspects of the Agreement and related correspondence were confidential.  SGI, nonetheless,
14 went forward with the planned November 6 meeting.  DSC served its complaint two days later,
15 on November 8, 2019, demonstrating its clear intent to pursue a dispute resolution pathway in
16 breach of the Agreement.  To mitigate DSC's breach, SGI prepared this Demand for filing and
17 service on November 12, 2019, the next business day after DSI served its complaint.

18 9.  The Agreement provides that the dispute is to be arbitrated in Seattle, Washington,
19 and that the proceedings are to be "governed by" and the Agreement "construed in accordance
20 with" the laws of "the State of Washington and the United States of America."  (*Id.* § 19.2.)  The
21 AAA is the arbitral body that the parties selected to conduct the Arbitration in the Agreement.
22 (*Id.* § 19.3.4.)

23 10.  The Agreement further provides:

> The Parties shall choose, by mutual agreement, one (1) arbitrator within thirty (30) days of receipt of notice of the intent to arbitrate. If no arbitrator is appointed within the times herein provided or any extension of time that is mutually agreed upon, the AAA shall make such appointment within thirty (30) days of such failure.  The judgment rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses.  Nothing in this Agreement shall be deemed as preventing either Party from seeking injunctive relief (or

> any other equitable or provisional remedy). If the issues in dispute involve scientific, technical or commercial matters, any arbitrator chosen hereunder shall have educational training and/or industry experience sufficient to demonstrate a reasonable level of relevant scientific, medical and industry knowledge.

(*Id.* § 19.3.4.)

## THE PARTIES

11. Claimant SGI is a biotechnology company that develops and commercializes transformative therapies targeting cancer, with a specific emphasis on ADCs. SGI is headquartered in Bothell, Washington, and incorporated under the laws of Delaware.

12. Respondent DSC is a Japanese pharmaceutical corporation having its principal place of business at 3-5-1, Nihonbashi Honchō, Chūo-ku, Tokyo 103-8426, Japan.

## BACKGROUND

**SGI Pioneered Antibody-Drug Conjugation Technology**

13. SGI has been a pioneer in the field of antibody-drug conjugation and remains at the forefront of this area to this day. Drs. Perry Fell and Clay Siegall, who met while working as research scientists at Bristol Myers Squibb ("BMS"), founded SGI in 1998 to explore and develop technologies for targeted antibody and biological therapeutics, including ADCs.

14. As a result of pioneering early research and significant investment, SGI introduced many of the critical advancements in the field of antibody-drug conjugation, including path-breaking developments relating to protease cleavable linkers—peptide linkers capable of being enzymatically cleaved, allowing for targeted intracellular release of the drug. Of the five currently approved ADCs in the United States, two—ADCETRIS® (developed by SGI) and POLIVY® (developed by SGI's licensee Genentech/Roche)—use SGI's proprietary drug-conjugation technology. Other ADCs that incorporate SGI's technology are in advanced stages of clinical development, including enfortumab vedotin (co-developed by SGI and SGI's licensee Astellas), tisotumab vedotin (co-developed by SGI and SGI's licensee Genmab), and belantamab mafodotin (developed by SGI's licensee GlaxoSmithKline).

15. U.S. Patent No. 6,214,345 (the "'345 patent"), which SGI licensed from BMS at the company's inception, is a foundational patent relating to SGI's drug conjugation technology.

The class of protease cleavable linkers that the '345 patent describes is often referred to as "Firestone Linkers" after the first named inventor. During its term, the '345 patent was a crown jewel in SGI's broader suite of ADC patents and know-how. As disclosed and claimed in the '345 patent and shown below, the basic components of a Firestone Linker include a carboxylic acyl unit such as a maleimidocaproyl, a protease-cleavable peptide unit of two to twelve amino acids in length, and, optionally, one or two self-immolative spacers.

