The Honorable Tana Lin

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

SEAGEN INC.,

          Petitioner,

   v.

DAIICHI SANKYO CO., LTD.,

          Respondent.

Case No. 2:22-cv-01613-TL

**PETITIONER SEAGEN INC.'S
MEMORANDUM IN SUPPORT OF PETITION
TO VACATE ARBITRATION AWARD**

**<u>REDACTED VERSION</u>**

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

## TABLE OF CONTENTS

I.       INTRODUCTION ................................................................................................. 1

II.      STATEMENT OF FACTS ...................................................................................... 3

         A.      The Collaboration ....................................................................................3

         B.      DSC's Parallel ADC Program ................................................................6

         C.      The Dispute/ Procedural History ...........................................................6

         D.      The First Arbitration Hearing .................................................................7

         E.      The Reopened Arbitration Hearing.........................................................8

         F.      The Arbitration Award............................................................................10

III.     ARGUMENT ..................................................................................................... 12

         A.      An Arbitral Award Must Be Vacated When It Is Completely Irrational
                 Or Exhibits A Manifest Disregard Of The Law .....................................12

         B.      The Award Contradicts the Collaboration Agreement's Definition of "Drug
                 Conjugation Technology" .......................................................................13

                 1.      The Award Disregarded the Express Language in the Definition
                         of Drug Conjugation Technology .................................................13

                 2.      The Award Allowed its Views About Reasonableness to Trump
                         the Plain Terms of the Collaboration Agreement .....................16

         C.      The Award's Application Of A Breach Of Contract Statute Of Limitations
                 To The Quiet Title Claim Is Both In Manifest Disregard Of The Law And
                 Completely Irrational ..............................................................................21

IV.      CONCLUSION .................................................................................................. 24

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD                                         i
Case No. 2:22-CV-01613

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*,
    918 F.2d 1215 (5th Cir. 1990) ........................................................................12

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*,
    913 F.3d 1162 (9th Cir. 2019) ................................................................ *passim*

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)........................................................................................15

*Comedy Club, Inc. v. Improv W. Assocs.*,
    553 F.3d 1277 (9th Cir. 2009) ...............................................................13, 21

*Cook v. Evanson*,
    920 P.2d 1223 (Wash. Ct. App. 1996)............................................................16

*Covington 18 Partners, LLC v. Attu, LLC*,
    No. 2:19-cv-00253-BJR, 2019 WL 3502512 (W.D. Wash. Aug. 1, 2019) ...........22

*DDB Techs., L.L.C. v. MLB Advanced Media, LP.*,
    517 F.3d 1284 (Fed. Cir. 2008).......................................................................23

*Hearst Commc'ns, Inc. v. Seattle Times Co.*,
    154 Wash. 2d 493 (2005) (*en banc*).................................................................18

*Kent Sch. Dist. No. 415 v. Ladum*,
    728 P.2d 164 (Wash. App. 1986)....................................................................22

*Mo. River Servs., Inc. v. Omaha Tribe*,
    267 F.3d 848 (8th Cir. 2001) .........................................................................12

*Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg.
    Allied Indus. & Serv. Workers Int'l Union AFL-CIO CLC*,
    946 F.3d 195 (3d Cir. 2019).............................................................................12

*Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*,
    820 F.3d 527 (2d Cir. 2016)............................................................................12

*Pac. Motor Trucking Co. v. Auto. Machinists Union*,
    702 F.2d 176 (9th Cir. 1983) ...................................................................12, 17

*Petersen v. Schafer*,
    42 Wash. App. 281 (1985).............................................................................22

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

iv

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*PNY Techs., Inc. v. Netac Tech. Co.*,
  800 F. App'x 110 (3d Cir. 2020) .......................................................................13

*Providence St. Peter Hosp. v. United Staff Nurses' Union Local 141*,
  No. C08-5639RJB, 2009 WL 426300 (W.D. Wa. Feb. 19, 2009)..........................12

*Reid v. Dalton*,
  124 Wash. App. 113 (2004)...............................................................................24

*Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*,
  668 F.3d 60 (2d Cir. 2012).................................................................................12

*Stead Motors v. Auto. Machinists Lodge No. 1173*,
  886 F.2d 1200 (9th Cir. 1989) ...........................................................................14

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*,
  548 F.3d 85 (2d Cir. 2008), *cert. granted on other grounds*, 557 U.S. 903
  (2009)...................................................................................................................13

*U.S. Life Credit Life Ins. Co. v. Williams*,
  919 P.2d 594 (Wash. 1996) (*en banc*) ................................................................16

*United Paperworkers Int'l Union v. Misco, Inc.*,
  484 U.S. 29 (1987)..............................................................................................12

*United Steelworkers v. Enter. Wheel & Car Corp.*,
  363 U.S. 593 (1960).................................................................................13, 16, 17

*Wachovia Sec., LLC v. Brand*,
  671 F.3d 472 (4th Cir. 2012) ...............................................................................13

**STATUTES**

9 U.S.C. § 10 ("Federal Arbitration Act") ...............................................................12, 24

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

iii

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

**INDEX OF EXHIBITS**

The exhibits listed herein refer to the exhibits to the Declaration of Matthew A. Chivvis

submitted concurrently in support of this memorandum.

| Exhibit No. | Document Title | Short Title |
|---|---|---|
| Exhibit 1 | July 2, 2008 Collaboration Agreement | Collaboration Agreement |
| Exhibit 2 | November 12, 2019 Arbitration Demand | Arbitration Demand |
| Exhibit 3 | June 24, 2020 Amended Arbitration Demand | Am. Arbitration Demand |
| Exhibit 4 | August 11, 2022 Interim Award pursuant to AAA Rule 47(b) | Award |
| Exhibit 5 | April 23, 2020 Order | April 23, 2020 Order |
| Exhibit 6 | March 5, 2021 Expert Report of Carolyn Bertozzi | Bertozzi Report |
| Exhibit 7 | January 11, 2021 DSC's Response to Seagen's Motion to Reopen Arbitration | January 11, 2021 DSC's Response |
| Exhibit 8 | March 5, 2021 Expert Report of George Gould | Gould Report |
| Exhibit 9 | July 26, 2021 DSC Opening Posthearing Brief | DSC's Post-Hrg. Br. |
| Exhibit 10 | April 5, 2021 DSC Letter Request to File a Dispositive Motion | DSC's Request to File Dispositive Motion |
| Exhibit 11 | April 15, 2021 Order | April 15, 2021 Order |
| Exhibit 12 | June 4, 2021 Seagen Prehearing Brief | Seagen's Pre-Hrg. Br. |
| Exhibit 13 | June 4, 2021 DSC Prehearing Brief | DSC's Pre-Hrg. Br. |
| Exhibit 14 | July 26, 2021 Seagen Posthearing Brief | Seagen's Post-Hrg. Br. |
| Exhibit 15 | April 21, 2022 Seagen Opening Brief after Reopened Hearing | Seagen's Op. Br. after Reopened Hrg. |
| Exhibit 16 | August 13, 2021 Seagen's Responsive Posthearing Brief | Seagen's Resp. Post-Hrg. Br. |
| Exhibit 17 | January 25, 2022 Order | January 25, 2022 Order |
| Exhibit 18 | March 11, 2022 Bertozzi Supplemental Expert Report | Bertozzi Suppl. Report |
| Exhibit 19 | Email from G. Risdon to P. Senter FW: From Sankyo_SeattleG | CX-1041 |
| Exhibit 20 | Agenda for the meeting with Seattle Genetics, Inc. - May 23, 2006 | CX-1051 |
| Exhibit 21 | Agenda for Seattle Genetics / Daiichi Sankyo Conference Call - May 15th 2007 | CX-1068 |
| Exhibit 22 | DVComparison_Daiichi-Sankyo Collaboration Agreement (DS comments )- Daiichi-Sankyo Collaboration Agreement (v.3) | CX-1092 |

