# EXHIBIT A

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

_____
                               :

SEAGEN INC.,                    :
                               :
       Claimant,         :
                               :     ICDR CASE NO: 01-19-0004-0115
       v.                  :
                               :     **FINAL AWARD**
DAIICHI SANKYO CO., LTD.,  :
                               :
       Respondent.     :
_____:

**Table of Contents**

**I.**    **The Parties**  (1)

**II.**    **Counsel**  (1)

**III.**    **The Arbitrator**  (2)

**IV.**    **Arbitrability, Procedural Rules and Substantive Law**  (2)

**V.**    **Procedural History**  (4)

    *A. Preliminary Proceedings*  (4)

    *B. The Parties' Operative Pleadings* (6)

        *1.    Seagen's Amended Demand*  (6)

            *a.    Factual Allegations*  (6)

            *b.    Seagen's Two Causes of Action*  (10)

            *c.    Seagen's Requested Relief*  (12)

        *2.    DSC's Answer and Statement of Defenses*  (12)

    *C. Discovery and Pre-Hearing Proceedings*  (13)

    *D. The Arbitration Hearing*  (15)

    *E. Supplemental Proceedings* (16)

        *1.    Seagen's Motion to Reopen*  (16)

        *2.    The Reopened Arbitration Hearing*  (19)

    *F. The Interim Award*  (20)

    *G. Proceedings Related to DSC's Request*
      *for an Award of its Attorneys' Fees and Costs*  (20)

**VI.**    **Scope of Final Award**  (21)

**VII.**    **Discussion**  (22)

    *A. Timeliness of Seagen's Claims* (22)

1.      *The Breach of Contract Claim*  (23)

        a.      *Relevant Contract Terms*  (23)

        b.      *Legal Standard*  (24)

                i.      *Contract Interpretation*  (24)

                ii.     *Statute of Limitations*  (25)

        c.      *Application*  (27)

        d.      *Arguments in Support of a Different Result*  (31)

2.      *The Quiet Title Claim*  (37)

3.      *Conclusion*  (39)

B.  *"Improvements" Related To "Drug Conjugation Technology"*  (39)

**VIII.   <u>DSC's Request for an Award of its Attorneys' Fees and Costs</u>**  (46)

A.  *Procedural History*  (46)

B.  *Discussion*  (52)

        1.      *Reasonable Attorneys' Fees*  (52)

                a.      *Exhibit 3*  (53)

                b.      *The Lodestar Methodology*  (54)

                        i.      *The First Step of the Lodestar Methodology*  (54)

                        ii.     *The Second Step of the Lodestar Methodology*  (56)

        2.      *Costs*  (62)

**IX.    <u>Final Award</u>**  (66)

I, THE UNDERSIGNED ARBITRATOR, having been duly appointed in accordance with the dispute resolution clause in the Collaboration Agreement entered into by the above-named Parties effective July 2, 2008, and having heard the Parties' proofs and allegations in this proceeding, do hereby issue the following FINAL AWARD:

## I.      **The Parties**

Claimant is Seagen Inc. ("Seagen").[1]

Respondent is Daiichi Sankyo Co., LTD ("DSC").

## II.      **Counsel**

The Parties are represented as follows:

MORRISON & FOERSTER LLP

Michael A. Jacobs, Esq.
Matthew A. Chivvis, Esq.
425 Market Street
San Francisco, CA 94105

Bryan Wilson, Esq.
Pieter S. de Ganon, Esq.
Teresa A. MacLean, Esq.
755 Page Mill Road
Palo Alto, CA 94304-1018

*Counsel for Seagen*

---

[1] The initial Demand for Arbitration names Seattle Genetics, Inc. as Claimant.  However, during the pendency of this proceeding, Seattle Genetics, Inc. was renamed Seagen Inc.  By mutual agreement of the Parties, since its renaming, the Claimant in this proceeding has been Seagen.  For the avoidance of confusion, the Arbitrator shall refer to Claimant as Seagen throughout this Final Award.  The Arbitrator notes, however, that certain underlying documents cited herein – e.g., the Collaboration Agreement – refer to Seagen as either Seattle Genetics, Inc. or "SGI".

PAUL HASTINGS LLP

Preston K. Ratliff II, Esq.
Isaac S. Ashkenazi, Esq.
Kevin P. Broughel, Esq.
Ashley N. Mays-Williams, Esq.
Amanda L. Pober, Esq.
200 Park Avenue
New York, NY 10166

Joseph R. Profaizer, Esq.
Jeff A. Pade, Esq.
875 15th Street, N.W.
Washington, D.C. 20005

*Counsel for DSC*

## III.    The Arbitrator

Hon. Garrett E. Brown, Jr. (Ret.)
JAMS
620 Eighth Ave., 34th Floor
New York, NY  10018
Tel: 212-607-2770

## IV.    Arbitrability, Procedural Rules and Substantive Law

The Parties entered into a Collaboration Agreement effective July 2, 2008 (the "Collaboration Agreement"), that states as follows at Section 19.3, entitled "Dispute Resolution":

> The Parties agree that if any dispute or disagreement arises between Licensee [DSC] on the one hand and SGI [Seagen] on the other in respect of this Agreement, they shall follow the following procedure in an attempt to resolve the dispute or disagreement.
>
> **19.3.1**  The Party claiming that such a dispute exists shall give notice in writing ("Notice of Dispute") to the other Party of the nature of the dispute;
>
> **19.3.2**  Within fourteen (14) business days of receipt of a Notice of Dispute, a nominee or nominees of Licensee and nominee or nominees of SGI shall meet in person and exchange written

2

summaries reflecting, in reasonable detail, the nature and extent of the dispute, and at this meeting they shall use their reasonable endeavors to resolve the dispute;

**19.3.3**  If, within a further period of fourteen (14) business days, the dispute has not been resolved, the President of SGI and an Executive Officer of Licensee shall meet at a mutually agreed upon time and location for the purpose of resolving such dispute;

**19.3.4**  If, within a further period of thirty (30) business days, the dispute has not been resolved or if, for any reason, the required meeting has not been held, then the same shall be submitted by the Parties for resolution by an arbitral body in Seattle, Washington in accordance with the then-current commercial arbitration rules of the American Arbitration Association ("AAA") except as otherwise provided herein.  The Parties shall choose, by mutual agreement, one (1) arbitrator within thirty (30) days of receipt of notice of the intent to arbitrate.  If no arbitrator is appointed within the times herein provided or any extension of time that is mutually agreed upon, the AAA shall make such appointment within thirty (30) days of such failure.  The judgment rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses.  Nothing in this Agreement shall be deemed as preventing either Party from seeking injunctive relief (or any other equitable or provisional remedy).  If the issues in dispute involve scientific, technical or commercial matters, any arbitrator chosen hereunder shall have educational training and/or industry experience sufficient to demonstrate a reasonable level of relevant scientific, medical and industry knowledge.

**19.3.5**  In the event of a dispute regarding any payments owing under this Agreement, all undisputed amounts shall be paid promptly when due and the balance, if any, promptly after resolution of the dispute.

**19.3.6**  Notwithstanding the foregoing, any disputes relating to inventorship or the validity, enforceability or scope of any patent or trademark rights shall be submitted for resolution by a court of competent jurisdiction.

(RX-0008 at § 19.3).

3

Importantly, at the outset of this proceeding, the Parties disputed whether the claims stated by Seagen in its initial Demand for Arbitration are arbitrable pursuant to Section 19.3.4 of the Collaboration Agreement; or conversely, whether Section 19.3.6 of the Collaboration Agreement requires Seagen to litigate its claims in a court of competent jurisdiction.  The Arbitrator instructed the Parties to submit briefs on the issue of arbitrability, and subsequently heard oral argument from Counsel via teleconference.  Ultimately, as fully explained in the Decision & Order issued on April 23, 2020, the Arbitrator concluded that Seagen's claims are arbitrable in this proceeding.  (4/23/20 D&O at 6-8).  For the avoidance of doubt, this Final Award fully adopts and integrates by reference the Arbitrator's April 23, 2020 Decision & Order, which is attached hereto as Exhibit A.

The Collaboration Agreement also states as follows at Section 19.2, entitled "Applicable Law": "The Agreement shall be governed by and construed in accordance with the laws of the State of Washington and the United States of America, without regard to the conflict of law principles thereof that may dictate application of the laws of any other state."  (Id. at § 19.2).

Therefore, based upon the Collaboration Agreement and the Arbitrator's April 23, 2020 Decision & Order, it is either undisputed or has been established that: (1) Seagen's claims and requests for relief, as well as DSC's affirmative defenses thereto, are arbitrable in this proceeding; (2) the American Arbitration Association ("AAA") Commercial Arbitration Rules (amended and effective October 1, 2013) (the "AAA Rules") are applicable; and (3) the substantive laws of the State of Washington and the United States of America are applicable.

## V.     <u>Procedural History</u>

### A.     *Preliminary Proceedings*

Seagen filed its initial Demand for Arbitration with the AAA on November 12, 2019.  After being duly appointed by the Parties, the Arbitrator conducted a Preliminary Hearing via

teleconference on February 3, 2020, pursuant to the AAA Rules.  During that Preliminary Hearing, the Arbitrator established a briefing schedule to address the Parties' threshold dispute related to the arbitrability of Seagen's claims.  (See 2/20/20 Amd. Report of Preliminary Hr'g and Sched. Order No. 1).  As discussed above, the issue of arbitrability was resolved by the Arbitrator in a Decision & Order issued on April 23, 2020.  (See Ex. A).

At the terminus of the April 23, 2020 Decision & Order, the Arbitrator scheduled a Second Preliminary Hearing, and instructed the Parties to make a joint-submission in advance thereof that addressed their agreement/respective positions on the various point raised in the "Checklist" found at P-2 of the AAA Rules.  (See id. at 8).  The Parties made that joint-submission on May 7, 2020, and the Arbitrator discussed the various issues raised therein during a Second Preliminary Hearing conducted via teleconference on May 11, 2020.  (See 5/29/20 Report of Second Preliminary Hr'g and Sched. Order. No. 2).  Thereafter, following additional meet-and-confer efforts by the Parties and a further teleconference conducted by the Arbitrator on June 10, 2020, the Arbitrator issued Scheduling Order No. 3 that established as follows in pertinent part:

> • Not later than June 24, 2020, SGI shall file an Amended Demand that contains additional specificity with respect to the patents, patent applications, and "know-how" that SGI contends are at issue in this proceeding. For the avoidance of doubt, the Arbitrator anticipates that the additional specificity SGI will provide in its forthcoming Amended Demand shall be substantially similar to SGI's allegations in its present Demand related to U.S. Patent No. 6,214,345.
>
> • Not later than July 22, 2020, DSC shall file an answering statement along with any affirmative counterclaims. Pursuant to the terms of Scheduling Order No. 2, any such affirmative counterclaims shall reflect a substantially similar level of detail as SGI's forthcoming Amended Demand.
>
> • Not later than August 12, 2020, SGI shall file an answering statement to any affirmative counterclaims lodged by DSC, which shall also reflect a substantially similar level of detail as the above documents.

• The Parties shall promptly meet-and-confer with respect to an agreed-upon Confidentiality/Protective Order, and not later than June 17, 2020, shall provide to the Arbitrator either: (1) an agreed-upon proposed Confidentiality/Protective Order; or (2) the Parties' respective proposals for the same, with areas of disagreement clearly highlighted, and to the extent necessary, explained.

• Production of the Parties' Initial Disclosures pursuant to AAA R-22(b)(i) shall commence immediately on a rolling basis, and shall be substantially completed not later than August 21, 2020.

(6/10/20 Sched. Order No. 3).

### B.     The Parties' Operative Pleadings

#### 1.     Seagen's Amended Demand

##### a.     Factual Allegations

In accordance with Scheduling Order No. 3, Seagen filed its Amended Demand on June 24, 2020.  Therein, Seagen summarizes the gravamen of its contentions in this proceeding as follows:

> 62.     In 2008, SGI scientists were at the forefront of antibody-drug conjugation research, and SGI was one of only a select few biotechnology companies in the world capable of practicing and exploiting this technology for therapeutic purposes.  Even today, ADCs are so cutting edge that only a handful of companies – many of them SGI licensees – have been able to develop products successfully.

> 63.     A small number of companies have their own proprietary antibody-drug conjugation technologies.  There are, however, key differences between these technologies and SGI's, including: (1) the chemistry for conjugating the drug to the target antibody, including whether the amino acid in the antibody to which the drug linker is conjugated is cysteine or lysine, and (2) whether the linker is cleavable or non-cleavable, and if cleavable, the mechanism of cleavage.  [Embedded graphic omitted].  ImmunoGen and Pfizer, for example, utilize technology with cleavage and conjugation modes in their approved ADCs that are structurally and functionally distinct from SGI's.  Unlike SGI, both companies use lysines in an antibody as the site of conjugation.  The KADCYLA® ADC uses

6

an ImmunoGen linker that is non-cleavable, and released only upon degradation of the antibody to which it is attached. Pfizer's MYLOTARG® ADC uses an acid-cleavable linker, which as the name suggests is cleaved based on pH – not by a protease. Neither Pfizer nor Immunogen use a Firestone Linker architecture for their approved ADCs.

64.     SGI was aware that DSC was working on ADCs after the collaboration concluded. Until SGI's recent review, however, SGI did not realize that DSC's ADCs include Improvements relating to SGI's Drug Conjugation Technology. Upon closer analysis, including a detailed comparison of the DSC linker structure with SGI's Firestone Linker architecture, SGI learned that the linkers DSC uses in its ADCs are indeed Improvements over Firestone Linkers with the same elements in the same sequence set forth in the '345 Patent.

65.     The technology used in conjunction with DSC's ADCs and disclosed in related patents are also Improvements over other SGI Patents, including the '839 application, '241 patent, '186 patent, '980 patent, and '707 patent, and over complementary SGI Know-How regarding linker design, conjugation chemistry and manufacturing, methods for effecting a desired DAR, analytical methods and assays and quality control, and regulatory requirements and study design.

66.     As to SGI Know-How, in particular, DSC asked scores of detailed questions beyond what SGI's scientific articles revealed, and requested confidential reports, protocols, and assays, establishing that this information was not available to DSC in the public domain.

67.     Below, this amended demand sets forth the SGI Technology on which DSC developed Improvements, and the correspondence between the SGI Technology and the DSC Improvements.

(Amd. Demand at ¶¶ 62-67).

Seagen proceeds to specifically identify various U.S. Patents that it owns or controls, and correlates those U.S. Patents to corresponding U.S. Patents/Applications that DSC allegedly owns or controls. (Id. at ¶¶ 68-85). Notably, the most prominent of the U.S. Patents that Seagen controls is No. 6,214,345 (the "'345 Patent"), which Seagen licensed from Bristol Myers Squibb. The '345

Patent reflects what Seagen refers to as the "Firestone Linker" structure for ADCs – i.e., "a cysteine antibody connector unit, a protease-cleavable amino acid unit, and, optionally one or two self-immolative spacers."  (Id. at ¶ 19).  Moreover, Seagen identifies several forms of allegedly proprietary "Know-How", including: Linker Design; Conjugation Chemistry and Manufacturing; Drug-to-Antibody Ratio (DAR); Analytical Methods/Assays and Quality Control; Regulatory Requirements and Study Design.  (Id. at ¶¶ 86-100).

