1

2

3

4

5

6

7

Honorable James L. Robart

8

9

10

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

11   SEAGEN INC.,

12              Petitioner,

13        v.

14   DAIICHI SANKYO CO., LTD.,

15              Respondent.

Case No. 2:22-cv-01613-JLR

**PETITIONER SEAGEN INC.'S MEMORANDUM IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD**

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................1

II.     STATEMENT OF FACTS .............................................................................3

        A.      The Collaboration ............................................................................3

        B.      DSC's Parallel ADC Program ..........................................................6

        C.      The Dispute/ Procedural History .....................................................6

        D.      The First Arbitration Hearing ..........................................................7

        E.      The Reopened Arbitration Hearing ..................................................8

        F.      The Arbitration Award .....................................................................9

III.    ARGUMENT ................................................................................................11

        A.      An Arbitral Award Must Be Vacated When It Is Completely Irrational Or Exhibits A Manifest Disregard Of The Law ........................................................11

        B.      The Award Contradicts the Collaboration Agreement's Definition of "Drug Conjugation Technology" ..................................................12

                1.      The Award Disregarded the Express Language in the Definition of Drug Conjugation Technology .........................................12

                2.      The Award Allowed its Views About Reasonableness to Trump the Plain Terms of the Collaboration Agreement ...........................14

        C.      The Award's Application Of A Breach Of Contract Statute Of Limitations To The Quiet Title Claim Is Both In Manifest Disregard Of The Law And Completely Irrational ..............................19

        D.      The Award's Determination That DSC Should Receive More than $43 Million in Attorneys' Fees Is In Manifest Disregard For The Law ....................22

IV.     CONCLUSION .............................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*,
   918 F.2d 1215 (5th Cir. 1990) ...........................................................................11

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*,
   913 F.3d 1162 (9th Cir. 2019) ................................................................... *passim*

*Berryman v. Metcalf*,
   177 Wash. App. 644 (2013)................................................................................23

*Bowers v. Transamerica Title Ins. Co.*,
   100 Wash. 2d 581 (1983)...................................................................................23

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)...........................................................................................14

*Cedar Grove Composting, Inc. v. City of Marysville*,
   188 Wash. App. 695 (2015)................................................................................22

*Comedy Club, Inc. v. Improv W. Assocs.*,
   553 F.3d 1277 (9th Cir. 2009) ...............................................................12, 19, 22

*Cook v. Evanson*,
   920 P.2d 1223 (Wash. Ct. App. 1996) ..............................................................18

*Covington 18 Partners, LLC v. Attu, LLC*,
   No. 2:19-cv-00253-BJR, 2019 WL 3502512 (W.D. Wash. Aug. 1, 2019) ...........20

*DDB Techs., L.L.C. v. MLB Advanced Media, LP.*,
   517 F.3d 1284 (Fed. Cir. 2008).........................................................................21

*Fiore v. PPG Indus., Inc.*,
   169 Wash. App. 325 (2012)................................................................................22

*HayDay Farms Inc. v. FeeDx Holdings, Inc.*,
   55 F.4th 1232 (9th Cir. 2022) ............................................................................11

*Hearst Commc'ns, Inc. v. Seattle Times Co.*,
   154 Wash. 2d 493 (2005) (*en banc*)...................................................................16

*Kent Sch. Dist. No. 415 v. Ladum*,
   728 P.2d 164 (Wash. App. 1986)........................................................................20

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

iv

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mo. River Servs., Inc. v. Omaha Tribe*,
    267 F.3d 848 (8th Cir. 2001) ...............................................................................11

*Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg.*
    *Allied Indus. & Serv. Workers Int'l Union AFL-CIO CLC*,
    946 F.3d 195 (3d Cir. 2019)...............................................................................11

*Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*,
    820 F.3d 527 (2d Cir. 2016)...............................................................................11

*Pac. Motor Trucking Co. v. Auto. Machinists Union*,
    702 F.2d 176 (9th Cir. 1983) .........................................................................11, 15

*Petersen v. Schafer*,
    42 Wash. App. 281 (1985) ..................................................................................20

*PNY Techs., Inc. v. Netac Tech. Co.*,
    800 F. App'x 110 (3d Cir. 2020) ........................................................................12

*Providence St. Peter Hosp. v. United Staff Nurses' Union Local 141*,
    No. C08-5639RJB, 2009 WL 426300 (W.D. Wa. Feb. 19, 2009)..........................11

*Reid v. Dalton*,
    124 Wash. App. 113 (2004)................................................................................21

*Stead Motors v. Auto. Machinists Lodge No. 1173*,
    886 F.2d 1200 (9th Cir. 1989) ............................................................................13

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*,
    548 F.3d 85 (2d Cir. 2008), *cert. granted on other grounds*,
    557 U.S. 903 (2009)...........................................................................................12

*U.S. Life Credit Life Ins. Co. v. Williams*,
    919 P.2d 594 (Wash. 1996) (*en banc*) ...............................................................18

*United Paperworkers Int'l Union v. Misco, Inc.*,
    484 U.S. 29 (1987)............................................................................................11

*United Steelworkers v. Enter. Wheel & Car Corp.*,
    363 U.S. 593 (1960)......................................................................................12, 15

*Wachovia Sec., LLC v. Brand*,
    671 F.3d 472 (4th Cir. 2012) ..............................................................................12

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD        iii
Case No. 2:22-CV-01613-JLR

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**STATUTES**

9 U.S.C. § 10 ("Federal Arbitration Act") ................................................................11, 23

**OTHER AUTHORITIES**

AAA Commercial Rules R-21(b) ...................................................................................22

**SEAGEN INC.'S MEMO I/S/O PETITION TO**
**VACATE ARBITRATION AWARD**
**CASE NO. 2:22-CV-01613-JLR**

iv

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

1

## INDEX OF EXHIBITS

2

The exhibits listed herein refer to the exhibits to the Declarations of Matthew A. Chivvis

3

submitted in support of this, and Seagen's previous memorandum.

4

| Exhibit No. | Document Title | Short Title |
| --- | --- | --- |
| Exhibit 1 | July 2, 2008 Collaboration Agreement | Collaboration Agreement |
| Exhibit 2 | November 12, 2019 Arbitration Demand | Arbitration Demand |
| Exhibit 3 | June 24, 2020 Amended Arbitration Demand | Am. Arbitration Demand |
| Exhibit 4 | August 11, 2022 Interim Award pursuant to AAA Rule 47(b) | Interim Award |
| Exhibit 5 | April 23, 2020 Order | April 23, 2020 Order |
| Exhibit 6 | March 5, 2021 Expert Report of Carolyn Bertozzi | Bertozzi Report |
| Exhibit 7 | January 11, 2021 DSC's Response to Seagen's Motion to Reopen Arbitration | January 11, 2021 DSC's Response |
| Exhibit 8 | March 5, 2021 Expert Report of George Gould | Gould Report |
| Exhibit 9 | July 26, 2021 DSC Opening Posthearing Brief | DSC's Post-Hrg. Br. |
| Exhibit 10 | April 5, 2021 DSC Letter Request to File a Dispositive Motion | DSC's Request to File Dispositive Motion |
| Exhibit 11 | April 15, 2021 Order | April 15, 2021 Order |
| Exhibit 12 | June 4, 2021 Seagen Prehearing Brief | Seagen's Pre-Hrg. Br. |
| Exhibit 13 | June 4, 2021 DSC Prehearing Brief | DSC's Pre-Hrg. Br. |
| Exhibit 14 | July 26, 2021 Seagen Posthearing Brief | Seagen's Post-Hrg. Br. |
| Exhibit 15 | April 21, 2022 Seagen Opening Brief after Reopened Hearing | Seagen's Op. Br. after Reopened Hrg. |
| Exhibit 16 | August 13, 2021 Seagen's Responsive Posthearing Brief | Seagen's Resp. Post-Hrg. Br. |
| Exhibit 17 | January 25, 2022 Order | January 25, 2022 Order |
| Exhibit 18 | March 11, 2022 Bertozzi Supplemental Expert Report | Bertozzi Suppl. Report |
| Exhibit 19 | Email from G. Risdon to P. Senter FW: From Sankyo_SeattleG | CX-1041 |
| Exhibit 20 | Agenda for the meeting with Seattle Genetics, Inc. - May 23, 2006 | CX-1051 |
| Exhibit 21 | Agenda for Seattle Genetics / Daiichi Sankyo Conference Call - May 15th 2007 | CX-1068 |
| Exhibit 22 | DVComparison_Daiichi-Sankyo Collaboration Agreement (DS comments )-Daiichi-Sankyo Collaboration Agreement (v.3) | CX-1092 |

