1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

SEAGEN INC.,

CASE NO. C22-1613JLR

11

Petitioner,

ORDER

12

v.

13

DAIICHI SANKYO CO., LTD.,

14

Respondent.

15

## I.   INTRODUCTION

16

Before the court are (1) Petitioner Seagen Inc.'s ("Seagen") petition to vacate an

17

August 11, 2022 interim arbitration award and a November 17, 2023 final arbitration

18

award (together, the "Award") (Petition (Dkt. # 78); Pet. Mem. (Dkt. ## 81 (sealed), 115

19

(redacted)); Pet. Reply (Dkt. ## 116 (sealed), 118 (redacted)); *see* 12/1/23 Chivvis Decl.

20

(Dkt. # 82) ¶ 2, Ex. 77 ("Award"); 12/13/23 Chivvis Decl. (Dkt. # 89) ¶ 5, Ex. 4

21

//

22

//

("Interim Award"))[1]; and (2) Respondent Daiichi Sankyo Co., Ltd.'s ("DSC")

cross-motion to confirm the Award (Resp. Mem. (Dkt. # 112); Resp. Reply (Dkt. # 120)).

The court has considered the parties' submissions, the relevant portions of the record, and

the governing law.  Being fully advised,[2] the court DENIES Seagen's petition to vacate

the Award and GRANTS DSC's cross-motion to confirm the Award.

## II.   BACKGROUND

This case arises out of a failed partnership between Seagen, a Bothell-based

biotech company, and DSC, a Japanese pharmaceutical company.  (*See generally*

12/13/23 Chivvis Decl. ¶ 2, Ex. 1 (Dkt. ## 89-1 (cover page), 90 (sealed))

("Collaboration Agreement").)  Seagen describes itself as a "pioneer" in antibody-drug

conjugates ("ADCs") and holds several patents relating to the technology.  (Pet. Mem. at

3; *see* Collaboration Agreement at 39-40[3] (listing Seagen patents).)  According to

Seagen, DSC was interested in its ADC technology and initiated negotiations that

eventually led to the execution of a collaboration agreement on July 2, 2008.  (*See* Pet.

Mem. at 4.  *See generally* Collaboration Agreement.)  That agreement granted DSC a

license to develop, manufacture, and sell Seagen's proprietary ADC technology.  (*See*

*generally* Collaboration Agreement.)  The collaboration agreement, however, didn't work

---

[1]  Because the final arbitration award "fully adopts and integrates by reference" the interim award (except where otherwise specified), all references and citations to the "Award" in this order refer to the final arbitration award.  (Award at 20.)

[2]  Neither party requests oral argument (*see* Petition at 1; Pet. Mem. at 1; Resp. at 1), and the court concludes that oral argument would not be helpful to its disposition of Seagen's petition or DSC's cross-motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3]  Citations to the collaboration agreement reference page numbers in the CM/ECF header.

1   out, and DSC terminated the agreement in 2015. (Award at 9.) Years later, on

2   November 12, 2019, Seagen filed a demand for arbitration for breach of contract and

3   quiet title claims against DSC, arguing that DSC improperly filed patent applications on

4   Seagen's technology and incorporated that technology into its own drug pipeline.

5   (12/13/23 Chivvis Decl. ¶ 3, Ex. 2 (arbitration demand) at 1-2.) The case proceeded to

6   arbitration, and on November 14, 2023, the Arbitrator issued a 67-page final arbitration

7   award in DSC's favor. (*See generally* Award.) Below, the court summarizes the relevant

8   technology, the parties' collaboration agreement, and the Arbitrator's conclusions and

9   reasoning.

10          1.    ADC Technology

11          ADCs are a family of therapeutic agents that can be used to treat various cancers.

12   (*See* 12/13/23 Chivvis Decl. ¶ 7, Ex. 6 (Dkt. ## 89-6 (cover page), 91-1 (sealed)) ("3/5/21

13   Bertozzi Rpt.") ¶¶ 25-27.) They comprise a Y-shaped monoclonal antibody, a cytotoxic

14   drug called the "payload," and a "linker" component connecting the payload to the

15   antibody. (*Id.* ¶¶ 23, 25-26.) The following image is a representation of an ADC:



(*Id.* ¶ 26.)  The antibodies used in ADCs "preferentially target cancer cells over normal cells due to the presence of antigens on the surface of the cancer cells."  (*Id.* ¶ 27.)  This provides a significant advantage over traditional chemotherapy, in which "drugs are administered in an untargeted fashion," harming both cancer cells and normal, healthy cells.  (*Id.*)  The toxic payload in an ADC "gets delivered where it is needed," meaning ADCs function like "smart bombs that target cancer cells."  (*Id.*)