"Firestone Linker"

| Ligand | carboxylic acyl unit | peptide unit | self-immolative spacer | Payload |

Firestone Linkers are useful for attaching a broad range of drug compounds to a broad range of biologic molecules, including antibodies. The '345 patent specifically contemplates the use of Firestone Linker technology to conjugate antibodies to camptothecin derivatives—a class of drug compounds that includes the cytotoxic (i.e., cell killing) drug used in at least four ADCs now in DSC's pipeline: DS-8201, U3-1402, DS-1062, and DS-7300. As discussed below, the linker in all four of these products has the Firestone Linker architecture.

16.  SGI's other patents and applications relating to its drug conjugation technology claim, among other aspects of the technology, methods for linking drugs to antibodies, e.g., U.S. Patent No. 8,288,352 (the "'352 patent"); methods of treating patients with drug-resistant cancer using antibody-drug conjugates, e.g., U.S. Patent Application No. 11/677,029, issued as U.S. Patent No. 7,750,116 (the "'116 patent"); antibody-drug conjugates containing alcohol-based linkages, e.g., U.S. Patent No. 7,091,186 (the "'186 patent"); and antibody-drug conjugates for treating cancer, autoimmune disease, or infectious disease, e.g., U.S. Patent Application No. 10/522,911, issued as U.S. Patent No. 7,659,241 (the "'241 patent"). DSC's desire for access to the Firestone Linker and these technologies, as well as SGI's related know-how, drove the bargain that the parties ultimately reached in the Agreement.

**SGI and DSC Carefully Negotiated the Provisions of the Agreement**

17.     In the mid-2000s, SGI was still a small research and development company, with about 250 employees and less than $40 million in revenues, focused on the development of the first ADCs with Firestone Linker technology.  With no commercial product, SGI's ADC technology was its primary asset.  Many companies were looking to partner with SGI due to the promise of its platform, and SGI needed licensing revenues from well-capitalized companies to fund its research.  SGI, however, was keenly aware that its licenses needed to provide robust protection for the integrity of SGI's ADC-related technology and needed to mitigate against misappropriation of this technology outside the scope of the licenses, lest its licensees soon become direct competitors with vastly larger resources.

18.     In contrast, DSC was a large Japanese multinational pharmaceutical company with more than 10,000 employees, expertise in small molecule drugs, and many products, and was looking to move into large molecule cancer therapeutics.  DSC's initial attempts to develop such therapeutics ended in failure.  In the early 2000s, DSC began testing DE-310, a molecule that attached a chemotherapeutic (based on camptothecin) to a poly-alcohol polymer carrier.  Early results with DE-310 did not justify commercialization, and DSC turned to antibody therapeutics.  It partnered with the University of Alabama to develop an antibody targeting the DR5 cell surface receptor and later pursued other opportunities in the antibody space by acquisition.  It was at this time, in 2006, that DSC became interested in pursuing ADCs, but DSC had no expertise in the area.  Given SGI's seminal work on ADCs and strong technology platform, it was natural that DSC would turn to SGI.

19.     In 2006, SGI and DSC entered into their first agreement to produce and evaluate certain antibodies conjugated using SGI's technology.  Following promising results, the relationship expanded, resulting in the parties' 2008 Collaboration Agreement to research and develop ADC products for a designated antigen, DR5, using antibodies that DSC had developed in its partnership with the University of Alabama.

20.     The premise of SGI's Agreement with DSC appears in the preamble.  SGI owned rights relating to technology "useful for linking" antibodies to cytotoxic compounds.  (Ex. A,

Preamble.) DSC desired to obtain access to "SGI patent rights and know-how related to SGI's proprietary cytotoxin and linker technology" for use in the "development, commercialization, manufacture, marketing and sale of Licensed Products." (*Id.*) Thus, the Agreement recognized that it was SGI—and not DSC—that had expertise in antibody-drug conjugation.