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

iv

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

| Exhibit 23 | Daiichi-Sankyo Collaboration Agreement (v.DS04223 4PM) | CX-1095 |
|---|---|---|
| Exhibit 24 | Daiichi-Sankyo Collaboration Agreement (v.4) | CX-1096 |
| Exhibit 25 | Daiichi-Sankyo ADC (v.DS0512) - Draft Collaboration Agreement between Seattle Genetics, Inc. and Daiichi Sankyo Co., LTD | CX-1097 |
| Exhibit 26 | Email from K. Schumacher to T. Iwabuchi cc'ing M. Kubik, E. Dobmeier, N. Ishida, Y. Yonekawa, T. Yamada, T. Miyata RE: Collaboration Agreement | CX-1102 |
| Exhibit 27 | Example Method for Technology Transfer Purposes Only Determination of (1) Drug-Load Distribution of Light and Heavy Chains and (2) Average Drug-to-antibody Molar Ratio of an Antibody-Drug Conjugate by RPHPLC | CX-1109 |
| Exhibit 28 | In-Process Determination of 1-Drug-Loaded Conjugate Species using HIC-HPLC | CX-1110 |
| Exhibit 29 | Determination of ADC Drug-Load Distribution and Average Drug-to-Antibody Molar Ratio by HIC-HPLC | CX-1111 |
| Exhibit 30 | Daiichi Sankyo/Seattle Genetics ADC Collaboration Kick-Off Meeting - Tuesday July 29, 2008, Seattle Genetics, Inc., Bothell, WA Hellstrom Board Room | CX-1114 |
| Exhibit 31 | Development of ADC Drug Substance Manufacturing Process | CX-1132 |
| Exhibit 32 | Antibody-Drug Conjugation Process | CX-1133 |
| Exhibit 33 | CS1008 conjugation - Daiichi Sankyo Meeting Sept. 9, 2009 | CX-1151 |
| Exhibit 34 | Email from P. Senter to K. Hambly and D. Benjamin RE: CS-1008 ADC - additional request | CX-1153 |
| Exhibit 35 | Conjugation of hTRA-8 anti-DR5 to MCvcPMMAE: Lot 1074004A - Ruth Moser, Seattle Genetics, August 31, 2007 | CX-1155 |
| Exhibit 36 | Equipment Preparation and Setup for Multigram Research Conjugations | CX-1156 |
| Exhibit 37 | CS-1008 Conjugation Batch Record (Daiichi-Sankyo) | CX-1166 |
| Exhibit 38 | Email from T. Masuda to Y. Abe; K. Morita; Y. Ogitani; Y. Yabe; T. Iguchi; T. Matsuoka RE: Selection bases for antibodies to be evaluated in vivo (Japanese document) | CX-1220_CT |

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

v

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

| Exhibit 39 | Email from L. Xu to ma.daisuke.ea@daiichisankyo.co.jp cc'ing ohtsuka.toshiaki.tc@daiichisankyo.co.jp; K. Jansen; saito.shuntaro.e5@daiichisankyo.co.jp; D. Garrard RE: Questions for control of SGD-1269 | CX-1227 |
|---|---|---|
| Exhibit 40 | QR-171 Method Qualification for the HPLC Method to Determine Purity of SG9-I-015 (SGD-1269) | CX-1228 |
| Exhibit 41 | 3.2.S.2.2 Description of Manufacturing Process and Process Controls DS-8201a, Daiichi Sankyo Chemical Pharma Co., Ltd. | CX-1267 |
| Exhibit 42 | 3.2.S.2.2 Description of Manufacturing Process and Process Controls DS-1062a, Daiichi Sankyo Chemical Pharma Co., Ltd. | CX-1305 |
| Exhibit 43 | S.2.2 Description of Manufacturing Process and Process Controls fam-trastuzumab deruxtecan, Daiichi Sankyo Chemical Pharma Co., Ltd. (Onahama) | CX-1369 |
| Exhibit 44 | S.2.6.1 Manufacturing Process Development - Manufacturing Process Development History famtrastuzumab deruxtecan, Daiichi Sankyo Chemical Pharma Co., Ltd. (Onahama) | CX-1370 |
| Exhibit 45 | ESMO 2018 Daiichi Sankyo Satelite Symposium - HER2 expression in metastatic breast cancer - A paradigm shift | CX-1507 |
| Exhibit 46 | Email from K. Schumacher to T. Iwabuchi cc'ing T. Koga, M. Kubik, E. Dobmeier, K. Hambly, Y. Yonekawa, T. Yamada RE: Seattle Genetics Collaboration Agreement | CX-1520 |
| Exhibit 47 | Email from J. Okada to S. Ohsuki re Linker technology (Japanese document) | CX-1535_CT |
| Exhibit 48 | Research flow (using DS-8201a as an example) (Japanese document) | CX-1536_RT |
| Exhibit 49 | Daiichi-Sankyo Collaboration Agreement (v.DS0328â¡) | CX-1611 |
| Exhibit 50 | ADC Bulk Drug Substance Manufacturing Process | CX-1622 |
| Exhibit 51 | Daiichi halts US and European development of cancer drug DE-310 | CX-1657 |
| Exhibit 52 | Definition term of "such as" downloaded from https://www.dictionary.com/browse/such--as | CX-1663 |

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

vi

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

| Exhibit 53 | Compilation of translated pages from Hideki Miyazaki Lab Notebook No. 54895 | CX-1953_CT |
| Exhibit 54 | Compilation of translated pages from Hideki Miyazaki Lab Notebook No. 55221 | CX-1954_CT |
| Exhibit 55 | Koji Morita Lab Notebook No. 54878 | CX-1955 |
| Exhibit 56 | Email from Koji Morita to Hideki Miyazaki re FW: Seattle Genetics CMC follow-up | CX-1958_CT |
| Exhibit 57 | Email from Yuji Moriyana to Koji Morita and others RE: CS1008 ADC Meeting - Minutes inspection matter (request) (Japanese document with translation) | CX-1959_CT |
| Exhibit 58 | Email from Yuji Moriyama to Koji Morita and others RE: CS-1008 ADC - additional request (Japanese document with translation) | CX-1960_CT |
| Exhibit 59 | Email from Yuji Moriyana to Koji Morita and others RE: About the secret of 10 mg/ml | CX-1961_CT |
| Exhibit 60 | Stephen Alley Witness Statement | RX-1354 |
| Exhibit 61 | Mark Kubik Witness Statement | RX-1356 |
| Exhibit 62 | David Meyer Witness Statement | RX-1358 |
| Exhibit 63 | Kirk Schumacher Witness Statement | RX-1360 |
| Exhibit 64 | Peter Senter Witness Statement | RX-1362 |
| Exhibit 65 | Koji Morita Deposition Excerpts | Morita Dep. Tr. |
| Exhibit 66 | Arbitration Hearing Transcript Excerpts | Arb. Hrg. Tr. |

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

vii

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

## I.   INTRODUCTION

Petitioner Seagen Inc. ("Seagen") recognizes that an arbitration award is entitled to substantial deference.  But where an arbitrator issues an award that is "completely irrational," disregards clear contract terms to "dispense[] his own brand of industrial justice," or exhibits a "manifest disregard of the law," a court must vacate.  *See Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166-67 (9th Cir. 2019).  The arbitration award in favor of Daiichi Sankyo Co., Ltd. ("DSC") (the "Award") is one of the rare awards that meets this standard.  The Arbitrator departed from the clear language of the contract and deprived Seagen of its ownership right to valuable intellectual property.

This petition challenges the Award on one of Seagen's two claims, the first and principal claim to quiet title.[1]  The issue on the quiet title claim was whether, under a collaboration agreement between the parties to develop specialized therapeutics, DSC's drug technology was an "Improvement that relates to the Drug Conjugation Technology."[2]   If so, that technology was assigned to Seagen—immediately and automatically upon its creation without any further action by either party.  When DSC disputed Seagen's assertion that it owned the relevant DSC technology, Seagen sought to quiet title to it.  The Arbitrator denied the claim on two separate bases:  (1) that the technology at issue did not relate to "Drug Conjugation Technology" under the relevant contractual definition; and (2) that the claim was barred by the statute of limitations.  The Arbitrator's Award was not just erroneous; it was untethered to the underlying contract language and disregarded the applicable law.

As defined in the Collaboration Agreement, the term "Drug Conjugation Technology" has three independent subparts—(a), (b), and (c).[3]  Seagen showed that the DSC technology met all three subparts with evidence from DSC's own patents and publications.  Seagen then obtained additional evidence in a separate litigation after three motions to compel, for which DSC was sanctioned.  Seagen presented that evidence in a reopened hearing before the Arbitrator, showing

---

[1] Seagen disagrees with the Award's disposition of its alternative claim for breach of contract.  In light of the high standard for vacating an arbitration award and to simplify the issues, however, Seagen does not challenge that decision.
[2] Ex. 1 at § 3.3.1.
[3] Ex. 1 at §1.1.17.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613                    1                    COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

further proof that the DSC technology was derived from Seagen's technology.  Notwithstanding

Seagen's showing, the Arbitrator did exactly what the Ninth Circuit and Supreme Court prohibit—

he "disregard[ed] contract provisions to achieve a desired result."  *Aspic*, 913 F.3d at 1167:

- First, the Arbitrator decided the dispute as if subparts (b) and (c) of the Drug Conjugation Technology definition did not even exist.  An arbitrator cannot write a provision out of the contract simply because it is problematic—indeed fatal—to his desired result.

- Second, on subpart (a), the Arbitrator's decision was completely irrational.  The Arbitrator read the words "such as" to limit the scope of the clause rather than to provide examples.  But that interpretation is not plausible as it conflicts with dictionary definitions and Supreme Court precedent, ignores basic rules of contract interpretation, and adopts an interpretation that the parties expressly rejected during negotiations.