Seagen alleges as follows with respect to the identified U.S. Patents/Applications and Know-How:

> 101.    As the correlation between SGI Patents and SGI Know-How and DSC's ADCs and related patents demonstrates, DSC developed Improvements as defined in the Agreement.  That is, DSC conceived, developed, or reduced to practice "inventions, discoveries or other know-how . . . that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology" and that relate to SGI's Drug Conjugation Technology.  [Quoting Section 1.1.32 of the Collaboration Agreement.]    The Improvements that SGI owns under the Agreement include:
>
> • *The linker platform and associated conjugation technology that DSC uses in its ADC products DS-8201, U3-1402, DS-1062, and DS-7300.*  Each of these products has a Firestone Linker constructed in accordance with the design considerations that SGI taught to DSC.  The linkers are attached using conjugation chemistry and manufacturing processes, including methods to affect DAR, that are derivative of SGI's chemistry and processes.  They were tested and validated using analytics SGI taught DSC.  And they are being brought to market with the benefit of SGI's path breaking pre-clinical and clinical research.
>
> • *The linker platform to which U.S. Patent Nos. 9,808,537 and its foreign counterparts are directed, and the conjugation technology associated with that linker.*  This linker platform is the Firestone Linker found in DSC's DS-8201, U3-1402, DS-1062, and DS-7300, which can be used with various antibodies and payload.  The conjugation protocols that the patent discusses largely repeat the confidential protocols that SGI taught DSC scientist[s] at SGI's own facilities and shared with DSC in documentary form.

8

*• The linker platform and associated conjugation technology in U.S. Patent Nos. 9,850,312, 9,872,924, 10,155,821, 10,195,288, 10,227,417, and 10,383,878; U.S. Patent Application Nos. 15/302,803, 15/821,697, 16/130,615, 16/142,354, 16/256,715, and 16/264,395; and their foreign counterparts.* These patents and patent applications include the linker platform and conjugation technology found in DSC's U.S. Patent No. 9,808,537, with variations as to the antibody to which linker would be attached and antibody connector, amino acid, and self-immolative spacer units of the linker platform. Even with these variations, they follow the Firestone Linker Architecture.

*• The conjugation methods to which U.S. Patent Application No. 15/597,512 and its foreign counterparts are directed.* SGI first taught DSC methods for partially loading ADCs and the methods found in this application have, at most, slight variations the SGI methods.

102.   These Improvements were developed and the associated patents and patent applications were filed during the term of the Agreement, when DSC scientists were receiving access to SGI Technology. Indeed, some of the named inventors on these patents and patent applications, including Koji Morita, Yuji Kasuya, Hideki Miyazaki, Toshinori Agatsuma, and Yuki Abe, were among the DSC scientists who, as the parties' communications show, had access to SGI Know-How. Toshinori Agatsuma was also the DSC representative who signed the termination letter ending the parties' collaboration agreement in 2015. While not named as inventors on the patents and patent applications listed above, DSC scientists Hiroshi Kuga, Toshimasa Jindo, Masataka Oitate, and Hiroyuki Taniguchi also had access to SGI Know-How and were on the development team for DS-8201 or authored papers about DS-8201.

103.   These Improvements are not incidental to the value of DSC's ADCs because the antibodies and drug payloads used in them are of little value to DSC on their own. DS-8201 is comprised of the trastuzumab antibody marketed by Genentech, Inc. as HERCEPTIN®. The antibodies associated with DSC's other ADCs (U3-1402, DS-1062, and DS-7300) have not been validated as stand-alone treatments. And the payload that DSC uses with all four ADCs, a camptothecin derivative, failed both as a stand-alone treatment and as a component of the polymer carrier conjugate DE-310. Without a Firestone Linker joining the antibody and the payload using SGI's conjugation technology and the access SGI

provided to SGI Patents and SGI Know-How, none of DSC's ADC products would exist in their current form.

104.    Nonetheless, SGI does not seek all rights to DS-8201, U3-1402, DS-1062, and DS-7300, and certainly not the rights to more than "350 patents" as DSC has suggested.  SGI seeks only those rights to Improvements to the SGI Technology that SGI brought to the collaboration – the Firestone Linker architecture and associated conjugation technology that SGI pioneered and DSC misappropriated.

(Id. at ¶¶ 101-104) (italics in original).

> b.    *Seagen's Two Causes of Action*

Based upon all of the factual allegations in its Amended Demand, Seagen lodges two discrete Causes of Action against DSC.  Seagen's First Cause of Action is for "Declaratory Relief/Quiet Title – Ownership of IP" under both Washington State law and Federal common law. In support thereof, Seagen states as follows:

105.    SGI incorporates by reference the allegations in paragraphs 1 through 104 above.

106.    This claim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 and RCW 7.28.310.

107.    An actual, immediate, and real controversy has arisen and now exists between SGI, on the one hand, and DSC, on the other hand, regarding the ownership of certain intellectual property, patents, and/or applications – including, but not limited to, the linker platform and associated conjugation technology that DSC uses in its ADC products DS-8201, U3-1402, DS-1062, and DS-7300; U.S. Patent Nos. 9,808,537, 9,850,312, 9,872,924, 10,155,821, 10,195,288, 10,227,417, and 10,383,878; U.S. Patent Application Nos. 15/302,803, 15/579,512, 15/821,697, 16/130,615, 16/142,354, 16/256,715, and 16/264,395; and foreign counterparts thereof (individually and/or collectively, the "Improvement IP").

108.    The Improvement IP constitutes "Improvements that relate to the Drug Conjugation Technology."  DSC "hereby assign[ed]" to SGI these Improvements under the Agreement by operation of law. SGI, therefore, has an ownership interest in the Improvement IP.

10

109.    DSC has made adverse claims to the Improvement IP, including by causing assignments to be recorded with the United States Patent and Trademark Office that fail to list SGI as assignee.

110.    SGI seeks a declaration that SGI owns the Improvement IP as inventions, discoveries, and other know-how "hereby assign[ed]" to SGI under the Agreement by operation of law.

111.    SGI also requests an adjudication of title that removes any and all adverse claims by DSC as clouds upon SGI's title to the Improvement IP, including injunctive relief requiring DSC to execute confirmatory assignments and other documents that SGI requests to confirm SGI's ownership interest in the Improvement IP.

(Id. at ¶¶ 105-111).

Seagen's Second Cause of Action is for Breach of Contract under Washington State law.

In support thereof, Seagen states as follows:

112.    SGI incorporates by reference the allegations in paragraphs 1 through 111 above.

113.    On or about July 2, 2008, SGI and DSC entered into the Agreement, which is a valid, lawful and enforceable contract.

114.    As described in more detail above DSC has breached its obligations under the Agreement by failing to perform as required. For example, DSC breached its obligations under Section 3.3.1 of the Agreement at least by causing a cloud over title to the Improvements IP that the Agreement provides was "hereby assign[ed]" to SGI, including by causing assignments to be recorded with the United States Patent and Trademark Office that fail to list SGI as assignee.  As an additional example, DSC failed to inform SGI about, and may have purposefully concealed, the Improvement IP during the term of the Agreement up to and including the date DSC terminated the Agreement.  As a further example, DSC breached its obligations under Section 8.1 of the Agreement by having used and continuing to use SGI's Confidential Information for purposes not expressly authorized or contemplated by the Agreement.  DSC also breached the Agreement by failing to follow the dispute resolution procedures set forth in Section 19.3.

115.    As a result of DSC's multiple breaches of the Agreement, SGI has suffered injury for which specific performance may be the only remedy.

11

(Id. at ¶¶ 105-111).

c. <em>Seagen's Requested Relief</em>

As remedies, Seagen requests the following relief in its Amended Demand:

>A. An order declaring SGI the sole and rightful owner and legal title holder of (and rightful applicant for any term extension or other equivalent rights relating to) the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

>B. Injunctive relief, in the form of an order directing DSC to: (a) take all necessary steps to confirm, assign, and/or restore ownership to SGI of the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement; (b) cease and desist from using any Improvement IP and from representing that DSC owns the Improvement IP (including for the purpose of applying for any term extension or other equivalent rights); and (c) identify and return to SGI the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

>C. A constructive trust as to the Improvement IP and any other developments that constitute Improvements relating to SGI's Drug Conjugation Technology under the Agreement;

>D. A running royalty;

>E. Monetary damages (including lost profits and royalties and any other consequential damages) according to proof;

>F. All costs, including attorney fees, expenses and other costs, incurred in connection with this arbitration; and

>G. Any other and further relief that the Tribunal deems just and proper.

(Id. at 31).

2. <em>DSC's Answer and Statement of Defenses</em>

DSC submitted its Answer and Statement of Defenses to Seagen's Amended Demand on July 22, 2020, also in accordance with Scheduling Order No. 3.  Therein, DSC: (1) provides a

12

contrary narrative of alleged facts; (2) denies the substantive allegations underlying Seagen's Causes of Action; and (3) asserts three Affirmative Defenses, including that Seagen's Causes of Action are time-barred pursuant to both the applicable statute of limitations and the doctrine of laches.  (See 7/22/20 DSC Ans. at ¶¶ 126-141).

For the avoidance of doubt, the Amended Demand submitted by Seagen on June 24, 2020, and the Answer and Statement of Defenses thereto submitted by DSC on July 22, 2020, represent the Parties' operative pleadings in this proceeding.

### C.   Discovery and Pre-Hearing Proceedings

On September 3, 2020, the Arbitrator issued Scheduling Order No. 5 that established various milestone dates and addressed certain procedural issues related to, inter alia, the Arbitration Hearing.  More specifically, Scheduling Order No. 5 stated as follows in pertinent part:

> • Document production would be substantially completed by January 15, 2021, and fact discovery would close on February 12, 2021.
>
> • Expert discovery would proceed according to the following schedule: (1) any affirmative expert reports would be served not later than March 5, 2021; (2) any rebuttal expert reports would be served not later than May 7, 2021; and (3) any expert depositions would be completed not later than May 28, 2021.
>
> • On or about May 21, 2021, the Parties would submit: (1) a list of witnesses they intended to call at the Arbitration Hearing; (2) a short description of the anticipated testimony of each witness, as well as the duration of testimony and the order in which witnesses would be called; (3) any expert reports that would be introduced at the Arbitration Hearing; and (4) a list of all exhibits the Parties intended to use at the Arbitration Hearing – including, to the extent appropriate, joint exhibits.
>
> • The Arbitrator expressed a preference that "the direct testimony of fact witnesses be submitted in the form of a sworn witness statement, and that expert reports be substituted for the direct testimony of expert witnesses (truncated direct testimony from an

13

> expert witness that summarizes the underlying report and opinion(s) is acceptable)."
>
> • The Parties would submit pre-hearing briefs not later than June 4, 2021.
>
> • The Arbitration Hearing would commence on June 14, 2021, and would proceed either in-person in Seattle, Washington, or remotely via the Zoom videographic platform.
>
> • To the extent that either Party wished to file a dispositive motion, leave from the Arbitrator was required in advance based upon a concise explanation of why, pursuant to AAA Rule 33, the prospective motion "is likely to succeed and dispose of or narrow the issues in the case."

(See generally, 9/3/20 Scheduling Order No. 5).

The Parties proceeded in general accordance with Scheduling Order No. 5 throughout the remainder of calendar year 2020 and into calendar year 2021.  During that time, the Parties presented a number of discovery disputes to the Arbitrator, which were promptly addressed and resolved.

In Scheduling Order No. 6 issued on April 1, 2021, the Arbitrator denied DSC's request to adjourn the Arbitration Hearing until approximately the fall of 2021; however, the Arbitrator allowed the Parties to meet and confer with respect to appropriate adjustments to certain dates established within Scheduling Order No. 5, and added a second week to the Arbitration Hearing – i.e., the week of June 21, 2021.  (See generally, 4/1/21 Scheduling Order No. 6).  Notably, in an Order dated April 15, 2021, the Arbitrator denied a request made by DSC to file a dispositive motion in advance of the Arbitration Hearing.

14

D.     *The Arbitration Hearing*

Pursuant to the corpus of prior guidance issued by the Arbitrator, the Arbitration Hearing commenced as scheduled on June 14, 2021, and was conducted entirely via the Zoom videographic platform due to continuing challenges presented by the COVID-19 pandemic.

At the outset thereof, the Arbitrator heard opening statements from, respectively, Mr. Jacobs on behalf of Seagen and Mr. Ratliffe on behalf of DSC.  During the first five days of the Arbitration Hearing, between June 14 and 18, 2021, the Arbitrator heard live testimony from the following (listed in order of appearance): fact witnesses Clay Siegall, Mark Kubik, Kirk Schumacher, Peter Senter, David Meyer, Stephen Alley, Todd Simpson, Yuji Kasuya, Kimihisa Ichikawa, Toshinori Agatsuma and Hiroyuki Naito; as well as expert witnesses George Gould, Gene Dubowchik, Carrie Distler and Carolyn Bertozzi.  The Arbitration Hearing continued on June 21, 22 and 24, 2021, when the Arbitrator heard live testimony from the following (listed in order of appearance): fact witnesses Yuki Abe, Shigeru Noguchi and Antoine Yver; as well as expert witnesses Christian Schoneich, Tamar Howson, H. Dalton King, Lee Nadler and Mohan Roa.[2]  Following the completion of witness testimony on June 24, 2021, the Arbitrator heard brief closing arguments from, respectively, Mr. Jacobs on behalf of Seagen and Mr. Ratliffe on behalf of DSC.[3]

---

[2]  The Arbitrator notes that the direct testimony for each of the fact witnesses was submitted via sworn written witness statements in advance of the Arbitration Hearing.  The direct testimony for the various expert witnesses was primarily comprised of their expert reports, which were also submitted in advance of the Arbitration Hearing; however, expert witnesses had the opportunity to provide brief overviews of their expert reports/opinions during live direct testimony.  The same procedure was followed for the expert witnesses that subsequently testified during the Reopened Arbitration Hearing.

[3]  The Arbitrator notes that the live testimony of many fact witnesses was in Japanese, which necessitated the active participation of interpreters that the respective Parties had retained.  The Arbitrator further notes that despite the frequent need for translation, the Parties proceeded efficiently, and neither came close to utilizing the 30-hours on the record that each had been

At the conclusion of the Arbitration Hearing, the Arbitrator established that each side would submit an Opening Post-Hearing Brief not later than July 26, 2021, and a Responsive Post-Hearing Brief not later than August 13, 2021.  Moreover, based upon the Parties' agreement, the Arbitrator scheduled oral argument related to the Parties' aforementioned Post-Hearing Briefs for August 31, 2021, via Zoom.  The Parties made their respective submissions as scheduled, and the Arbitrator heard oral argument on August 31, 2021, from, respectively, Mr. Jacobs on behalf of Seagen and Mr. Ratliffe on behalf of DSC.

At the conclusion of oral argument on August 31, 2021: (1) the Arbitrator declared the Arbitration Hearing closed pursuant to AAA Rule 38; and (2) the Parties stipulated on the record to extend the due date for an Award until November 30, 2021.  (See 8/27/21 Hr'g Tr. at 1609-10).  Subsequently, at the Arbitrator's request, the Parties stipulated to extend the due date for an Award until January 31, 2022.

### E.    Supplemental Proceedings

#### 1.    Seagen's Motion to Reopen

On January 6, 2022 – i.e., approximately three weeks before the Arbitrator was scheduled to issue an Award – Seagen submitted a Motion to Reopen the Hearing Record pursuant to AAA Rule R-40 (the "Motion to Reopen").  Therein, Seagen argued that the evidentiary record related to the Arbitration Hearing, which had been closed by the Arbitrator on August 31, 2021, should be reopened "based upon, inter alia, documents that were recently produced by [DSC] during the course of parallel litigation between the Parties in the United States District Court for the Eastern

---

allotted by the Arbitrator in conjunction with the "chess-clock" format that was adopted for the Arbitration Hearing.  The Arbitrator particularly commends the Parties for their efficient conduct of the Arbitration Hearing under the circumstances presented – i.e., the need for significant translation in real time via Zoom.