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

iv

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

| Exhibit 23 | Daiichi-Sankyo Collaboration Agreement (v.DS04223 4PM) | CX-1095 |
|---|---|---|
| Exhibit 24 | Daiichi-Sankyo Collaboration Agreement (v.4) | CX-1096 |
| Exhibit 25 | Daiichi-Sankyo ADC (v.DS0512) - Draft Collaboration Agreement between Seattle Genetics, Inc. and Daiichi Sankyo Co., LTD | CX-1097 |
| Exhibit 26 | Email from K. Schumacher to T. Iwabuchi cc'ing M. Kubik, E. Dobmeier, N. Ishida, Y. Yonekawa, T. Yamada, T. Miyata RE: Collaboration Agreement | CX-1102 |
| Exhibit 27 | Example Method for Technology Transfer Purposes Only Determination of (1) Drug-Load Distribution of Light and Heavy Chains and (2) Average Drug-to-antibody Molar Ratio of an Antibody-Drug Conjugate by RPHPLC | CX-1109 |
| Exhibit 28 | In-Process Determination of 1-Drug-Loaded Conjugate Species using HIC-HPLC | CX-1110 |
| Exhibit 29 | Determination of ADC Drug-Load Distribution and Average Drug-to-Antibody Molar Ratio by HIC-HPLC | CX-1111 |
| Exhibit 30 | Daiichi Sankyo/Seattle Genetics ADC Collaboration Kick-Off Meeting - Tuesday July 29, 2008, Seattle Genetics, Inc., Bothell, WA Hellstrom Board Room | CX-1114 |
| Exhibit 31 | Development of ADC Drug Substance Manufacturing Process | CX-1132 |
| Exhibit 32 | Antibody-Drug Conjugation Process | CX-1133 |
| Exhibit 33 | CS1008 conjugation - Daiichi Sankyo Meeting Sept. 9, 2009 | CX-1151 |
| Exhibit 34 | Email from P. Senter to K. Hambly and D. Benjamin RE: CS-1008 ADC - additional request | CX-1153 |
| Exhibit 35 | Conjugation of hTRA-8 anti-DR5 to MCvcPMMAE: Lot 1074004A - Ruth Moser, Seattle Genetics, August 31, 2007 | CX-1155 |
| Exhibit 36 | Equipment Preparation and Setup for Multigram Research Conjugations | CX-1156 |
| Exhibit 37 | CS-1008 Conjugation Batch Record (Daiichi-Sankyo) | CX-1166 |
| Exhibit 38 | Email from T. Masuda to Y. Abe; K. Morita; Y. Ogitani; Y. Yabe; T. Iguchi; T. Matsuoka RE: Selection bases for antibodies to be evaluated in vivo (Japanese document) | CX-1220_CT |

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

vi

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

| Exhibit 39 | Email from L. Xu to ma.daisuke.ea@daiichisankyo.co.jp cc'ing ohtsuka.toshiaki.tc@daiichisankyo.co.jp; K. Jansen; saito.shuntaro.e5@daiichisankyo.co.jp; D. Garrard RE: Questions for control of SGD-1269 | CX-1227 |
|---|---|---|
| Exhibit 40 | QR-171 Method Qualification for the HPLC Method to Determine Purity of SG9-I-015 (SGD-1269) | CX-1228 |
| Exhibit 41 | 3.2.S.2.2 Description of Manufacturing Process and Process Controls DS-8201a, Daiichi Sankyo Chemical Pharma Co., Ltd. | CX-1267 |
| Exhibit 42 | 3.2.S.2.2 Description of Manufacturing Process and Process Controls DS-1062a, Daiichi Sankyo Chemical Pharma Co., Ltd. | CX-1305 |
| Exhibit 43 | S.2.2 Description of Manufacturing Process and Process Controls fam-trastuzumab deruxtecan, Daiichi Sankyo Chemical Pharma Co., Ltd. (Onahama) | CX-1369 |
| Exhibit 44 | S.2.6.1 Manufacturing Process Development - Manufacturing Process Development History famtrastuzumab deruxtecan, Daiichi Sankyo Chemical Pharma Co., Ltd. (Onahama) | CX-1370 |
| Exhibit 45 | ESMO 2018 Daiichi Sankyo Satelite Symposium - HER2 expression in metastatic breast cancer - A paradigm shift | CX-1507 |
| Exhibit 46 | Email from K. Schumacher to T. Iwabuchi cc'ing T. Koga, M. Kubik, E. Dobmeier, K. Hambly, Y. Yonekawa, T. Yamada RE: Seattle Genetics Collaboration Agreement | CX-1520 |
| Exhibit 47 | Email from J. Okada to S. Ohsuki re Linker technology (Japanese document) | CX-1535_CT |
| Exhibit 48 | Research flow (using DS-8201a as an example) (Japanese document) | CX-1536_RT |
| Exhibit 49 | Daiichi-Sankyo Collaboration Agreement (v.DS0328â¡) | CX-1611 |
| Exhibit 50 | ADC Bulk Drug Substance Manufacturing Process | CX-1622 |
| Exhibit 51 | Daiichi halts US and European development of cancer drug DE-310 | CX-1657 |
| Exhibit 52 | Definition term of "such as" downloaded from https://www.dictionary.com/browse/such--as | CX-1663 |

| Exhibit 53 | Compilation of translated pages from Hideki Miyazaki Lab Notebook No. 54895 | CX-1953_CT |
| Exhibit 54 | Compilation of translated pages from Hideki Miyazaki Lab Notebook No. 55221 | CX-1954_CT |
| Exhibit 55 | Koji Morita Lab Notebook No. 54878 | CX-1955 |
| Exhibit 56 | Email from Koji Morita to Hideki Miyazaki re FW: Seattle Genetics CMC follow-up | CX-1958_CT |
| Exhibit 57 | Email from Yuji Moriyana to Koji Morita and others RE: CS1008 ADC Meeting - Minutes inspection matter (request) (Japanese document with translation) | CX-1959_CT |
| Exhibit 58 | Email from Yuji Moriyama to Koji Morita and others RE: CS-1008 ADC - additional request (Japanese document with translation) | CX-1960_CT |
| Exhibit 59 | Email from Yuji Moriyana to Koji Morita and others RE: About the secret of 10 mg/ml | CX-1961_CT |
| Exhibit 60 | Stephen Alley Witness Statement | RX-1354 |
| Exhibit 61 | Mark Kubik Witness Statement | RX-1356 |
| Exhibit 62 | David Meyer Witness Statement | RX-1358 |
| Exhibit 63 | Kirk Schumacher Witness Statement | RX-1360 |
| Exhibit 64 | Peter Senter Witness Statement | RX-1362 |
| Exhibit 65 | Koji Morita Deposition Excerpts | Morita Dep. Tr. |
| Exhibit 66 | Arbitration Hearing Transcript Excerpts | Arb. Hrg. Tr. |
| Exhibit 77 | Final Award, dated November 14, 2023 (transmitted to the parties November 17, 2023) | Final Award |

SEAGEN INC.'S MEMO I/S/O PETITION TO
VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

viii

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

1

## I.   INTRODUCTION

2          Petitioner Seagen Inc. ("Seagen") recognizes that an arbitration award is entitled to

3   substantial deference.  But where an arbitrator issues an award that is "completely irrational,"

4   disregards clear contract terms to "dispense[] his own brand of industrial justice," or exhibits a

5   "manifest disregard of the law," a court must vacate.  *See Aspic Eng'g & Constr. Co. v. ECC*

6   *Centcom Constructors LLC*, 913 F.3d 1162, 1166-67 (9th Cir. 2019).  The arbitration award in

7   favor of Daiichi Sankyo Co., Ltd. ("DSC")[1] meets this standard.  The Arbitrator departed from the

8   clear language of the contract and deprived Seagen of ownership of valuable intellectual property.

9          This petition challenges the Award on one of Seagen's two claims, the first and principal

10  claim to quiet title.[2]  At issue was whether, under a collaboration agreement between the parties,

11  DSC's drug technology was an "Improvement that relates to the Drug Conjugation Technology."[3]

12  If so, that technology was assigned to Seagen—immediately and automatically upon its creation.

13  When DSC disputed Seagen's assertion that it owned the relevant technology, Seagen sought to

14  quiet title to it.  The Arbitrator denied the claim on two bases:  (1) that the technology at issue did

15  not relate to "Drug Conjugation Technology"; and (2) that the claim was barred by the statute of

16  limitations.   The Arbitrator's Award was not just erroneous; it completely disregarded the

17  underlying contract language and the applicable law.