Various antibodies, payloads, and linkers can be used in ADCs.  (*See id.* ¶¶ 28-29.)  Different antibodies seek out different cancer cells, meaning the antibody used in a treatment for one type of cancer may not be effective against another.  (*See id.* Annex B at 4.)  There are also several families of payload drugs, which kill cancer cells in different ways.  Two such examples are camptothecin and auristatin derivatives, which inhibit different enzymes and proteins necessary for cells to live and reproduce.  (*See id.* Annex B at 4-5; Award at 42.)  Linking the chosen antibody to the desired payload presents "one of the most complex problems that researchers have faced in developing ADCs" because the bond must be strong enough to remain stable in the blood stream and yet permit release of the payload drug once the ADC arrives at a cancer cell.  (3/5/21 Bertozzi Rpt. ¶ 28.)  Some linkers are so strong that the entire antibody must dissolve in a cancer cell before the payload is released, but other linkers quickly degrade when exposed to certain environments or enzymes inside a cancer cell, providing for a more efficient release.  (*See id.* ¶¶ 29-37 (describing acid-cleavable and protease-cleavable linkers).)

*//*

Altogether, the right antibody, payload, and linker combine to form an inspiring cancer treatment.

2.      The Collaboration Agreement

The parties' July 2, 2008 collaboration agreement contemplates ownership rights of "Improvements" related to the "Drug Conjugation Technology" at issue.  (*E.g.*, Collaboration Agreement at 12.)  Section 3.3.1 describes the parties' rights to any such improvements:

> 3.3.1  **Improvements**.  In the event that, during the Term, [DSC] conceives, develops or reduces to practice an Improvement that relates to the Drug Conjugation Technology, [DSC] shall promptly notify [Seagen] of the discovery of such Improvement.  [Seagen] shall own all such Improvements that relate to the Drug Conjugation Technology and, to the extent that such Improvements shall have been conceived, developed or reduced to practice by [DSC], [DSC] hereby assigns all of its right, title and interest therein to [Seagen].  [Seagen's] interest in any such Improvements that it Controls shall be included in the [Seagen] Technology and made available to [DSC] via the Exclusive License provided in Article 3.  [DSC] may use such Improvement assigned to [Seagen] by [DSC] for any purpose within the scope of the Exclusive License granted herein solely during the Term of this Agreement.

(*Id.* at 12.)  The collaboration agreement defines the terms "Improvements" and "Drug Conjugation Technology" at sections 1.1.32 and 1.1.17, respectively:

> 1.1.32  **"Improvements"** means all patentable or non-patentable inventions, discoveries or other know-how developed and Controlled by either Party after the Effective Date that utilize, incorporate, derive directly from, directly relate to, are made using or are based directly on the [Seagen] Technology . . . .

> 1.1.17  **"Drug Conjugation Technology"** means (a) cytotoxins or cytostatic compounds such as monomethyl Auristatin E and monomethyl Auristatin F and certain variants, derivates, analogues and salts thereof, and methods of making and using such cytotoxic or cytostatic compounds (b) compositions and methods useful for attaching the foregoing cytotoxic or cytostatic

compounds to antibodies and (c) any related assays and methods [Seagen] provides to Licensee pursuant to the Research Program.

(*Id.* at 4-5.)  The collaboration agreement also contains a provision concerning attorneys' fees and costs:

> 19.3.4 . . . The judgment rendered by the arbitrator shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses.

(*Id.* at 33.)  Washington law governs the collaboration agreement.  (*Id.*)

   3.   The Award

   During arbitration, Seagen argued that DSC breached the collaboration agreement by "naming itself as owner of the Improvement IP" and sought to quiet title "to confirm Seagen's ownership of the Improvement IP."  (Petition ¶ 20.)  The Arbitrator rejected Seagen's claims, concluding that both "fail[ed] for essentially straightforward reasons." (Award at 22.)  The Arbitrator then awarded DSC attorneys' fees and costs.  (*Id.* at 66.)

   a.   *Breach of Contract*

   With respect to Seagen's breach of contract claim, the Arbitrator concluded that the claim was time-barred because the statute of limitations had expired.  (*See id.* at 30.) The Arbitrator found that the claim accrued—at the latest—on October 11, 2012, the date DSC filed a patent application in its own name constructively reducing its ADC technology to practice.  (*Id.* at 27.)  Noting that Washington has a six-year statute of limitations for breach of contract actions, the Arbitrator concluded that Seagen's November 12, 2019 arbitration demand came 13 months too late.  (*Id.* at 30.)  Seagen

//

1   does not challenge the Arbitrator's decision on its breach of contract claim.  (Pet. Mem.

2   at 1 n.2.)