21. Because the parties' collaboration involved a license to SGI's fundamental patents and applications and extensive knowledge transfer, SGI took careful steps to ensure it retained control of "Improvements," as defined in the Agreement, insisting on express terms to that effect. "Program Inventions" arising more specifically out of the collaboration, on the other hand, had separate governing provisions, with different ownership depending on the relative contribution of each party. The parties, therefore, agreed to an intellectual property framework that struck the following balance: DSC would receive a broad license to SGI's patent rights and proprietary drug conjugation know-how (together, "SGI Technology") for use in developing and commercializing an ADC for the specified target, and SGI would own all Improvements relating thereto, regardless of the antibody or the drug conjugated. In certain circumstances, Program Inventions would be subject to joint ownership.

22. To effectuate the Improvements concept, the Agreement expressly granted to SGI a present assignment of "*all* such *Improvements* that relate to the *Drug Conjugation Technology*," providing that "to the extent that such Improvements shall have been conceived, developed or reduced to practice by [DSC], [DSC] *hereby assigns* all of its right, title and interest therein to SGI." (*Id.* § 3.3.1 (emphasis added).) The Agreement further required that DSC "promptly notify SGI of the discovery of [any] Improvement[s]." (*Id.*) DSC requested broader rights to Improvements during the parties' negotiations, but SGI refused. A license that would have allowed DSC to develop derivatives of SGI's Drug Conjugation Technology and pursue them outside the scope of the Agreement was non-negotiable.

23. The Agreement defined "Improvements" broadly to include "*all* patentable or non-patentable inventions, discoveries or other know-how . . . that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology." (*Id.* § 1.1.32 (emphasis added).) In turn, "SGI Technology" meant "SGI Patents"—the patents and

applications designated on Schedule B and related patents—and "SGI Know-How"—defined as "any and all technical information, processes, formulae, data, inventions, methods, chemical compounds, biological or physical materials, know-how and trade secrets, in each case that are not in the public domain, *that relate to or are useful to practice* the Drug Conjugation Technology." (*Id.* §§ 1.1.63 (emphasis added), 1.1.64, 1.1.65.)

24. Drug Conjugation Technology included any "compositions and methods *useful for attaching*" drugs to antibodies, and "*any related assays and methods* SGI provides to Licensee pursuant to the Research Program." (*Id*. § 1.1.17 (emphasis added).) This definition provided, as an example of drugs to conjugate to an antibody, "cytotoxins or cytostatic compounds *such as* monomethyl Auristatin E and monomethyl Auristatin F." (*Id.* (emphasis added).) Nothing in the definition limited Improvements to specific antibodies or cytotoxins or cytostatic compounds.

25. The Agreement provided that DSC may use SGI's Confidential Information only for purposes "expressly authorized and contemplated" by the Agreement. (*Id.* § 8.1.) "Confidential Information" was defined to include "SGI Know-How, Drug Conjugation Technology disclosed to [DSC] that is Controlled by SGI, SGI's interest in any Improvements and New Technologies" and "may also include information relating to such Party's research programs, development, marketing and other business practices and finances." (*Id*.)

**SGI Provided DSC with Extensive Access to SGI's Drug Conjugation Technology Under the Agreement**

26. SGI undertook its obligations under the Agreement in good faith, providing DSC with extensive access to SGI Technology. The SGI Patents designated in Schedule B of the Agreement include twelve patent families covering essential and diverse aspects of SGI's conjugation technology, such as linkers, conjugation methods, drugs, manufacturing, and medical uses. (Ex. A, Schedule B.) Among these patents and applications, the '345 patent (discussed above) exemplifies the fundamental linker technology that SGI provided to DSC under the Agreement. SGI also licensed other fundamental patents and applications to DSC, including the '352, '116, '186, and '241 patents (also discussed above).

27. In addition to providing DSC with a license to a wide array of patent rights, SGI worked closely with DSC to provide DSC with proprietary technical knowledge about SGI's conjugation technology, including vital "research bench" insights on how to implement the technology. As part of this knowledge transfer, SGI provided DSC scientists with starting materials, protocols, and extensive research and development support. This included on-site demonstrations and hands-on training in antibody-drug conjugation to produce ADCs, as well as the information and assays needed to analyze and characterize those ADCs once made. SGI and DSC held multiple in-person meetings during which SGI provided extensive information and assistance regarding ADC toxicology, pharmacology, manufacturing, and analytical methods. The purpose of the know-how transfer was to enable DSC to enter and progress in the ADC field, albeit only under the terms of the Agreement and for the specified target.