The Arbitrator doubted that DSC, "a sophisticated international pharmaceutical conglomerate," would have agreed to terms of the contract that would produce this result.[4]  To correct what he perceived as an injustice, the Arbitrator cast aside the plain language of the contract, the negotiating history, and the undisputed facts.

The Arbitrator also ignored Washington law on statute of limitations to foreclose Seagen's claim. After recognizing that applicable Washington law has no statute of limitations for a quiet title claim,[5] the Arbitrator applied one anyway.[6]  The Arbitrator found the quiet title claim time-barred because the "gravamen" of that claim was purportedly a contract breach and request for specific performance.[7]  That aspect of the Award is "completely irrational" in view of the plain language of the assignment provisions of the Collaboration Agreement.  The Award acknowledged the assignment provision "does not reasonably establish an affirmative duty" to accomplish the change in ownership, and that ownership transfer was immediate and automatic as a matter of law.[8]  As the contract imposed no affirmative obligations to transfer ownership, there was nothing to specifically enforce to accomplish the quieting of title.  The gravamen of Seagen's quiet title claim was not for breach based on a failure to act, but instead to remove a cloud on title that had already

[4] Ex. 4 at 43.
[5] *Id.* at 36.
[6] *Id.* at 37–38.
[7] *Id.* at 37.
[8] *Id.* at 27.

been assigned—which cannot be time-barred under Washington law.

When parties agree to arbitration, they give up certain rights, including the right to a full appeal. But parties do not give up all right to review. Where an arbitrator's award is "completely irrational" or exhibits a "manifest disregard of the law," the courts must intervene. For the reasons set forth below, the Award meets that high standard and should be vacated.

## II.    STATEMENT OF FACTS

### A.    The Collaboration

The technology in this case is antibody-drug conjugates ("ADCs"). Seagen (formerly Seattle Genetics, Inc.) is widely recognized as a pioneer in ADCs with a focus on cancer treatments. ADCs are specialized therapeutics that address a key problem with many cancer drugs. Cancer drugs are effective because they are toxic, but they can be toxic to both diseased cells and healthy cells. Thus, the drug itself may be useless as a treatment unless it can be targeted to reach the diseased cells only. ADCs do exactly that. In an ADC, the toxic drug—referred to as the "payload"—is linked to an antibody with a component called a "linker" through a process called "conjugation."[9] The antibody is engineered to bind to a particular protein in the body, such as proteins found only on cancer cells. By linking a toxic drug to a disease-targeting antibody, an ADC can deliver the drug directly to the diseased cells. A representation of an ADC was presented in the Amended Demand:[10]



---

[9] Ex. 4 at 3; Ex. 6 at ¶¶ 27-30.
[10] Ex. 3 at ¶ 2.

**SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613**                                    3                    COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

In the diagram above, the blue "Y" shaped object represents the antibody.[11]  The purple circular object is the payload, a highly toxic molecule that when released can kill the cancer cell.[12] The linker (the dark blue object) connects the payload to the antibody, but releases the payload when the ADC reaches the target cancer call.[13]  An ADC is a particularly useful way to administer powerful anti-cancer drugs that are too toxic to be administered by themselves.[14]

Before the collaboration with Seagen, DSC approached Seagen and explained that DSC had ████████████████████████████████████████████████████████████ it was seeking ████████ ██████████████████████████████[15] ████████████████████ ██████████████████████████████████████████████ ██████████████████[16]  Thus, DSC sought to partner with Seagen in order to gain access to Seagen's proprietary ADC technology, know-how, patents, and patent applications.[17]  The parties agreed on the terms set forth in the Collaboration Agreement.[18]

For more than seven years, Seagen provided DSC with critical knowledge, information, materials, and instruction—including extensive in-person training—to enable DSC to develop and commercialize ADCs.[19]  The Collaboration Agreement acknowledged that Seagen possessed "intellectual property rights relating to certain technology useful for linking certain proprietary cytotoxins to other molecules such as antibodies capable of directing such cytotoxins to specific tissues and/or cells[.]"[20]  Recognizing the importance of that technology, the parties reached a clear and unambiguous bargain:  improvements to the Seagen ADC technology developed during the

---

[11] Ex. 12 at 3; Ex. 6 at ¶¶ 23, 26.
[12] Ex. 12 at 3; Ex. 6 at ¶¶ 26–27.
[13] Ex. 12 at 3; Ex. 6 at ¶¶ 26–28.
[14] Ex. 12 at 3; Ex. 6 at ¶ 27.
[15] Ex. 19 at 2; Ex. 12 at 8; Ex. 6 at ¶ 60.
[16] *See, e.g.*, Ex. 51; Ex. 47; Ex. 12 at 8; Ex. 6 at ¶¶ 100–103.
[17] Ex. 19.  *See also* Ex. 66 at 397:25–398:18; Ex. 12 at 8; Ex. 6 at ¶¶ 61–73, 105–107.
[18] Ex. 61 at ¶¶ 6–18; Ex. 63 at ¶¶ 14–51.  Ex. 1; *see also* Ex. 3 at ¶ 3; Ex. 12 at 9–14; Ex. 8 at ¶¶ 25–31.
[19] *See, e.g.*, Ex. 27; Ex. 28; Ex. 37; Ex. 31; Ex. 32; Ex. 50; Ex. 35; Ex. 36; Ex. 39; Ex. 40; Ex. 33 at 6; Ex. 56; Ex. 64; Ex. 62; Ex. 60.  *See also* Ex. 66 at 1751:25-1752:3, 1754:6-1755:6. *See, e.g.*, Ex. 12 at 14–15; Ex. 14 at 28–31, 36– 39; Ex. 15 at 2–4; Ex. 6 at ¶¶ 60–74, 87, 91–92, 96.
[20] Ex. 1 at 1.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613                    4                    COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

term of the collaboration would be owned by Seagen.[21]  As a result, the Collaboration Agreement provides that DSC "hereby assigns" such improvements to Seagen.[22]

The Collaboration Agreement at Section 3.3.1 provides:

> **Improvements**.  In the event that, during the Term, Licensee [DSC] conceives, develops or reduces to practice an Improvement that relates to the Drug Conjugation Technology, Licensee shall promptly notify SGI [Seagen] of the discovery of such Improvement.  *SGI shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such improvements shall have been conceived, developed or reduced to practice by Licensee, Licensee hereby assigns all of its rights, title and interest therein to SGI.  .  .  .*[23]

This definition provides for the automatic assignment of (1) any "Improvements" that (2) relate to "Drug Conjugation Technology" and are (3) conceived of developed or reduced to practice during the term of the agreement.  The Collaboration Agreement in turn defines "Improvements" broadly:

> "**Improvements**" means all patentable or non-patentable inventions, discoveries or other know-how developed and Controlled by either Party after the Effective Date that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology . . . .[24]

The Collaboration Agreement also included a definition of "Drug Conjugation Technology:"

> "**Drug Conjugation Technology**" means (a) cytotoxins or cytostatic compounds *such as* monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic compounds to antibodies and (c) any related assays and methods SGI provides to Licensee pursuant to the Research Program.[25]

---

[21] Ex. 1 at § 3.3.1; *see also* Ex. 6 at 9–14; Ex. 14 at 12–16, 18–20; Ex. 8 at ¶¶ 29–30, 76–108.

[22] Ex. 1 at § 3.3.1.

[23] *Id.* (emphasis added).

[24] Under this definition, "Improvements" are any inventions, discoveries, or know-how that (1) "utilize," (2) "incorporate," (3) derive directly from," (4) "directly relate to," (5) "are made using" or (6) "based directly" on "SGI Technology."  SGI Technology in turn is defined to mean "SGI Patents"—the patents and applications designated on Schedule B to the agreement and related patents—and "SGI Know-How." *Id.* §§ 1.1.63 (emphasis added), 1.1.64, 1.1.65, 1.1.32 (emphasis added).

[25] Ex. 1 at § 1.1.17 (emphasis added).

**SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613**                    5                    COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

Under these provisions, then, Seagen owned Improvements that related to any of (a) "methods of making and using" cytotoxins and cytostatic compounds *such as* the enumerated auristatins, (b) compositions and methods useful for attaching compounds to antibodies, or (c) any related assays and methods Seagen provided to Licensee under the collaboration.