District of Texas."  (1/25/22 GEB Order at 1).  DSC submitted opposition to that Motion on January 11, 2022, Seagen submitted a reply on January 12, 2022, and DSC submitted a sur-reply via email on January 13, 2022.  The Arbitrator then heard oral argument from Counsel via Zoom on January 19, 2022.

Based upon the foregoing record, the Arbitrator issued an Order on January 25, 2022, that granted Seagen's Motion to Reopen in light of the following conclusions: (1) AAA Rule R-40 vests the Arbitrator with discretion to reopen the evidentiary record; and (2) Seagen carried its "high burden and established that the evidentiary record related to the Arbitration Hearing should be reopened pursuant to AAA Rule R-40."  (1/25/22 Order at 6).  For the avoidance of doubt, this Final Award fully adopts and integrates by reference the Arbitrator's January 25, 2022 Order, which is attached hereto as Exhibit B.

Following issuance of the Arbitrator's January 25, 2022 Order, the Parties iteratively met-and-conferred with respect to: (1) the extent to which the evidentiary record would be reopened; and (2) various procedural issues related to the reopening of the evidentiary record.  In an effort to promptly and efficiently resolve those matters, the Arbitrator conducted videoconferences with Counsel on February 8, 11 and 15, 2022.  Ultimately, based upon guidance provided by the Arbitrator during those videoconferences and various stipulations reached by the Parties, the Arbitrator issued a Scheduling Order on February 17, 2022, that established as follows in pertinent part:

> • On March 3, 2022, the Parties shall exchange, by 11:59 p.m. Eastern Time, initial designations for the deposition transcripts of Drs. Koji Morita, Peter Senter, and Scott Jeffrey from the Texas litigation.
>
> • On March 8, 2022, the Parties shall exchange, by 11:59 p.m. Eastern Time, any counter-designations to the deposition testimony designated by the Parties on March 3, 2022.

17

• On March 10, 2022, the Parties shall submit, by 11:59 p.m. Eastern Time, their respective designations to the Arbitrator. The Parties may include a single-page statement, in 12-point font and double-spaced, describing the relevance of the designated testimony as well as a single-page statement, in 12-point font and double-spaced, with any objections as to the testimony designated by the other Party. The Parties shall also submit exhibit stamped copies of the new documents entered into the arbitration record.

• On March 11, 2022, the Parties shall exchange, by 11:59 p.m. Eastern Time, opening expert reports of Drs. Carolyn Bertozzi and John M. Lambert, which shall be in 12-point font, double-spaced, and of no more than 10 pages.

• On March 25, 2022, the Parties shall exchange, by 10:59 p.m. Eastern Time, responsive expert reports of Drs. Bertozzi and Lambert, which shall be in 12-point font, double-spaced, and of no more than 10 pages. The Parties shall submit both the opening and responsive expert reports to the Arbitrator by 11:59 p.m. Eastern Time. Any cited portions of exhibits in a foreign language shall be provided in original and certified translated form.

• On April 13, 2022, the Arbitrator will conduct a hearing during which each Party shall be allowed up to 15 minutes of "mini-direct" examination of its expert witness. "Mini-direct" examination may be followed by cross-examination, and re-direct examination (as appropriate).

  o Any Party intending to use a demonstrative in the examination of a witness must disclose the demonstrative by 11:59 p.m. Eastern Time, two days prior to such use. "Call outs" to exhibits or prior witness testimony, and any demonstratives previously disclosed in the March 11, 2022 or March 25, 2022 expert reports, are not subject to this disclosure requirement.

  o If an attorney defending a witness during the hearing is present in the same room as the witness, the Party whose attorney is examining the witness may, at its option, request the use of a 360-degree camera or other suitable camera to view the entirety of the room.

• On April 21, 2022, the Parties shall submit, by 11:59 p.m. Eastern Time, opening post-hearing briefs to the Arbitrator, which shall be in 12-point font, double-spaced, and of no more than 10 pages.

18

• On April 28, 2022, the Parties shall submit, by 11:59 p.m. Eastern Time, responsive post-hearing briefs to the Arbitrator, which shall be in 12-point font, double-spaced, and of no more than 10 pages. Upon submission of the post-hearing briefs, the arbitration record shall be deemed closed.

• There shall be no post-briefing closing arguments.

(2/17/22 Order).

## 2.  *The Reopened Arbitration Hearing*

The Parties proceeded in general accordance with the foregoing terms of the Arbitrator's February 17, 2022 Order, and the Reopened Arbitration Hearing was conducted as scheduled on April 13, 2022, via Zoom.  During the Reopened Arbitration Hearing, the Arbitrator heard live testimony from the following two expert witnesses (listed in order of appearance): Carolyn Bertozzi, and John Lambert.  Following the completion of witness testimony on April 13, 2022, the Arbitrator established, inter alia, that: (1) pursuant to the February 17, 2022 Order, the Parties would submit supplemental Opening Post-Hearing Briefs on April 21, 2022, and supplemental Responsive Post-Hearing Briefs on April 28, 2022; and (2) following those submissions, the Arbitrator would appraise the Parties whether further briefing and/or oral argument was required. (See 4/13/22 Hr'g Tr. at 1869-70).

After reviewing the aforementioned supplementary Post-Hearing Briefs, the Arbitrator determined that no additional submissions were necessary, and deemed the evidentiary record closed as of May 13, 2022, pursuant to AAA Rule R-39.  (See 5/11/22 ICDR Ltr.).  The Parties subsequently stipulated that an Award would issue not later than August 13, 2022.  (See 7/11/22 ICDR Email).  Accordingly, as discussed below, the Interim Award was timely issued pursuant to AAA Rule R-45.

F.    *The Interim Award*

The Arbitrator issued an Interim Award dated August 11, 2022, pursuant to AAA Rule 47(b) (the "Interim Award").  Therein, the Arbitrator explained as follows at Section VI, entitled "Scope of Interim Award":

> [T]his Interim Award addresses and is fully and finally dispositive with respect to all factual issues, legal and equitable arguments, and defenses raised in conjunction with the Parties' claims and requests for relief, with the sole exception of the Parties' respective requests for an award of, inter alia, attorneys' fees pursuant to Section 19.3.4, which the Arbitrator addresses below at Section VIII.

(Interim Award at 20).

This Final Award fully adopts and integrates by reference the Interim Award.  For the avoidance of doubt, the Arbitrator clarifies that this Final Award makes no substantive changes to the Interim Award, with the sole exception of addressing and resolving DSC's request for an award of attorneys' fees and costs pursuant to Section 19.3.4 of the Collaboration Agreement.  (See infra Section VIII).

G.    *Proceedings Related to DSC's Request*
      *for an Award of its Attorneys' Fees and Costs*

In accordance with Section VIII of the Interim Award, DSC has submitted a request for an award of attorneys' fees and costs pursuant to Section 19.3.4 of the Collaboration Agreement.  As the above-excerpted provision within the Interim Award made clear, that request by DSC was the only component of this arbitration left unresolved, and therefore all subsequent proceedings have exclusively related to DSC's request.  Those proceedings and the Arbitrator's full and final disposition of DSC's request are addressed below in Section VIII.

20

## VI.    **Scope of Final Award**

This Final Award is issued pursuant to AAA Rule R-47, entitled "Scope of Award".  In preparing this Final Award, the Arbitrator has considered the many legal arguments raised and the evidence presented in conjunction with the Arbitration Hearing, the Reopened Arbitration Hearing, and the proceedings related to DSC's request for an award of its attorneys' fees and costs pursuant to Section 19.3.4 of the Collaboration Agreement, and has determined the relevance, credibility, weight and merits thereof.  For efficiency and economy, this Final Award concisely recites only those facts and discusses only those legal arguments that the Arbitrator considers necessary to establish the basis for resolution of the Parties' claims, defenses, and requests for relief, as well as any other determinations made herein.  Therefore, to the extent that any factual assertion, expert opinion, legal argument, claim, defense, or request for relief raised by the Parties is not specifically mentioned, the Arbitrator has decided that it is either or both not persuasive and/or not essential to establish the basis for this Final Award.

For the avoidance of doubt, this Final Award: (1) addresses and is fully and finally dispositive with respect to all factual issues, legal and equitable arguments, and defenses raised in conjunction with the Parties' claims and requests for relief; and (2) has been issued within 30-days of the Arbitrator declaring the hearing/evidentiary record closed on October 19, 2023, and is therefore timely pursuant to AAA Rule R-45.  (See 10/20/23 ICDR Email).

Finally, the Arbitrator once again recognizes and appreciates the very high quality of both the oral and written presentations by all Counsel throughout this proceeding.  The Arbitrator also particularly commends all Counsel on their collaborative efforts towards completing these proceedings despite the challenges presented by the COVID-19 pandemic.  It follows that this

Final Award is based upon the Arbitrator's review of the evidentiary record and applicable law, and is not a reflection of the quality of the Parties' respective presentations.

**VII.**     **Discussion**

As noted above, in its operative Amended Demand, Seagen has asserted the following two Causes of Action against DSC: (1) Declaratory Relief/Quiet Title – Ownership of IP (the "Quiet Title Claim"); and (2) Breach of Contract (the "Breach of Contract Claim").  (See generally, Amd. Demand at ¶¶ 105-115).  Throughout this proceeding, the Parties have addressed many often-intertwined factual and legal issues in relation to each of those Claims – and, of course, have built a voluminous evidentiary record in conjunction with the Arbitration Hearing and the Reopened Arbitration Hearing.  Nevertheless, having fully considered that evidentiary record and the Parties' arguments related thereto, the Arbitrator is ultimately persuaded that both of Seagen's Claims fail for essentially straightforward reasons.  The Arbitrator explains those reasons below.

*A.     Timeliness of Seagen's Claims*

The threshold issue presented by both of Seagen's Claims is whether they have been timely asserted under applicable Washington State law.  With respect to that threshold issue, on the one hand, Seagen contends that: (1) there is no statute of limitations for a quiet title action under Washington State law, and therefore its Quiet Title Claim cannot be time barred; and (2) the breach of the Collaboration Agreement that gives rise to its Breach of Contract Claim occurred in 2015 – i.e., when DSC first filed an assignment naming itself owner of the Improvement IP – which is unquestionably within the six-year statute of limitations for breach of contract actions under Washington State law.  On the other hand, DSC contends that: (1) Seagen's Quiet Title Claim should be deemed untimely pursuant to both the statute of limitations and the common law doctrine of laches; and (2) any breach of the Collaboration Agreement occurred on October 11, 2012, when

DSC filed its first patent application in Japan, and therefore Seagen's Breach of Contract Claim falls outside the applicable six-year statute of limitations by more than a year.

For purposes of analyzing the Parties' respective arguments related to timeliness under Washington State law, the Arbitrator will first address Seagen's Breach of Contract Claim, and then address Seagen's Quiet Title Claim.

#### 1.   The Breach of Contract Claim

##### a.   Relevant Contract Terms

Seagen's Breach of Contract Claim primarily arises from Section 3.3.1 of the Collaboration Agreement, which states as follows:

> **Improvements.**   In the event that, during the Term, Licensee conceives, develops or reduces to practice an Improvement that relates to the Drug Conjugation Technology, Licensee shall promptly notify SGI of the discovery of such Improvement.  SGI shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such Improvements shall have been conceived, developed or reduced to practice by Licensee, Licensee hereby assigns all of its right, title and interest therein to SGI.  SGI's interest in any such Improvements that it Controls shall be included in the SGI Technology and made available to Licensee via the Exclusive License provided in Article 3.  Licensee may use such Improvement assigned to SGI by Licensee for any purpose within the scope of the Exclusive License granted herein solely during the Term of this Agreement.

(RX-0008 at §3.3.1) (emphasis in original).

Also relevant in the present context, the Collaboration Agreement defines the terms "Improvements" at Section 1.1.32 and "Drug Conjugation Technology" at Section 1.1.17, in pertinent part as follows:

> **"Improvements"** means all patentable or non-patentable inventions, discoveries or other know-how developed and Controlled by either Party after the Effective Date that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology . . . .

> **"Drug Conjugation Technology"** means (a) cytotoxins or
> cytostatic compounds such as monomethyl Auristatin E and
> monomethyl Auristatin F and certain variants, derivatives,
> analogues and salts thereof, and methods of making and using such
> cytotoxic or cytostatic compounds (b) compositions and methods
> useful for attaching the foregoing cytotoxic or cytostatic compounds
> to antibodies and (c) any related assays and methods SGI provides
> to Licensee pursuant to the Research Program.

(Id. at § 1.1.32 and 1.1.17) (emphasis in original).

*b.*      *Legal Standard*

*i.*      *Contract Interpretation*

In its July 26, 2021 Opening Post-Hearing Brief, DSC quotes, inter alia, the Washington

Court of Appeals' decision in RSD AAP, LLC v. Alyeska Ocean, Inc., 190 Wash. App. 305, 315

(2015), for bedrock principles of contract interpretation.   (See 7/26/21 DSC P.H. Br. at 22

(collecting cases)).   The Arbitrator is persuaded that the Court's discussion in Alyeska Ocean

accurately and concisely summarizes the applicable breach of contract standard under Washington

State law as follows:

> "The interpretation of a contract can be a mixed question of law and
> fact.  But where the contract presents no ambiguity and no extrinsic
> evidence is required to make sense of the contract terms, contract
> interpretation is a question of law."  Rekhter v. Dep't of Soc. &
> Health Servs., 180 Wash.2d 102, 134, 323 P.3d 1036 (2014)
> (plurality opinion) (citations omitted).
>
> The touchstone of contract interpretation is the parties' intent.  See
> Newport Yacht Basin Ass'n of Condo Owners v. Supreme Nw.,
> Inc., 168 Wash. App. 86, 100, 258 P.3d 70 (2012); 25 DAVID K.
> DEWOLF ET AL., WASHINGTON PRACTICE: CONTRACT
> LAW AND PRACTICE § 5:8, 185 (3d ed. 2014).  We construe
> contracts "to reflect the intent of the parties."  Corbay v. Stevenson,
> 98 Wash. 2d 410, 415, 656 P.2d 473 (1982).  We follow the
> "'objective manifestation'" theory of contract interpretation
> focusing on the "'reasonable meaning of the contract language to
> determine the parties' intent.'"  Viking Bank v. Firgrove Commons
> 3, LLC, 183 Wash. App. 706, 712, 334  P.3d 116 (2014) (quoting

24

Hearst Commc'ns Inc. v. Seattle Times Co., 154 Wash.2d 493, 503, 115 P. 262 (2005)).  "We impute an intention corresponding to the reasonable meaning of the words used."  Hearst, 154 Wash.2d at 503, 115 P.3d 262.

We also follow the context rule that "extrinsic evidence relating to the context in which a contract is made may be examined to determine the meaning of specific words and terms" used in the contract.  William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Trust v. Port of Everett, 159 Wash. App. 389, 399-400, 245 P.3d 779 (2011) (emphasis added).  Extrinsic evidence includes both the contract's subject matter and objective, the circumstances surrounding the contract formation, both the parties' conduct and subsequent acts, and the reasonableness of the parties' respective interpretations.  Hulbert, 159 Wash. App. at 400, 245 P.3d 779.  However, extrinsic evidence may not be used to "'show an intention independent of the [contract]' or to 'vary, contradict[,] or modify the written word.'"  Hearst, 154 Wash.2d at 503, 115 P.3d 262 (quoting Hollis v. Garwall, Inc., 137 Wash.2d 683, 693, 974 P.2d 836 (1999)).  Moreover, extrinsic evidence of a party's subjective, unilateral, or undisclosed intent regarding the meaning of a contract's terms is inadmissible.  Hulbert, 159 Wash.App. at 400, 245 P.3d 779.  "Nor is it admissible under the parol evidence rule to add to the terms of a fully integrated written contract."  Hulbert, 159 Wash. App. at 400, 245 P.3d 779.