18         As defined in the Collaboration Agreement, the term "Drug Conjugation Technology" has

19  three independent subparts—(a), (b), and (c).[4]  Seagen showed that the DSC technology met all

20  three subparts with evidence from DSC's own patents and publications.  Seagen then obtained

21  additional evidence in a separate litigation after three motions to compel, for which DSC was

22  sanctioned.  Seagen presented that evidence in a reopened hearing before the Arbitrator, showing

23  further proof that the DSC technology was derived from Seagen's technology.  Notwithstanding

24

25  [1] On August 11, 2022, the Arbitrator issued an "Interim Award pursuant to AAA Rule 47(b)" (the "Interim Award").
    On November 17, 2023, the Arbitrator delivered to the parties a final award (the "Final Award").  The Interim

26  Award and Final Award are collectively referred to as the "Award" in this memorandum.
    [2] Seagen disagrees with the Award's disposition of its alternative claim for breach of contract.  In light of the high

27  standard for vacating an arbitration award and to simplify the issues, however, Seagen does not challenge that decision.
    [3] Ex. 1 at § 3.3.1.

28  [4] Ex. 1 at §1.1.17.

**SEAGEN INC.'S MEMO I/S/O PETITION**
**TO VACATE ARBITRATION AWARD**
**Case No. 2:22-CV-01613-JLR**

1

DLA PIPER LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

Seagen's showing, the Arbitrator did exactly what the Ninth Circuit and Supreme Court prohibit—he "disregard[ed] contract provisions to achieve a desired result." *Aspic*, 913 F.3d at 1167:

- First, the Arbitrator decided the dispute as if subparts (b) and (c) of the Drug Conjugation Technology definition did not even exist.

- Second, on subpart (a), the Arbitrator's decision was completely irrational. The Arbitrator read the words "such as" to limit the scope of the clause rather than as exemplary, in conflict with dictionary definitions, Supreme Court precedent, and basic rules of contract interpretation.

The Arbitrator doubted that DSC, "a sophisticated international pharmaceutical conglomerate," would have agreed to terms of the contract that would produce this result.[5] To correct what he perceived as an injustice, the Arbitrator cast aside the plain language of the contract, the negotiating history, and the undisputed facts.

The Arbitrator also ignored Washington law on statute of limitations to foreclose Seagen's claim. After recognizing that applicable Washington law has no statute of limitations for a quiet title claim,[6] the Arbitrator applied one anyway.[7] The Arbitrator found the quiet title claim time-barred because the "gravamen" of that claim was purportedly a contract breach and request for specific performance.[8] That aspect of the Award is "completely irrational" in view of the plain language of the assignment provisions. The Award acknowledged the assignment provision "does not reasonably establish an affirmative duty" to accomplish the change in ownership, and that ownership transfer was immediate and automatic as a matter of law.[9] There was thus nothing to specifically enforce to accomplish the quieting of title. The gravamen of Seagen's claim was not for breach based on a failure to act, but instead to remove a cloud on title that had already been assigned—which cannot be time-barred under Washington law.

The Arbitrator then compounded his errors in the merits decision in his ruling on DSC's motion for attorney fees. The Arbitrator awarded, in a case with two claims involving the same contract provision, a breathtaking $43.7 million in fees. The sheer magnitude of that award—in

---

[5] Ex. 77 at 44.
[6] Ex. 77 at 37.
[7] Ex. 77 at 38–39.
[8] Ex. 77 at 38.
[9] Ex. 77 at 28.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

2

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

what is supposed to be a more efficient and cost-effective process—is "completely irrational" on its face.

When parties agree to arbitration, they give up certain rights, including the right to a full appeal.  But parties do not give up all right to review.  Where an arbitrator's award is "completely irrational" or exhibits a "manifest disregard of the law," the courts must intervene and vacate.

## II.    STATEMENT OF FACTS

### A.    The Collaboration Agreement

The technology in this case is antibody-drug conjugates ("ADCs").  Seagen (formerly Seattle Genetics, Inc.) is a pioneer in ADCs with a focus on cancer treatments.  ADCs address a key problem with many cancer drugs.  Cancer drugs are effective because they are toxic, but they can be toxic to both diseased cells and healthy cells.  In an ADC, the toxic drug—referred to as the "payload"—is linked to an antibody with a component called a "linker" through a process called "conjugation."[10] By linking a toxic drug to a disease-targeting antibody, an ADC can deliver the drug directly to the diseased cells.  A representation of an ADC was presented in the Amended Demand:[11]



---

[10] Ex. 6 at ¶¶ 27-30.
[11] Ex. 3 at ¶ 2.

In the diagram above, the blue "Y" shaped object represents the antibody.[12]  The purple circular object is the payload, a highly toxic molecule that when released can kill the cancer cell.[13] The linker (in dark blue) connects the payload to the antibody, and releases the payload when the ADC reaches the target cancer call.[14]  An ADC is a particularly useful way to administer powerful anti-cancer drugs that are too toxic to be administered by themselves.[15]

DSC initiated negotiations that led to the collaboration, explaining that it had ████████ ███████████████████████████████████████████████████████████████████████ it was seeking ███████████████ ████████████████████████████████████████████[16] █████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████[17]  DSC sought to partner with Seagen to gain access to Seagen's proprietary ADC technology, know-how, patents, and patent applications.[18]  After exchanging drafts, the parties agreed to the Collaboration Agreement.[19]

The Collaboration Agreement acknowledged that Seagen possessed "intellectual property rights relating to certain technology useful for linking certain proprietary cytotoxins to other molecules such as antibodies capable of directing such cytotoxins to specific tissues and/or cells[.]"[20] Recognizing the importance of that technology, the parties reached a clear and unambiguous bargain:  improvements to the Seagen ADC technology developed during the term of the collaboration would be owned by Seagen.[21]  As a result, the Collaboration Agreement provides that DSC "hereby assigns" such improvements to Seagen.[22]

The Collaboration Agreement at Section 3.3.1 provides:

---

[12] Ex. 12 at 3; Ex. 6 at ¶¶ 23, 26.
[13] Ex. 12 at 3; Ex. 6 at ¶¶ 26–27.
[14] Ex. 12 at 3; Ex. 6 at ¶¶ 26–28.
[15] Ex. 12 at 3; Ex. 6 at ¶ 27.
[16] Ex. 19 at 2; Ex. 12 at 8; Ex. 6 at ¶ 60.
[17] *See, e.g.*, Ex. 51; Ex. 47; Ex. 12 at 8; Ex. 6 at ¶¶ 100–103.
[18] Ex. 19.  *See also* Ex. 66 at 397:25–398:18; Ex. 12 at 8; Ex. 6 at ¶¶ 61–73, 105–107.
[19] Ex. 61 at ¶¶ 6–18; Ex. 63 at ¶¶ 14–51.  Ex. 1; *see also* Ex. 3 at ¶ 3; Ex. 12 at 9–14; Ex. 8 at ¶¶ 25–31.
[20] Ex. 1 at 1.
[21] Ex. 1 at § 3.3.1; *see also* Ex. 6 at 9–14; Ex. 14 at 12–16, 18–20; Ex. 8 at ¶¶ 29–30, 76–108.
[22] Ex. 1 at § 3.3.1.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD                    4
Case No. 2:22-CV-01613-JLR

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

> **Improvements**.  In the event that, during the Term, Licensee [DSC] conceives, develops or reduces to practice an Improvement that relates to the Drug Conjugation Technology, Licensee shall promptly notify SGI [Seagen] of the discovery of such Improvement.  *SGI shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such improvements shall have been conceived, developed or reduced to practice by Licensee, Licensee hereby assigns all of its rights, title and interest therein to SGI. . . .*[23]

This definition provides for the automatic assignment of (1) any "Improvements" that (2) relate to "Drug Conjugation Technology" and are (3) conceived of developed or reduced to practice during the term of the agreement.  The Collaboration Agreement in turn defines "Improvements" broadly:

> "**Improvements**" means all patentable or non-patentable inventions, discoveries or other know-how developed and Controlled by either Party after the Effective Date that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the SGI Technology . . . .[24]

The Collaboration Agreement also included a definition of "Drug Conjugation Technology:"

> "**Drug Conjugation Technology**" means (a) cytotoxins or cytostatic compounds *such as* monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic compounds to antibodies and (c) any related assays and methods SGI provides to Licensee pursuant to the Research Program.[25]

These provisions were heavily negotiated.  DSC asked Seagen to agree to narrower rights on several occasions.[26]  In each case, Seagen refused.[27]

Under these provisions, then, Seagen owned Improvements that related to any of (a) "methods of making and using" cytotoxins and cytostatic compounds *such as* the enumerated

---

[23] *Id.* (emphasis added).
[24] Under this definition, "Improvements" are any inventions, discoveries, or know-how that (1) "utilize," (2) "incorporate," (3) derive directly from," (4) "directly relate to," (5) "are made using" or (6) "based directly" on "SGI Technology."  SGI Technology in turn is defined to mean "SGI Patents"—the patents and applications designated on Schedule B to the agreement and related patents—and "SGI Know-How."  *Id.* §§ 1.1.63 (emphasis added), 1.1.64, 1.1.65, 1.1.32 (emphasis added).
[25] Ex. 1 at § 1.1.17 (emphasis added).
[26] Ex. 14 at 14–16.
[27] *Id.*

auristatins, (b) compositions and methods useful for attaching compounds to antibodies, or (c) any related assays and methods Seagen provided to Licensee under the collaboration.