3       *b.    Quiet Title*

4       The Arbitrator rejected Seagen's claim for quiet title on two distinct grounds:

5   (1) like the breach of contract claim, the claim for quiet title was time-barred; and

6   (2) DSC's alleged "Improvement IP" did not meet the definition of "Drug Conjugation

7   Technology" under Section 1.1.17 of the collaboration agreement.  (Award at 39-40, 45.)

8       First, with respect to the time bar, the Arbitrator acknowledged that Washington

9   generally does not have a statute of limitations for quiet title actions.  (*Id.* at 37.)  But the

10  Arbitrator also acknowledged that, in Washington, "[t]he gravamen of the claim

11  determines the applicable statute of limitations."  (*Id.* (quoting *Aberdeen Fed. Sav. &*

12  *Loan Ass'n v. Hanson*, 794 P.2d 1322, 1324 (Wash. Ct. App. 1990)).)  The Arbitrator

13  concluded that the "gravamen" of Seagen's quiet title claim was "quintessentially

14  contractual" and therefore time barred because the claim (1) "solely ar[ose] from Section

15  3.3.1 of the Collaboration Agreement," (2) could not "plausibly be determined without

16  undertaking the same breach of contract analysis mandated by Seagen's Breach of

17  Contract Claim," and (3) was ultimately "nothing more than a request for specific

18  performance of Section 3.3.1."  (*Id.* at 37-38.)  The Arbitrator recognized that, "while

19  Seagen decline[d] to identify Section 3.3.1 in conjunction with its Quiet Title Claim, it

20  specifically quote[d]—though without attribution—two clauses from Section 3.3.1 as the

21  express and sole basis for that claim."  (*Id.* at 38.)  Accordingly, the Arbitrator concluded

22  //

1    that the applicable statute of limitations for breach of contract applied to and barred

2    Seagen's quiet title claim as a matter of Washington law.  (*Id.*)

3            Second, the Arbitrator concluded in the alternative that DSC's alleged

4    "Improvement IP" did not, under the terms of the collaboration agreement, constitute an

5    "Improvement" related to "Drug Conjugation Technology" because DSC's alleged

6    improvement utilized a different payload drug than that expressly contemplated in the

7    agreement.  (*See id.* at 39-46.)  The Arbitrator reasoned that, because section 1.1.17

8    defined "Drug Conjugation Technology" in part as "cytotoxins or cytostatic compounds

9    *such as* monomethyl ***Auristatin*** E and monomethyl ***Auristatin*** F and certain variants,

10   derivatives, analogues and salts thereof," Seagen's claim failed for a simple reason:

11   DSC's "improvement" utilized a "proprietary ***camptothecin***" payload "that it had already

12   developed at the time the Collaboration Agreement was executed."  (*Id.* at 41 (quoting

13   Collaboration Agreement at 4 (emphasis added)), 44 (emphasis added).)  The Arbitrator

14   rejected Seagen's argument that the "such as" language in section 1.1.17 was nonlimiting

15   for three reasons:  (1) such an interpretation was inconsistent with Washington's

16   "objective manifestation" theory of contract interpretation; (2) Seagen's interpretation

17   would render the clause "substantively meaningless, and therefore superfluous"; and

18   (3) it was inconsistent with a "more objectively reasonable interpretation . . . that the

19   Parties commonsensically intended to tether the scope of the term 'Drug Conjugation

20   Technology' to the type of ADC technology that Seagen actually possessed," which

21   utilized auristatin payloads.  (*Id.* at 43-44.)

22   *//*

1        c.      *Attorneys' Fees and Costs*

2        Having ruled in favor of DSC, the Arbitrator assessed fees in accordance with

3   section 19.3.4.  (*See id.* at 46-66.)  The Arbitrator considered DSC's request for a total

4   award of $58,092,301.58 and ¥3,436,666.00 and Seagen's objections thereto.  (*See id.* at

5   47.)  DSC's requested award consisted of (1) the Arbitrator's fees and expenses;

6   (2) hearing and support services expenses; (3) outside counsel attorneys' fees and

7   expenses; (4) expert witness fees and expenses; and (5) fact witness expenses.  (*Id.* at 47.)

8        The Arbitrator recognized DSC's burden under Washington law to prove that its

9   requested fees and costs were "reasonable" and that, to meet that burden, DSC was

10   required to provide documentation of the work performed in order to allow the Arbitrator

11   to assess whether the number of hours expended was reasonable.  (*Id.* at 48 (quoting

12   *Zones, Inc. v. Evergreen Info. Tech Servs., Inc.*, No. C17-0457RAJ, 2019 WL 6894676,

13   at *1 (W.D. Wash. Dec. 18, 2019)).)  The Arbitrator considered a 113-page categorical

14   chart submitted by DSC that, for each month beginning in September 2019 through June

15   2022, provided the following nine columns of information:

16        1. "Task Categories" explaining the work undertaken by DSC's Counsel;

17        2. "Timekeeper Category" explaining the role/position of the individuals billing;

18        3. "Effective Billed Rate," essentially providing an average hourly rate in U.S.