28. Below are some of the meetings that SGI and DSC held during the term of the Agreement:

- On July 29, 2008, DSC employees visited SGI's office in Bothell, WA, for a day of meetings where SGI provided them with training and information regarding toxicology, pharmacokinetics, pharmacology, and other methods of ADC analysis, as well as SGI's proprietary peptide linker technology.

- DSC employees again visited SGI's office on July 28, 2009, for another day of meetings at which SGI shared additional know-how, including answering detailed questions from DSC regarding pharmacology, toxicology, and development methods, and providing feedback on DSC's activities and data.

- In September 2009, DSC employees visited SGI's office for another series of meetings where SGI provided them with training and detailed information regarding SGI's ADC manufacturing process and strategy, as well as its ADC conjugation process. During this visit, the DSC employees also toured SGI's chemistry laboratory and its conjugation laboratory.

- In December 2009, several DSC researchers spent at least two days in SGI's laboratories, where SGI scientists provided hands-on training on how to conjugate

antibodies to drugs. On the first day, SGI scientists demonstrated the conjugation process, and on the second day, the DSC researchers carried out the process under the supervision of the SGI scientists. The purpose of the visit was to enable DSC scientists to replicate SGI's conjugation technology successfully in their own labs.

- On June 10, 2010, at least two DSC employees visited SGI's office for meetings to discuss toxicity study design and preclinical safety evaluations of ADCs. For this meeting, DSC asked for, and SGI provided, detailed information relating to one of SGI's ADC drug candidates.

- On March 22, 2012, DSC employees again visited SGI's office for a day of meetings, where SGI provided them with additional training and information regarding pharmacology, biomarkers, toxicology, and clinical pharmacology of ADCs.

29.     In the years following 2008, DSC scientists received and benefited from expansive access to SGI's patent rights and know-how.[1] DSC nonetheless chose to terminate the Agreement on June 30, 2015, without an ADC on which SGI would earn royalties. DSC suggested that activity and toxicity issues were the reasons for its termination. SGI was disappointed by the termination as the collaboration still showed promise. Given the substantial amount of Drug Conjugation Technology that SGI shared, SGI insisted on a five-year extension of the Confidential Information provisions covering SGI Know-How under the Agreement.

30.     Unbeknownst to SGI, DSC had already embarked on a parallel ADC program, developing Improvements that exploit Firestone Linkers and relate to SGI's Drug Conjugation Technology. These Improvements are now reflected in the ADC products in DSC's pipeline, such as DS-8201, U3-1402, DS-1062, and DS-7300. DSC concealed these Improvements from SGI while continuing to benefit from SGI's Confidential Information. To date, DSC has made no offer to compensate SGI whatsoever for the use of SGI Technology. Had SGI known that DSC

---

[1] DSC may still have significant SGI information and documentation in its possession, and the current arbitration proceedings may reveal additional facts about the nature and extent of DSC's access to, and use of, SGI Technology.

was developing such drug conjugation technology, it never would have provided the access to SGI Technology that it did.

## THE DISPUTE

**SGI's Discovery That DSC's Drug Conjugation Technology Constitutes Improvements Relating to SGI's Drug Conjugation Technology**

31. In 2008, SGI scientists were at the forefront of antibody-drug conjugation research, and SGI was one of only a select few biotechnology companies in the world capable of practicing and exploiting this technology for therapeutic purposes. Even today, ADCs are so cutting edge that only a handful of companies—many of them SGI licensees—have been able to develop products successfully.

32. Only a few companies have their own proprietary antibody-drug conjugation technologies. There are, however, key differences between these technologies and SGI's, including: (1) whether the linker is cleavable or non-cleavable; (2) if cleavable, the mechanism of cleavage; and (3) the chemistry for conjugating the drug to the target antibody, including the amino acid residue on the antibody to which the drug linker is conjugated. ImmunoGen and Pfizer, for example, utilize technology with cleavage and conjugation modes that are structurally and functionally distinct from SGI's. None of these companies use Firestone Linker architecture for their ADCs.