## B.   DSC's Parallel ADC Program

Unbeknownst to Seagen, in 2010 DSC started its own ADC program outside the collaboration with Seagen.[26] ██████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████.[27]

Ultimately, in this parallel program, DSC developed promising ADC candidates using Seagen's technology.[28]  In developing its own ADCs, DSC used and copied parameters in "assays and methods SGI provide[s] to Licensee pursuant to the Research Program," exactly the items covered in subpart (c) of the definition of Conjugation Technology.  DSC included these parameters and method steps copied from Seagen in DSC filed patent applications, and later DSC had the inventors assign those applications to itself.[29]  It then abruptly terminated the Seagen collaboration.[30]  Those patent applications and related intellectual property were the "Improvement IP" at issue in the Arbitration.[31]

## C.   The Dispute/ Procedural History

Seagen filed a demand for arbitration against DSC on November 12, 2019.[32]  Seagen alleged in its demand that certain intellectual property (the "Improvement IP") constitutes "Improvements" to Seagen's "Drug Conjugation Technology" that Seagen owns under the Collaboration Agreement's automatic assignment provisions.  Seagen asserted two causes of action: (1) Declaratory Relief/Quiet Title-Ownership of IP (the "quiet title claim") and (2) a claim

---

[26] Ex. 6 at ¶¶ 74, 105–107, 114; Ex. 12 at 15–17; Ex. 48 at 12.
[27] Ex. 12 at 21, 52–53; Ex. 14 at 2, 36–38; Ex. 6 at ¶¶ 56, 106–107; Ex. 48 at 17
[28] Ex. 6 at ¶¶ 75–97, 105–107; Ex. 18 at ¶¶ 6–20; Ex. 15 at 2–6; Ex. 14 at 21–28.
[29] Ex. 12 at 55–56.
[30] *Id.* at 15; Ex. 6 at ¶¶ 72–73.
[31] Ex. 3 at ¶¶ 101–102, 107.
[32] Ex. 2.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

6

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

1    for breach of contract (the "breach of contract claim").[33]

2           On April 23, 2020, the Arbitrator issued a Decision & Order in which he denied DSC's

3    motion to stay the arbitration pending motion practice in related litigation in the United States

4    District Court for the District of Delaware, or alternatively, to dismiss the proceeding for lack of

5    arbitrability.  The Arbitrator found that Seagen's claims and requests for relief were arbitrable.[34]

6    On June 24, 2020, Seagen filed an amended demand for arbitration.[35]

7           On April 5, 2021, DSC filed a letter with the Arbitrator seeking leave to file a dispositive

8    motion raising its statute of limitations defense.[36]   The parties briefed the issue, presenting

9    essentially the same authorities and arguments they later briefed in their pre-hearing and post-

10   hearing briefs.  In an April 15, 2021 order, the Arbitrator denied DSC's request to file a dispositive

11   motion on statute of limitations, noting that he was "not persuaded of the likelihood of DSC's

12   prospective motion succeeding as a matter of law."[37]

13          **D.     The First Arbitration Hearing**

14          An arbitration hearing began on June 14, 2021, during which the parties presented

15   testimony from fourteen fact witnesses and nine expert witnesses.[38]   As explained above, under

16   the Collaboration Agreement, Seagen was automatically assigned any (1) "Improvement" that (2)

17   "relates to the Drug Conjugation Technology" that DSC conceived of or reduced to practice (3)

18   during the Term of the Agreement.[39]   During the Arbitration, Seagen presented overwhelming

19   evidence that the Improvement IP met all three of these requirements.  First, Seagen showed that

20   the linker technology used by DSC constitutes an Improvement because it "utilizes, incorporates,

21   derives directly from, directly relates to, is made using or is based directly on" the distinctive and

22   unique features of Seagen's linker architecture, as well as Seagen's conjugation chemistry useful

23   for linking and associated analytical methods.[40]   Second, the Improvement IP clearly "relates to"

24   _____
     [33] Ex. 2 at ¶¶ 36–46.
25   [34] Ex. 5.
     [35] Ex. 3.
26   [36] Ex. 10.
     [37] Ex. 11 at 1.
27   [38] *See* Ex. 4 at 15.
     [39] Ex. 1 at § 3.3.1.
28   [40] Ex. 14 at 3–4, 21–30.

Seagen's proprietary Drug Conjugation Technology, including Seagen's linker technology, conjugation chemistry, and analytical methods.[41]   Finally, there was no dispute that DSC developed these improvements during the term of the Collaboration Agreement.[42]

Seagen showed that despite having many options for the structure of its ADC, DSC chose to use a linker with the identical architecture (the "Firestone" architecture) as the seminal Seagen '345 patent listed on Schedule B to the Collaboration Agreement.[43]   DSC's paid Key Opinion Leader acknowledged that the linker in DSC's ADC is in the same category as the Firestone linker found in Seagen's own approved ADC products.[44]   An internal DSC email showed ███████████
████████████████████████████████████████████████████████████.[45]

DSC also used Seagen's proprietary methods for conjugating ADCs.  DSC scientists copied Seagen's conjugation protocols parameter-for-parameter into Improvement IP patents and used the Seagen protocols in its ADC program.[46]   DSC admitted that it requested and received ███████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████[47]

DSC could not deny the use of Seagen technology but argued that Seagen's technology was in "the public domain."  DSC, however, presented no evidence that it obtained the specific proprietary Seagen information and methods from a source other than Seagen.  DSC's expert Dr. Lambert acknowledged that the ████████████████████████████████████████████
████████████████████████████████████████████[48]   In the end, DSC was reduced to its statute of limitations and contract interpretation defenses.

## E.     The Reopened Arbitration Hearing

While the arbitration was ongoing, Seagen and DSC were also litigating a patent infringement case in the United States District Court for the Eastern District of Texas.  In the

[41] Ex. 14 at 32–35.
[42] Ex. 14 at 35–36.
[43] *See, e.g.*, Ex. 12 at 15–18; Ex. 6 at ¶¶ 75–85, Annex B; Ex. 18 at ¶¶ 6–16; Ex. 15 at 2–6.
[44] Ex. 45 at 44; Ex. 6 at ¶ 57; Ex. 12 at 45.
[45] Ex. 38 at 1; Ex. 6 at ¶ 80; Ex. 12 at 46–47.
[46] Ex. 18 at ¶¶ 6–16; Ex. 15 at 2–6.
[47] Ex. 34 at 2; Ex. 59 at 2; *see also* Ex. 62 at ¶¶ 6–22; Ex. 6 at ¶¶ 68–69, 117; Ex. 12 at 22–23; Ex. 18 at ¶¶ 8–9.)
[48] Ex. 66 at 1760:23–1761:02.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

8

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

district court, DSC maintained that one of its scientists, Dr. Hiroyuki Naito, was the sole inventor of the ADC accused of infringement, which embodied Improvement IP at issue in the arbitration. Seagen requested production of documents and materials including Dr. Naito's lab notebooks, but DSC repeatedly failed to produce them.

Seagen filed three motions to compel production in district court, ultimately leading the court to order a deposition of a different DSC scientist, Dr. Koji Morita.  At that deposition, Seagen learned that Dr. Morita, not Dr. Naito, had performed the first "conjugation" to connect an ADC linker to the antibody used in DSC's ADC and that he recorded this in one of his notebooks.[49]  For these conjugation steps, he referred to the notebooks of two other DSC scientists, Dr. Hideki Miyazaki and Dr. Yuji Kasuya.[50]  Drs. Morita, Miyazaki, and Kasuya were each heavily involved in the collaboration with Seagen, and they all availed themselves of access to Seagen's confidential conjugation chemistry documents.[51]  These notebooks, which the court in Texas ordered DSC to produce after the first arbitration hearing had been completed, revealed their involvement in the development of DSC's technology and confirmed their use of confidential Seagen Drug Conjugation Technology for DSC's own parallel program.

The court later granted Seagen's request for monetary sanctions against DSC for DSC's discovery misconduct, finding "that DSC violated its disclosure obligation and breached its discovery responsibility in this case, and accordingly, sanctions were warranted."  *Seagen Inc. v. Daiichi Sankyo Co., Ltd.*, No. 2:20-CV-00337-JRG, Order on Pretrial Motions and Motions In Limine, Dkt. 437 at 3 (Mar. 15, 2022 E.D. Tex.).

On January 25, 2022, the Arbitrator granted a motion from Seagen to reopen the hearing record.[52]  The Arbitrator found that a hearing could be reopened only for "unusual and extreme" circumstances, but ruled that:

> Seagen has carried the elevated burden of establishing that the present circumstances are 'unusual and extreme' for several reasons.

---

[49] Ex. 65 (Morita Dep. Tr.) at 17:13-23; 211:19-212:9, 266:1-267:25; Ex. 18 at ¶ 15; Ex. 15 at 4–5.

[50] Ex. 65 (Morita Dep. Tr.) at 17:13-23; 268:12–24; Ex. 18 at ¶ 15; Ex. 15 at 4–5.

[51] *See, e.g.*, Ex. 57 at 4; Ex. 58 at 2; Ex. 20, Ex. 21 at 1, Ex. 30 at 1; *see also* Ex. 65 (Morita Dep. Tr.) 77:15-79:17; Ex. 6 at ¶¶ 106–107; Ex. 18 at ¶¶ 6–12.