We "should ultimately give effect to . . . the intent of the parties at the time of execution."  25 DEWOLF & ALLEN § 5:8, at 187-88.  If contractual language is "clear and unambiguous," we must enforce the written contract.  Lehrer v. Dep't of Soc. & Health Servs., 101 Wash. App. 509, 515; 5 P.3d 722 (2000).

Alyeska Ocean, 190 Wash. App. at 314-316.

*ii.    Statute of Limitations*

Under Washington State law, breach of contract actions are subject to a six-year statute of limitations.  See RCW § 4.16.040(1).  However, the Parties disagree with respect to when a breach of contract action accrues for purposes of applying the statute of limitations.  On that point, in their respective Post-Hearing Briefs, both Parties cite to and primarily rely upon the Supreme Court of

Washington's <u>en banc</u> decision in <u>1000 Virginia Ltd. P'ship v. Vertecs Corp.</u>, 158 Wash. 2d 566 (2006).  (<u>Compare</u> 7/26/21 Seagen P.H. Br. at 49-50, <u>with</u> 7/26/21 DSC P.H. Br. at 56).

Based upon <u>1000 Virginia Ltd. P'Ship</u>, which appears to be the authoritative recitation of Washington State law in the present context, the longstanding general rule is that a cause of action for breach of contract accrues – and therefore the six-year statute of limitations begins to run – when the underlying breach occurs.  Indeed, throughout its decision in <u>1000 Virginia Ltd. P'Ship</u>, the Court repeatedly reinforced its prior decisions stating that general rule.  <u>See id.</u> at 578 (citing, <u>e.g.</u>: <u>Taylor v. Puget Sound Power & Light Co.</u>, 64 Wash. 2d 534, 537-38, 392 P.2d 802 (1964), noting that therein, the Court had "clearly rejected a discovery rule approach to the contract action"; and <u>Cornell v. Edsen</u>, 78 Wash. 662, 655, 139 P. 602 (1914), noting the Court's determination that "the action arises out of the breach, and the statute of limitations <u>begins to run from the time of the breach and not the time of its discovery</u>" (emphasis in original)).

Nevertheless, in <u>1000 Virginia Ltd. P'Ship</u>, the Supreme Court of Washington ultimately held that the so-called "discovery rule" – <u>i.e.</u>, where the cause of action does not accrue until "the plaintiff discovers, or in the reasonable exercise of diligence should discover, the elements of a cause of action" – is applicable to breach of contract actions that involve latent construction defects.  <u>Id.</u> at 576-77 (citation omitted).  In so holding, the Court noted, <u>inter alia</u>, that "[a] court must consider the goal of the common law 'to provide a remedy for every genuine wrong' while recognizing, at the same time, that 'compelling one to answer stale claims in the courts is in itself a substantial wrong.'"  <u>Id.</u> at 579 (quoting <u>Ruth v. Dight</u>, 75 Wash. 2d 660, 665, 453 P.2d 631 (1969)).

Notably, throughout their voluminous Post-Hearing Briefing, neither Party has apparently identified any case applying Washington State law in which the aforementioned "discovery rule"

has meaningfully impacted upon the statute of limitations analysis for a breach of contract claim arising outside the context of latent construction defects; and that context, of course, is remote from the issues presented by Seagen's Claims in this proceeding.

*c.    Application*

Applying the foregoing legal standard to Section 3.3.1 of the Collaboration Agreement, the Arbitrator is persuaded that Seagen's Breach of Contract Claim accrued – at the latest – on October 11, 2012, specifically: "when DSC filed the '887 application in its own name and constructively reduced to practice DSC's ADC technology, because the filing of that application in DSC's own name was contrary to an obligation to notify or assign it to Seagen." (7/26/21 DSC P.H. Br. at 57).

To that end, as noted above, the first sentence of Section 3.3.1 of the Collaboration Agreement states as follows: "In the event that, during the Term, Licensee [DSC] conceives, develops, or reduces to practice an Improvement that relates to the Drug Conjugation Technology, Licensee shall promptly notify SGI of the discovery of such an Improvement." Thus, on its face, Section 3.3.1 clearly and unambiguously establishes that DSC had an affirmative duty to "promptly notify" Seagen "[i]n the event that, during the Term, Licensee [DSC] conceives, develops, or reduces to practice an Improvement that relates to the Drug Conjugation Technology". The Arbitrator so concludes as a matter of Washington State law. See <u>Rekhter</u>, 180 Wash. 2d at 134.

The Arbitrator is further persuaded that DSC's aforementioned duty to "promptly notify SGI" under the prescribed circumstances is the <u>only</u> affirmative duty that Section 3.3.1 of the Collaboration Agreement imposes upon DSC. Indeed, as Seagen has asserted throughout this proceeding, the subsequent sentence in Section 3.3.1 is declaratory, and unambiguously reflects

27

the Parties' contemporaneous stipulation that: "SGI <u>shall</u> own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such Improvements shall have been conceived, developed or reduced to practice by Licensee, Licensee <u>hereby</u> <u>assigns</u> all of its right, title and interest therein to SGI." (Emphasis added). Therefore, on its face, the second sentence of Section 3.3.1 does not reasonably establish an affirmative duty for either DSC or Seagen; instead, it simply memorializes the Parties' agreement with respect to the <u>status</u> <u>quo</u> of any future "Improvements". The Arbitrator so concludes as a matter of Washington State law.[4] <u>See id.</u>

Accordingly, the remaining inquiry related to the timeliness of Seagen's Breach of Contract Claim is the date upon which DSC plausibly breached its sole affirmative duty under Section 3.3.1 to "promptly notify SGI" that it had "conceived, developed or reduced to practice" "Improvements" related to Seagen's "Drug Conjugation Technology".

Here, based upon the weight of relevant and credible evidence in the record, it appears either undisputed or reasonably indisputable that the '887 application filed by DSC in Japan on October 11, 2012 – <u>i.e.</u>, JP 2012/225887 – reflects the fundamental elements of DSC's ADC technology that Seagen contends are "Improvements" to its "Drug Conjugation Technology" under the Collaboration Agreement. (<u>See</u> RX-0186; RX-0088). Axiomatically, by the time the '877 application was filed on October 11, 2012, DSC had inherently "conceived of", "developed" or "reduced to practice" the "Improvement IP" reflected therein, which in turn, forms the bedrock of

---

[4] In so concluding, the Arbitrator notes that even if Section 3.3.1 imposed an affirmative duty on DSC to assign any "Improvements" to Seagen, that duty would plainly be coextensive with DSC's duty to notify based upon the declaratory language used – <u>e.g.</u>, "shall own" and "hereby assigns"; therefore, any breach of that duty would accrue at the same time for purposes of the six-year statute of limitations under Washington State law. Accordingly, the Arbitrator is persuaded that any debate on this point ultimately presents an (arguable) distinction without any substantive difference.

Seagen's claims in this proceeding.[5]  Therefore, assuming <u>arguendo</u> that the '877 application does in fact reflect "Improvements" to Seagen's "Drug Conjugation Technology" – as Seagen fundamentally contends – it necessarily follows based upon the plain terms of Section 3.3.1 of the Collaboration Agreement that as of October 11, 2012, DSC had breached its affirmative duty to "promptly notify SGI" of those "Improvements".  The Arbitrator so concludes.

In light of the foregoing conclusions, the Arbitrator is persuaded that Seagen's Breach of Contract Claim against DSC accrued for purposes of the six-year statute of limitations under Washington State law not later than October 11, 2012.  To that end, having carefully reviewed the Washington Supreme Court's decision in <u>1000 Virginia Ltd. P'Ship</u>, the Arbitrator is persuaded that the general rule under Washington State law remains that a breach of contract action accrues for purposes of the six-year statute of limitations on the date the underlying breach occurs, and that the so-called "discovery rule" is only applicable to/has not been expanded beyond the context of latent construction defect claims.  Indeed, contrary to Seagen's apparent view of <u>1000 Virginia Ltd. P'Ship</u>, the Arbitrator is not persuaded that decision stands for the proposition that the so-called "discovery rule" can be discretionarily applied in any breach of contract action; rather, it appears that the Court's discussion of the equitable underpinnings of the "discovery rule" in <u>1000 Virginia Ltd. P'Ship</u> simply explained one basis for its narrow application of the "discovery rule" in breach of contract cases arising from latent construction defects.  Importantly, the Arbitrator's

---

[5] While this point appears uncontroversial if not commonsensical, the Arbitrator notes that in its July 26, 2021 Opening Post Hearing Brief, DSC cites the Federal Circuit's decision in <u>Frazer v. Schlegel</u>, 498 F.3d 1283, 1288 (Fed. Cir. 2007), which states as follows in pertinent part: "The filing of a patent application is a constructive reduction to practice of the invention disclosed therein."  (7/26/21 DSC P.H. Br. at 57 n.295).  Federal Circuit precedent is of course part of the laws of the "United States of America" that are applicable in this proceeding in conjunction with Washington State law pursuant to Section 19.2 of the Collaboration Agreement.  (See <u>supra</u>, at Section IV).

understanding of <u>1000 Virginia Ltd. P'Ship</u> is supported not only by the four-corners of that decision – which, as noted above, repeatedly reinforced the general rule that, under Washington State law, a breach of contract action accrues on the date of the underlying breach – but also by the absence of persuasive authority to suggest that, in the 16 years since <u>1000 Virginia Ltd. P'Ship</u> was decided by the Supreme Court of Washington, other courts applying Washington State law have understood that decision to have the expansive effect that Seagen urges.

It necessarily follows that because Seagen's Breach of Contract Claim against DSC accrued for purposes of the six-year statute of limitations under Washington State law not later than October 11, 2012, that Claim became time-barred on October 11, 2018.  Seagen did not file its initial Demand for Arbitration with the AAA that commenced this proceeding until November 12, 2019 – <u>i.e.</u>, 13-months after the six-year statute of limitations expired.  Accordingly, the Arbitrator concludes that Seagen's Breach of Contract Claim against DSC is time-barred under applicable Washington State law.[6]

---

[6] In so concluding, the Arbitrator notes that to the extent Seagen's Breach of Contract Claim also alleges that "DSC breached its obligations under Section 8.1 of the Agreement by having used and continuing to use SGI's Confidential Information for purposes not expressly authorized by the Agreement", the Arbitrator is persuaded that any such underlying breach also accrued not later than October 11, 2012, upon DSC's filing of the '887 application in Japan.  (<u>See</u> Amd. Demand at ¶ 114.)  Accordingly, the Arbitrator concludes that Seagen's breach of contract allegations related to Section 8.1 are also time-barred by the six-year statute of limitations pursuant to the same analysis and for all the same reasons explained above.  Finally, to the extent that Seagen's Breach of Contract Claim alleges that DSC failed "to follow the dispute resolution procedures set forth in Section 19.3" of the Collaboration Agreement, the Arbitrator concludes that any such claim has been rendered moot by the Parties' implicit decision to undertake this years-long proceeding on the merits of the Claims stated by Seagen in its Amended Demand.  In any event, Seagen has neither sought any relief related to Section 19.3 of the Collaboration Agreement, nor proven its entitlement to any such relief, whether legal or equitable in nature.

### d.      Arguments in Support of a Different Result

Throughout its Post-Hearing Briefing, Seagen has made the following primary arguments in support of a different result with respect to the timeliness of its Breach of Contract Claim: (1) reinforcing its allegation that DSC's breach of the Collaboration Agreement that gives rise to its Breach of Contract Claim occurred in 2015, within the six-year statute of limitations; (2) contending that DSC's failure to notify Seagen of the "Improvements" in conjunction with the '887 application in October, 2012, was not a "material breach" of Section 3.3.1 of the Collaboration Agreement; and (3) urging that in any event, equitable tolling, equitable estoppel and/or fraudulent concealment provide exceptions to the application of the six-year statute of limitations under the present circumstances.  Most of Seagen's foregoing arguments have been inherently rejected by the Arbitrator's foregoing explanation.  However, for completeness, the Arbitrator will specifically address each of those arguments and clarify why they lack merit.

First, Seagen's argument that "the breach occurred only when [DSC] flouted the Agreement by recording an assignment naming itself as the owner, thereby casting Seagen's ownership into doubt", was inherently rejected by the Arbitrator as part of the analysis and conclusions above.  While the Arbitrator understands that Seagen plead – or intended to plead – that the underlying breach occurred in 2015, when DSC recorded certain assignments in its own name, for the reasons explained above, the Arbitrator has inherently rejected that contention, which presents a mixed question of law and fact.  Indeed, the Arbitrator has determined based upon Washington State law and the weight of evidence that any breach by DSC occurred not later than October 11, 2012.  Seagen's first argument therefore fails.

Second, Seagen's argument that DSC's failure to notify it of the alleged "Improvements" not later than October 11, 2012, did not represent a material breach of the Collaboration Agreement

was also inherently rejected by the Arbitrator as part of the analysis and conclusions above.  Once again, while the Arbitrator understands that Seagen plead – or intended to plead – that DSC's breach of Section 3.3.1 of the Collaboration Agreement occurred when it recorded certain assignments in its own name, for the reasons explained above, the Arbitrator has inherently rejected that contention.  Instead, the Arbitrator has determined as a matter of Washington State law that the sole affirmative duty imposed upon DSC by Section 3.3.1 of the Collaboration Agreement was to "promptly notify" Seagen that it had "conceived, developed or reduced to practice" "Improvements" related to Seagen's "Drug Conjugation Technology".  Therefore, to the extent that a breach of Section 3.3.1 is or can be a material breach of the Collaboration Agreement, any such material breach by DSC occurred not later October 11, 2012.  Seagen's second argument therefore fails.

Third and finally, Seagen argues that equitable tolling, equitable estoppel and/or fraudulent concealment are exceptions that should foreclose application of the six-year statute of limitations under the present circumstances.  Based upon the cases cited by Seagen in its July 26, 2021 Post-Hearing Brief, the Arbitrator notes as follows with respect to each those theories under Washington State law:

- Equitable tolling: "The predicates for equitable tolling are bad faith, deception, or false assurances by the defendant and exercise of diligence by the plaintiff." Millay v. Cam, 135 Wash. 2d 193, 206 (1998).

- Equitable estoppel: "The elements to be proved are: (1) an admission, statement, or act inconsistent with a claim afterward asserted; (2) action by another in reasonable reliance on that act, statement, or admission; and (3) injury to the party who relied if the court allows the first party to contradict or repudiate the prior act, statement or admission." Petersen v.

Groves, 111 Wash. App. 306, 310-11 (2002).  Moreover, "[e]stoppel is appropriate to prohibit a defendant from raising a statute of limitations defense when a defendant has "'fraudulently or inequitably invited a plaintiff to delay commencing suit until the applicable statute of limitations has expired.'"  Id. at 311 (quoting Robinson v. City of Seattle, 119 Wash. 2d 34, 82 (1992)).  Importantly, "'[e]quitable estoppel is not favored, and the party asserting estoppel must prove each of its elements by clear, cogent and convincing evidence.'"  Id. at 310 (quoting Robinson, 119 Wash 2d. at 34).

- Fraudulent concealment: "At common law, fraudulent concealment of a cause of action tolls the statute of limitations.  In order to establish fraudulent concealment, the plaintiff must show that he or she was ignorant of the defect and the plaintiff must further show that the defendant engaged in some conduct of an affirmative nature designed to prevent the plaintiff from becoming aware of the defect.  Absent a special relationship between the parties, the defendant's failure to disclose the existence of a defect to the plaintiff is insufficient.  It has been said that the affirmative act of concealment requires actual subjective knowledge by the defendants of the wrong done, i.e., scienter, and some affirmative action on his part in concealing the wrong."  Giraud v. Quincy Farm & Chem., 102 Wash. App. 443, 452 (2000) (internal quotations and citations omitted).