### B.    The Collaboration and DSC's Parallel ADC Program

For more than seven years beginning in 2006, Seagen provided DSC with critical knowledge, information, materials, and instruction—including extensive in-person training—to enable DSC to develop and commercialize ADCs.[28]  Unbeknownst to Seagen, in 2010, DSC started its own ADC program outside the Seagen collaboration.[29] ███████████████████████████
█████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████[30]

Ultimately, in this parallel program, DSC developed promising ADC candidates using Seagen's technology.[31]  In developing its ADCs, DSC used and copied Seagen's parameters in "assays and methods SGI provide[d] to Licensee pursuant to the Research Program." DSC included these parameters and method steps in DSC filed patent applications, and DSC had the inventors assign those applications to itself.[32]  It then abruptly terminated the Seagen collaboration.[33]  Those patent applications were the "Improvement IP" at issue in the Arbitration.[34]

### C.    The Dispute/ Procedural History

Seagen filed a demand for arbitration against DSC on November 12, 2019.[35]  Seagen asserted two causes of action: (1) Declaratory Relief/Quiet Title-Ownership of IP (the "quiet title claim") and (2) a claim for breach of contract (the "breach of contract claim").[36]

On April 5, 2021, DSC filed a letter with the Arbitrator seeking leave to file a dispositive motion raising statute of limitations.[37]  The parties briefed the issue, presenting essentially the

---

[28] *See, e.g.*, Ex. 27; Ex. 28; Ex. 37; Ex. 31; Ex. 32; Ex. 50; Ex. 35; Ex. 36; Ex. 39; Ex. 40; Ex. 33 at 6; Ex. 56; Ex. 64; Ex. 62; Ex. 60.  *See also* Ex. 66 at 1751:25-1752:3, 1754:6-1755:6. *See, e.g.*, Ex. 12 at 14–15; Ex. 14 at 28–31, 36–39; Ex. 15 at 2–4; Ex. 6 at ¶¶ 60–74, 87, 91–92, 96.
[29] Ex. 6 at ¶¶ 74, 105–107, 114; Ex. 12 at 15–17; Ex. 48 at 12.
[30] Ex. 12 at 21, 52–53; Ex. 14 at 2, 36–38; Ex. 6 at ¶¶ 56, 106–107; Ex. 48 at 17
[31] Ex. 6 at ¶¶ 75–97, 105–107; Ex. 18 at ¶¶ 6–20; Ex. 15 at 2–6; Ex. 14 at 21–28.
[32] Ex. 12 at 55–56.
[33] *Id.* at 15; Ex. 6 at ¶¶ 72–73.
[34] Ex. 3 at ¶¶ 101–102, 107.
[35] Ex. 2.
[36] Ex. 2 at ¶¶ 36–46.
[37] Ex. 10.

same authorities and arguments they later briefed in their pre-hearing and post-hearing briefs.  In an April 15, 2021 order, the Arbitrator denied DSC's request to file a dispositive motion on statute of limitations, stating that he was "not persuaded of the likelihood of DSC's prospective motion succeeding as a matter of law."[38]

### D.    The First Arbitration Hearing

An arbitration hearing began on June 14, 2021, with testimony from fourteen fact witnesses and nine expert witnesses.[39]  As explained above, the Collaboration Agreement automatically assigned to Seagen any (1) "Improvement" that (2) "relates to the Drug Conjugation Technology" that DSC conceived of or reduced to practice (3) during the Term of the Agreement.[40]  Seagen presented overwhelming evidence that the Improvement IP met all three of these requirements.  First, Seagen showed that the linker technology used by DSC constitutes an Improvement because it "utilizes, incorporates, derives directly from, directly relates to, is made using or is based directly on" the distinctive and unique features of Seagen's linker architecture, as well as Seagen's conjugation chemistry and associated analytical methods.[41]  Second, the Improvement IP clearly "relates to" Seagen's proprietary Drug Conjugation Technology, including Seagen's linker technology, conjugation chemistry, and analytical methods.[42]  Finally, there was no dispute that DSC developed these improvements during the term of the Collaboration Agreement.[43]

Seagen showed that despite having alternatives, DSC chose to use a linker with the identical architecture as the seminal Seagen '345 patent listed on Schedule B to the Collaboration Agreement.[44]  DSC's own Key Opinion Leader acknowledged that the linker in DSC's ADC is in the same category as that found in Seagen's ADCs.[45]  An internal DSC email showed ███████
████████████████████████████████████████████████████████████████████[46]

---

[38] Ex. 11 at 1.
[39] *See* Ex. 77 at 15.
[40] Ex. 1 at § 3.3.1.
[41] Ex. 14 at 3–4, 21–30.
[42] Ex. 14 at 32–35.
[43] Ex. 14 at 35–36.
[44] *See, e.g.*, Ex. 12 at 15–18; Ex. 6 at ¶¶ 75–85, Annex B; Ex. 18 at ¶¶ 6–16; Ex. 15 at 2–6.
[45] Ex. 45 at 44; Ex. 6 at ¶ 57; Ex. 12 at 45.
[46] Ex. 38 at 1; Ex. 6 at ¶ 80; Ex. 12 at 46–47.

DSC also used Seagen's proprietary methods for conjugating ADCs.  DSC admitted that it requested and received ████████████████████████████████████████████████████████████████████████████████████[7] DSC scientists copied Seagen's conjugation protocols parameter-for-parameter into the Improvement IP and used the Seagen protocols in its ADC program.[48]

DSC could not deny the use of Seagen technology.  Instead, it argued that Seagen's technology was in "the public domain."  But it presented no evidence that it obtained the specific proprietary Seagen information and methods from a source other than Seagen.  DSC's expert Dr. Lambert acknowledged that the ████████████████████████████████████████████████████████████████████████████████████████[49]  In the end, DSC was reduced to its statute of limitations and contract interpretation defenses.

### E.     The Reopened Arbitration Hearing

While the arbitration was ongoing, Seagen and DSC were also litigating a patent infringement case in the Eastern District of Texas.  DSC maintained that one of its scientists, Dr. Hiroyuki Naito, was the sole inventor of the ADC accused of infringement, which embodied Improvement IP at issue in the arbitration.  Seagen requested production of lab notebooks, but DSC repeatedly failed to produce them.

Seagen filed three motions to compel, ultimately leading the district court to order a deposition of a different DSC scientist, Dr. Koji Morita.  At that deposition, Seagen learned that Dr. Morita, not Dr. Naito, had performed the first "conjugation" to connect an ADC linker to the antibody used in DSC's ADC and that he recorded this in one of his notebooks.[50]  For these conjugation steps, he referred to the notebooks of two other DSC scientists, Dr. Hideki Miyazaki and Dr. Yuji Kasuya.[51]  Drs. Morita, Miyazaki, and Kasuya were each heavily involved in the collaboration with Seagen, and they all availed themselves of access to Seagen's confidential

---

[47] Ex. 34 at 2; Ex. 59 at 2; *see also* Ex. 62 at ¶¶ 6–22; Ex. 6 at ¶¶ 68–69, 117; Ex. 12 at 22–23; Ex. 18 at ¶¶ 8–9.)
[48] Ex. 18 at ¶¶ 6–16; Ex. 15 at 2–6.
[49] Ex. 66 at 1760:23–1761:02.
[50] Ex. 65 (Morita Dep. Tr.) at 17:13-23; 211:19-212:9, 266:1-277:25; Ex. 18 at ¶ 15; Ex. 15 at 4–5.
[51] Ex. 65 (Morita Dep. Tr.) at 17:13-23; 268:12–24; Ex. 18 at ¶ 15; Ex. 15 at 4–5.

**SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD**         8
**Case No. 2:22-CV-01613-JLR**

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

1   conjugation chemistry documents.[52]  These notebooks, which the district court ordered DSC to

2   produce after the first arbitration hearing, revealed their involvement in the development of DSC's

3   technology and confirmed their use of Seagen Drug Conjugation Technology for DSC's own

4   parallel program.[53]

5        On January 25, 2022, the Arbitrator granted Seagen's motion to reopen the hearing

6   record.[54]  The Arbitrator found the new evidence uncovered by Seagen in the district court case

7   "clearly goes to the heart of a core theory of liability that has been (and continues to be) vigorously

8   contested by the Parties: the extent to which DSC used and incorporated Seagen's proprietary

9   linker architecture."[55]

10       The parties participated in a reopened arbitration hearing on April 13, 2022.  Among the

11  compelling evidence Seagen presented was emails and laboratory notebooks from the DSC

12  scientists described above.[56]  Those emails and notebooks showed how DSC used Seagen's

13  confidential conjugation protocols—the protocols that are useful for attaching ADC linkers to form

14  functioning ADCs—parameter-for-parameter.  They identified the protocols as "SG-type

15  conjugation," a reference to "Seattle Genetics" (the prior name for Seagen) more than 30 times.[57]

16  DSC conceded that the conjugation protocols in the notebooks formed the basis for the

17  Improvement IP subject to Seagen's ownership claim.[58]

18       ### F.   The Arbitration Award

19       On August 11, 2022, the Arbitrator issued an Interim Award denying Seagen's claims.[59]

20  On November 17, 2023, the Arbitrator delivered a final award resolving the remaining issues in

21  the Arbitration, which repeats the findings and conclusions from the Interim Award and adds

---

[52] *See, e.g.*, Ex. 57 at 4; Ex. 58 at 2; Ex. 20, Ex. 21 at 1, Ex. 30 at 1; *see also* Ex. 65 (Morita Dep. Tr.) 77:15-79:17; Ex. 6 at ¶¶ 106–107; Ex. 18 at ¶¶ 6–12.

[53] The court ultimately ordered monetary sanctions against DSC, finding "that DSC violated its disclosure obligation and breached its discovery responsibility in this case..."  Seagen Inc. v. Daiichi Sankyo Co., Ltd., No. 2:20-CV-00337-JRG, Order on Pretrial Motions and Motions In Limine, Dkt. 437 at 3 (Mar. 15, 2022 E.D. Tex.).

[54] Ex. 17.

[55] Ex. 17 at 4-5.

[56] Ex. 53; Ex. 54; Ex. 55.

[57] *See, e.g.*, Ex. 53 at 2, 3, 6, 8, 13, 15, 26, 30, 42; Ex. 54 at 10, 14, 16, 19, 22, 28, 31, 38, 46; Ex. 15 at 2–6; Ex. 18 at ¶¶ 6–16.

[58] Ex. 7 at 3.

[59] Ex. 4.

1   findings and conclusions as to DSC's request for attorney fees.

2       The Award holds that both of Seagen's causes of action were time-barred under the six-

3   year statute of limitations for breach of contract actions under Washington State law.[60]  For the

4   breach of contract claim, the Award finds that DSC had a duty to "promptly notify" Seagen of any

5   Improvements, and that this notification requirement "is the only affirmative duty" imposed by the

6   Improvements clause on DSC.[61]  The Award further finds that DSC had filed a patent application

7   in Japan in 2012 that "reflects the fundamental elements of DSC's ADC technology that Seagen

8   contends are 'Improvements,'" so the breach of contract claim accrued in 2012.[62]  Since the

9   arbitration was commenced in 2019, more than six years later, the Award finds the breach of

10  contract claim barred by the Washington's six year statute of limitations.[63]

11      With respect to the quiet title claim, the Award acknowledges that there is no statute of

12  limitations for quiet title actions under Washington law.[64]  The Award nonetheless finds that the

13  "gravamen" of Seagen's quiet title action is for specific performance, and thus the Award applies

14  the breach of contract statute of limitations to bar Seagen's claim for quiet title.[65]

15      The Award also finds as a matter of contract interpretation that DSC's parallel ADC

16  program did not reflect an "Improvement that relates to the Drug Conjugation Technology."[66]  The

17  Award does not address the compelling evidence Seagen presented.  Despite reopening the hearing

18  to allow Seagen's evidence that "goes to the heart of a core theory of liability that has been (and

19  continues to be) vigorously contested by the Parties: the extent to which DSC used and

20  incorporated Seagen's proprietary linker architecture,"[67] the Award makes no findings as to this

21  evidence.

22      Following its interpretation of "Drug Conjugation Technology," the Award states in

23  footnote 12 that "for all the same reasons discussed above with respect to the term 'Drug

---

[60] Ex. 77 at 30, _39.
[61] Ex. 77 at 27–28 (emphasis in original).
[62] Ex. 77 at 30.
[63] Ex. 77 at 28.
[64] Ex. 77 at 37.
[65] Ex. 77 at 38–39.
[66] Ex. 77 at 45–46.
[67] Ex. 17 at 4-5.

**SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR**

10

Conjugation Technology,' Seagen has not proven by a preponderance of the relevant and credible evidence that any alleged 'Improvements' at issue in this proceeding meet the definition of the term . . . ."[68]  The footnote includes no factual findings.

The Award also grants DSC more than $43 million in attorney fees, and more than $1.8 million in costs.[69]  Seagen seeks to vacate the Award in its entirety.

## III.   ARGUMENT

### A.   An Arbitral Award Must Be Vacated When It Is Completely Irrational or Exhibits a Manifest Disregard of the Law

The Federal Arbitration Act, 9 U.S.C. § 10 ("FAA"), governs review of the arbitration award.  *See HayDay Farms Inc. v. FeeDx Holdings, Inc.,* 55 F.4th 1232, 1240 (9th Cir. 2022). Under Section 10(a)(4) of the FAA, an arbitration award must be vacated where the arbitrator "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).

Arbitrators "exceed their powers" when an award is "completely irrational" or exhibits a "manifest disregard of the law."  *Aspic Eng'g*, 13 F.3d at 1166.  An award is "completely irrational" "where the arbitration decision fails to draw its essence from the agreement." *Id.*[70]  An award fails to draw its essence from the agreement if it contradicts or is not authorized by the plain language of the parties' agreement, conflicts with or disregards the express language of the agreement, or is not a plausible interpretation of the contract.  *Providence St. Peter Hosp. v. United Staff Nurses' Union Local 141*, No. C08-5639RJB, 2009 WL 426300, at *9 (W.D. Wa. Feb. 19, 2009) (vacating remedy in arbitration award that "is in direct conflict with the express language" of the agreement); *Pac. Motor Trucking Co. v. Auto. Machinists Union,* 702 F.2d 176, 177 (9th

---

[68] Ex. 77 at 46 n. 12.

[69] Ex. 77 at 59, 66.

[70] Other Circuits are in accord.  *See e.g. United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36 (1987) (award must draw essence from agreement); *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527 (2d Cir. 2016); *Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO CLC*, 946 F.3d 195, 199 (3d Cir. 2019) (we will vacate an award "if it is entirely unsupported by the record or if it reflects a manifest disregard of the agreement."); *Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*, 918 F.2d 1215 (5th Cir. 1990); *Mo. River Servs., Inc. v. Omaha Tribe*, 267 F.3d 848 (8th Cir. 2001) (award not drawing essence from contract where arbitrator eliminated geographical limitation and gaming limitation to bingo and bingo-related activities as provided in contract).

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

11

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

Cir. 1983) ("An award that conflicts directly with the contract cannot be a 'plausible interpretation.'") (internal citation omitted).

An arbitrator is commissioned to interpret and apply the parties' agreement; "he does not sit to dispense his own brand of industrial justice." *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). An award should be vacated when the arbitrator "dispense[d] his own brand of industrial justice" by "disregard[ing] a specific contract provision to correct what he perceived as an injustice." *Aspic Eng'g*, 913 F.3d at 1167. An award is in "manifest disregard of the law," where it is "clear from the record that the arbitrator[] recognized the applicable law and then ignored it." *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009).[71]

## B.   The Award Contradicts the Collaboration Agreement's Definition of "Drug Conjugation Technology"

The Award's finding that the Improvement IP does not reflect any Improvement related to Drug Conjugation Technology fails to draw its essence from the Collaboration Agreement and contradicts its plain language.

### 1.   The Award Disregarded the Definition of Drug Conjugation Technology

The Award ignored the plain language of the Collaboration Agreement in determining that the Improvement IP is not an "improvement related to the Drug Conjugation Technology" within the meaning of the Collaboration Agreement. As described above, the definition of "Drug Conjugation Technology" in the Collaboration Agreement has three subparts:

> "**Drug Conjugation Technology**" means (a) cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic compounds

---

[71] *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 94–96 (2d Cir. 2008), *cert. granted on other grounds*, 557 U.S. 903 (2009) (manifest disregard doctrine is "a judicial gloss on the specific grounds for vacatur enumerated in section 10 of the FAA"); *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 480 (4th Cir. 2012) (manifest disregard remains an independent ground for vacatur); *PNY Techs., Inc. v. Netac Tech. Co.*, 800 F. App'x 110, 113 (3d Cir. 2020) (declining to decide if "manifest disregard of the law" theory survives as a basis for vacatur but assessing the case under the standard).