19   Dollars;

20        4. "Billed Rate Range" explaining the range of hourly rates in U.S. Dollars for

21   each "Timekeeper Category";

22        5. "Hours" – the total number of hours billed;

6. "Timekeeper Category Total" in U.S. Dollars;

7. "Monthly Task Category Total" in U.S. Dollars;

8. "Monthly Invoice Total" in U.S. Dollars; and

9. "Monthly Amount Requested" – the attorneys' fees actually incurred by DSC in U.S. Dollars net of any discounts that were negotiated from the invoice amount.

(*Id.* at 53.)  The Arbitrator then set forth and applied the two-step "lodestar" methodology Washington courts apply when determining reasonable attorneys' fees.  (*Id.* at 54 (citing *Berryman v. Metcalf*, 312 P.3d 745, 753 (Wash. Ct. App. 2013)).)

At step one of the lodestar methodology, where the "decision-maker determines a lodestar base by multiplying a reasonable hourly rate by the number of hours reasonably expended," (*id.* at 54 (citing *Bowers v. Transam. Title Ins. Co.*, 675 P.2d 193, 201 (Wash. 1983)), the Arbitrator was "clearly convinced that DSC ha[d] carried its burden of proving that its requested attorneys fees [were] 'reasonable'" (*id.* at 54-55).  The Arbitrator concluded that DSC's 113-page chart "cogently organized the information necessary to support a lodestar base calculated both on a micro level (because [the chart] fundamentally provide[d] a discrete lodestar basis for each month in which DSC incurred attorneys' fees), as well as on a macro level (because the monthly data aggregate[d] into DSC's overall lodestar basis)."  (*Id.* at 55.)

At step two of the lodestar methodology, where the burden shifts to the party opposing the fee award to establish that the decision-maker should "adjust the . . . base to reflect factors not yet considered, such as the contingent nature of success in the action or

ORDER - 10

the quality of the legal representation" (*id.* at 54 (citing *Bowers*, 675 P.2d at 201-04)), the

Arbitrator concluded that Seagen "generally" did not carry its burden (*id.* at 54-56).  The

Arbitrator considered and rejected Seagen's arguments in favor of large rate reductions.

(*See id.* at 56-62.)  The Arbitrator did, however, agree with Seagen that a 5% reduction to

the fees charged by Paul Hastings LLP was appropriate "to match the blended hourly

rates that Seagen was charged."  (*Id.* at 58.)

With respect to costs, Seagen did not challenge DSC's request for arbitration

costs, expert witness costs and fees, and fact witness costs.  (*Id.* at 62.)  Concerning

DSC's request for over $10,000,000 in costs for various other "expenses," the Arbitrator

agreed with Seagen that such costs were "not allowable under Section 19.3.4 of the

Collaboration Agreement."  (*Id.* at 64-65.)  DSC does not challenge this ruling.  (*See*

Resp. Mem. at 21.)

Below, the court sets forth the relevant legal standard before turning to the merits

of Seagen's petition to vacate the Award and DSC's cross-motion to confirm the Award.

### III.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") "states that if a party seeks a judicial order

confirming an arbitration award, 'the court must grant such an order unless the award is

vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.'"

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003)

(en banc) (quoting 9 U.S.C. § 9).  "[C]onfirmation is required even in the face of

erroneous findings of fact or misinterpretations of law."  *Id.* (quoting *French v. Merrill

Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986)).  In relevant part,

1    Section 10 allows for vacatur only "where the arbitrators exceeded their powers." 9

2    U.S.C. § 10(a)(4).

3          "Arbitrators exceed their powers when they express a 'manifest disregard of law,'

4    or when they issue an award that is 'completely irrational.'" *Bosack v. Soward*, 586 F.3d

5    1096, 1104 (9th Cir. 2009) (quoting *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d

6    1277, 1290 (9th Cir. 2009)).  These grounds provide the district court with "extremely

7    limited review authority," *Kyocera*, 341 F.3d at 998, and the burden rests on the party

8    seeking vacatur, *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th

9    Cir. 2010).

10         "To demonstrate manifest disregard, the moving party must show that the

11   arbitrator understood and correctly stated the law, but proceeded to disregard the same."

12   *Hayday Farms, Inc. v. FeeDx Holdings, Inc.*, 55 F.4th 1232, 1241 (9th Cir. 2022)

13   (quoting *Bosack*, 586 F.3d at 1104).  This standard "requires something beyond and

14   different from a mere error in the law or failure on the part of the arbitrators to

15   understand and apply the law." *Id.* at 1240 (quoting *Bosack*, 586 F.3d at 1104).  "There

16   must be some evidence in the record, other than the result, that the arbitrators were aware

17   of the law and intentionally disregarded it." *Id.* at 1241 (quoting *Bosack*, 586 F.3d at

18   1104).  The court also "must accept the arbitrator's findings of fact." *Id.* (citing *Carter v.

19   Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir. 2004)).