33. SGI was aware that DSC had started to develop ADCs. Until SGI's recent review, however, SGI did not realize that DSC's drug conjugation technology, in fact, constituted Improvements relating to SGI's Drug Conjugation Technology. Upon closer analysis, including a detailed comparison of the DSC linker structure with SGI's Firestone Linker, SGI learned that the DSC linkers are indeed Firestone Linkers with the same elements in the same sequence described and claimed in the '345 patent. For example, the linker used in DS-8201 contains what DSC describes as an "enzymatically cleavable peptide-linker," which includes a carboxylic acyl unit, a

protease-cleavable peptide unit, and what DSC itself characterizes as a self-immolative spacer, as shown here:[2]

**"Firestone Linker"**

Ligand — carboxylic acyl unit — peptide unit — self-immolative spacer — Payload

**DSC Linker**

Ligand — carboxylic acyl unit — peptide unit — self-immolative spacer — Payload

As to the carboxylic acyl group, DSC uses the very molecule—maleimidocaproyl—that SGI uses in ADCETRIS. During the parties' collaboration under the Agreement, SGI provided DSC with detailed instructions on how to use maleimidocaproyl for conjugating drug linkers to an antibody. U3-1402, DS-1062, and DS-7300 use the same linker platform as DS-8201, and related DSC patents and applications describe conjugation protocols substantially the same as the proprietary protocols that SGI provided to DSC.

34. These conjugation technology Improvements were developed, and many of the associated patents and applications were filed, during the term of the Agreement, when DSC scientists were receiving access to SGI's patent rights and know-how. Indeed, some of the named inventors on these patents and applications, including Koji Morita, Yuji Kasuya, Toshinori Agatsuma, and Yuki Abe, were among the DSC scientists who had access to SGI know-how. In

---

[2] See, e.g., Yusuke Ogitani et al., *Bystander killing effect of DS-8201a, a novel anti-human epidermal growth factor receptor 2 antibody-drug conjugate, in tumors with human epidermal growth factor receptor 2 heterogeneity*, 107 Cancer Sci. 1039-1046, 1039, 1041 (July 2016) (noting that DS-8201 has an "enzymatically cleavable peptide-linker" that includes "a self-immolative moiety between the tetrapeptide linker and payload part.").

what cannot be a coincidence, Toshinori Agatsuma was also the DSC representative who signed the termination letter ending the parties' collaboration in 2015.

**Improvements at Issue Relating to SGI's Drug Conjugation Technology**

35. From its review, SGI now knows that DSC conceived, developed, or reduced to practice at least the following "inventions, discoveries or other know-how . . . that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology" and that relate to SGI's Drug Conjugation Technology:

- The conjugation technology that DSC uses in its ADC products, such as DS-8201, U3-1402, DS-1062, and DS-7300.

- U.S. Patent Nos. 9,808,537, 9,850,312, 9,872,924, 10,155,821, and 10,195,288; U.S. Patent Application Nos. 15/285,156, 15/302,803, 15/821,662, 15/821,697, 16/130,615, 16/142,354, 16/256,715, 16/264,395, and 16/330,085; International Patent Application Nos. PCT/JP2017/036215, PCT/JP2018/007152, and PCT/JP2018/018572; and other U.S. and foreign counterparts thereof (describing ADCs having a protease-cleavable linker that contains a carboxylic acyl unit and a peptide unit, as well as pharmaceutical compositions and uses thereof).

- U.S. Patent Application No. 15/579,512 and other U.S. and foreign counterparts thereof (describing conjugation methods for producing ADCs).