[52] Ex. 17.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613                    9                    COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

> First and foremost, the specific new evidence that impels Seagen's request – e.g., the lab notebooks of Drs. Koji Morita and Hideki Miyazaki, as well as prospective testimony from those two DSC-controlled fact witnesses, and potentially related expert testimony – clearly goes to the heart of a core theory of liability that has been (and continues to be) vigorously contested by the Parties: the extent to which DSC used and incorporated Seagen's proprietary linker architecture.[53]

The parties participated in a reopened arbitration hearing on April 13, 2022.  Among the compelling evidence Seagen presented at the reopened hearing was emails and laboratory notebooks from the same DSC scientists described above:  Drs. Morita, Miyazaki, and Kasuya.[54] Those emails and notebooks showed how DSC used Seagen's confidential conjugation protocols—the protocols that are useful for attaching ADC linkers for form functioning ADCs—parameter-for-parameter and identified the protocols as "SG-type conjugation," a reference to "Seattle Genetics" (the prior name for Seagen), more than 30 times.[55]  DSC conceded that the conjugation protocols in the notebooks formed the basis for DSC's patents, which are part of the Improvement IP subject to Seagen's ownership claim.[56]

## F.    The Arbitration Award

On August 11, 2022, the Arbitrator issued the Award denying Seagen's claims.[57]  Although styled as an "Interim Award," the Award states that it "is fully and finally dispositive with respect to all factual issues, legal and equitable arguments, and defenses raised in conjunction with the Parties' claims and requests for relief, with the sole exception of the Parties' respective requests for an award of, inter alia, attorneys' fees pursuant to Section 19.3.4 . . . ."[58]  The Award also notes that "for purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this *Final Award* was made in Seattle, Washington, United States of America."[59]

The Award holds that both of Seagen's causes of action were time-barred under the six-

---

[53] Ex. 17 at 4-5.
[54] Ex. 53; Ex. 54; Ex. 55.
[55] *See, e.g.*, Ex. 53 at 2, 3, 6, 8, 13, 15, 26, 30, 42; Ex. 54 at 10, 14, 16, 19, 22, 28, 31, 38, 46; Ex. 15 at 2–6; Ex. 18 at ¶¶ 6–16.
[56] Ex. 7 at 3.
[57] Ex. 4.
[58] *Id.* at 20.
[59] *Id.* at 46 (emphasis added).

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

10

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

year statute of limitations for breach of contract actions under Washington State law.[60]  For the breach of contract claim, the Award finds that DSC had a duty to "promptly notify" Seagen of any Improvements, and that this notification requirement "is the only affirmative duty" imposed by the Improvements clause on DSC.[61]  The Award further finds that DSC had filed a patent application in Japan in 2012 that "reflects the fundamental elements of DSC's ADC technology that Seagen contends are 'Improvements,'" so the breach of contract claim accrued in 2012.[62]  Since the arbitration was commenced in 2019, more than six years later, the Award finds the breach of contract claim barred by the Washington's six year statute of limitations.[63]

With respect to the quiet title claim, the Award acknowledges that there is no statute of limitations for quiet title actions under Washington law.[64]  The Award nonetheless finds that the "gravamen" of Seagen's quiet title action is for specific performance, and thus the Award applies the same six year statute of limitations to bar Seagen's claim for quiet title.[65]

The Award also finds as a matter of contract interpretation that DSC's parallel ADC program did not reflect an "Improvement that relates to the Drug Conjugation Technology."[66]  The Award does not address any of the compelling evidence Seagen presented to show liability. Despite reopening the hearing to allow Seagen to introduce evidence that "goes to the heart of a core theory of liability that has been (and continues to be) vigorously contested by the Parties: the extent to which DSC used and incorporated Seagen's proprietary linker architecture," the Award makes no findings as to this evidence.

Seagen seeks to vacate the Award's findings that (a) the Improvement IP does not constitute "Improvements" to "Drug Conjugation Technology" under the Collaboration Agreement; and (b) Seagen's quiet title claim is barred by a statute of limitations.

---

[60] Ex. 4 at 29, 38.
[61] Id. at 26-27 (emphasis in original).
[62] Id. at 29.
[63] Id.
[64] Id. at 36.
[65] Id. at 38.
[66] Id. at 45.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

11

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

**III.   ARGUMENT**

### A.   An Arbitral Award Must Be Vacated When It Is Completely Irrational Or Exhibits A Manifest Disregard Of The Law

The Federal Arbitration Act, 9 U.S.C. § 10 ("FAA"), governs review of the arbitration award in this case.  *See Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co*., 668 F.3d 60, 71 (2d Cir. 2012) (applying Section 10 of FAA to award rendered in the United States between U.S. and foreign corporation).  Under Section 10(a)(4) of the FAA, an arbitration award must be vacated where the arbitrator "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).

Arbitrators "exceed their powers" when an award is "completely irrational" or exhibits a "manifest disregard of the law."  *Aspic Eng'g*, 13 F.3d at 1166.  An award is "completely irrational" "where the arbitration decision fails to draw its essence from the agreement."  *Id.*[67]  An award fails to draw its essence from the agreement if it contradicts or is not authorized by the plain language of the parties' agreement, conflicts with or disregards the express language of the agreement, or is not a plausible interpretation of the contract.  *Providence St. Peter Hosp. v. United Staff Nurses' Union Local 141*, No. C08-5639RJB, 2009 WL 426300, at *9 (W.D. Wa. Feb. 19, 2009) (vacating remedy in arbitration award that "is in direct conflict with the express language" of the agreement); *Pac. Motor Trucking Co. v. Auto. Machinists Union,* 702 F.2d 176, 177 (9th Cir. 1983) ("We enforce an arbitration award if it represents a 'plausible interpretation of the contract in the context of the parties' conduct' . . . . An award that conflicts directly with the contract cannot be a 'plausible interpretation.'") (internal citation omitted).

An arbitrator is commissioned to interpret the agreement between the parties and is confined to interpretation and application of that agreement; "he does not sit to dispense his own

---

[67] Other Circuits are in accord.  *See e.g. United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36 (1987) (award must draw essence from agreement); *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527 (2d Cir. 2016); *Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO CLC*, 946 F.3d 195, 199 (3d Cir. 2019) (we will vacate an award "if it is entirely unsupported by the record or if it reflects a manifest disregard of the agreement."); *Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co*., 918 F.2d 1215 (5th Cir. 1990); *Mo. River Servs., Inc. v. Omaha Tribe*, 267 F.3d 848 (8th Cir. 2001) (award not drawing essence from contract where arbitrator eliminated geographical limitation and gaming limitation to bingo and bingo-related activities as provided in contract).

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD                    12
Case No. 2:22-CV-01613

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

brand of industrial justice." *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  An arbitrator may not "disregard contract provisions to achieve a desired result." *Aspic*, 913 F.3d at 1166.  An award should be vacated when the arbitrator "dispense[d] his own brand of industrial justice" by "disregard[ing] a specific contract provision to correct what he perceived as an injustice." *Aspic Eng'g*, 913 F.3d at 1167 (quoting *United Steelworkers*, 363 U.S. at 597).

An award is in "manifest disregard of the law," where it is "clear from the record that the arbitrator[] recognized the applicable law and then ignored it."  *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009).[68]

## B.    The Award Contradicts the Collaboration Agreement's Definition of "Drug Conjugation Technology"

The Award's finding that the Improvement IP does not reflect any Improvement related to Drug Conjugation Technology is irrational and in manifest disregard of the law because it fails to draw its essence from the Collaboration Agreement and contradicts its plain language.

### 1.    The Award Disregarded the Express Language in the Definition of Drug Conjugation Technology

The Award ignored the plain language of the Collaboration Agreement in determining that the Improvement IP is not an "improvement related to the Drug Conjugation Technology" within the meaning of the Collaboration Agreement.  As described above, the definition of "Drug Conjugation Technology" in the Collaboration Agreement has three subparts:

> "**Drug Conjugation Technology**" means (a) cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic compounds to antibodies and (c) any related assays and methods SGI provides to Licensee pursuant to the Research Program.  (Ex. 1 at § 1.1.17.)

---

[68] *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 94–96 (2d Cir. 2008), *cert. granted on other grounds*, 557 U.S. 903 (2009) (manifest disregard doctrine is "a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA"); *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 480 (4th Cir. 2012) (manifest disregard remains an independent ground for vacatur); *PNY Techs., Inc. v. Netac Tech. Co.*, 800 F. App'x 110, 113 (3d Cir. 2020) (declining to decide if "manifest disregard of the law" theory survives as a basis for vacatur but assessing the case under the standard).

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

13

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

Seagen presented evidence demonstrating that DSC's technology meets all three subparts of the "Drug Conjugation Technology" definition, *i.e.* subparts (a), (b), and (c). The Award's decision conflicts with and disregards the express language of the Collaboration Agreement as to each of the three subparts—any one of which is independently a basis to rule in Seagen's favor.