(See 7/26/21 Seagen P.H. Br. at 47-48).

Importantly, with respect to each of the foregoing theories, DSC correctly notes in its August 13, 2021 Responsive Post-Hearing Brief that under Washington State law, "[a] plaintiff asserting an exception to the statute of limitations [. . .] bears the burden of proving that a tolling provision applies."  (8/13/21 DSC P.H. Br. at 39 (quoting Cortez-Kloehn v. Morrison, 162 Wash. App. 166, 172 (2011)).

33

Here, the Arbitrator is not persuaded that Seagen has carried its burden of proving that any of the aforementioned exceptions to the six-year statute of limitations are applicable.  With respect to equitable tolling, the Arbitrator is not persuaded that Seagen has proven by a preponderance of the evidence that DSC or any of its agents engaged in, exhibited, or made "bad faith, deception, or false assurances" with respect to any act or omission that is relevant to this proceeding.  Millay, 135 Wash. 2d at 206.  Similarly, with respect to equitable estoppel, the Arbitrator is not persuaded that Seagen has carried its even higher burden and proven by "clear, cogent and convincing evidence" that DSC or any of its agents made "an admission, statement, or act inconsistent with a claim afterward asserted" or "fraudulently or inequitably invited a plaintiff to delay commencing suit until the applicable statute of limitations had expired."  Petersen, 111 Wash. App. at 301-11. To the contrary, Seagen itself affirmatively argues that its Cause of Action for Breach of Contract accrued in April, 2015, when DSC accorded certain assignments with the U.S. Patent Office – i.e., approximately 3.5 years before the date that the Arbitrator has determined the six-year statute of limitations expired.  And lastly, with respect to fraudulent concealment, the Arbitrator is also not persuaded that Seagen has proven by a preponderance of the evidence – and certainly not by any heightened standard, which a fraud-related theory typically requires – that DSC or any of its agents "engaged in some conduct of an affirmative nature designed to prevent [Seagen] from becoming aware of" the alleged breach of the Collaboration Agreement.  Giraud, 102 Wash. App. 452. Accordingly, Seagen's third argument in support of tolling or otherwise excepting the six-year statute of limitations fails.[7]

---

[7]  For the avoidance of doubt, the Arbitrator clarifies that the voluminous evidentiary record developed in conjunction with the Arbitration Hearing and the Reopened Arbitration Hearing is devoid of credible evidence that at any point, DSC or any of its agents engaged in any conduct or omission that plausibly suggests – and far less establishes – bad faith, inequity, or any intent to defraud Seagen.  Accordingly, to the extent that any claim, request for relief, or argument stated

For these reasons, the Arbitrator concludes that all of Seagen's arguments in support of the timeliness of its Breach of Contract Claim are unpersuasive, fail as a matter of Washington State law, and/or have not been proven.

In so concluding, the Arbitrator briefly addresses a point that impacts upon the entirety of the foregoing analysis related to Seagen's Breach of Contract Claim – namely, the apparently undisputed facts that the '877 application filed by DSC in Japan on October 11, 2012: was confidential/not made public until it was published in Japanese on April 17, 2014; and was not published in English until 2015.  Those facts are of course relevant.  However, for the reasons explained above, they are not dispositive under well-established Washington State law, because for purposes of accrual under the statute of limitations, knowledge of an alleged breach of contract is not the dispositive issue.  Those facts are also not dispositive with respect to the various exceptions to the statute of limitations that Seagen has identified.  Each of those exceptions requires, in essence, inequitable or fraudulent conduct by the breaching party, and an exercise of diligence by the non-breaching party.  Here though, the non-publication of the '877 application in English until 2015 does not plausibly represent either inequitable or fraudulent conduct by DSC.  But even if it did, the Arbitrator is not persuaded that Seagen displayed reasonable diligence after Dr. Senter admittedly learned of DS-8201 as a result of Dr. Abe's presentation at the Engineering & Therapeutics conference in December, 2015.  Instead, as discussed below in Section VII(B), it appears that Seagen did not commence a detailed analysis of DS-8201 until March, 2017, and even when it did, the documentary evidence does not suggest that Seagen personnel contemporaneously

---

by Seagen in this proceeding is reliant upon establishing such conduct or omissions – e.g., the applicability of equitable tolling, equitable estoppel and/or fraudulent concealment – the Arbitrator concludes that Seagen has not carried its burden of proof.

believed that DSC's ADC technology was plausibly related to or arose from Seagen's ADC technology.

Finally, the Arbitrator notes that there is no credible evidence in the record to plausibly suggests that, prior to the date of Dr. Abe's presentation in December, 2015, Seagen had any procedures in place that would, more likely than not, have identified the so-called "Improvement IP", even if it had been published in English.  (See 5/21/21 Siegall Witness Stmt. at ¶ 25 (Seagen's "competitive intelligence team" was "recently formed" as of "early 2019")).  To the contrary, in his May 21, 2021 Witness Statement, Mr. Siegall explained that he "paid little attention to DSC" until 2019, when he was informed that DS-8201 was likely to receive FDA approval – and thereby become a "significant competitor" to Seagen.  (Id. at ¶ 24-25).  Indeed, only then did Mr. Siegall instruct his "legal team to investigate", and "[a]fter careful investigation and discussion, [Seagen] determined that [DSC's] linker platform qualifies as an 'Improvement' that Seagen owns under the collaboration agreement."  (Id. at ¶ 26).  The Arbitrator is not persuaded that those facts reasonably demonstrate diligence on Seagen's part.[8]

Stated simply, the foregoing landscape does not support an exception to the six-year statute of limitations, irrespective of the circumstances surrounding the '877 application.  Indeed, as the Supreme Court of Washington reiterated in 1000 Virginia, "'compelling one to answer stale claims . . . is in itself a substantial wrong.'"  158 Wash. 2d at 566 (quoting Ruth, 75 Wash. 2d at 665).

---

[8]  The Arbitrator also notes that during his cross-examination at the Arbitration Hearing, DSC's Counsel questioned Dr. Siegall on the close temporal proximity in 2019 of Seagen's determination that DS-8201 represented an "Improvement" under the Collaboration Agreement, and DSC's announcement of a multi-billion dollar deal with AstraZeneca related to DS-8201/Enhertu.  (See 6/14/21 Hr'g Tr. at 175-177).  During his testimony, Dr. Seigall did not acknowledge a connection between those two events.  (See id.).  Nevertheless, the coincidence is conspicuous.

2.      *The Quiet Title Claim*

Seagen's Quiet Title Claim solely arises from Section 3.3.1 of the Collaboration Agreement.  More specifically, in support of that Claim, Seagen quotes the provisions of Section 3.3.1 that establish the Parties' agreement with respect to the <u>status</u> <u>quo</u> of any future "Improvements" by DSC to Seagen's "Drug Conjugation Technology" – <u>i.e.</u>, that they are "hereby assigned" by DSC to Seagen.  (<u>See</u> Amd. Demand at ¶ 108).  DSC argues that Seagen's Quiet Title Claim is untimely pursuant to both the six-year statute of limitations governing breach of contract actions under Washington State law, and the common law doctrine of laches.  For the reasons explained below, the Arbitrator agrees with DSC that the six-year statute of limitations governing breach of contract actions under Washington State law is also applicable to Seagen's Quiet Title Claim; and resultantly, that Claim is also time-barred.

In its Post-Hearing Briefs, Seagen argues that there is no statute of limitations for quiet title actions under Washington State law.  (<u>See</u> e.g., 7/26/21 Seagen P.H. Br. at 44-45 ("Washington has no statute of limitations that applies to a quiet title action.")).  As a general matter, Seagen appears to be correct.  <u>See</u> <u>Kent Sch. Dist. No. 415 v. Ladum</u>, 45 Wash. App. 854, 856 (1986) ("There is no statute of limitations with regard to an action to quiet title.")  However, as DSC correctly notes in its Post-Hearing Brief, persuasive authority establishes that under Washington State law, the applicable statute of limitations – or the lack thereof – is determined by examining the "gravamen" of the underlying cause of action.  (<u>See</u> 7/26/21 DSC P.H. Br. at 56-57).  Indeed, under Washington State law, "[t]he gravamen of the claim determines the applicable statute of limitations."  <u>Aberdeen Fed. Sav. & Loan Ass'n v. Hanson</u>, 58 Wash. App. 773, 776 (citing <u>Bradbury v. Nethercutt</u>, 95 Wash. 670, 672, 164 P. 194 (1917)).

Applying the foregoing precepts here, the Arbitrator is clearly convinced that on the face of Seagen's Amended Demand, the "gravamen" of its Quiet Title Claim is a breach of Section 3.3.1 of the Collaboration Agreement – i.e., the very same allegation that is the primary thrust of Seagen's subsequently-plead Breach of Contract Claim.  To that end, while Seagen declines to identify Section 3.3.1 in conjunction with its Quiet Title Claim, it specifically quotes – though without attribution – two clauses from Section 3.3.1 as the express and the sole basis for that claim. (See Amd. Demand at ¶ 108).  Moreover, when Section 3.3.1 is considered as a whole, the appropriateness of the relief that Seagen seeks through its Quiet Title Claim – i.e., quiet title to the Improvement IP via the "hereby assigns" clause in Section 3.3.1 – cannot plausibly be determined without undertaking the same breach of contract analysis mandated by Seagen's Breach of Contract Claim.  Indeed, when Seagen's Amended Demand is considered as a whole, it is apparent that Seagen's Quiet Title Claim simply requests an equitable remedy – namely, a declaratory judgment of quiet title arising out of Section 3.3.1 – that is entirely reliant upon the alleged breach of Section 3.3.1 that is expressly plead in Seagen's Breach of Contract Claim.  Stated simply, as a matter of law and logic, without establishing that breach, Seagen cannot prove its entitlement to quiet title.  Ultimately then, lexical semantics aside, the Arbitrator is persuaded that Seagen's Quiet Title Claim is nothing more than a request for specific performance of Section 3.3.1; and the gravamen of that request, of course, is quintessentially contractual.

For these reasons, the Arbitrator concludes as a matter of Washington State law that: (1) the "gravamen" of Seagen's Quiet Title Claim is DSC's alleged breach of Section 3.3.1 of the Collaboration Agreement; (2) because it is, the six-year statute of limitations that is applicable to breach of contract actions also applies to Seagen's Quiet Title Claim; and (3) because it does, Seagen's Quiet Title Claim is also time-barred for all of the same reasons discussed above with

respect to Seagen's Breach of Contract Claim.[9]  Based upon those conclusions, DSC's alternate argument related to the doctrine of laches is moot, and need not be addressed.

*3.      Conclusion*

For the reasons explained above, the Arbitrator concludes that Seagen's Breach of Contract Claim and Quiet Title Claim are both untimely pursuant to the six-year statute of limitations for breach of contract actions under Washington State law.  See RCW § 4.16.040(1).  Therefore, both of Seagen's affirmative claims in this proceeding fail as a matter of Washington State law and must be DENIED.

*B.      "Improvements" Related To "Drug Conjugation Technology"*

Following the Arbitrator's conclusion that both of Seagen's Claims in this proceeding are time-barred, the Parties' myriad other factual and legal contentions are moot.  Nevertheless, for the avoidance of any doubt, the Arbitrator clarifies that Seagen did not carry its burden of proving by a preponderance of the relevant and credible evidence adduced in conjunction with the Arbitration Hearing and/or the Reopened Arbitration Hearing that its fundamental contention in

---

[9] In so concluding, for completeness, the Arbitrator notes the alternate assertion made by Seagen in its July 26, 2012 Opening Post Hearing Brief, that federal law forecloses application of Washington State's statute of limitations to its Causes of Action in this proceeding.  (See 7/26/22 Seagen P.H. Br. at 45 (citing DBB Techs., L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008)).  The Arbitrator does not agree.  To the contrary, in its August 13, 2021 Responsive Post-Hearing Brief, DSC cites authority from the Federal Circuit that makes clear: (1) declaratory judgment actions seeking ownership of patents are generally a matter of state law; and (2) state statutes of limitations apply in those actions.  (8/13/21 DSC P.H. Br. at 37 (citing Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 583 F.3d 832, 846 (Fed. Cir. 2009)).  Moreover, the Arbitrator notes that in Roche Molecular Sys., Inc., the Federal Circuit clarified and distinguished DBB Techs., L.L.C. by noting that decision was impelled by the underlying district court's conclusions with respect to applicable Texas state law, which foreclosed the defendant's assertion of certain affirmative defenses in that case.  Specifically, in Roche Molecular Sys., Inc., the Federal Circuit determined that applicable California law did not similarly foreclose the assertion of various affirmative defenses, including the statute of limitations.  The Arbitrator is persuaded that the same situation exists with respect to applicable Washington State law in this case, and that DBB Techs., L.L.C. is inapposite for the same reasons.

39

this proceeding has merit – <u>i.e.</u>, that the so-called "Improvement IP" actually reflects any "Improvement" related to "Drug Conjugation Technology" within the reasonable meaning of the Collaboration Agreement.

To that end, relevant here, the Arbitrator reiterates that the Collaboration Agreement establishes as follows:

> **Improvements.**   In the event that, during the Term, Licensee conceives, develops or reduces to practice an Improvement that relates to the Drug Conjugation Technology, Licensee shall promptly notify SGI of the discovery of such Improvement.  SGI shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such Improvements shall have been conceived, developed or reduced to practice by Licensee, Licensee hereby assigns all of its right, title and interest therein to SGI.  SGI's interest in any such Improvements that it Controls shall be included in the SGI Technology and made available to Licensee via the Exclusive License provided in Article 3.  Licensee may use such Improvement assigned to SGI by Licensee for any purpose within the scope of the Exclusive License granted herein solely during the Term of this Agreement.

(RX-0008 at §3.3.1) (emphasis in original).

The Arbitrator also reiterates that the Collaboration Agreement defines the terms "Improvements" at Section 1.1.32 and "Drug Conjugation Technology" at Section 1.1.17, in pertinent part as follows:

> **"Improvements"** means all patentable or non-patentable inventions, discoveries or other know-how developed and Controlled by either Party after the Effective Date that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology . . . .

> **"Drug Conjugation Technology"** means (a) cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic compounds

40

to antibodies and (c) any related assays and methods SGI provides
to Licensee pursuant to the Research Program.

(Id. at § 1.1.32 and 1.1.17) (emphasis in original).

When the foregoing relevant provisions within the Collaboration Agreement are considered in conjunction – as they must be – the fundamental question presented is whether Seagen has proven by a preponderance of the evidence that the so-called "Improvement IP" actually reflects an "Improvement that relates to the Drug Conjugation Technology" as both of those underlined terms are defined.  Indeed, that fundamental question must be answered in the affirmative for Seagen to potentially prevail on the merits of either Cause of Action it has asserted against DSC.  However, for the reasons explained below, the Arbitrator is not persuaded that Seagen has carried its burden of proof with respect to that fundamental question.

Here, DSC has established by a preponderance of the relevant and credible evidence in the record that DS-8201 utilizes DSC's proprietary cytotoxin, DX-8951.  (5/6/21 King Rpt. at ¶ 66). As Dr. King explained in his May 6, 2021 Rebuttal Report: "DX-8951 belongs to the camptothecin family of cytotoxins, and was developed in the 1990s by a predecessor company of DSC . . . . Camptothecins cause DNA damage and cell death by inhibiting Topoisomerase I."  (Id. at ¶ 66). As Dr. King further explained in his Rebuttal Report: "DSC's non-traceless linker is uniquely designed to release a payload that is an active derivative of DX-8951.  In other words, a part of the spacer remains bound to DX-8951 to form the payload."  (Id. at 67).  Specifically, "[t]he remaining part of the spacer (hydroxyacetyl) remains bound to DX-8951 to form the payload DXd (**_DX_**-8951 **_d_**erivative).  DSC's linker is, therefore, a **_non-traceless_** linker."  (Id.) (emphasis in original).  Thus, the Arbitrator is persuaded and therefore finds that DS-8201 utilizes the proprietary camptothecin DX-8951, which results in the active payload DXd-8951 by virtue of the non-traceless linker.