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

to antibodies and (c) any related assays and methods SGI provides
to Licensee pursuant to the Research Program.  (Ex. 1 at § 1.1.17.)

Meeting any one of these subparts was sufficient, yet the Award's decision disregards the express language of the Collaboration Agreement as to each of them.

First, the Award's discussion of this provision is limited to subpart (a).  The Award concludes that "the most reasonable meaning of the term 'such as' in the defined term 'Drug Conjugation Technology' is to limit the scope of the definition to the actual boundaries of Seagen's ADC technology that is the subject of the Collaboration Agreement – namely, drug payloads in the auristatin class, as exemplified by the cytotoxins MMAE and MMAF."[72]  That finding is completely irrational as shown below.  But a more fundamental problem with the Award is that it treats the contract as though subparts (b) and (c) did not exist.  The Award's disregard and failure to address those subparts of the Collaboration Agreement alone requires vacatur.  *Stead Motors v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1205 n.6 (9th Cir. 1989).

*Subpart (c)*:  The Award ignores subpart (c) and Seagen's arguments regarding it.  The Award's justification of the purported "commonsensical[]" meaning of "Drug Conjugation Technology" was focused exclusively on subpart (a).[73]  Nothing in subpart (c) is even arguably limited to "auristatins" or in any other way that would preclude Seagen's claim.[74]  Seagen showed that it prevailed under subpart (c) because the Improvement IP includes "related assays and methods" plainly included within the scope of subpart (c).  For example, Seagen showed that it provided to DSC confidential processes for determining the number of ADC linkers attached to an ADC pursuant to the collaboration—a crucial consideration in ADC development—and that DSC used and incorporated these analytical methods into the Improvement IP.[75]

*Subpart (b)*:  The Award similarly disregards subpart (b).  Subpart (b) is met by compositions and methods useful for attaching cytotoxic or cytostatic compounds to antibodies.[76]  Seagen's powerful showing included unrebutted evidence that the Improvement IP includes

---

[72] Ex. 77 at 43–44.
[73] Ex. 77 at 44.
[74] Ex. 1 at § 3.3.1.
[75] Ex. 35; Ex. 27; Ex. 28; Ex. 29; Ex. 31; Ex. 32; Ex. 36; *see also* Ex. 62 ¶¶ 9–10, 14, 19, 20-21, 30-32, 34; Ex. 12 at 23, 48; Ex. 6 at ¶ 90, Annex E.
[76] Ex. 1 at § 3.3.1.

**SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR**

13

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

Seagen's information that is useful for attaching antibodies to many different kinds of payloads, including auristatins.[77]  Thus, even if the Award were correct that subpart (a) is limited to "drug payloads in the auristatin class," the Improvement IP would still qualify as Drug Conjugation Technology under this subpart because the conjugation protocol would be useful for attaching auristatins as well as other drug payloads.  The Award disregarded subpart (b) entirely.

*Subpart (a)*:  The Award's interpretation of subpart (a) is also completely irrational, as it redefines the term "such as" to reach a preferred outcome.  The Award found that subpart (a) was limited to "drug payloads in the auristatin class, as exemplified by the cytotoxins MMAE and MMAF."[78]  But "such as" means "for example."[79]  The Supreme Court has held "such as" is illustrative.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994).  It does not mean "limited to."

The Award's interpretation also directly conflicts with the rest of the clause.  Subpart (a) applies to "cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F."[80]  The undisputed evidence showed that when the Collaboration Agreement was negotiated, the parties understood auristatins to be cytotoxins (cell-killers), not cytostatic compounds (cell growth-inhibitors).[81]  The Award's construction of the phrase as limited to "drug payloads in the auristatin class" renders the reference to "cytostatic" superfluous, as Seagen argued to the Arbitrator and DSC did not rebut.[82]

## 2.  The Award Allowed Views About Reasonableness to Trump the Plain Terms of the Collaboration Agreement

The Arbitrator decided what was "commonsensically intended" and commercially reasonable and used that to drive the determination of the scope of "Drug Conjugation Technology," over the express words of the Collaboration Agreement.[83]  As the Supreme Court

---

[77] *See* Ex. 66 at 1055:17–1056:15; *see also* Ex. 37; Ex. 32; Ex. 31; Ex. 50; Ex. 36; Ex. 28; Ex. 43; Ex. 44; Ex. 41; Ex. 42; Ex. 12 at 22–23, 47–49; Ex. 14 at 28–30, 34; Ex. 6 at ¶¶ 86–88, Annex D.
[78] Ex. 77 at 43–44.
[79] Ex. 52; Ex. 12 at 36.
[80] Ex. 1 at § 3.3.1.
[81] Ex. 63 ¶ 25; Ex. 66 at 248:11–17; Ex. 14 at 7–9.
[82] Ex. 14 at 8.
[83] Ex. 77 at 44.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

14

has stated, "an arbitrator is confined to interpretation and application of the [] agreement; he does not sit to dispense his own brand of industrial justice." *United Steelworkers*, 363 U.S. at 597.  In *Aspic*, the Ninth Circuit held vacatur was appropriate where the arbitrator found that it was not reasonable to expect that Afghanistan subcontractors like Aspic would be able to conform to the strict and detailed requirements of U.S. general contractors and so did not hold Aspic to the strict provisions in the contract.  *Aspic Eng'g*, 913 F.3d at 1167.  "The [a]ward disregarded specific provisions of the plain text in an effort to prevent what the Arbitrator deemed an unfair result."  *Id.* at 1168; *see also Pac. Motor Trucking Co. v. Auto. Machinist Union*, 702 F.2d 176, 177 (9th Cir. 1983) (award properly vacated where arbitrator disregarded a specific contract provision to correct what he perceived as an injustice).

An award should be vacated where, as here and in *Aspic*, the arbitrator determined what is fair and then worked backwards to achieve that desired result in disregard of the plain text of the agreement.  The Arbitrator essentially eliminated subparts (b) and (c) out of the definition of "Drug Conjugation Technology" and interpreted "such as" in subpart (a) in conflict with its plain meaning and the uncontested evidence of the parties' negotiating history.[84]  The Award does so by first making the unremarkable and undisputed finding that Seagen and DSC have approved ADCs with different drug payloads.[85]  The Award then found that "it defies credulity to suggest that DSC – a sophisticated international pharmaceutical conglomerate – would intentionally agree to assign Seagen 'any right, title and interest' in a potential future drug that utilizes DX-8951, a proprietary cytotoxin that it had already developed at the time the Collaboration Agreement was executed."[86] But the Arbitrator's view of what DSC would have reasonably agreed to directly conflicts with the terms of the contract.  *See United Steelworkers*, 363 U.S. at 597.  This starting point for the Award to work backward from fails for several reasons.

First, it disregards the Collaboration Agreement and the facts.  While DSC's DX-8951 payload may have previously existed, DSC's ADC—created *with Seagen's ADC Technology* using

---

[84] Ex. 1 § 1.1.17; Ex. 14 at 7, 9–10; Ex. 8 ¶¶ 103–108.
[85] Ex. 77 at 41–42.
[86] Ex. 77 at 44.

1    a derivative of DX-8951 as the component payload—did not exist and could be made only through

2    use of Improvements developed during the term of the collaboration.[87]   The Award failed to take

3    account that the Collaboration Agreement did not automatically transfer "any right title and

4    interest" in preexisting DSC intellectual property to Seagen; the only improvements assigned to

5    Seagen were those that (a) utilized, incorporated, derive directly from, directly relate to, were made

6    using, or were based directly on Seagen's proprietary information, and (b) were conceived of or

7    reduced to practice during the Term of the Agreement.[88]   As a result, Seagen never sought

8    intellectual property claiming DX-8951 itself; the Improvement IP instead involved ADC linkers

9    and methods of making ADCs that were derived from Seagen's proprietary technology.[89]

10        Second, the Award misapplies Washington State law.  The Award notes that Washington

11   State law adopts "the 'objective manifestation' theory of contract interpretation focusing on the

12   reasonable meaning of the contract language to determine the parties' intent."[90]   Under this

13   approach, [the Court] attempt[s] to determinate the parties' intent *by focusing on the objective*

14   *manifestations of the agreement*, rather than on the unexpressed subjective intent of the parties. . .