20         Under the "completely irrational" standard, the moving party must establish that

21   the award "ignores controlling terms of the parties' contract." *Id.* at 1241.  The test is

22   "whether the arbitrator's decision draws its essence from the contract" rather than "the

rightness or wrongness of the arbitrator's contract interpretation." *Id.* at 1241 (quoting *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019)).  The court will not disturb the arbitrator's award so long as it sets forth "a plausible interpretation of the arbitration contract." *Id.* (quoting *U.S. Life Ins. Co.*, 591 F.3d at 1177).  "Accordingly, the court must defer to the arbitrator's decision as long as the arbitrator even arguably construed or applied the contract." *Id.* (quoting *U.S. Life Ins. Co.*, 591 F.3d at 1177).

The "manifest disregard" and "completely irrational" standards are purposefully deferential and "designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera*, 341 F.3d at 998.  The "simplicity, informality, and expedition of arbitration" are "attributes not normally associated with federal trials," and courts must take care not to "render[] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).  Sections 9 through 11 of the FAA therefore "substantiat[e] a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).

## IV.    THE ARBITRATOR'S AWARD

Seagen argues that the Arbitrator exceeded his powers.  (*See* Petition ¶ 26.)  In particular, Seagen takes issue with the Arbitrator's (1) interpretation of "Drug Conjugation Technology" in the collaboration agreement; (2) statute of limitations ruling;

1  and (3) fee award to DSC.  (*Id.* ¶¶ 26-29.)  The court considers Seagen's arguments

2  below before turning to DSC's requests for prejudgment and postjudgment interest and

3  attorneys' fees and costs.

4  **A.    "Drug Conjugation Technology"**

5      Seagen argues that the Arbitrator exceeded his powers with respect to his

6  interpretation of "Drug Conjugation Technology" in section 1.1.17 for two reasons:

7  (1) the Arbitrator misconstrued the "such as" language in section 1.1.17 to be limiting;

8  and (2) the Arbitrator failed to consider subparts (b) and (c) of section 1.1.17.  (Pet. Mem.

9  at 12-14.)  Seagen posits that the Arbitrator "determined what is fair and then worked

10  backwards to achieve that desired result in disregard of the plain text of the agreement."

11  (*Id.* at 15.)  Seagen's arguments are not well taken.

12      The question is not whether the Arbitrator correctly interpreted section 1.1.17, but

13  whether he "even arguably construed or applied" it.  *Hayday Farms*, 55 F.4th at 1241

14  (quoting *U.S. Life Ins. Co.*, 591 F.3d at 1177).  The Arbitrator undoubtedly did so.  He

15  began his analysis by quoting section 1.1.17 in its entirety.  (Award at 40-41.)  The

16  Arbitrator then considered—and rejected—Seagen's interpretation of the "such as"

17  language in section 1.1.17 and concluded that "DSC's proposed interpretation" of "Drug

18  Conjugation Technology" was more "objectively reasonable" than Seagen's.  (*Id.* at

19  42-45.)  For the reasons stated below, the court will not disturb the Arbitrator's

20  conclusions.

21      First, the Arbitrator plausibly interprets "such as" as limiting "Drug Conjugation

22  Technology" to ADCs containing auristatin-derived payloads.  As the Arbitrator correctly

1  recognized, Washington follows the objective manifestation theory of contract

2  interpretation, which focuses on the "reasonable meaning of the contract language to

3  determine the parties' intent." (*Id.* at 43 (quoting *RSD AAP, LLC v. Alyeska Ocean, Inc.*,

4  358 P.3d 483, 488 (Wash. Ct. App. 2015)).) Under this theory, "a contract can be

5  informed not only by its language, but also by its subject matter and objective, all the

6  circumstances surrounding its making, and the reasonableness of the respective

7  interpretations advocated by the parties." (*Id.* (quoting *Wash. Pro. Real Est., LLC v.*

8  *Young*, 360 P.3d 59, 63 (Wash. Ct. App. 2015)).) The Arbitrator concluded that a

9  limiting interpretation of "such as" best "effectuates the objective manifestation theory of

10  contract interpretation" because Seagen's ADC technology utilizes auristatin payloads

11  and the only "cytotoxins or cytostatic compounds" mentioned in section 1.1.17 are

12  auristatins. (*Id.* at 42-44.) The parties therefore "commonsensically intended to tether

13  the scope of the term 'Drug Conjugation Technology' to the type of ADC technology that

14  Seagen actually possessed." (*Id.*) Seagen's contrary interpretation, on the other hand,

15  would have given it the right to improvements in "a proprietary cytotoxin that [DSC] had

16  already developed at the time the Collaboration Agreement was executed." (*Id.* at 44.)

17  The Arbitrator's reasoning is not just plausible but persuasive. The court therefore rejects

18  Seagen's argument that the Arbitrator "redefine[d] the term 'such as' to reach a preferred

19  outcome." (Pet. Mem. at 14.)