**FIRST CAUSE OF ACTION**
(Declaratory Relief/Quiet Title – Ownership of IP "Hereby Assigned" under Federal Common Law and Washington State Law)

36. SGI incorporates by reference the allegations in paragraphs 1 through 35 above.

37. This claim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and RCW 7.28.310.

38. An actual, immediate, and real controversy has arisen and now exists between SGI, on one hand, and DSC, on the other hand, regarding the ownership of certain intellectual property, patents, and/or applications—including, but not limited to, the conjugation technology that DSC uses in its ADC products, including DS-8201, U3-1402, DS-1062, and DS-7300; U.S. Patent Nos. 9,808,537, 9,850,312, 9,872,924, 10,155,821, and 10,195,288; U.S. Patent Application Nos. 15/285,156, 15/302,803, 15/579,512, 15/821,662, 15/821,697, 16/130,615, 16/142,354, 16/256,715, 16/264,395, and 16/330,085; International Patent Application

Nos. PCT/JP2017/036215, PCT/JP2018/007152, and PCT/JP2018/018572; and other U.S. and foreign counterparts thereof (individually and/or collectively, the "Improvement IP").

39. The Improvement IP constitutes "Improvements that relate to the Drug Conjugation Technology." DSC "hereby assign[ed]" to SGI these Improvements under the Agreement by operation of law. SGI, therefore, has an ownership interest in the Improvement IP.

40. DSC has made adverse claims to the Improvement IP, including by causing assignments to be recorded with the United States Patent and Trademark Office that fail to list SGI as assignee.

41. SGI seeks a declaration that SGI owns the Improvement IP as inventions, discoveries, and other know-how "hereby assign[ed]" to SGI under the Agreement by operation of law.

42. SGI also requests an adjudication of title that removes any and all adverse claims by DSC as clouds upon SGI's title to the Improvement IP, including injunctive relief requiring DSC to execute confirmatory assignments and any other documents that SGI requests to confirm SGI's ownership interest in the Improvement IP.

**SECOND CAUSE OF ACTION**
(Breach of Contract under Washington State Law)

43. SGI incorporates by reference the allegations in paragraphs 1 through 42 above.

44. On or about July 2, 2008, SGI and DSC entered into the Agreement, which is a valid, lawful, and enforceable contract.

45. As described in more detail above, DSC has breached its obligations under the Agreement by failing to perform as required. For example, DSC breached its obligations under Section 3.3.1 of the Agreement at least by causing a cloud over title to the Improvements IP that the Agreement provides was "hereby assigned" to SGI, including by causing assignments to be recorded with the United States Patent and Trademark Office that fail to list SGI as assignee. As an additional example, DSC failed to inform SGI about, and may have purposefully concealed, the Improvement IP during the term of the Agreement up to and including the date DSC terminated the Agreement. As a further example, DSC breached its obligations under Section 8.1

of the Agreement by having used and continuing to use SGI's Confidential Information for purposes not expressly authorized or contemplated by the Agreement. DSC also breached the Agreement by failing to follow the dispute resolution procedures set forth in Section 19.3.

46. As a result of DSC's multiple breaches of the Agreement, SGI has suffered injury for which specific performance may be the only remedy.

**RELIEF REQUESTED**

WHEREFORE, SGI prays for award against DSC as follows:

A. An order declaring SGI the sole and rightful owner and legal title holder of (and rightful applicant for any term extension or other equivalent rights relating to) the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

B. Injunctive relief, in the form of an order directing DSC to: (a) take all necessary steps to confirm, assign, and/or restore ownership to SGI of the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement; (b) cease and desist from using any Improvement IP and from representing that DSC owns the Improvement IP (including for the purpose of applying for any term extension or other equivalent rights); and (c) identify and return to SGI the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

C. A constructive trust as to the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

D. A running royalty;

E. Monetary damages (including lost profits and royalties and any other consequential damages) according to proof;

F. All costs, including attorney fees, expenses, and other costs, incurred in connection with this Demand; and

G.  Any other and further relief that the Arbitrator deems just and proper.

Dated: November 12, 2019        MORRISON & FOERSTER LLP

By _____
MICHAEL A. JACOBS

Attorneys for Claimant
SEATTLE GENETICS, INC.