First, the Award's discussion of this provision is limited to subpart (a). The Award concludes that "the most reasonable meaning of the term 'such as' in the defined term 'Drug Conjugation Technology' is to limit the scope of the definition to the actual boundaries of Seagen's ADC technology that is the subject of the Collaboration Agreement – namely, drug payloads in the auristatin class, as exemplified by the cytotoxins MMAE and MMAF."[69]  That finding is completely irrational as shown below. But a more fundamental problem with the Award is that it treats the contract as though subparts (b) and (c) did not exist. The Award's disregard and failure to address those subparts of the Collaboration Agreement alone requires vacatur. *Stead Motors v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1205 n.6 (9th Cir. 1989) (award fails to draw its essence from an agreement when it ignores the plain language of the contract and disregards the contours of the agreement).

*Subpart (c)*:  The Award simply ignores subpart (c) and Seagen's arguments regarding it. The Award's justification of the purported "commonsensical[]" meaning of "Drug Conjugation Technology" was focused exclusively on subpart (a).[70]  Nothing in subpart (c) is even arguably limited to "auristatins" or limited in any way that would preclude Seagen's claim.[71]  Seagen showed that it prevailed under subpart (c) because the Improvement IP includes "related assays and methods" plainly included within the scope of subpart (c). For example, Seagen showed that it provided to DSC confidential processes for determining the number of ADC linkers attached to an ADC pursuant to the collaboration—a crucial consideration in ADC development—and that DSC used and incorporated these analytical methods into the Improvement IP.[72]

---

[69] Ex. 4 at 42–43.
[70] *See id.* at 43.
[71] Ex. 1 at § 3.3.1.
[72] Ex. 35; Ex. 27; Ex. 28; Ex. 29; Ex. 31; Ex. 32; Ex. 36; *see also* Ex. 62 ¶¶ 9–10, 14, 19, 20-21, 30-32, 34; Ex. 12 at 23, 48; Ex. 6 at ¶ 90, Annex E.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

14

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

*Subpart (b)*:  The Award similarly disregards subpart (b) and Seagen's arguments about it. Subpart (b) is met by compositions and methods useful for attaching cytotoxic or cytostatic compounds to antibodies.[73]  Seagen's powerful evidentiary showing included unrebutted evidence that the Improvement IP includes Seagen's confidential information that is useful for attaching antibodies to many different kinds of payloads, including auristatins.[74]  Thus, even if the Award were correct that subpart (a) is limited to "drug payloads in the auristatin class," the Improvement IP would still qualify as Drug Conjugation Technology under subpart (b) of the definition because the conjugation protocol would be useful for attaching auristatins as well as other drug payloads. Again, the Award disregarded subpart (b) entirely.

*Subpart (a)*:  The Award's interpretation of subpart (a) is also completely irrational, as it eliminates the plain term "such as" from the contract to reach a preferred outcome.  The Award found that subpart (a) was limited to "drug payloads in the auristatin class, as exemplified by the cytotoxins MMAE and MMAF."[75]  But the dictionary Seagen cited to the Arbitrator defines "such as" to mean "for example."[76]  The Supreme Court has held "such as" is illustrative.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)).  It does not mean "limited to."

The Award's interpretation also directly conflicted with the rest of the clause.  Subpart (a) applies to "cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F."[77]  The undisputed evidence from the arbitration shows that when the Collaboration Agreement was negotiated, the parties understood auristatins to be cytotoxins (cell-killers), not cytostatic compounds (cell growth-inhibitors).[78]  The Award's construction of the phrase as limited to "drug payloads in the auristatin class" renders the reference to "cytostatic" superfluous, as Seagen argued to the Arbitrator and DSC did not rebut.[79]

---

[73] Ex. 1 at § 3.3.1.
[74] *See* Ex. 66 at 1055:17–1056:15; *see also* Ex. 37; Ex. 32; Ex. 31; Ex. 50; Ex. 36; Ex. 28; Ex. 43; Ex. 44; Ex. 41; Ex. 42; Ex. 12 at 22–23, 47–49; Ex. 14 at 28–30, 34; Ex. 6 at ¶¶ 86–88, Annex D.
[75] Ex. 4 at 43.
[76] Ex. 52; Ex. 12 at 36.
[77] Ex. 1 at § 3.3.1.
[78] Ex. 63 ¶ 25; Ex. 66 at 248:11–17; Ex. 14 at 7–9.
[79] Ex. 14 at 8.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

15

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

The Award also completely failed to address the significant negotiation history evidence that contradicted its interpretation. "Extrinsic evidence," including drafting history, "is admissible in order to assist the court in ascertaining the intent of the parties and in interpreting the contract," although it may not be used to "vary[] the terms of a written contract." *U.S. Life Credit Life Ins. Co. v. Williams*, 919 P.2d 594, 597 (Wash. 1996) (*en banc*) (citations omitted); *accord Cook v. Evanson*, 920 P.2d 1223, 1227 (Wash. Ct. App. 1996). The negotiation and drafting history in this case confirms that the parties' use of "such as" to modify MMAE and MMAF was non-limiting. Specifically, during negotiations, DSC changed "such as" to "that are" but Seagen rejected this change and the parties agreed to revert the language to "such as."[80] Seagen explained to DSC at the time that "because Seagen's linker technology can be used to attach many different payloads to many different antibodies, Seagen could not accept limiting Drug Conjugation Technology to MMAE and MMAF."[81] The Award finds the clause means precisely what the parties explicitly rejected during negotiations.

### 2.    The Award Allowed its Views About Reasonableness to Trump the Plain Terms of the Collaboration Agreement

The Arbitrator decided what was "commonsensically intended" and commercially reasonable and used that to drive the determination of the scope of "Drug Conjugation Technology," over the express words of the Collaboration Agreement.[82] As the Supreme Court has stated, "an arbitrator is confined to interpretation and application of the [] agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers*, 363 U.S. at 597. In *Aspic*, the Ninth Circuit found that an arbitration award must be vacated where the arbitrator, concerned with unfairness, rationalized that to enforce the contract clauses would be unjust and went against what the contracts plainly required. *Aspic Eng'g*, 913 F.3d at 1168. The arbitrator in *Aspic* found that it was not reasonable to expect that Afghanistan subcontractors like Aspic would be able to conform to the strict and detailed requirements of U.S. general contractors so did not hold Aspic to the strict provisions in the contract. *Id.* at 1167. "The [a]ward disregarded

---

[80] Ex. 63 at ¶¶ 22–28; Ex. 12 at 38.
[81] Ex. 63 at ¶ 28; Ex. 12 at 38–39.
[82] Ex. 4 at 43.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

16

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

specific provisions of the plain text in an effort to prevent what the Arbitrator deemed an unfair result."  *Id*. at 1168; *see also Pac. Motor Trucking Co. v. Auto. Machinist Union*, 702 F.2d 176, 177 (9th Cir. 1983) (award properly vacated because arbitrator dispensed own brand of industrial justice by disregarding a specific contract provision to correct what he perceived as an injustice).

An award should be vacated where, as here and in *Aspic*, the arbitrator determined what is fair and then works backwards to achieve that desired result in disregard of the plain text of the contract.  The Arbitrator essentially eliminated subparts (b) and (c) out of the definition of "Drug Conjugation Technology" and interpreted "such as" in subpart (a) in conflict with its plain meaning and the uncontested evidence of the parties' negotiating history.[83]  The Award does so by first making the unremarkable and undisputed finding that Seagen and DSC have approved ADCs with different drug payloads.[84]  The Award then found that "it defies credulity to suggest that DSC – a sophisticated international pharmaceutical conglomerate – would intentionally agree to assign Seagen 'any right, title and interest' in a potential future drug that utilizes DX-8951, a proprietary cytotoxin that it had already developed at the time the Collaboration Agreement was executed."[85]  But the Arbitrator's view of what DSC would have reasonably agreed to directly conflicts with the terms of the contract.  *See United Steelworkers*, 363 U.S. at 597.  This starting point for the Award to work backward from fails for several reasons.

First, it disregards the Collaboration Agreement and the facts.  While DSC's DX-8951 payload may have previously existed, DSC's ADC—created *with Seagen's ADC Technology* using a derivative of DX-8951 as the component payload—did not exist and could be made only through use of Improvements developed during the term of the collaboration.[86]  The Award failed to take account that the Collaboration Agreement did not automatically transfer "any right title and interest" in preexisting DSC intellectual property to Seagen; the only improvements assigned to Seagen were those that (a) utilized, incorporated, derive directly from, directly relate to, were made using, or were based directly on Seagen's proprietary information, and (b) were conceived of or

---

[83] Ex. 1 § 1.1.17; Ex. 14 at 7, 9–10; Ex. 8 ¶¶ 103–108.
[84] Ex. 4 at 40-41.
[85] *Id*. at 43.
[86] Ex. 14 at 9–10; Ex. 8 ¶¶ 71, 98–107.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

17

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

reduced to practice during the Term of the Agreement.[87]   As a result, Seagen never sought intellectual property claiming DX-8951 itself; the Improvement IP instead involved ADC linkers and methods of making ADCs that were derived from Seagen's proprietary technology.[88]

Second, the Award misapplies Washington State law.  The Award notes that Washington State law adopts "the 'objective manifestation' theory of contract interpretation focusing on the reasonable meaning of the contract language to determine the parties' intent."[89]   Under this approach, [the Court] attempt[s] to determinate the parties' intent *by focusing on the objective manifestations of the agreement*, rather than on the unexpressed subjective intent of the parties. . . Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined *from the actual words used*."  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 503 (2005) (*en banc*) (emphasis added).