Contrarily, as Dr. King persuasively noted in his Rebuttal Report: "Seagen's ADC technology is appropriately described as 'auristatin based' because Seagen uses the cytotoxins monomethyl auristatin E (MMAE) or monomethyl auristatin F (MMAF)."  (Id. at 70).  MMAE and MMAF "[b]oth belong to the auristatin family of cytotoxins, which kill cells by inhibiting tubulin formation."  (Id.).  Indeed, during her cross-examination at the Arbitration Hearing on June 17, 2021, Dr. Bertozzi acknowledged that, to her understanding: "Seagen's FDA-approved ADCs use analogs of auristatin, and it's true DS-8201 has a DXd payload, which is a different payload from the Seagen drug."  (6/17/21 Hr'g Tr. at 691).  Moreover, as Dr. King also persuasively noted in his Rebuttal Report: "Seagen's cleavable linker ADC technology uses traceless linkers that release an unmodified cytotoxin."  (5/6/21 King Rpt. at ¶ 46).  Thus, the Arbitrator is persuaded and therefore finds that Seagen's ADC technology utilizes an auristatin-based payload with a traceless linker that results in the release of an unmodified cytotoxin.[10]

As relevant here, the defined term "Drug Conjugation Technology" – which Section 3.3.1 unambiguously establishes must be the basis for any "Improvements" – means "cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof . . . ."  (RX-0008 at §1.1.17) (emphasis added).

With respect to that definition, in their respective Post-Hearing Briefs, the Parties advocate for diametrically opposed constructions of the pivotal term "such as".  More specifically, on the

---

[10]  With respect to the aforementioned findings of fact, the Arbitrator understands and appreciates that those issues – and many others – were strongly contested throughout this proceeding.  As such, to the extent the aforementioned findings of fact are discordant with any testimony offered by a fact witness, an opinion offered by an expert witness, or documentary evidence that has been admitted into the record, the Arbitrator has not found that testimony/opinion/evidence persuasive and/or has not accorded it great weight when viewed in the context of the entire (voluminous) evidentiary record developed in conjunction with the Arbitration Hearing and the Reopened Arbitration Hearing.

one hand, Seagen argues that in context the term "such as" merely introduces two examples of cytotoxins that would fit within the definition, but otherwise serves no limiting function.  (7/26/21 Seagen P.H. Br. at 7 (citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994)).  On the other hand, DSC argues that in context the term "such as" functions to limit "the sub-class of compounds to which MMAE and MMAF belong, namely auristatins"; DSC also asserts that Seagen's proposed construction would render portions of the definition superfluous in contravention of well-established Washington State law.  (7/26/21 DSC P.H. Br. at 29 (citing, e.g., Wash. Pro. Real Estate LLC v. Young, 190 Wash. App. 541, 551 (2015) ("An interpretation of a contract that gives effect to all provisions is favored over an interpretation that renders a provision ineffective, and a court should not disregard language that the parties have used.")).

The Arbitrator agrees with DSC.  As discussed above, Washington State law adopts "the 'objective manifestation' theory of contract interpretation focusing on the reasonable meaning of the contract language to determine the parties' intent."  Alyeska Ocean, 190 Wash. App. at 314 (internal citations and quotations omitted).   Further, as DSC correctly notes in its July 26, 2021 Post-Hearing Brief, under Washington State law, "a contract can be informed not only by its language, but also by its subject matter and objective, all the circumstances surrounding its making, and the reasonableness of the respective interpretations advocated by the parties."  (7/26/21 DSC P.H. Br. at 22 (citing Wash. Pro. Real Estate, 190 Wash App. at 549)).

Applying those precepts here, the Arbitrator has found that Seagen's ADC technology utilizes an auristatin-based payload with a traceless linker that results in the release of an unmodified cytotoxin.  Based upon those findings, the Arbitrator is persuaded that the most reasonable meaning of the term "such as" in the defined term "Drug Conjugation Technology" is to limit the scope of the definition to the actual boundaries of Seagen's ADC technology that is

the subject of the Collaboration Agreement – namely, drug payloads in the auristatin class, as exemplified by the cytotoxins MMAE and MMAF.  That result comports with Washington State law in at least three critical respects: (1) it effectuates the objective manifestation theory of contract interpretation; (2) it favors an interpretation that gives substantive effect to the "such as" clause, versus Seagen's proposed interpretation that would render that clause substantively meaningless, and therefore superfluous; and (3) it favors DSC's more objectively reasonable interpretation of the "such as" clause – namely, that the Parties commonsensically intended to tether the scope of the term "Drug Conjugation Technology" to the type of ADC technology that Seagen actually possessed.  Indeed, with respect to the last point, it defies credulity to suggest that DSC – a sophisticated international pharmaceutical conglomerate – would intentionally agree to assign Seagen "any right, title and interest" in a potential future drug that utilizes DX-8951, a proprietary cytotoxin that it had already developed at the time the Collaboration Agreement was executed.

The Arbitrator further notes that, with respect to assessing "the reasonableness of the respective interpretations advocated by the parties" in relation to Section 1.1.17 of the Collaboration Agreement, relevant aspects of the March 11, 2022 Opening Expert Report of Dr. John M. Lambert, and his subsequent testimony during the Reopened Arbitration Hearing related thereto, are persuasive.  More specifically, in conjunction with the Reopened Arbitration Hearing, Dr. Lambert: (1) persuasively corroborated the opinions previously offered by Dr. King in relation to the critical (and highly relevant) differences between the campothecin-based ADC technology developed by DSC and utilized in DS-8201, versus the auristatin-based ADC technology developed by Seagen; (2) persuasively explained and further corroborated the ground-breaking nature of DSC's campothecin-based ADC technology and the "buzz" and "immediate industry interest" that accompanied Dr. Abe's presentation related to DS-8201's "structure and preclinical

data" at the 2015 Antibody Engineering & Therapeutics conference that Dr. Senter also attended; (3) analyzed documentary evidence that, in sum, clearly shows Seagen undertook an in-depth analysis of DS-8201 not later than March, 2017, based on the recognition that DS-8201 "may change the playing field pretty quickly", but that Seagen was ultimately unsuccessful in developing its own campothecin-based ADC technology; and (4) his observation that the documentary evidence does not suggest that during the in-depth analysis of DS-8201, Seagen personnel suggested – and far less clearly expressed – that DSC's ADC technology was plausibly related to or arose from Seagen's ADC technology, either generally or with respect to the Collaboration Agreement.  (See generally, 3/10/22 Lambert Rpt.).  The Arbitrator accords significant weight to Dr. Lambert's testimony on the aforementioned points, as well as the underlying documentary evidence that he cites.[11]  (See e.g., RX-1571, RX-1569, RX-1583, RX-1521).   The Arbitrator is persuaded that the aforementioned points strongly support the objective reasonableness of DSC's proposed interpretation of Section 1.1.7 of the Collaboration Agreement – and, indeed, of the Collaboration Agreement as a whole – and correspondingly render Seagen's proposed interpretation implausible.

For these reasons, the Arbitrator concludes that DS-8201 does not meet the definition of "Drug Conjugation Technology" under Section 1.1.17 of the Collaboration Agreement.  Because it does not, the Arbitrator concludes that Seagen has failed carry its burden of proving that the so-

---

[11] The Arbitrator notes that during his cross-examination at the Reopened Arbitration Hearing, Dr. Lambert's testimony with respect to each of the aforementioned points – whether offered through his March 11, 2022 Opening Expert Report, his March 25, 2022 Responsive Expert Report, or his live direct testimony – was not significantly addressed.  Therefore, the veracity and credibility of Dr. Lambert's testimony with respect to each of the aforementioned points has not been effectively challenged.  For the avoidance of doubt, to the extent that Dr. Bertozzi or any other Seagen witness has offered disparate testimony and/or opinions with respect to each of the aforementioned points, the Arbitrator has accorded greater weight to the testimony and opinions of Dr. Lambert.

called "Improvement IP" reflects an "Improvement that relates to the Drug Conjugation Technology" under Section 3.1.1. of the Collaboration Agreement.[12]  Therefore, even assuming <u>arguendo</u> that Seagen's Claims are not time-barred, the Arbitrator clarifies that they also fail on their merits, and must be DENIED.

## VIII.   <u>DSC's Request for an Award of its Attorneys' Fees and Costs</u>

### A.   *Procedural History*

At Section VIII of the Interim Award, entitled "Future Proceedings", the Arbitrator determined as follows:

> Section 19.3.4 of the Collaboration Agreement establishes that: "[t]he judgment rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses." (RX-0008 at § 19.3). Therefore, following issuance of this Interim Award, the Parties shall promptly meet and confer, and not later than August 31, 2022, make a single joint submission that explains the Parties' agreement and/or respective positions on the need for/suggested structure of future proceedings related to any request for an award of, <u>inter alia</u>, attorneys' fees pursuant to Section 19.3.4 of the Collaboration Agreement.

(Interim Award at 45).

Accordingly, the Parties provided a joint submission on August 31, 2022, in which they explained their stipulation that: (1) by September 14, 2022, DSC would make a submission to the Arbitrator that sets forth (a) its request for an award of reasonable attorneys' fees and costs, and (b) the categories attorneys' fees and costs that should be shifted, the amounts for each category,

---

[12]  In so concluding, for completeness, the Arbitrator notes that for all the same reasons discussed above with respect to the defined term "Drug Conjugation Technology", Seagen has not proven by a preponderance of the relevant and credible evidence that any alleged "Improvements" at issue in this proceeding reasonably meet the definition of that term as established at Section 1.1.32 of the Collaboration Agreement, because they necessarily do not "utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology".

and a supporting affidavit; (2) by October 12, 2022, Seagen would submit any response to DSC's request; and (3) DSC would submit any reply by November 2, 2022.  (See 8/31/22 Jt. Ltr.).  The Arbitrator adopted the Parties' stipulation on September 1, 2022, and in doing so, stated as follows:

> Given the size and complexity of this proceeding, I agree that a categorical approach to DSC's request – and any disputes arising therefrom – is appropriate, and strongly urge the Parties to avoid the need for me to undertake a granular/detailed review of time entries and/or invoices as part of their forthcoming submissions.

(9/1/22 ICDR Email).

Pursuant to the aforementioned stipulation, the Parties timely made respective submissions that reflected, in sum: (1) DSC's request for a total award of $58,092,301.58 and ¥3,436,666 that collectively consists of "(i) Arbitrator fees and expenses; (ii) hearing and support services expenses; (iii) outside counsel attorneys' fees and expenses; (iv) expert witness fees and expenses; and (v) fact witness expenses" (9/14/22 DSC Mot. Br. at 2); and (2) Seagen's objections – stated in both general and categorical terms – to an award of any amount pursuant to Section 19.3.4.

On November 10, 2022, after the Parties' submissions had been made, Seagen requested that the Arbitrator "stay his ruling on Respondent DSC's request for fees" pending resolution of a petition to vacate the Interim Award that Seagen filed in the United States District Court for the Western District of Washington.  (11/10/22 Seagen Email).  DSC submitted a letter in opposition to that request on November 21, 2022, and Seagen submitted a letter in reply on December 1, 2022.

In an Order dated December 18, 2022, the Arbitrator denied Seagen's request for a stay, and addressed other issues collectively presented by the Parties' submissions as follows in pertinent part:

- DSC's assertion that the Arbitrator should apply certain concepts drawn from the realm of "international arbitration" as discussed in various scholarly publications is unavailing.  As the

47

Arbitrator made clear in the Interim Award, the AAA Rules and the substantive laws of the State of Washington and/or the United States of America are applicable in this proceeding and have been consistently and exclusively applied since its inception. (See Interim Award at § IV). Accordingly, it is the Arbitrator's expectation that the Parties' future arguments – like their arguments prior to the Interim Award – will be based upon those applicable sources of authority.

- Relatedly, the primary question presented by the Parties' submissions is the extent to which DSC's requested attorneys' fees are "reasonable" within the meaning of Section 19.3.4 of the Collaboration Agreement. It follows that the yardstick for gauging "reasonableness" in this context will be substantive Washington law, which as reiterated above, governs the Collaboration Agreement.

- Under Washington State law, DSC bears the burden of proving that its requested attorneys' fees and costs are "reasonable", and to bear that burden, DSC must provide, inter alia, "reasonable documentation of the work performed in order to allow the court to assess whether the number of hours expended was reasonable." (10/12/22 Seagen Opp'n Br. at 4 (quoting Zones, Inc. v. Evergreen Info. Tech Servs., Inc., No. 2:17-CV-00457-RAJ, 2019 WL 6894676, at *1 (W.D. Wash. Dec. 18, 2019) (internal quotations omitted)). Axiomatically, the "lodestar" paradigm is a well-accepted – if not mandatory – method of gauging reasonableness under Washington State law. (See id. at 5 (citing, e.g., Crest Inc. v. Costco Wholesale Corp., 128 Wash. App. 760, 773 (Wash. Ct. App. 2005)).

- To the extent that DSC asserts, either expressly or impliedly, that Seagen agreed to waive or otherwise abrogate DSC's burden to prove the reasonableness of its requested attorneys' fees and costs under Washington State law by virtue of the Parties' August 31, 2022 stipulation, the Arbitrator disagrees.

- Finally, to the extent that Seagen argues that the attorneys' fees and costs it claims to have accrued to date in this proceeding are relevant to the reasonableness inquiry that the Arbitrator must undertake with respect to DSC's request, the Arbitrator disagrees.

(12/18/22 Order at 4-5).

In view of that guidance, the Arbitrator instructed the Parties to again promptly meet and confer, and "make an additional single joint submission that explains: (1) their agreement upon a process [to address DSC's request]; (2) if the Parties are not in complete agreement, any areas or issues upon which the Parties do agree; and/or (3) the Parties' respective proposals – made in appropriate detail – for an effective process that reasonably accords with Washington State law." (Id. at 6).

Accordingly, the Parties provided another joint submission on January 24, 2023, that "[made] clear that despite the guidance provided by the Arbitrator in [the December 18, 2022 Order], the Parties remain unable to reach agreement on any issue related to DSC's request for an award of its attorneys' fees and costs pursuant to Section 19.3.4 of the Collaboration Agreement." (2/8/23 Order at 2).  Rather, in conjunction with that joint submission, the Parties each provided a "Position Statement" that presented "their separate and entirely disparate proposals for how the Arbitrator should address what is undisputedly the sole remaining issue in this arbitration."  (Id.). In an Order dated February 8, 2023, the Arbitrator summarized the Parties' respective Position Statements as follows:

> [I]n its Position Statement, DSC proposes to compile and submit several types of detailed, categorical charts that will demonstrate a "task-based" month-by-month analysis of, inter alia, the attorneys' fees it seeks; on the other hand, in its Position Statement, Seagen primarily proposes that the Arbitrator "retain an auditor to conduct a review of DSC's time entries and invoices to determine their reasonableness", or alternatively, that the Arbitrator conduct an independent in camera review of DSC's billing records.  While both Parties propose additional briefing, DSC advocates for iterative submissions over the course of several months, while Seagen advocates for the the simultaneous submission of truncated briefs shortly after the prospective auditor's report is submitted.  Perhaps the only commonality between the Parties' Position Statements is that they both endeavor to support their respective proposals with citation to Washington State law.

(Id. at 2).

Ultimately, the Arbitrator chose the general framework presented by DSC, and explained

that decision as follows:

> Based upon the present record, the Arbitrator is persuaded that DSC's proposal, which envisions detailed categorical breakdowns of fees and costs over time, is practicable under Washington State law.