15   Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the

16   intent can be determined *from the actual words used*."  *Hearst Commc'ns, Inc. v. Seattle Times*

17   *Co*., 154 Wash. 2d 493, 503 (2005) (*en banc*) (emphasis added).

18        But then the Award, disregarding the objective manifestation of the actual words used,

19   rewrites the language of the Collaboration Agreement.  The Award rewrites the definition on the

20   left below from Section 1.1.17 of the Collaboration Agreement to the narrow definition on the

21   right "based upon th[e] findings" "that Seagen's ADC technology utilizes an auristatin-based

22   payload with a traceless linker that results in the release of an unmodified cytotoxin."[91]

---

[87] Ex. 14 at 9–10; Ex. 8 ¶¶ 71, 98–107.
[88] Ex. 1 § 1.1.17; Ex. 14 at 12–13.
[89] Ex. 14 at Annex A.
[90] *See* Ex. 77 at 43.
[91] Ex. 77 at 43.

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

| Collaboration Agreement Definition | Award Revised Definition |
|---|---|
| "**Drug Conjugation Technology**" means (a) cytotoxins or cytostatic compounds such as [MMAE] and [MMAF] and certain variants, derivatives, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxins or cytostatic compounds to antibodies and (c) any related assays and methods SGI provides to Licensee pursuant to the Research Program.[92] | "**Drug Conjugation Technology**" means [only] cytotoxin drug payloads in the auristatin class, as exemplified by the cytotoxins MMAE and MMAF. |

The Award thus deletes subparts (b) and (c) altogether and improperly narrows the definition of subpart (a). The rewriting of the definition departs from the actual words used, rendering the words of the contract superfluous. If the parties intended Drug Conjugation Technology to be limited to the Award definition shown on the right above, they would not have written it as they did.

Third, the negotiating history of the Collaboration Agreement, which the Award ignores, shows that DSC at several points asked Seagen to agree to narrower rights.[93] In each case, Seagen refused and the Collaboration Agreement omitted DSC's proposed revisions.[94] Specifically, DSC attempted to limit the definition of "Drug Conjugation Technology" to only MMAE and MMAF.[95] Seagen rejected this proposal.[96] Seagen's negotiator Kirk Schumacher explained to DSC's negotiator Tetsuya Iwabuchi that "because Seagen's linker technology can be used to attach many different payloads to many different antibodies, Seagen could not accept limiting Drug Conjugation Technology to MMAE and MMAF."[97] If DSC made an Improvement to Seagen's ADC linker technology, Mr. Schumacher continued, that Improvement would have to be assigned to Seagen.[98] Mr. Iwabuchi accepted this, and this evidence was unrebutted: DSC did not challenge Mr. Schumacher's recollection, and did not call Mr. Iwabuchi to testify at the Arbitration.[99] "Extrinsic evidence," including drafting history, "is admissible in order to assist the court in

---

[92] Ex. 1 § 1.1.17.
[93] Ex. 14 at 14–16.
[94] *Id.*
[95] Ex. 63 at ¶ 27 (citing Ex. 26 at 1); Ex. 14 at 14.
[96] Ex. 63 at ¶ 28; Ex. 14 at 14.
[97] *Id.*
[98] *Id.*
[99] Ex. 14 at 14.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

17

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

ascertaining the intent of the parties and in interpreting the contract," although it may not be used to "vary[] the terms of a written contract." *U.S. Life Credit Life Ins. Co. v. Williams*, 919 P.2d 594, 597 (Wash. 1996) (*en banc*); *accord Cook v. Evanson*, 920 P.2d 1223, 1227 (Wash. Ct. App. 1996). The negotiation and drafting history in this case confirms that the parties' use of "such as" to modify MMAE and MMAF was non-limiting. The Award ignores this history in finding that the clause means precisely what the parties rejected during negotiations.

At one point DSC also sought to secure a license permitting it to use Improvements "for any purpose [and] beyond the expiration or termination" of the Collaboration Agreement.[100] Seagen declined.[101] As Mr. Schumacher told Mr. Iwabuchi, DSC's right to use Improvements was pursuant (and only pursuant) to the Collaboration Agreement's license grant.[102] Mr. Iwabuchi agreed.[103] This negotiation history completely undercuts the Award's conclusion that a "sophisticated international pharmaceutical conglomerate" like DSC would not have agreed to an expansive improvements clause.[104] In short, the Award gives DSC the benefit of provisions that were expressly contemplated but rejected by the parties in negotiations.

Fourth, the Award mistakenly relies for its contract interpretation on evidence showing that Seagen scientists studied DSC's ADC program in 2017, but did not at that time express the view "that DSC's ADC technology was plausibly related to or arose from Seagen's ADC technology, either generally or with respect to the Collaboration Agreement."[105] The Award does not address, however, that DSC failed to show that any individual at Seagen with knowledge of DSC's technology was also aware of Seagen's rights under the Collaboration Agreement until 2018 at the earliest.[106] Seagen initiated the Arbitration shortly after it recognized that DSC's technology had been assigned to Seagen under the Collaboration Agreement. Nothing in Seagen's conduct undermines its claims in the Arbitration.

---

[100] Ex. 63 at ¶ 48 (citing Ex. 49 at 11); Ex. 14 at 16.
[101] Ex. 63 at ¶ 49 (citing Ex. 22 at 11), ¶ 50 (citing Ex. 46 at 2); Ex. 14 at 16.
[102] Ex. 63 at ¶ 50; Ex. 14 at 16.
[103] Ex. 63 at ¶ 51; Ex. 14 at 16.
[104] *See* Ex. 77 at 44.
[105] Ex. 77 at 45.
[106] Ex. 16 at 37–38.

1    The Award's reliance on Dr. Lambert's testimony to support the "objective

2    reasonableness" of DSC's interpretation and his finding that the testimony of DSC's expert Dr.

3    Lambert should be given "greater weight" does not support the Award's interpretation of the

4    Collaboration Agreement.[107]  The "objective reasonableness" is determined by the words of the

5    Collaboration Agreement itself, not by an expert unfamiliar with the formation of the

6    Collaboration Agreement.

7    **C.    The Award's Application of a Breach of Contract Statute of Limitations to
         the Quiet Title Claim Is Both in Manifest Disregard of the Law and
8         Completely Irrational**

9         An arbitrator's award is in manifest disregard of the law if it is "clear from the record that

10   the arbitrator[] recognized the applicable law and then ignored it."  *Comedy Club, Inc. v. Improv*

11   *W. Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009) *cert. denied*, 558 U.S. 824 (citations omitted).

12   The Award's determination on the statute of limitations for Seagen's quiet title claim fails not just

13   for this reason, but because it is completely irrational as well.

14        The Award acknowledged that Washington law has no statute of limitations for quiet title

15   claims:

16            "Seagen argues that there is no statute of limitations for quiet title
              actions under Washington State law. . . As a general matter, Seagen
17            appears to be correct.  *See Kent Sch. Dist. No. 415 v. Ladlum*, 45
              Wash. App. 854, 856 (1986) ("There is no statute of limitations with
18            regard to an action to quiet title.")[108]

19   The Award nonetheless found that the quiet title claim was barred by the six-year breach of

20   contract statute of limitations.[109] This finding manifestly disregards Washington law that there is

21   no statute of limitations for quiet title claims.

22        The Award's rationale for applying a non-existent statute of limitations is completely

23   irrational because it disregards the terms of the contract itself.  The Award reasoned that the

24   "gravamen" of the quiet title claim was a breach of Section 3.3.1: "without establishing that breach,

25

26

27   ---
     [107] Ex. 77 at 44–45.
     [108] Ex. 77 at 37.
28   [109] Ex. 77 at 37–39.

1    Seagen cannot prove its entitlement to quiet title."[110]  But the mere fact that the quiet title claim

2    relates to a contract does not change its nature.  Federal district and Washington appellate courts

3    have uniformly held that quiet title has no statute of limitations even if the claim arises out of a

4    contract.  *Kent Sch. Dist. No. 415 v. Ladum*, 728 P.2d 164, 165–66 (Wash. App. 1986) (trial court

5    clearly erred in applying statute of limitations for breach of contract in a quiet title action on a

6    written contract); *Petersen v. Schafer*, 42 Wash. App. 281 (1985) (no statute of limitations for

7    quiet title action where dispute arose out of fraud in the deed for the procurement of real property);

8    *Covington 18 Partners, LLC v. Attu, LLC,* No. 2:19-cv-00253-BJR, 2019 WL 3502512, at *8

9    (W.D. Wash. Aug. 1, 2019) (citing *Petersen*, and rejecting statute of limitations defense to quiet

10   title action even where underlying contract was at issue).  Seagen cited all of these cases; DSC had

11   no persuasive answer.[111]

12        The Award's gravamen determination that "Seagen's Quiet Title Claim is nothing more

13   than a request for specific performance of Section 3.3.1" completely disregards the terms of the

14   contract—as internal inconsistencies in the Award clearly show.