20      Second, the Arbitrator did not ignore subparts (b) and (c); he did not need to

21  consider them. Again, the Arbitrator began his analysis by quoting section 1.1.17 in full,

22  including subparts (b) and (c). (*See id.* at 40-41.) Seagen argues that it made a "powerful

showing" that its linker technology is "useful for attaching antibodies to many different

kinds of payloads" (Pet. Mem. at 13-14), but it ignores the plain language of subpart (b),

which is limited to "compositions and methods useful for attaching the ***foregoing***

cytotoxic or cytostatic compounds to antibodies" (Collaboration Agreement at 4

(emphasis added)).  The only "foregoing" cytotoxic compounds are the auristatins listed

in subpart (a).  (Collaboration Agreement at 4.)  Seagen further argues that "[n]othing in

subpart (c) is even arguably limited to 'auristatins,'" but it is wrong.  (Pet. Mem. at 13.)

Subpart (c) discusses "***related*** assays and methods," meaning it is, "arguably," limited to

the auristatins mentioned in subpart (a).  (Collaboration Agreement at 4 (emphasis

added).)  Seagen's overconfidence on these points in its opening brief is unjustified and

disappointing.

As it pertains to the definition of "Drug Conjugation Technology," the Award is

not completely irrational, nor does it exhibit a manifest disregard for the law.  Because

the Arbitrator neither disregarded the controlling law nor ignored the collaboration

agreement's controlling terms, the court AFFIRMS the Award on this ground.

**B.   Statute of Limitations**

The court next considers the Arbitrator's alternative conclusion that the statute of

limitations bars Seagen's claim for quiet title.  Seagen argues that the Arbitrator exceeded

his powers by (1) "acknowledg[ing] that Washington law has no statute of limitations for

quiet title claims" and yet still applying one, and (2) ignoring the "hereby assigns" clause

in section 3.3.1 of the collaboration agreement.  (Pet. Mem. at 19-22.)  The court does not

agree.

1        To begin, Seagen fails to meet its burden to show that the Arbitrator disregarded

2    the applicable law.  Seagen must show more than "a mere error in the law"; it must

3    establish that the Arbitrator "understood and correctly stated the law, but proceeded to

4    disregard the same." *Hayday Farms*, 55 F.4th at 1242 (quoting *Bosack*, 586 F.3d at

5    1104).  According to Seagen, the Arbitrator recognized that Washington has no statute of

6    limitations for quiet title claims "but applied one anyway."  (Pet. Mem. at 2.)  Seagen's

7    argument fails because the Arbitrator did not "disregard" the applicable law.  Rather, he

8    considered it head-on.  As the Arbitrator recognized, it is the "gravamen" of the

9    underlying cause of action that determines the applicable statute of limitations.  (Award

10    at 37 (quoting *Aberdeen*, 794 P.2d at 1324).)  The Arbitrator concluded that the

11    "gravamen" of Seagen's quiet title claim was "a breach of Section 3.3.1 of the

12    Collaboration Agreement." (*Id.* at 38.)  Seagen cites several cases in which courts have

13    held that a breach of contract statute of limitations did not apply to a quiet title claim (Pet.

14    Mem. at 20 (collecting cases)), but the court is not persuaded by this line of authority in

15    light of the Arbitrator's reasonable conclusion that the essence of Seagen's claim was not

16    quiet title but breach of contract.  It is notable and illuminating that Seagen neither

17    addresses nor attempts to explain the Arbitrator's observation that Seagen "specifically

18    quote[d]—though without attribution—two clauses from Section 3.3.1 as the express and

19    sole basis for [its] claim."  (Award at 38.  *See generally* Pet. Mem.)

20        Seagen pivots and argues that the Award is "irrational" because the Arbitrator

21    "disregard[ed] the 'hereby assigns' language" in section 3.3.1.  (Pet. Mem. at 21.)  Again,

22    the Arbitrator did no such thing.  The Arbitrator explicitly addressed Seagen's claim for

1    "quiet title to the Improvement IP via the '***hereby assigns***' clause in Section 3.3.1" and

2    concluded that Seagen's claim could not "plausibly be determined without undertaking

3    the same breach of contract analysis mandated by Seagen's Breach of Contract Claim."

4    (Award at 38 (emphasis added); *see also id.* (considering section 3.3.1 "as a whole").)

5    Seagen disagrees with the Arbitrator's interpretation of the "hereby assigns" clause, but

6    Seagen cannot argue that the Arbitrator ignored it.  As DSC argues, the Arbitrator found

7    that Seagen did not own DSC's alleged "Improvement IP" and, consequently, there was

8    no property for DSC to "hereby assign" in the first place.  (*See* Def. Mem. at 12.)

9        Accordingly, the Arbitrator neither disregarded the controlling law nor ignored the

10   "hereby assigns" clause in the collaboration agreement.  The Arbitrator's conclusions

11   concerning the statute of limitations are therefore neither completely irrational nor a

12   manifest disregard for the law.  The court AFFIRMS the Award on this ground.