But then the Award, disregarding the objective manifestation of the actual words used, rewrites the language of the Collaboration Agreement.  The Award rewrites the definition on the left below from Section 1.1.17 of the Collaboration Agreement to the narrow definition on the right "based upon th[e] findings" "that Seagen's ADC technology utilizes an auristatin-based payload with a traceless linker that results in the release of an unmodified cytotoxin."[90]

| Collaboration Agreement Definition | Award Revised Definition |
|---|---|
| "**Drug Conjugation Technology**" means (a) cytotoxins or cytostatic compounds such as [MMAE] and [MMAF] and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxins or cytostatic compounds to antibodies and (c) any related assays and methods SGI provides to Licensee pursuant to the Research Program.[91] | "**Drug Conjugation Technology**" means [only] cytotoxin "drug payloads in the auristatin class, as exemplified by the cytotoxins MMAE and MMAF. |

The Award thus deletes subparts (b) and (c) altogether and improperly narrows the definition of

[87] Ex. 1 § 1.1.17; Ex. 14 at 12–13.
[88] Ex. 14 at Annex A.
[89] *See* Ex. 4 at 42.
[90] *Id.*
[91] Ex. 1 § 1.1.17.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

18

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

subpart (a).  The rewriting of the definition departs from the actual words used, rendering the words of the contract superfluous.  If the parties intended Drug Conjugation Technology to be limited to the Award definition shown on the right above, they would not have written it as they did.

Third, the negotiating history of the Collaboration Agreement, which the Award ignores, shows that DSC at several points asked Seagen to agree to narrower rights.[92]  In each case, Seagen refused and the Collaboration Agreement omitted DSC's proposed revisions.[93]  Specifically, DSC attempted to limit the definition of "Drug Conjugation Technology" to only MMAE and MMAF.[94]  Seagen rejected this proposal.[95]  Seagen's negotiator Kirk Schumacher explained to DSC's negotiator Tetsuya Iwabuchi that "because Seagen's linker technology can be used to attach many different payloads to many different antibodies, Seagen could not accept limiting Drug Conjugation Technology to MMAE and MMAF."[96]  If DSC made an Improvement to Seagen's ADC linker technology, Mr. Schumacher continued, that Improvement would have to be assigned to Seagen.[97]  Mr. Iwabuchi accepted this, and this evidence was unrebutted:  DSC did not challenge Mr. Schumacher's recollection, and did not call Mr. Iwabuchi to testify at the Arbitration.[98]

DSC also attempted to limit the Collaboration Agreement's ownership and automatic assignment provision only to Improvements developed during the two-year Research Program Term, rather than for the Agreement's full Term.[99]  Seagen rejected this as well.[100]  It was imperative, as Mr. Schumacher explained, that Improvements to Seagen's ADC linker technology developed during the life of the Collaboration Agreement be owned by and automatically assigned to Seagen.[101]  Mr. Schumacher also reminded Mr. Iwabuchi of DSC's obligation not to use SGI Technology in any independent ADC development.[102]  Again, Mr. Iwabuchi agreed.[103]

---

[92] Ex. 14 at 14–16.
[93] Id.
[94] Ex. 63 at ¶ 27 (citing Ex. 26 at 1); Ex. 14 at 14.
[95] Ex. 63 at ¶ 28; Ex. 14 at 14.
[96] Id.
[97] Id.
[98] Ex. 14 at 14.
[99] Ex. 63 at ¶¶ 41–47 (citing Ex. 23 at 11 & Ex. 25 at 12); Ex. 14 at 14–15.
[100] Ex. 63 at ¶ 42 (citing Ex. 24 at 11); Ex. 14 at 15.
[101] Ex. 63 at ¶ 45; Ex. 14 at 15.
[102] Ex. 63 at ¶ 46; Ex. 14 at 15.
[103] Ex. 14 at 15.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

19

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

1    DSC also attempted at one point to secure a license permitting it to use Improvements "for

2   any purpose [and] beyond the expiration or termination" of the Collaboration Agreement.[104]

3   Seagen declined.[105]  As Mr. Schumacher told Mr. Iwabuchi, DSC's right to use Improvements was

4   pursuant (and only pursuant) to the Collaboration Agreement's license grant.[106]  Mr. Iwabuchi

5   agreed.[107]   This negotiation history completely undercuts the Award's conclusion that a

6   "sophisticated international pharmaceutical conglomerate" like DSC would not have agreed to an

7   expansive improvements clause.[108]  In short, the Award gives DSC the benefit of provisions that

8   were expressly contemplated but rejected by the parties in negotiations.

9    Fourth, the Award mistakenly relies for its contract interpretation on evidence showing that

10   Seagen scientists studied DSC's ADC program in 2017, but did not at that time express the view

11   "that DSC's ADC technology was plausibly related to or arose from Seagen's ADC technology,

12   either generally or with respect to the Collaboration Agreement."[109]  The Award does not address,

13   however, that DSC failed to show that any individual at Seagen with knowledge of DSC's

14   technology was also aware of Seagen's rights under the Collaboration Agreement until 2018 at the

15   earliest.[110]  Seagen initiated the Arbitration shortly after it recognized that DSC's technology had

16   been assigned to Seagen under the Collaboration Agreement.  Nothing in Seagen's conduct

17   undermines its claims in the Arbitration.

18    The Award's reliance on Dr. Lambert's testimony to support the "objective

19   reasonableness" of DSC's interpretation and his finding that the testimony of DSC's expert Dr.

20   Lambert should be given "greater weight" does not support the Award's interpretation of the

21   Collaboration Agreement.[111]  The "objective reasonableness" is determined by the words of the

22   Collaboration Agreement itself, not by an expert unfamiliar with the formation of the

23   Collaboration Agreement.  That the Award disregarded the Collaboration Agreement by relying

[104] Ex. 63 at ¶ 48 (citing Ex. 49 at 11); Ex. 14 at 16.
[105] Ex. 63 at ¶ 49 (citing Ex. 22 at 11), ¶ 50 (citing Ex. 46 at 2); Ex. 14 at 16.
[106] Ex. 63 at ¶ 50; Ex. 14 at 16.
[107] Ex. 63 at ¶ 51; Ex. 14 at 16.
[108] *See* Ex. 4 at 43.
[109] Ex. 4 at 44.
[110] Ex. 16 at 37–38.
[111] Ex. 4 at 43–44.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613                    20                    COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

on an expert's view as to what would be commercially reasonable highlights the results-oriented approach the Award took to dispense its own justice, unconnected with the terms of the Collaboration Agreement.

### C. The Award's Application Of A Breach Of Contract Statute Of Limitations To The Quiet Title Claim Is Both In Manifest Disregard Of The Law And Completely Irrational

An arbitrator's award is in manifest disregard of the law if it is "clear from the record that the arbitrator[] recognized the applicable law and then ignored it." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009) *cert. denied*, 558 U.S. 824 (internal citations omitted). The Award's determination on the statute of limitations for Seagen's quiet title claim fails not just for this reason, but because it is completely irrational as well.

The Award acknowledged that Washington law has no statute of limitations for quiet title claims:

> "Seagen argues that there is no statute of limitations for quiet title actions under Washington State law. . . As a general matter, Seagen appears to be correct. *See Kent Sch. Dist. No. 415 v. Ladlum*, 45 Wash. App. 854, 856 (1986) ("There is no statute of limitations with regard to an action to quiet title.")[112]

The Award nonetheless found that the quiet title claim was barred by the six-year breach of contract statute of limitations.[113] Finding that a quiet title claim is time-barred manifestly disregards undisputed Washington law that there is no statute of limitations for quiet title claims.

The Award's rationale for applying a non-existent statute of limitations is completely irrational because it disregards the terms of the contract itself. The Award reasoned that the "gravamen" of the quiet title claim was a breach of Section 3.3.1: "without establishing that breach, Seagen cannot prove its entitlement to quiet title."[114] But neither Washington State Law nor the Collaboration Agreement are merely "lexical semantics."