> To that end, the Supreme Court of Washington has made clear that the foundation for an award of attorney's fees and costs must be a record that allows meaningful appellate review given the discretionary nature of the undertaking: specifically, a trial court "must supply findings of fact and conclusions of law sufficient to permit a reviewing court to determine why the trial court awarded the amount in question." SentinelC3, Inc. v. Hunt, 181 Wash. 2d 127, 144 (2014) (citing Mahler v. Szucs, 135 Wash. 2d 398, 435 (1998)).  Seagen correctly asserts in its Position Statement that, as part of building such a record here, the Arbitrator: "must take an active role in assessing the reasonableness of fee awards, rather than treating cost decisions as a litigation afterthought.  Courts should not simply accept unquestioningly fee affidavits from counsel." (Seagen Position Stmt. at 3 (quoting Mahler 135 Wash. at 434-435 (emphasis in original)).    However, Seagen overreaches in its proffered application of the foregoing precedent to the present circumstances.

> Indeed, contrary to Seagen's apparent arguments, it does not follow from the plain meaning of Mahler and its progeny that: the "active role" the Arbitrator must take in determining an appropriate award requires a detailed review of underlying billing records, much less the independent, granular in camera review urged by Seagen; or that DSC's proposal would plausibly require the Arbitrator to "simply accept unquestioningly fee affidavits from counsel." Instead, the Arbitrator is persuaded that, viewed fairly, the various cases cited by the Parties in their Position Statements collectively support the establishment of an efficient process that will allow the Arbitrator to meaningfully assess the reasonableness of DSC's request via, inter alia, the type of "lodestar" calculation that those cases exhaustively discuss.  The Arbitrator concludes that DSC's proposal represents such an approach, and will presumptively form an adequate basis for the findings of fact and conclusions of law that Washington State law requires.

> Notwithstanding that conclusion, the Arbitrator is persuaded that one discrete objection made by Seagen to DSC's proposal has

merit and should be preemptively addressed.  Specifically, Seagen contends that by not providing the underlying billing records, DSC's categorical approach will not "permit a proper analysis of reasonableness under Washington State law" because it will not allow for an assessment of, e.g., attorney hours potentially spent on duplicative tasks, parallel proceedings, non-attorney personnel costs, etc.  (See generally, Seagen's Position Stmt at 3-4).  Seagen's foregoing objection appears to highlight a shortcoming in DSC's proposal that will foreseeably undermine Seagen's ability to make what are essentially standard objections to DSC's proposed lodestar calculation, such as the examples noted above.

To effectively address Seagen's objection without surrendering the efficiencies that DSC's proposal embodies, the Arbitrator concludes that it is appropriate to augment/modify DSC's proposal as follows: after DSC serves its summary charts, Seagen may promptly select any six (6) discrete months during which DSC incurred attorneys' fees and costs; DSC will promptly provide Seagen with the complete underlying billing records for those months; and those billing records should reflect only narrow redactions made on the basis of privilege.  With the benefit of the underlying billing records for those six discrete exemplar months – which the Arbitrator expects will be selected by Seagen based upon their likelihood to serve as representative exemplars – the Arbitrator is satisfied that Seagen will have an objectively fair and reasonable basis upon which to raise and support any appropriate objections.

In so concluding, the Arbitrator clarifies four points: (1) pursuant to well-established Washington State law, DSC shall bear the burden of demonstrating the reasonableness of the award it has requested, and the Arbitrator expects that DSC shall do so via the lodestar calculation framework (see Berryman v. Metcalf, 177 Wash. App. 644, 657 (2013)); (2) to the extent that Seagen ultimately contests the reasonableness of the hourly rates charged by individual attorneys representing DSC, the Arbitrator expects that Seagen will support its position by providing the contemporaneous hourly rate charged by individual attorneys of analogous experience representing Seagen; (3) all other arguments made by the Parties in their respective Position Statements – particularly Seagen in opposition to DSC's proposal – may be renewed as part of their subsequent submissions; and (4) notwithstanding anything herein, the Arbitrator maintains the discretion to direct future proceedings as necessary to generate a record that accords with Washington State law.

(Id. at 4-6).

Based upon the Arbitrator's foregoing conclusion, on March 17, 2023, DSC made an initial submission that renewed its request for a total award of $58,092,301.58 and ¥3,436,666, this time supported by three appended Exhibits that collectively reflected a detailed categorical "task-based" breakdown of the amounts sought.  Seagen submitted a response in opposition to DSC's request on May 23, 2023, and argued in sum that any award should be limited to a total of $10,232,157.89 and ¥169,076.  Notably, Seagen's response principally relied upon the appended Declaration of Jaqueline S. Vinaccia, Esq. – i.e., the individual that Seagen had (unsuccessfully) proposed be appointed as an auditor, and who Seagen subsequently engaged as Counsel.  DSC submitted a reply on June 20, 2023.

After reviewing the foregoing submissions, the Arbitrator determined that oral argument would be beneficial.  Given the challenges presented by summer schedules, the Arbitrator ultimately heard oral argument from the Parties' Counsel via Zoom on September 15, 2023.  Following oral argument, the Arbitrator determined that no additional submissions were necessary, and deemed the evidentiary record closed as of October 19, 2023, pursuant to AAA Rule R-39.  (See 10/20/23 ICDR Email).

B.    *Discussion*

1.    *Reasonable Attorneys' Fees*

DSC has requested an award of its "reasonable attorneys' fees" pursuant to Section 19.3.4 of the Collaboration Agreement in the total amount of $46,006,322.55.  (See 3/17/23 DSC Ex. 3 at 113).  Seagen opposes DSC's request and argues that the Arbitrator should apply various reductions that result in an adjusted amount of "reasonable attorneys' fees" that are a fraction of what DSC has requested.  For the reasons explained below, the Arbitrator concludes that – with one exception – DSC has established that the total amount of attorneys' fees it has requested is

reasonable, and concomitantly, that Seagen's various arguments in opposition to an award of that amount are without merit.

a.      *Exhibit 3*

DSC's request is primarily supported by Exhibit 3 to its March 17, 2023 submission ("Exhibit 3").  In accordance with the Arbitrator's February 8, 2023 Order and DSC's underlying proposal, Exhibit 3 is a 113-page categorical chart that, for each month beginning in September, 2019 and continuing through June, 2022, provides the following nine columns of factual information:

(1) "Task Categories" that explain the work undertaken by DSC's Counsel – i.e., one of 28 discrete "Task-Based Categories" reflected on Exhibit 2 to DSC's March 17, 2023 submission;

(2) "Timekeeper Category" that explains the role/position of the individuals billing – e.g., "Partners/Of Counsel" or "Associates";

(3) "Effective Billed Rate" that essentially provides an average hourly rate in US Dollars;

(4) "Billed Rate Range" that explains the range of hourly rates in US Dollars for each "Timekeeper Category" – e.g., the range of hourly rates billed by "Associates" of "675-1050" US Dollars;

(5) "Hours" – i.e., the total number of hours billed;

(6) "Timekeeper Category Total" in US Dollars;

(7) "Monthly Task Category Total" in US Dollars;

(8) "Monthly Invoice Total" in US Dollars;

(9) "Monthly Amount Requested" – i.e., the attorneys' fees actually incurred by DSC in US Dollars net of any discounts that were negotiated from the invoiced amount.

Importantly, the amounts reflected in this column aggregate to the total amount of attorneys' fees that DSC seeks.

(See generally 3/17/23 DSC Ex. 3).

> ### b.   The Lodestar Methodology

The Arbitrator previously decided that pursuant to Washington State law, DSC must prove the reasonableness of the attorneys' fees it seeks through the "lodestar" methodology.  (See e.g., 2/8/23 Order at 6 (citing Berryman, 177 Wash. App at 657)).   In light of that decision, DSC correctly notes in its March 17, 2023 submission that under Washington State law, "the lodestar methodology contains two main steps":

> *First*, a decision-maker determines a lodestar base by multiplying a reasonable hourly rate by the number of hours reasonably expended. *Second*, the decision-maker may consider whether to adjust the that base to reflect factors not yet considered, such as the contingent nature of success in the action or the quality of the legal representation.  There is a strong presumption that the lodestar base represents a reasonable fee, and the burden of justifying any deviation from the lodestar base rests on the party proposing the deviation.

(3/17/23 DSC Mot. Br. at 13 (citing Bowers v. Transamerica Title Ins. Co., 100 Wash. 2d 581, 597-600 (1983)).  DSC further correctly notes that, under Washington State law, "any adjustments to the lodestar base are both 'discretionary and rare.'"  (Id. (quoting Deep Water Brewing, LLC v. Fairway Res., Ltd., 170 Wash. App. 1, 10 (2012)).  The Arbitrator applies the foregoing two-step framework below.

> ### i.   The First Step of the Lodestar Methodology

Having thoroughly reviewed Exhibit 3 in conjunction with the entire corpus of the Parties' respective submissions, the Arbitrator is clearly convinced that DSC has carried its burden of

proving that its requested attorneys' fees are "reasonable" – as both Washington State law and the plain terms of Section 19.3.4 of the Collaboration Agreement demand.

To that end, Exhibit 3 is a voluminous document that, in sum, details on a monthly basis: the various tasks that DSC's Counsel undertook; the allocation of responsibility for those tasks; how many hours were billed by the individuals working on specific tasks; the rates those individuals were charging; and how much expense DSC actually incurred. Thus, through Exhibit 3, DSC has distilled and cogently organized the information necessary to support a lodestar base calculated both on a micro level (because Exhibit 3 fundamentally provides a discrete lodestar basis for each month in which DSC incurred attorneys' fees), as well as on a macro level (because the monthly data aggregates into DSC's overall lodestar basis). The Arbitrator finds that by providing the information organized within Exhibit 3, DSC has demonstrably satisfied the threshold requirement under Washington State law of facilitating the calculation of a lodestar base that presumptively validates the attorneys' fees it has requested.

The Arbitrator further concludes that by virtue of the monthly billing information contained within Exhibit 3, other imperatives established by Washington State law that were identified by the Arbitrator in prior guidance are also satisfied. Specifically, DSC has provided an evidentiary record that allows the Arbitrator to make findings of fact and conclusions of law with respect to DSC's request – which, for the avoidance of doubt, the Arbitrator has done herein by finding DSC's request amply supported by the facts that are summarized in Exhibit 3 and reasonable as a matter of Washington State law. (See 2/8/23 Order at 4 (citing SentinelC3, Inc. v. Hunt, 181 Wash. 2d 127, 144 (2014)). Moreover, in light of that evidentiary record, the Arbitrator's conclusions are well supported and, if appropriate, reviewable. (See id.). Finally, via Exhibit 3, DSC has provided the Arbitrator with an opportunity to take an "active role" in evaluating the

reasonableness of its request by presenting its supporting information in a format that provides insight into the categories of tasks that DSC's Counsel was undertaking on a monthly basis, and the attorneys' fees that resulted.  (Id. (quoting Mahler v. Szucs, 135 Wash. 2d 398, 435 (1998)).

        *c.*     *The Second Step of the Lodestar Methodology*

The second step of the lodestar methodology addresses whether Seagen has carried its burden of justifying the "discretionary and rare" action that it urges the Arbitrator to take – namely, reducing the "reasonable attorneys' fees" that DSC has requested by more than 75%, to an amount ranging between $14,051,762,94 and $8,442,342.79.  (5/23/23 Seagen Br. at 25).   The Arbitrator is generally not persuaded that Seagen has carried that burden.  To the contrary, for the reasons explained below – and with one exception – the Arbitrator concludes that the various reductions and exclusions proposed by Seagen are individually and collectively inappropriate.

- The Vinaccia Declaration:  Seagen's arguments in opposition to DSC's request are primarily supported by the May 23, 2023 Declaration of Jacqueline S. Vinaccia, Esq., an attorney licensed to practice law in California and a partner at Vanst Law LLP.  (Vinaccia Decl. at ¶ 1).  Ms. Vinaccia has apparently been engaged by Seagen as Counsel in this matter.  Throughout her 20-page, 84-paragraph Declaration, Ms. Vinaccia purports to "analyze" essentially every aspect of DSC's March 17, 2023 request for attorneys' fees and costs, and draws certain "conclusions" therefrom – e.g., that "[t]he rates requested by [DSC's Counsel at Paul Hastings LLP] are significantly higher than prevailing market rates for counsel performing similar work in the Seattle, Washington area", and that "DSC's request for fees and costs is largely unreasonable and unnecessary".  (Id. at ¶¶ 11, 81).  Ultimately, based upon her "analysis" and "conclusions", Ms. Vinaccia urges the Arbitrator to apply

the following percentage reductions to DSC's requested attorneys' fees: (1) 40% for the supposedly excessive rates charged by Paul Hastings LLP; (2) a further 40% for alleged "Duplicative or Wasteful Billing"; (3) another 15% for "Overly Vague or Redacted Entries"; and (4) a final 1.5% for "Non-Legal Tasks". (Id. at ¶82). Importantly, however, the Arbitrator previously rejected Seagen's proposal to appoint Ms. Vinaccia as an "'auditor' (or expert witness/special master)" in this matter for purposes of analyzing DSC's request. (2/8/23 Order at 3). And as DSC establishes in its June 20, 2023 reply, the Parties previously agreed that Ms. Vinaccia would not be offered as an expert witness in this proceeding. (See 6/20/23 DSC Reply at 6-10). Despite that procedural history – which unequivocally demonstrates that neither the Arbitrator nor the Parties consented to receive any expert testimony, "analysis" or "conclusions" from Ms. Vinaccia – the obvious and inescapable upshot of Ms. Vinaccia's May 23, 2023 Declaration is not to offer facts, but rather to proffer opinions and advocacy on Seagen's behalf in relation to facts that have been established by DSC through, inter alia, Exhibit 3. The Arbitrator concludes that Ms. Vincaccia's Declaration is both procedurally and substantively improper. It follows that the Arbitrator has accorded Ms. Vinaccia's Declaration no weight as evidence and has found it unpersuasive as attorney argument.

- The Reasonableness of Paul Hastings Rates: Seagen argues that because the seat of this arbitration is Seattle, Washington, DSC's "reasonable attorneys' fees" must be "informed by the rates charged by Washington attorneys with intellectual property experience". (See 5/23/23 Seagen Opp'n at 17-19). Based upon that argument – which, in turn, relies upon Ms. Vinaccia's Declaration – Seagen urges

the Arbitrator to reduce DSC's requested attorneys' fees by 40%.  The Arbitrator declines to exercise discretion and make any such reduction because while the Collaboration Agreement establishes that the seat of this arbitration is nominally Seattle, Washington, in reality this proceeding has had little connectivity to that location.  Rather, due to the challenges presented by the COVID-19 pandemic, this proceeding has largely been conducted virtually, with the Parties choosing to be primarily represented by top-tier national/international law firms with teams of attorneys based, respectively, in California and New York.  Seagen has identified no authority that persuades the Arbitrator that under the circumstances presented – i.e., the arbitration of a highly complex intellectual property dispute between sophisticated corporate entities with billions of dollars at stake – the 40% rate reduction that Seagen seeks is appropriate, and much less mandatory, based simply upon the nominal seat of this arbitration.  Relatedly though, Seagen argues that the blended hourly rates charged by Paul Hastings LLP should be reduced by 5% to effectively match the blended hourly rates that Seagen represents (and DSC does not apparently dispute) it was charged Morrison & Foerster LLP throughout this proceeding.  (Id. at 20 (citing 10/12/22 Chivvis Decl. at ¶ 13)).  The Arbitrator agrees with Seagen that a 5% reduction to the attorneys' fees charged by Paul Hastings LLP is appropriate to match the blended hourly rates that Seagen was charged.  Indeed, the Arbitrator concludes that it is "reasonable" for Seagen to reimburse DSC at the same blended hourly rate that it was charged throughout this proceeding for the services of Morrison & Foerster LLP that were: (1) also located outside of Seattle, Washington; (2) similarly undertaken by eminent and specialized

attorneys; and (3) similarly demonstrated exceptionally high quality.  Accordingly, the Arbitrator will reduce the total amount of attorneys' fees that DSC has requested in relation to Paul Hastings LLP (i.e., $45,922,105.9) by 5% (i.e., $2,296,105.3), thus yielding total reasonable attorneys' fees of $43,710,217.2 (i.e., ($43,626,000.6 in relation to Paul Hastings LLP) + ($44,344.33 in relation to Washington State Local Counsel) + ($39,872.28 in relation to Japan Local Counsel)).  (See 3/17/23 DSC Ex. 3 at 106, 112, 113).