15        The dispute here is whether Seagen owns the technology at issue—a quintessential quiet

16   title claim.  Seagen says it does because the technology at issue was *automatically* transferred to

17   Seagen immediately upon its creation pursuant to the clear terms of the Collaboration

18   Agreement.[112]  The Award agrees with how transfer of ownership works—finding that the "hereby

19   assigns" clause "does not reasonably establish an affirmative duty" on either party; "it simply

20   memorializes the Parties' agreement" that such improvements are automatically assigned to

21   Seagen.[113]  "The Arbitrator so concludes as a matter of Washington State law."[114]

22        The Arbitrator's conclusion on how and when ownership transfers "as a matter of

23   Washington State law" renders the Award's "gravamen" analysis completely irrational.  Because

---

[110] Ex. 77 at 38; *see also* Ex. *id*. ("Ultimately then, lexical semantics aside, the Arbitrator is persuaded that Seagen's quiet title claim is nothing more than a request for specific performance of Section 3.3.1 and the gravamen of that request, or course, is quintessentially contractual.").

[111] Ex. 12 at 59–60; Ex. 14 at 44; Ex. 16 at 30–31.

[112] Ex. 1 at § 3.3.1.

[113] *Id.*

[114] *Id.*

Section 3.3.1 does not impose an "affirmative duty" to accomplish the transfer of ownership, there is no contract breach that bears on that transfer. And because, as the Award found, ownership to Improvement IP automatically and immediately transferred upon its creation, then there was no obligation relating to its existing ownership to specifically enforce. Seagen already owns the Improvement IP under the undisputed terms of the Collaboration Agreement, and any action for a judicial determination reflecting that is neither a claim for breach nor for specific performance.

The Award attempts to avoid this obvious conclusion by referencing Section 3.3.1 of the Collaboration Agreement. The Award concludes that the quiet title claim "is entirely reliant upon the alleged breach of Section 3.3.1 that is expressly plead[ed] in Seagen's Breach of Contract Claim."[115] But the Award acknowledged that the only affirmative duty imposed by Section 3.3.1 was DSC's duty to "promptly notify" Seagen of any Improvements. That notice provision has nothing to do with who owns the Improvement IP. Even if the Collaboration Agreement had no notice provision, or even if DSC had been transparent with Seagen regarding its conduct, Seagen would still have a claim to quiet title under the "hereby assigns" clause. The quiet title claim is not subservient to the notice requirement because transfer of ownership happened before and exists regardless of whether DSC complied with its obligation to provide notice. By disregarding the "hereby assigns" language, the Award's analysis is irrational. *See DDB Techs., L.L.C. v. MLB Advanced Media, LP.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).

The decision on the statute of limitations is particularly suspect given the Arbitrator's prior decisions in the arbitration. The Arbitrator rejected DSC's pre-hearing request to file a dispositive motion on the issue of statute of limitations to dispose of the matter in its entirety.[116] After the hearing, DSC simply repeated the same argument that the "gravamen" of Seagen's quiet title claim was a breach of contract claim, citing the same cases it had cited previously.[117] Faced again with the same arguments and same cases, the Arbitrator inexplicably reversed course. The Arbitrator

---

[115] *Id.*
[116] Ex. 11.
[117] DSC also added one inapposite case that did not even mention "gravamen" and concerned a specific statute of limitations for challenging the results of an election. *See Reid v. Dalton*, 124 Wash. App. 113, 122 (2004). *See* Ex. 10; Ex. 13.

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

21

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

thus found that the same "arguments made and the issues raised" before the hearing that did not persuade him the statute of limitations argument would succeed as a matter of law were suddenly "correct" and "persuasive" to resolve the claims as a matter of law.[118]  His reversal is completely irrational and in manifest disregard of Washington law.

### D.    The Determination That DSC Should Receive More than $43 Million in Fees Also Demonstrates that the Award Should Be Vacated

The award of $43.7 million in attorney fees to DSC is also completely irrational and in manifest disregard of the law.  This arbitration involved two claims—for breach of contract and quiet title—grounded in the same contract language.  Defying the foundational principle that arbitration is designed to provide a "fair, efficient, and *economical* resolution of [a] dispute" (AAA Commercial Rules R-21(b) (emphasis added)), the Arbitrator awarded an astronomical $43.7 million in attorney fees for over *35,000* hours of claimed work.  The magnitude of that fee award is "completely irrational" in its own right.[119]  The Award also gave no weight to the fact that Seagen, using the same billing rates, litigated the same case for $16 million.[120]  The Arbitrator had no rational basis to find that DSC justifiably spent nearly three times more to litigate the same case.  *See*, *e.g.*, *Fiore v. PPG Indus., Inc.*, 169 Wash. App. 325, 355 (2012); *Cedar Grove Composting, Inc. v. City of Marysville*, 188 Wash. App. 695, 731 (2015).

In addition, the Award's resolution of the attorney fees request recognized the applicable law and then ignored it.  *Comedy Club.*, 553 F.3d at 1290.  Despite recognizing that, "[u]nder Washington State law, DSC bears the burden of proving that its requested attorneys' fees and costs are 'reasonable'. . . .'",[121]  the Arbitrator found that DSC's Exhibit 3 "presumptively validates" the entirety of DSC's fees, and that Seagen had "the burden of justifying the 'discretionary and rare'" action of "reducing" the fees DSC requested.[122]  Seagen never had that burden, however.

---

[118] *Compare* Ex. 77 at 27–30, 37–39 (citing Ex. 9 (DSC's July 26, 2021 brief)), *with* Ex. 10 (presenting the same authority and argument).

[119] *See*, *e.g.*, *Costs*, GLOBAL ARBITRATION REVIEW (Dec. 19, 2022), https://globalarbitrationreview.com/guide/the-guide-damages-in-international-arbitration/5th-edition/article/costs (tribunals reduce costs as "disproportionate and unreasonable" where "costs claimed by one side are manifestly excessive.").

[120] Ex. 77 at 61-62.

[121] Ex. 77 at 48.

[122] Ex. 77 at 55, 56.

**SEAGEN INC.'S MEMO I/S/O PETITION TO VACATE ARBITRATION AWARD Case No. 2:22-CV-01613-JLR**

22

*Berryman v. Metcalf*, 177 Wash. App. 644, 657 (2013).  Only by shifting it, in a manifest disregard of clear Washington law, was the Arbitrator able to find that DSC was entitled to every hour of attorney time spent.  *Bowers v. Transamerica Title Ins. Co.*, 100 Wash. 2d 581, 597 (1983) ("lodestar" must be reduced for hours spent on "duplicated effort, or otherwise unproductive time").

## IV.   CONCLUSION

The Award should be vacated pursuant to 9 U.S.C. § 10, and a rehearing should be ordered before a new arbitrator.

Dated:  January 25, 2024

I certify that this memorandum contains 8,383 words, in compliance with the Local Civil Rules.

*/s/Anthony Todaro*
Anthony Todaro, WSBA #30391
DLA PIPER LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7029
Tel.: (206) 839-4800
Fax: (206) 839-4801
Email: anthony.todaro@us.dlapiper.com

Michael A. Jacobs (*pro hac vice*)
Matthew A. Chivvis (*pro hac vice*)
Matthew I. Kreeger (*pro hac vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Tel.: (415) 268-7000
Fax: (415) 268-7522
Email: MJacobs@mofo.com
       MChivvis@mofo.com
       MKreeger@mofo.com

Evelyn L. Chang (*pro hac vice*)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Tel.: (650) 813-5600
Fax: (650) 494-0792
Email: EvelynChang@mofo.com

Hui Zhao (*pro hac vice*)

SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR

23

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORRISON & FOERSTER LLP
701 Brazos Street Suite 1100
Austin, Texas 78701-3232
Tel.: (512) 767-0324
Fax: (650) 494-0792
Email: HZhao@mofo.com

Attorneys for Petitioner SEAGEN INC.

**SEAGEN INC.'S MEMO I/S/O PETITION
TO VACATE ARBITRATION AWARD
Case No. 2:22-CV-01613-JLR**

24

DLA Piper LLP (US)
701 Fifth Avenue, Suite 6900
Seattle, WA  98104-7044 | Tel: 206.839.4800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the parties.

Dated this 25th day of January, 2024.

_s/ Jacey Bittle_
Jacey Bittle, Legal Practice Specialist