13   **C.     Attorneys' Fees**

14       Seagen's final argument concerns the Arbitrator's award of attorneys' fees to

15   DSC.  Seagen makes three arguments, each of which fails.

16       First, Seagen argues that "[t]he magnitude of th[e] fee award is 'completely

17   irrational' in its own right."  (Pet. Mem. at 22.)  Seagen's conclusory statement is not

18   enough.  Seagen cites no case law establishing a bright-line rule concerning the

19   "magnitude" of fee awards, makes no further attempt to explain its position, and ignores

20   the circumstances surrounding this litigation—"a highly complex intellectual property

21   dispute between sophisticated corporate entities with billions of dollars at stake."  (Award

22   //

at 58).  The court therefore declines to scrap the Arbitrator's fee award based solely on its "magnitude."  (Pet. Mem. at 22.)

Second, Seagen argues that the Arbitrator "gave no weight to the fact that Seagen, using the same billing rates, litigated the same case for $16 million."  (Pet. Mem. at 22.) Seagen mischaracterizes the Award.  The Arbitrator found this exact argument "not availing" and "conclude[d] that the disparity in attorneys' fees incurred by the Parties [was] not surprising" because DSC and Seagen were not "similarly situated . . . in the critical sense that DSC was required to gather evidence (dating back decades, across continents, in various forms and languages) and craft complex legal arguments (from various disciplines) in an effort to defend itself across the full spectrum of Seagen's very broad affirmative claims."  (Award at 61-62.)  Seagen argues in conclusory fashion that the Arbitrator "had no rational basis to find that DSC justifiably spent nearly three times more to litigate the same case," but Seagen fails to address the Arbitrator's well-reasoned explanation in response to this very point.  (Pet. Mem. at 22.)

Third, Seagen argues that the Arbitrator erred by finding that DSC's 113-page categorical chart "presumptively validate[d]" its fee request and improperly shifted the burden to Seagen.  (*Id.*)  Seagen cherry-picks this language from the Award while ignoring key aspects of the Arbitrator's analysis.  In whole, the sentence Seagen quotes reads as follows:  "The Arbitrator finds that by providing the information organized within [the categorical chart], DSC has demonstrably satisfied the threshold requirement under Washington State law of facilitating the calculation of a lodestar base that presumptively validates the attorneys' fees it has requested."  (Award at 55.)  The

Arbitrator "thoroughly reviewed" DSC's submission and was "clearly convinced that DSC ha[d] carried its burden of proving that its requested attorneys' fees [were] 'reasonable.'" (*Id.* at 54-55.)  The Arbitrator then correctly recognized that Seagen, as the party proposing a deviation from the lodestar base, had the burden of justifying any such deviation.  (*See id.* at 54 (citing *Bowers*, 675 P.2d at 597-600)); *see also 224 Westlake, LLC v. Engstrom Props., LLC*, 281 P.3d 693, 712 (Wash Ct. App. 2012) ("The party proposing the deviation from the lodestar bears the burden of justifying it."). Seagen's argument that the Arbitrator "presumptively" accepted DSC's fee request again mischaracterizes the Arbitrator's Award, and this argument is not well taken.  The court concludes that the Arbitrator's grant of reasonable attorneys' fees was neither completely irrational nor a manifest disregard for the law.

The court therefore AFFIRMS the Arbitrator's award of $43,710,217.20 in attorneys' fees and $1,856,915.10 and ¥169,076 in costs.

## V.   POST-AWARD PREJUDGMENT INTEREST

Having affirmed the Arbitrator's Award, the court considers DSC's request for post-award prejudgment interest on the total amount of $45,567,132.30 and ¥169,076. (*See* Resp. Mem. at 24-25.)  DSC's request is well taken.

"Courts presume that post-award, prejudgment interest is 'appropriate' absent a persuasive showing to the contrary," and the decision to award such interest "falls with the district court's discretion."  *Purus Plastics GmbH v. Eco-Terr Distrib., Inc.*, No. C18-0227JLR, 2018 WL 3064817, at *10 (W.D. Wash. June 21, 2018) (first citing *Al Maya Trading Establishment v. Glob. Exp. Mktg. Co.*, No. 16-CV-2140 (RA), 2017 WL

1   1050123, at *5 (S.D.N.Y. Mar. 17, 2017); and then citing *Ministry of Def. & Support for*

2   *the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091,

3   1100 (9th Cir. 2011)).  Prejudgment interest should not, however, be awarded as a

4   "penalty," *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir. 2001), or

5   if it would constitute a "windfall recovery," *Knapp v. Ernst & Whinney*, 90 F.3d 1431,

6   1442 (9th Cir. 1996).  Rather, the decision to award prejudgment interest is a "question of

7   fairness . . . to be answered by balancing the equities." *Wessel v. Buhler*, 437 F.2d 279,

8   284 (9th Cir. 1971).