The mere fact that the quiet title claim relates to a contract does not change the nature of

---

[112] Ex. 4 at 36.
[113] *Id.* at 36–38.
[114] Ex. 4 at 37; *see also id.* ("Ultimately then, lexical semantics aside, the Arbitrator is persuaded that Seagen's quiet title claim is nothing more than a request for specific performance of Section 3.3.1 and the gravamen of that request, or course, is quintessentially contractual.").

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

21

such a claim.  Federal district court and Washington appellate courts have uniformly held that quiet title has no statute of limitations even if the claim arises out of a contract.  *Kent Sch. Dist. No. 415 v. Ladum*, 728 P.2d 164, 165–66 (Wash. App. 1986) (trial court clearly erred in applying statute of limitations for breach of contract in a quiet title action on a written contract); *Petersen v. Schafer*, 42 Wash. App. 281 (1985) (no statute of limitations for quiet title action where dispute arose out of fraud in the deed for the procurement of real property); *Covington 18 Partners, LLC v. Attu, LLC,* No. 2:19-cv-00253-BJR, 2019 WL 3502512, at *8 (W.D. Wash. Aug. 1, 2019) (citing *Petersen*, and rejecting statute of limitations defense to quiet title action even where underlying contract was at issue).  Seagen cited all of these cases; DSC had no persuasive answer.[115]

The Award's gravamen determination that "Seagen's Quiet Title Claim is nothing more than a request for specific performance of Section 3.3.1" completely disregards the terms of the contract—as internal inconsistencies in the Award clearly show.  *Aspic*, 913 F.3d at 1166 (an award is irrational "where the arbitration decision fails to draw its essence from the agreement.").

The dispute here is whether Seagen owns the technology at issue—a quintessential quiet title claim.  Seagen says it does because the technology qualifies as "Improvement IP" and was *automatically* transferred to Seagen immediately upon its creation pursuant to the clear terms of the Collaboration Agreement:

> **3.3.1 <u>Improvements</u>.**  In the event that, during the Term, [DSC] conceives, develops or reduces to practice an Improvement that relates to the Drug Conjugation Technology, [DSC] shall promptly notify [Seagen] of the discovery of such Improvement.  [Seagen] shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such Improvements shall have been conceived, developed or reduced to practice by [DSC], [DSC] hereby assigns all of its right, title and interest to [Seagen]. . . .[116]

The Award agrees with how transfer of ownership works—finding that the "hereby assigns" clause "does not reasonably establish an affirmative duty" on either party; "it simply memorializes the Parties' agreement" that such improvements are automatically assigned to Seagen.[117]  "The

---

[115] Ex. 12 at 59–60; Ex. 14 at 44; Ex. 16 at 30–31.
[116] Ex. 1 at § 3.3.1.
[117] *Id.*

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

22

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

1    Arbitrator so concludes as a matter of Washington State law."[118]

2         The Arbitrator's conclusion on how and when ownership transfers "as a matter of

3    Washington State law" renders the Award's "gravamen" analysis completely irrational.  Because

4    Section 3.3.1 does not impose an "affirmative duty" to accomplish the transfer of ownership, there

5    is no contract breach that bears on that transfer.  And because, as the Award found, ownership to

6    Improvement IP automatically and immediately transferred upon its creation, then there was no

7    obligation relating to its existing ownership to specifically enforce.  Seagen already owns the

8    Improvement IP under the undisputed terms of the Collaboration Agreement, and any action for a

9    judicial determination saying just that is neither a claim for breach nor for specific performance.

10        The Award attempts to avoid this obvious conclusion by referencing Section 3.3.1 of the

11   Collaboration Agreement.  The Award concludes that the quiet title claim "is entirely reliant upon

12   the alleged breach of Section 3.3.1 that is expressly plead[ed] in Seagen's Breach of Contract

13   Claim."[119]  But the Award itself acknowledged that the only affirmative duty imposed by

14   Section 3.3.1 was DSC's duty to "promptly notify" Seagen of any Improvements.  That notice

15   provision has nothing to do with who owns the Improvement IP.  Even if the Collaboration

16   Agreement had no notice provision, or even if DSC had been transparent with Seagen regarding

17   its conduct, Seagen would still have a claim to quiet title under the "hereby assigns" clause.  The

18   quiet title claim is not subservient to the notice requirement because transfer of ownership

19   happened before and exists regardless of whether DSC complied with its obligation to provide

20   notice.  By disregarding the "hereby assigns" language, the Award's analysis is irrational.  *See*

21   *DDB Techs., L.L.C. v. MLB Advanced Media, LP.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) ("This

22   contractual language was not merely an agreement to assign, but an express assignment of rights

23   in future inventions.  [If] the patents in suit were within the scope of the employment agreement,

24   they would have been automatically assigned [] by operation of law with no further act required

25   on the part of the company.  Accordingly, DDB's statute of limitations, waiver, and estoppel

26   defenses have no merit.").

27   _____
    [118] *Id.*

28       [119] *Id.*

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

23

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

The decision on the statute of limitations is particularly suspect given the Arbitrator's prior decisions in the arbitration.  On April 15, 2021, the Arbitrator rejected DSC's request to file a dispositive motion on the issue of statute of limitations to dispose of the matter in its entirety.[120] "[B]ased upon the arguments made and the issues raised on the face of the Parties' . . . submissions, the Arbitrator is not persuaded of the likelihood of DSC's prospective motion succeeding as a matter of law in advance of the Arbitration Hearing."[121]  On July 26, 2021, DSC simply repeated the same argument that the "gravamen" of Seagen's quiet title claim was a breach of contract claim, citing the same cases it had cited previously.[122]  Faced again with the same arguments and same cases, the Arbitrator inexplicably reversed course one year later.  In other words, the Arbitrator found that the same "arguments made and the issues raised" in April 2021 that did not persuade him the statute of limitations argument would succeed as a matter of law were in August 2022 "correct" and "persuasive" to resolve the claims as a matter of law. [123]  His reversal and finding that the six-year breach of contract statute of limitations applies to Seagen's quiet title claim is completely irrational and in manifest disregard of Washington law.

## IV.    CONCLUSION

If the Award is allowed to stand, DSC will have succeeded in building an entire ADC franchise based on Seagen's proprietary technology.  The Collaboration Agreement expressly prevented such an outcome by providing that any such improvements were automatically assigned to Seagen.  The Award rejects this straightforward application of the Collaboration Agreement in a manner that is both "completely irrational" and exhibits a "manifest disregard of the law."  As a result, the Award should be vacated pursuant to 9 U.S.C. § 10, and a rehearing should be ordered before a new arbitrator.

---

[120] Ex. 11.

[121] *Id.* at 1.

[122] DSC also added one inapposite case that did not even mention "gravamen" and concerned a specific statute of limitations for challenging the results of an election.  *See Reid v. Dalton*, 124 Wash. App. 113, 122 (2004). *See* Ex. 10; Ex. 13.

[123] *Compare* Ex. 4 at 26–29, 36–38 (citing Ex. 9 (DSC's July 26, 2021 brief)), *with* Ex. 10 (presenting the same authority and argument).

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613

24

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700

1    Dated:  November 14, 2022

2                                                  */s/Christopher B. Durbin*
                                            Christopher B. Durbin (WSBA No. 41159)
3                                            COOLEY LLP
                                            1700 Seventh Avenue, Suite 1900
4                                            Seattle, WA  98101-1355
                                            Tel.: (206) 452-8700
5                                            Fax: (206) 452-8800
                                            Email: cdurbin@cooley.com
6
7                                            Michael A. Jacobs (*pro hac vice*)
                                            Matthew A. Chivvis (*pro hac vice*)
                                            Matthew I. Kreeger (*pro hac vice*)
8                                            MORRISON & FOERSTER LLP
                                            425 Market Street
9                                            San Francisco, California 94105-2482
                                            Telephone: 415.268.7000
10                                           Facsimile: 415.268.7522
                                            Email: MJacobs@mofo.com
11                                                   MChivvis@mofo.com
                                                     MKreeger@mofo.com
12
13                                           Evelyn L. Chang (*pro hac vice*)
                                            MORRISON & FOERSTER LLP
14                                           755 Page Mill Road
                                            Palo Alto, California 94304-1018
15                                           Telephone: 650.813.5600
                                            Facsimile: 650.494.0792
16                                           Email: EvelynChang@mofo.com

17                                           Hui Zhao (*pro hac vice*)
                                            MORRISON & FOERSTER LLP
18                                           701 Brazos Street Suite 1100
                                            Austin, Texas 78701-3232
19                                           Telephone: (512) 767-0324
                                            Facsimile: (650) 494-0792
20                                           Email: HZhao@mofo.com

21                                           Attorneys for Petitioner SEAGEN INC.

22

23

24

25

26

27

28

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD                        25
Case No. 2:22-CV-01613

COOLEY LLP
1700 SEVENTH AVE., SUITE 1900
SEATTLE, WA 98101-1355
(206) 452-8700