- Other Percentage Reductions:  Seagen argues that the Arbitrator should make the following iterative percentage reductions to DSC's requested attorneys' fees: a 40% reduction for "duplicative work"; a 15% reduction for "vague entries"; at 1.5% reduction for "clerical work"; and a 10% reduction for "work useful in parallel litigation".  (See generally id. at 25).  In sum then, Seagen urges the Arbitrator to reduce Seagen's request by 66.5% – once again, primarily based upon the "analysis" and "conclusions" in Ms. Vinaccia's Declaration.  But having independently reviewed Exhibit 3, the Arbitrator is not persuaded that Seagen has carried its burden of proving that any of the aforementioned percentage reductions are appropriate.  To the contrary, as DSC has consistently and persuasively argued throughout its submissions in relation to the present request, the scope of Seagen's affirmative claims and requests for relief in this proceeding are exceptionally broad and placed billions at stake – whether through the ownership of intellectual property, money damages in the form of royalty payments, or perhaps both.  As Exhibit 3 clearly establishes, the efforts undertaken to defend DSC against those affirmative claims and requests for relief represented a Herculean, years-long

59

engagement by a team of highly skilled attorneys, paralegal professionals, and scientific advisors.  Having presided over this proceeding from its beginning, the Arbitrator is persuaded that the efforts expended by that team were proportional to unique challenges presented – including the billions that DSC stood to potentially lose – and that the amount of attorneys' fees that DSC incurred has been largely validated by the results its Counsel achieved, as fully explained throughout this Final Award.  It seems inevitable that, over the course of years, the billing records generated by myriad timekeepers on a complex engagement may reflect potential inconsistencies and imperfections.  But neither Washington State law nor the plain terms of Section 19.3.4 of the Collaboration Agreement demand perfection for the recovery of attorneys' fees.  Instead, both simply require reasonableness.  The Arbitrator concludes that DSC has met that burden, and contrarily, that Seagen has failed – through unfounded objections and unpersuasive anecdotes – to prove that any of the percentage reductions it seeks are appropriate, or in fact, are anything more than arbitrary.[13]

- <u>The Reopened Arbitration Hearing</u>: Seagen argues that DSC's request for $4,060,761.53 in attorneys' fees (as well as costs of at least $67,100) related to the Reopened Arbitration Hearing should be disallowed because they are of DSC's "own making" and a result of DSC's "own failure to produce responsive, relevant

---

[13] The Arbitrator notes that conclusion is illustrated by, <u>inter alia</u>, Seagen's persistent argument that DSC's request should be reduced by 10% to account for alleged "work useful in parallel litigation".  In response to that argument, DSC's Counsel has repeatedly affirmed "that it excluded from its request *any work* done on the Eastern District of Texas or PTAB litigation with respect to Seagen's '039 patent."  (6/20/23 DSC Reply at 5-6 (citing 3/17/23 Ratliffe Declaration at ¶ 6) (emphasis added by DSC)).  Given DSC's Counsel's affirmation on that point, Seagen's objection and the reduction it seeks appear baseless.

documents". (Id. at 16, 24). The Arbitrator does not agree. Seagen objected to DSC's decision to withhold the lab notebooks that initially gave rise to the Reopened Arbitration Hearing, and all of the proceedings related to the Reopened Arbitration Hearing were fundamentally undertaken at Seagen's request based upon its January 6, 2022 Motion to Reopen. It is of course unsurprising that, once the evidentiary record was reopened at Seagen's request/insistence, DSC also presented additional evidence in support of its positions. In view of that posture, the Arbitrator concludes that the attorneys' fees (and costs) incurred by DSC in relation to the Reopened Arbitration Hearing are "reasonable" pursuant to Section 19.3.4 of the Arbitration Hearing, and shall therefore be awarded to DSC.

- <u>Seagen's Attorneys' Fees</u>: Finally, Seagen argues that its attorneys' fees should form "a yardstick that can be used to judge the reasonableness of" DSC's attorney's fees. (9/15/23 Hr'g. Tr. at 50). To that end, Seagen's Counsel represented during oral argument on September 15, 2023, that Seagen's "ballpark" attorneys' fees for this proceeding are approximately $16 million. (Id. at 51). The Arbitrator does not find that argument availing. Specifically, as DSC has persuasively noted in its submissions, DSC and Seagen have not been similarly situated throughout this proceeding in the critical sense that DSC was required to gather evidence (dating back decades, across continents, in various forms and languages) and craft complex legal arguments (from various disciplines) in an effort to defend itself across the full spectrum of Seagen's very broad affirmative claims. To draw a military analogy, while Seagen had the strategic and tactical advantage of choosing its points of attack, DSC had to defend an extended front. Moreover, by its own

description, DSC was defending against a potentially existential threat with billions at stake.  Under those circumstances, the Arbitrator concludes that the disparity in attorneys' fees incurred by the Parties is not surprising, does not render DSC's requested fees unreasonable, and does not support any reduction.

2.     *Costs*

DSC has requested an award of its "Costs" in the total amount of $12,085,979.03 and ¥3,436,666.00.  (See generally, 3/17/23 DSC Ex. 1).  As explained by Exhibit 1 to DCS's March 17, 2023 submission, that total amount is comprised of the following four sub-categories:

- Arbitration Costs in the amount of $244,500.  Notably, that amount includes "the 50% share of costs for Arbitrator compensation and expenses that DSC has incurred in connection with the Arbitration for the period between inception and its September 14, 2022 Opening Statement."  (3/17/23 DSC Ex. 1 at 1 n. 1).

- Expenses in the amount of $10,229,063.93 and ¥3,267,590.  (Id. at 2-3).

- Expert Witness Costs and Fees in the amount of $1,516,691.20.  (Id. at 4).

- Fact Witness Costs in the amount of $95,723.90 and ¥169,076.  (Id. at 5).

In its May 23, 2023 opposition, Seagen does not challenge the appropriateness of an award to DSC for the amounts sought in relation to the following three sub-categories of "Costs": Arbitration Costs (i.e., $244,500); Expert Witness Costs and Fees (i.e., $1,516,691.20); and Fact Witness Costs (i.e., $95,723.90 and ¥169,076).  (See 5/23/23 Seagen Br. at 6).  Therefore, in substance, Seagen does not object to an award of "Costs" to DSC in the total amount of $1,856,915.10 and ¥169,076.

Seagen does, however, object to any amount sought by DSC for the sub-category entitled "Expenses".  Specifically, Seagen argues that, in stark contrast to the aforementioned three sub-categories of "Costs", Section 19.3.4 of "[t]he Collaboration Agreement does not permit recovery of such ancillary expenses [as DSC seeks], noting explicitly that the arbitrator 'shall' grant *only* 'costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses.'"  (Id. (quoting RX-0008 at § 19.3.4) (emphasis added by Seagen)).

Here, neither Party asserts that Section 19.3.4 of the Collaboration Agreement is ambiguous.  Rather, both Parties inherently argue that the plain language of Section 19.3.4 supports their respective positions: on the one hand, DSC argues that Section 19.3.4 clearly and unambiguously allows it to recover the "Expenses" that it seeks as part of its "costs of arbitration"; while on the other hand, Seagen argues that no provision within Section 19.3.4 can be reasonably understood to allow DSC to recover the types of "Expenses" at issue.  The Arbitrator agrees with Seagen.

As the Arbitrator noted above in Section (VII)(A)(1)(b)(i), under Washington State law it is a bedrock principle of contract interpretation that "where the contract presents no ambiguity and no extrinsic evidence is required to make sense of the contract terms, contract interpretation is a question of law."  Alyeska Ocean, 190 Wash. App. at 314 (cleaned-up).  And of course, "[i]f contract language is clear and unambiguous" then the written contract "must" be enforced.  Id. (cleaned-up).

Applying those foundational precepts, Section 19.3.4 mandates that the "judgment rendered by the arbitrator shall include" the following three discrete components: (1) "costs of arbitration"; (2) "reasonable attorneys' fees"; and (3) "reasonable costs for expert and other witnesses".  The Arbitrator is persuaded that on a basic level, the term "Expenses" does not form

any part of those three discretely mandated components – a fact that clearly undermines DSC's position, particularly because the Collaboration Agreement was negotiated by sophisticated counterparties.  The Arbitrator is further persuaded that on a more granular level, the constellation of "Expenses" that DSC seeks – e.g., "E-data Vendor Costs", "Airfare and Transportation Expenses", "Lodging Expenses", "Meal Expenses" – does not comport with a reasonable, commonsense understanding of the discrete "costs of arbitration" component upon which DSC relies.  Indeed, that axiom is illustrated by DSC's own March 17, 2023 submission, in which DSC categorizes "Arbitration Costs" as encompassing only those amounts that appear on various invoices issued to the Parties by the ICDR throughout this proceeding – with its sundry "Expenses" conspicuously tabulated separately.  (3/17/23 DSC Ex. 1 at 1).

Moreover, given the kaleidoscopic nature of the "Expenses" that DSC seeks, the Arbitrator is persuaded that if the term "costs of arbitration" were given the implausibly broad definition that DSC urges, that term would effectively subsume and obviate at least the discretely mandated component "reasonable costs for expert and other witnesses".  But that result is antithetical to Washington State law because as the Arbitrator explained above in Section (VII)(B), a contractual term should not be construed in a way that renders another term superfluous or "ineffective".  Wash. Pro. Real Estate LLC, 190 Wash. App. at 551.  Stated somewhat differently, the implausibly broad definition that DSC urges would – in practical effect – render Section 19.3.4 an umbrella indemnity policy for every penny spent by DSC in relation to this proceeding, so long as the expenditure was deemed "reasonable".  The Arbitrator is not persuaded that result comports either with the clear and unambiguous terms of Section 19.3.4 or common sense.

For these reasons, the Arbitrator concludes that the "Expenses" sought by DSC in the amount of $10,229,063.93 and ¥3,267,590 are not allowable under Section 19.3.4 of the

Collaboration Agreement as a matter of law, and accordingly, DSC's request for that amount shall be DENIED.  The Arbitrator further concludes that, based upon the plain language of Section 19.3.4 of the Collaboration Agreement – and in the absence of any apparent and/or meritorious objection by Seagen – the balance of "Costs" sought by DSC in its March 17, 2023 submission are allowable, and shall therefore be GRANTED in the total amount of $1,856,915.10 and ¥169,076.

In so concluding, the Arbitrator clarifies three points.

First, in light of the Arbitrator's determination that the "Expenses" sought by DSC are not allowable under Section 19.3.4 of the Collaboration Agreement, the Arbitrator need not address Seagen's alternative arguments under Washington State statutory law.  (See 5/23/23 Seagen Br. at 6-9).  Notably though, DSC has unequivocally argued that Seagen's arguments on that front are irrelevant and inapplicable.  (See 6/20/23 DSC Reply Br. at 47 ("No part of RCW 4.84.010, however, relates to arbitration proceedings in Washington State, and Seagen provides no authority for the proposition that this statute applies in this Arbitration (where, in any event, the terms of the fee-shifting provision in the Collaboration Agreement govern), because there is none.")).

Second, neither Party has couched its arguments in terms of the applicable AAA Rules. Nevertheless, for the avoidance of doubt, to the extent that any AAA Rule might be construed as granting the Arbitrator discretion to apportion some or all of the "Expenses" sought by DSC, the Arbitrator declines exercise any such discretion under the present circumstances – i.e., where Section 19.3.4 of the Collaboration Agreement does not otherwise provide for apportionment of the "Expenses" that DSC seeks.

Third and finally, in its March 17, 2023 submission, DSC appears to contemplate augmenting its request and seeking additional "Costs" that were accrued after its September 14, 2022 Opening Statement was submitted.  (See 3/17/23 DSC Ex. 1 at 1 n. 1 ("DSC can collect and

submit . . . additional Arbitration Costs and other recompensable costs and fees since DSC's 2022 Opening Statement at a time deemed appropriate by the Arbitrator.")).  However, the Arbitrator is not persuaded that an award of any additional "Costs" to DSC is appropriate.

To that end, Section 19.3.4 expressly requires that any "Costs" that are awarded be "reasonable".  Given the procedural history of this matter, any additional "Costs" incurred by DSC following its September 14, 2022 Opening Statement have directly arisen from DSC's attempt to satisfy its burden of proof under Washington State law for the award of attorneys' fees and costs that it seeks – a burden that the Arbitrator previously determined DSC failed to carry in conjunction with its September 14, 2022 Opening Statement.  Therefore, the shortcomings in DSC's September 14, 2022 Opening Statement have largely impelled the proceedings that followed, and thus, any additional "Costs" that DSC has incurred.  Under those circumstances, the Arbitrator cannot find that DSC's additional "Costs" are "reasonable", at least in the sense that Seagen should be required to bear them pursuant to Section 19.3.4 of the Collaboration Agreement.

## IX.  **Final Award**

The foregoing comprises the Arbitrator's Final Award pursuant to AAA Rule 47:

- Seagen's Breach of Contract Claim is DENIED;

- Seagen's Quiet Title Claim is DENIED;

- DSC's March 17, 2023 request for an award of its reasonable attorneys' fees pursuant to Section 19.3.4 of the Collaboration Agreement is GRANTED, and DSC is awarded reasonable attorneys' fees in the adjusted total amount of $43,710,217.20;

- DSC's March 17, 2023 request for an award of its costs is GRANTED IN PART AND DENIED IN PART, and DSC is awarded its costs in the adjusted total amount of $1,856,915.10 and ¥169,076.  For the avoidance of doubt, with respect to DSC's

requested "Arbitration Costs": (1) the administrative fees and expenses of the AAA/ICDR totaled $116,000; and (2) the compensation and expenses of the Arbitrator totaled $536,400.   Seagen shall reimburse DSC for $244,500 of those amounts, which is included within the adjusted total amount awarded above.

- This Final Award fully resolves and is in full settlement of all claims and requests for relief submitted to the Arbitrator in this arbitration.   To the extent that any factual assertion, expert opinion, legal argument, claim, counterclaim or defense raised by the Parties is not specifically mentioned herein, it is DENIED.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Seattle, Washington, United States of America.

_____
HON. GARRETT. E. BROWN, JR. (RET.)
ARBITRATOR

DATED: NOVEMBER 14, 2023

State of ____NEW JERSEY____ )
                                               ) SS:
County of ____MERCER____ )

I, GARRETT E. BROWN, JR., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

_____
HON. GARRETT. E. BROWN, JR. (RET.)
ARBITRATOR

DATED: NOVEMBER 14, 2023

| DINA M IBRAHIM |
| Notary Public |
| State of New Jersey |
| My Commission Expires Mar. 25, 2024 |

State of ____New Jersey____ )
                                               ) SS:
County of ____Mercer____ )

On this 14th day of November, 2023, before me personally came and appeared GARRETT E. BROWN, JR., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
NOTARY PUBLIC