9        Here, equity favors granting post-award prejudgment interest.  The Arbitrator

10  concluded that DSC was entitled to its reasonable attorneys' fees and costs; post-award

11  prejudgment interest is part of DSC's "complete compensation." *Osterneck v. Ernst &*

12  *Whinney*, 489 U.S. 169, 175 (1989).  This award is neither a windfall nor a punishment.

13  The Agreement provided that the prevailing party should recover its reasonable costs and

14  attorneys' fees (Collaboration Agreement at 33), and prejudgment interest appropriately

15  compensates DSC for the time value of money, *see Hunter v. Allis-Chalmers Corp.*, 797

16  F.2d 1417, 1426 (7th Cir. 1986) (Posner, J.) ("[F]ull compensation requires recognition

17  of the time value of money."), *abrogated on other grounds as recognized in Malhotra v.*

18  *Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989).  The court therefore GRANTS DSC's

19  request for post-award prejudgment interest and applies the rate set forth in 28 U.S.C.

20  § 1961(a) to the $45,567,132.30 and ¥169,076 award from November 14, 2023, to the

21  date of judgment.

22  *//*

## VI.   POSTJUDGMENT INTEREST

The court next considers DSC's request for postjudgment interest.  (Resp. Mem. at 25.)  Seagen does not challenge DSC's request (*see generally* Pet. Reply), and the Ninth Circuit has held that an award of postjudgment interest "is mandatory, not discretionary," *see Cubic*, 665 F.3d at 1102.  The court therefore GRANTS DSC's request for postjudgment interest.  Postjudgment interest shall be calculated from the date of the entry of judgment through the date of payment at the rate from 28 U.S.C. § 1961(a).

## VII.   COSTS AND FEES FOR DISTRICT COURT PROCEEDINGS

Finally, the court considers DSC's request for costs and fees incurred during these proceedings.  DSC argues that Seagen acted in bad faith by making "cynical attacks on the Award" that went "beyond legitimate advocacy."  (Resp. Mem. at 26.)  Seagen counters that it "had every reason to challenge the Award" and properly "acknowledged the substantial deference owed to arbitration awards, but showed that the Award here is 'completely irrational,' disregards clear contract terms 'to dispense [its] own brand of industrial justice,' and exhibits a 'manifest disregard of the law.'"  (Pet. Reply at 14 (quoting *Aspic Eng'g & Constr. Co*, 913 F.3d at 1166-67).)  The court concludes that Seagen's conduct did not rise to the level of sanctionable bad faith.

"A prevailing litigant ordinarily may not collect attorneys' fees."  *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1298 (9th Cir. 1982).  There is an exception, however, if "the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons."  *Cubic*, 665 F.3d at 1104.  Such awards are punitive and can be imposed "only in exceptional cases and for dominating reasons of justice."  *Dogherra*,

679 F.2d at 1298 (quoting *United States v. Standard Oil Co.*, 603 F.2d 100, 103 (9th Cir. 1979)).  Examples of bad faith include the use of "frivolous dilatory tactics" and "an unjustified refusal to abide by an arbitrator's award."  *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.*, 707 F.2d 425, 428 (9th Cir. 1983).

Seagen walks the line between overzealous advocacy and sanctionable conduct, but the court concludes that its actions were not so egregious as to constitute bad faith.  There is no indication that Seagen filed its petition to cause undue delay or that it has refused to abide by the Arbitrator's Award.  Although Seagen makes liberal use of hyperbole and frequently mischaracterizes the Arbitrator's reasoning in the Award, the court does not find that Seagen purposefully intended to deceive the court or lie about the record.  Seagen's briefing is disappointing and at times evinces a lack of candor, but "dominating reasons of justice" do not weigh in favor of sanctions here.  DSC has vindicated its rights and is entitled to well over $45,000,000 in fees and costs.  The court will leave it at that.

## VIII.   CONCLUSION

For the foregoing reasons, the court DENIES Seagen's petition to vacate the Award (Dkt. # 78) and GRANTS DSC's gross-motion to confirm the Award (Dkt. # 112).  The court AFFIRMS the Arbitrator's Award and AWARDS DSC prejudgment and postjudgment interest pursuant to 28 U.S.C. § 1961(a).  The court DENIES DSC's request for additional costs and fees incurred during the district court proceedings.

Pursuant to the court's January 16, 2024 order, the parties are ORDERED to meet and confer and file redacted versions of Exhibits 1 and 6 to the December 13, 2023

1    declaration of Matthew Chivvis on the docket.  (*See* 1/16/24 Order at 2.)  The parties

2    must do so by no later than April 12, 2024.

3            Dated this 1st day of April, 2024.

4                                                _____

5                                                JAMES L. ROBART
                                                 United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 24